1   Laura L. Ho (SBN 173179)
    lho@gbdhlegal.com
2   Andrew P. Lee (SBN 245903)
    alee@gbdhlegal.com
3   GOLDSTEIN, BORGEN, DARDARIAN & HO
    300 Lakeside Drive, Suite 1000
4   Oakland, CA 94612
    Tel:   (510) 763-9800
5   Fax:   (510) 835-1417

6   Oren Sellstrom (SBN 161074)
    osellstrom@lccr.com
7   Meredith Desautels (SBN 259725)
    mdesautels@lccr.com
8   LAWYERS' COMMITTEE FOR CIVIL
      RIGHTS OF THE SAN FRANCISCO
9       BAY AREA
    131 Steuart Street, Suite 400
10   San Francisco, CA 94105
    Tel:   (415) 543-9444
11   Fax:   (415) 543-0296

12 Attorneys for Plaintiff Gillette and the Putative
    Class

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
AHDOOT & WOLFSON, P.C.
1016 Palm Avenue
West Hollywood, CA 90069
Tel:   (310) 474-9111
Fax:   (310) 474-8585

Counsel for Plaintiff Abdul Kadir Mohamed
and the Putative Classes

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDUL KADIR MOHAMED, individually, and on behalf of all others similarly-situated,<br><br>      Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.; RASIER, LLC; HIREASE, LLC; and DOES 1-50,<br><br>    Defendants. | Case No.: 3:14-cv-05200-EMC<br>Case No.: 3:14-cv-05241-EMC<br><br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION** |
| RONALD GILLETTE, individually, and on behalf of all others similarly-situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC., a California corporation, and DOES 1-20, inclusive<br><br>    Defendants. | Hon. Edward M. Chen<br><br>Date: April 14, 2015<br>Time: 10:30 a.m.<br>Courtroom: 5, 17th Floor |

566122.2

Pursuant to Federal Rule of Evidence 201 and the authorities cited below, Plaintiffs respectfully request that the Court take judicial notice of the following filings from the matters entitled *O'Connor v. Uber Technologies, Inc.*, Case No. 13-cv-03826-EMC (N.D. Cal.) ("*O'Connor*"), *Lavitman v. Uber Technologies, Inc.*, No. 2012-04490 (Mass. Sup. Ct.) ("*Lavitman*"), and *Zenelaj v. Handybook Inc.*, Case No. 14cv05449-TEH (N.D. Cal.) ("*Zenelaj*").

A. *O'Connor* Order Granting in Part Plaintiffs' "Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses," Dec. 6, 2013, ECF No. 60.

B. *O'Connor* Amended Order Denying Defendant's Motion for Reconsideration, May 2, 2014, ECF No. 99.

C. *O'Connor* Transcript of Proceedings, Nov. 14, 2014, ECF No. 56.

D. *O'Connor* Transcript of Proceedings, Jan. 30, 2015.

E. *Lavitman* Order on Defendants' Motions to Dismiss and for Partial Summary Judgment, Jan. 26, 2015

F. *Zenelaj* Order Granting Defendant's Motion to Compel Arbitration, Mar. 3, 2015, ECF No. 26.

## BASIS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201(b) provides that a court may take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Furthermore, "[t]he court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

The Court may take judicial notice of related proceedings in this and in other courts. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) ("We may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.") (internal

566122.2

quotation marks omitted). The filings listed above include filings from the United States District Court, Northern District (*O'Connor* and *Zenelaj*), as well as the related *Lavitman* case pending in Massachusetts state court.

Dated: March 5, 2015        Respectfully submitted,

                               ADHOOT & WOLFSON, PC

                               /s/ Theodore Maya
                               Tina Wolfson
                               Theodore Maya

                               Attorneys for Plaintiff Abdul Kadir Mohamed and the Putative Class

Dated: March 5, 2015        Respectfully submitted,

                               GOLDSTEIN, BORGEN, DARDARIAN & HO

                               /s/ Andrew P. Lee
                               Andrew P. Lee

                               Attorneys for Plaintiffs and the Putative Class

## **SIGNATURE ATTESTATION**

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatories on this e-filed document.

Dated: March 5, 2015                  */s/* Theodore Maya

566122.2

Exhibit A

United States District Court

For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8   DOUGLAS O'CONNOR, *et al.*,                    No. C-13-3826 EMC
9              Plaintiffs,                          **ORDER GRANTING IN PART
                                                    PLAINTIFFS' "RENEWED
10          v.                                      EMERGENCY MOTION FOR
                                                    PROTECTIVE ORDER TO STRIKE
11  UBER TECHNOLOGIES, INC., *et al.*,              ARBITRATION CLAUSES"**
12             Defendants.
    _____/             **(Docket No. 15)**
13
14

15          Plaintiffs Douglas O'Connor and Thomas Colopy ("Plaintiffs") filed the current class action

16  complaint against defendants Uber Technologies, Inc. ("Uber") and two of its executives, Travis

17  Kalanick and Ryan Graves (collectively "Defendants"), seeking restitution, damages, and other

18  relief for unremitted gratuity. Now pending before this Court is Plaintiffs' "Renewed Motion for

19  Protective Order to Strike Arbitration Clauses" (Docket No. 15).

20          Having considered the parties' moving and response papers, as well as the oral argument of

21  counsel, the Court hereby **GRANTS**, in part, Plaintiffs' motion.

22                      **I.    FACTUAL & PROCEDURAL BACKGROUND**

23          Uber offers a mobile phone application used by riders and drivers to facilitate an "on

24  demand" car service. *See* Docket No. 1 (Compl., ¶¶ 1, 11). The application is used by riders and

25  drivers alike. Riders and drivers begin by downloading the application to their mobile phones.

26  Riders can request rides via the application and the fare is assigned to the first driver within the

27  geographic area to respond to the rider's request via the application. *See* Docket No. 56 (Hearing

28  Transcript, at pgs. 35:19-37:6). Plaintiffs, who are former drivers and users of the application,

1    allege Uber advertises to riders that gratuity is included in the total cost of the service.  *Id.* at ¶ 14.

2    Plaintiffs contend that despite this advertisement, Uber does not remit the full amount of gratuity it

3    receives from customers to the drivers.  Plaintiffs have brought a putative class action against Uber

4    to recover the full amount of gratuity they believe they are owed.

5           Prior to the instant case, Uber was sued in Massachusetts state court over its gratuity policy

6    in 2012.  *See* Docket No. 15 (Mot., at pg. 6, n. 11) (citing *Lavitman et al. v. Uber Technologies, Inc.*

7    *et al.*, Mass. Super. Ct. (Suffolk), C.A. No. 12-4490).  A similar action was filed against Uber in

8    Illinois.  *See id.* (citing *Ehret v. Uber Technologies, Inc.*, C.A. No. 12CH36714 (Circuit Court of

9    Cook County, IL)).  Both actions are class action lawsuits.

10          The following year, during the pendency of the Massachusetts and Illinois lawsuits against

11   Uber, on July 22, 2013, Uber informed users (drivers) they would receive within two weeks an

12   electronic notification asking them to approve new agreements.  Docket No. 36-2 (Coleman Decl.,

13   ¶ 10).  Continued use of the Uber application was conditioned on approval of these agreements.  *See*

14   *id.*  One such agreement, titled Software Licensing and Online Services Agreement (the "Licensing

15   Agreement"), contained an arbitration provision.  *See id.* (Ex. A to Coleman Decl., § 14.3).  Users

16   could accept the Licensing Agreement, including its arbitration provision, by swiping a button on

17   their mobile phones.  Users were given thirty (30) days to opt out of the arbitration provision, *see id.*

18   at § 14.3(viii) ("Your Right to Opt Out of Arbitration").  However, opting out required users to send

19   a letter via hand delivery or overnight mail to Uber's general counsel, clearly indicating an intent to

20   opt out.  *See id.*  Otherwise, the drivers would be bound by the arbitration agreement, potentially

21   barring them from this or any other lawsuit.

22          Plaintiffs filed the current action on August 16, 2013.  Less than a week later, Plaintiffs

23   consented to proceed before Magistrate Judge Westmore and filed an "Emergency Motion for

24   Protective Order to Strike Arbitration Clauses," requesting the Court strike the arbitration provision,

25   or alternatively, to provide more time to opt out and notice of the pendency of the current class

26   action.  *See* Docket Nos. 3, 4.  On August 23, 2013, Magistrate Judge Westmore denied Plaintiffs'

27   motion without prejudice on grounds Plaintiffs had failed to first serve Defendants with summons

28   and complaint.  *See* Docket No. 14 (Order, at pg. 3-4).  Three days later, Plaintiffs filed their

United States District Court

For the Northern District of California

"Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses." *See* Docket No. 15. Plaintiffs personally served Uber with summons and complaint. *See* Docket No. 17. On September 4, Plaintiffs requested an order shortening time on Defendant's response to this motion. Docket No. 27. Defendants filed an ex parte application in response to this request. Docket No. 34. The Court denied Plaintiffs' emergency motion. Docket No. 37.

Currently before this Court is Plaintiffs' motion for a protective order, heard as a regularly noticed motion. Plaintiffs contend that because drivers are not informed of the pendency of the current action prior to approving the Licensing Agreement, and its arbitration provision, and the mode of opting out is unreasonably burdensome, "Uber's new agreement may deprive potential class members of their right to participate in this case." *See* Docket No. 15 (Mot., at pg. 5). Plaintiffs accordingly seek the following relief: (1) strike the arbitration provision in the Licensing Agreement; or, alternatively, (2) require Uber to (a) give notice of the current pending class action to its drivers, (b) explain that opting out of the arbitration provision is necessary to participate in the putative class, (c) extend the opt-out period beyond thirty (30) days, and (d) provide a less onerous means of opting out. *Id.* at pg. 4.

## II. DISCUSSION

A. Unconscionability: Striking the Arbitration Provision

Plaintiffs contend that the Court should strike the arbitration provision as unenforceably unconscionable under California law. In their briefing, Plaintiffs contend procedural unconscionability on numerous grounds – *e.g.*, (1) Uber only provides thirty (30) days to opt out of the arbitration provision; (2) Uber's failure to identify prior litigation against it; (3) the arbitration provision appears towards the end (*i.e.*, at page eleven of a fourteen-page agreement); (4) a separate signature is not required to approve the arbitration provision; and (5) there are relatively onerous opt-out procedures: (a) failure to provide an opt-out form or prepaid envelope, and (b) requiring hand delivery or overnight mail of a letter to opt out, whereas only *clicking* "I accept" to opt in. *See* Docket No. 15 (Mot., at pgs. 6-7, n. 12). At the hearing, Plaintiffs' counsel identified the arbitration provision's fee-splitting clause as substantively unconscionable. *See* Docket No. 56 (Hearing Transcript, 7:17-8:5).

3

United States District Court

For the Northern District of California

The Court declines to rule on the unconscionability of the arbitration provision as the issue is not properly before the Court at this juncture. Because there is no allegation that a motion to compel arbitration is pending or threatened, the issue of whether the arbitration provision is enforceable is not yet ripe for resolution. *See e.g.*, *Lee v. American Exp. Travel Related Services, Inc.*, 348 Fed. Appx. 205, 207 (9th Cir. 2009) (class representatives of a putative class action could not challenge inclusion of arbitration provision on unconscionability grounds because no arbitration was threatened or impending); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019-20 (1984) (challenge to constitutionality of arbitration scheme not ripe for resolution because Monsanto "did not allege or establish that it had been injured by actual arbitration under the statute"). *See also Posern v. Prudential Securities, Inc.*, No. C-03-0507 SC, 2004 WL 771399, at *8 (N.D. Cal. Feb. 18, 2004) (finding plaintiff's request to declare arbitration clause invalid speculative because defendant had not yet moved to compel arbitration). Even if an unnamed class member were faced with a motion to compel arbitration, Plaintiffs cite no authority establishing a putative class representative has standing to challenge the motion prior to certification of the class.

This is not to say that the issue may not properly be addressed later in the proceedings. For example, unconscionability and hence enforceability of the arbitration provision may arise at the class certification stage. Its validity and enforceability may be material to factors under Rule 23(a)(3) – *e.g.*, numerosity, typicality, and adequacy of representation. Furthermore, Plaintiffs are not foreclosed from adding a new putative class representative to join the current class action, a representative who has not yet opted out of the arbitration provision. At this juncture, the Court declines to address whether the arbitration agreement is unenforceable as unconscionable without prejudice to further consideration at a later time.[1]

---

[1] Since this Court declines to address unconscionability on ripeness grounds, the Court also declines to rule on Uber's contention, *see* Docket Nos. 36 (Opp'n, at pg. 10) and 59 (12/5/2013 Letter Brief at pg. 3) (citing *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)), that this Court lacks jurisdiction to entertain the enforceability issue because the parties have clearly and unmistakably evinced an intent to delegate that issue to the arbitrator, as discussed in *Rent-A-Center, West, Inc. v. Jackson*, 130 S.Ct. 2772 (2010) and its progeny.

United States District Court

For the Northern District of California

B.     Rule 23(d): Controlling Class Communications

Plaintiffs alternatively request this Court to assert control over communications by Uber with members of the putative class, pursuant to Fed. R. Civ. P. 23(d).  Specifically, Plaintiffs request this Court require (1) electronic notice of the current class action be given to the proposed class (*e.g.*, email or other electronic means); (2) to extend the opt-out period to sixty (60) days; and (3) to allow Uber drivers to opt out of the arbitration provision electronically – *i.e.*, swiping a button on their mobile phones or via email.

Uber responds threefold.  First, exercising control over communications here would "chill Uber's ability to exercise rights afforded to it under the FAA" and Supreme Court precedent, as articulated in *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1744 (2011).  Second, circulation of the Licensing Agreement, and the arbitration provision included within it, is not a class communication.  Third, the Court cannot assert control over class communications absent a "showing of misconduct."

Uber's argument that Plaintiffs' requested relief somehow pits the Federal Arbitration Act ("FAA") against Rule 23(d), wherein the latter should yield, is meritless.  Neither *Concepcion* nor the FAA abrogates Rule 23(d).  *Concepcion* imposed limitations on state law – California common law relating to the contractual defense to unconscionability – which would have effectively barred enforcement of an arbitration agreement.  The Court did not address the ability of the district court under Rule 23(d) to control communication which would lead to an arbitration agreement in the midst of a class action lawsuit.  *See e.g.*, *Balasanyan v. Nordstrom, Inc.*, No. 11-CV-2609-JM-WMC, 2012 WL 760566, *2, n. 1 (S.D. Cal., Mar. 8, 2012) (noting that the Supreme Court's holding in *Concepcion* does not affect that court's decision to control class communications or invalidate the arbitration agreement before it, where allowing parties to do so would "create an incentive to engage in misleading behavior ").  Indeed, Uber recognizes the generally broad power to manage class actions and communications with the class.  *See* Docket No. 36 (Opp'n, at pg. 22, n. 10) (". . .Defendants do not contest, for the purposes of this Opposition, that a court may limit future communications with putative class members where such communications would be misleading or coerce a putative class member to repudiate a substantive right.").

United States District Court
For the Northern District of California

1    Uber's citation to *American Exp. Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304, 2306-

2    2307 (2013) for the proposition that Rule 23 must yield to the FAA is unavailing. While *Italian*

3    *Colors* affirms that an otherwise valid arbitration agreement cannot be refused enforcement simply

4    because it would undermine the efficacy of a class action, the Court did not discuss Rule 23(d) and

5    the district court's ability to control communications with the class thereunder. *Italian Colors* is

6    inapposite to the issue at bar. The issue now before this Court is not the substantive validity of an

7    arbitration provision, but whether, as a procedural matter, a court may regulate an employer's

8    attempt to impose an arbitration requirement and waiver of legal rights during the course of a class

9    action lawsuit. Neither *Concepcion* nor *Italian Colors* addressed this question.

10    Next, Uber contends that circulating the Licensing Agreement, and its arbitration provision,

11    is a business communication, not a class communication subject to Rule 23(d). However, the

12    touchstone under Rule 23(d) is not whether the communication is of an ordinary business nature;

13    rather, the inquiry is whether the communication is abusive, misleading, coercive, or otherwise

14    affects the administration of justice in the context of a putative class action lawsuit. As the Ninth

15    Circuit held in *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment*

16    *vacated on other grounds*, 132 S.Ct. 74 (2011), ". . .Rule 23(d) gives district courts the power to

17    regulate the notice and opt-out processes and to impose limitations when a party engages in behavior

18    that threatens the fairness of the litigation." Such a threat may exist regardless of whether the

19    communication to the class is denominated as "business" in nature. No court has held that the

20    characterization of the communication as official business in and of itself immunizes such a

21    communication from Rule 23(d) scrutiny. At most, the existence of a possible business purpose may

22    counsel that any regulation imposed by the Court be narrowly tailored. *Montgomery v. Aetna*

23    *Plywood, Inc.*, No. 95-cv-3193, 1996 WL 189347, at *6 (N.D. Ill. Apr. 16, 1996) (noting that

24    communications ban was narrowly tailored in that it was limited to "communications regarding the

25    litigation").

26    Cases cited by Uber are distinguishable in that they involved or envisioned purely business

27    communications, completely unrelated to litigation that had no substantial effect on class members

28    rights therein. *See e.g.*, *Cobell v. Norton*, 212 F.R.D. 14, 20 (D.D.C. 2002) (not addressing any

United States District Court
For the Northern District of California

1  particular business communication but allowing "regular sorts of business communications" that "do

2  not purport to extinguish the rights of the class members in this litigation.").

3      The Court notes it would be particularly inappropriate to insulate the subject

4  communications from review under Rule 23(d) where, as here, there is a distinct possibility that the

5  arbitration provision and class waiver imposed by Uber was motivated at least in part by the

6  pendency of class action lawsuits which preceded the new Licensing Agreement. Suspicion that the

7  new Licensing Agreement's arbitration provision was intended by Uber as a means to thwart

8  existing class action litigation is heightened by the misleading nature of the communication and the

9  unusually onerous procedures for opting out discussed *infra*.

10      Uber's third argument that this Court must make an affirmative finding of misconduct before

11 exercising control over class communications misconstrues binding precedent. In general, district

12 courts have both a duty and broad authority to control communications to putative class members

13 even before class certification and to enter appropriate orders governing the conduct of counsel and

14 the parties. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). The Supreme Court's articulation

15 of the requisite factual finding for a district court to limit class communications pursuant to Rule

16 23(d) does not require a finding of actual misconduct:

17      "[A]n order limiting communications between parties and potential
        class members should be based on a clear record and specific findings
18      that reflect a weighing of the **need for a limitation** and the **potential
        interference** with the rights of the parties. Only such a determination
19      can ensure that the court is furthering, rather than hindering, the
        policies embodied in the Federal Rules of Civil Procedure, especially
20      Rule 23. In addition, such a weighing-identifying the potential abuses
        being addressed-should result in a carefully drawn order that limits
21      speech as little as possible, consistent with the rights of the parties
        under the circumstances."

22

23 *Gulf Oil*, 452 U.S. at 101-02 (emphasis added). The key is whether there is "potential interference"

24 with the rights of the parties in a class action. *See In re Currency Conversion Fee Antitrust*

25 *Litigation*, 361 F. Supp. 2d 237, 251 (S.D.N.Y. 2005) (describing right to join potential class action),

26 *order amended on other grounds*, 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005). Wilful misconduct

27 on the defendant's part is not required so long as the effect is to interfere with class members' rights.

28 In *In re School Asbestos Litigation*, 842 F.2d 671, 682 (3d Cir. 1988), the court upheld the district

United States District Court

For the Northern District of California

court's finding that a booklet was misleading as a matter of law and impliedly rejected appellant's contention that the district court's findings "fail[ed] to present. . . evidence of 'actual or threatened misconduct of a serious nature." In *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005), *order amended by* No. M 21-95, 2005 WL 1871012 (S.D.N.Y., Aug. 9, 2005), the district court rejected defendant's contention that *Gulf Oil* requires a "specific finding of abuses." Relying on Rule 23(d), the district court found that it had the authority to prevent misleading communications, and in particular, those communications that would "undermine Rule 23 by encouraging class members not to join the suit." *Id*. at 254.

In *Balasanyan*, discussed *infra*, the district court found it sufficient to exercise control under Rule 23(d) where defendant's failure to disclose pending litigation when it circulated its arbitration agreement for approval "create[d] an incentive to engage in misleading behavior." *Balasanyan*, 2012 WL 760566, at *3. The court noted that one purpose of Rule 23 is to "prevent improper contacts that could jeopardize the rights of the class members," including inducing putative class members from participating in the class action. *Id. See also Piekarski v. Amedisys Illinois, LLC*, No. 12-CV-7346, 2013 WL 605548, at *2 (N.D. Ill. Nov. 12, 2013) (finding improper, abusive, and misleading arbitration program implemented during pendency of action which involved onerous opt-out procedure that likely prevented participation in the class action).

The cases cited by Uber do not support the opposite conclusion. In *Mevorah*, for example, the court described its prior ruling where the alleged misconduct involved similar potential abuses as those at play here. *Mevorah v. Wells Fargo Home Mortg., Inc.*, No. C05-1175 MHP, 2005 WL 4813532, at *3 (N.D. Cal., Nov. 17, 2005). The court stated, "For example, this court has restricted a defendant's ability to communicate with potential class members following the defendant's publication of a notice that, in relevant part, failed to disclose the pendency or scope of the class action and may have caused confusion among potential class members regarding their rights." *Id*. The court noted that a limitation on class communications must be "based on a clear record and specific findings that reflect a weighing of *the need* for a limitation and the *potential interference* with the rights of the parties." *Id*. (citing *Gulf Oil Co.*, 452 U.S. at 101) (emphasis added). Hence,

*Mevorah* is consistent with this Court's reading of *Gulf Oil* that the focus is on the *effect* of

interfering with the fair administration of a class action lawsuit.[2]

       Here, the risk of interfering with the pending class action and the need for a limitation on

communication with the class that adversely affects their rights is palpable.  The communication

which is the subject of this motion is likely to mislead potential class members about their right to

join the current class action.  The arbitration provision at issue includes a class action waiver,

purporting to contractually bar Uber drivers from participating and benefitting from any class

actions.  Yet, the waivers were shrouded under the confusing title "How Arbitration Proceedings

Are Conducted."  Despite the title's innocuous wording, only a single paragraph is devoted to

discussing the what and how-to of arbitration.  The remaining four paragraphs set forth three

waivers of substantive rights – class action, collective action, private attorney general action.

Furthermore, the arbitration provision is not conspicuous and was not presented as a stand alone

agreement.  Instead, it is one of many provisions in the Licensing Agreement.

       Uber drivers likely did not know the consequences of assenting to the Licensing Agreement.

Many likely were not aware they were losing the right to participate in this or any other lawsuit.

Indeed, Uber drivers have no meaningful way of learning of the current lawsuit since there has been

no class notice.  Although Uber characterizes some of its drivers as large, sophisticated

"transportation companies," they do not dispute Plaintiffs' factual contention that many, if not the

majority of, Uber drivers are smaller outfits run by immigrants for whom English is not their native

language.  Docket No. 56 (Hearing Transcript, at pgs. 17:14-18:4).  Uber made no effort to inform

drivers of the legal consequence of the arbitration provision barring them from participation in

pending and future class action lawsuit brought on their behalf.  Moreover, Uber drivers who desired

to continue using Uber's mobile phone application, and as a consequence to continue receiving leads

from Uber, were *required* to assent to the terms of the Licensing Agreement, including its arbitration

provision.

---

[2] Even if intentional abuse or misconduct were required, as discussed above, there is a basis
for inferring that the arbitration provision at issue here was imposed by Uber as a means of
undermining pending class action lawsuit against it.

United States District Court

For the Northern District of California

1    While the Licensing Agreement did afford Uber drivers thirty (30) days to opt out of the

2 arbitration provision, the opt-out provision is buried in the agreement. It is part of the arbitration

3 provision, which itself is part of the larger, overall Licensing Agreement. The opt-out clause itself is

4 ensconced in the penultimate paragraph of a fourteen-page agreement presented to Uber drivers

5 electronically in a mobile phone application interface. In sum, it is an inconspicuous clause in an

6 inconspicuous provision of the Licensing Agreement to which drivers were required to assent in

7 order to continue operating under Uber.

8    Even if a driver were aware of the arbitration provision, and its consequence, and of the opt-

9 out clause, the opt-out procedure is extremely onerous. Whereas, opting in only requires an Uber

10 driver to swipe a button on their mobile phones, opting out required Uber drivers to send a letter via

11 *hand delivery or overnight mail* to Uber's general counsel, clearly indicating their desire to opt out.

12 Defendants failed, at the hearing or in briefing, to rebut Plaintiff's contention that many Uber drivers

13 are not native English speakers. Uber's requirement that an opt-out letter be hand delivered or

14 overnighted goes beyond simply ensuring receipt. Other, less burdensome, means – *e.g.*, email or

15 first class mail with return receipt requested – could credibly have accomplished the same end.[3]

16    In sum, the promulgation of the Licensing Agreement and its arbitration provision, runs a

17 substantial risk of interfering with the rights of Uber drivers under Rule 23. The Court concludes it

18 has the authority to assert control over class communications in a manner that is narrowly tailored,

19 supported by the record, and balances the interests of all parties involved consistent with *Gulf Oil*.

20 While the Court will not regulate communications issued prior to the filing of this suit, as Plaintiffs

21 have cited no authority where a court has asserted control under Rule 23(d) over class

22 communications issued *prior* to the filing of a class action complaint, the Court clearly has the

23 authority and jurisdiction to regulate post-filing communications by Uber under Rule 23(d). *See*

24

25    [3] Tellingly, Defendants cite no case where an opt-out procedure that mandates such onerous
means has been upheld. Defendants' opt-out procedure is significantly more burdensome than

26 others upheld in this circuit. *See e.g.*, *Meyer v. T-Mobile USA Inc.*, 836 F. Supp. 2d 994, 1002 (N.D.
Cal. 2011) (providing for thirty-day opt-out period via a toll free number or online form); *Alvarez v.*

27 *T-Mobile USA, Inc.*, No. 10-cv-2373 WBS, 2011 WL 6702424, at *2 (E.D. Cal. Dec. 21, 2011)
(same); *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002) (providing thirty-

28 day opt out period by mailing one-page form).

United States District Court

For the Northern District of California

1  *Gulf Oil*, 452 at 99-100 (noting district court's duty and broad authority to "enter appropriate orders

2  governing the conduct of counsel and parties"). This discretion includes requiring the issuance of

3  corrective notices and action to ameliorate confusing or misleading communications. *See e.g.*,

4  *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th Cir. 2009) (affirming district court's corrective

5  notice and extension of the opt-out period to "unwind the confusion" caused by plaintiffs' attorney

6  unilateral communication with putative class members to procure post-certification opt-outs) (citing

7  *Gulf Oil*); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 667 (E.D. Tex. 2003) (relying on *Gulf Oil* to

8  enter "appropriate orders," such as requiring defendant to issue corrective notice to inform potential

9  class members of their right to join a putative class action, where defendant sent letter discouraging

10  participation in pending class action).

11     Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to

12  arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration

13  provision within 30 days of the notice.  These requirements shall apply to new drivers

14  (prospectively) and past and current drivers (retrospectively).  As for arbitration provisions which

15  have already been distributed after the filing of the complaint in this action (August 16, 2013) to past

16  and current drivers who have approved the arbitration provision without opting out (or for whom

17  approval during the 30 day notice period has begun to run but is still pending), Uber must seek

18  approval of the arbitration provision for these drivers anew, giving them 30 days to accept or opt out

19  from the date of the revised notice.

20     The foregoing approach is narrowly tailored as required under *Gulf Oil* and is based on

21  factual findings discussed herein.

22  **III.**   <u>**CONCLUSION**</u>

23     Based on the foregoing, the Court hereby rules as follows:

24     (1)  The Court declines to rule on the alleged unconscionability of the arbitration

25  provision in the Licensing Agreement, as that issue is not yet ripe for adjudication.

26     (2)  Uber's efforts to seek approval of the arbitration provision in the Licensing

27  Agreement during the pendency of this class action is potentially misleading, coercive, and threatens

28

1    to interfere with the rights of class members.  This Court shall exercise its discretion and authority to

2    control communications to the putative class, pursuant to Rule 23(d), as follows:

3         (a)      The parties shall meet and confer within seven (7) days of this Order to

4                  discuss and stipulate to the appropriate form, content, and procedures of the

5                  corrective notices consistent with this order.  If the parties are unable to agree on a

6                  proposed corrective notice, they shall notify the Court by submitting their respective

7                  proposed notices and procedures for review and decision by the Court within fourteen

8                  (14) days of this Order.

9         (b)      Until revised notices and procedures are approved by the Court and sent to

10                 drivers, Uber shall not issue to Uber drivers or prospective drivers the Licensing

11                 Agreement or any other agreement containing an arbitration provision which waives

12                 putative class members rights herein.

13

14   This order disposes of Docket No. 15.

15

16   IT IS SO ORDERED.

17

18   Dated:  December 6, 2013

19

20                                                    _____

21                                                    EDWARD M. CHEN
                                                      United States District Judge
22

23

24

25

26

27

28

Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOUGLAS O'CONNOR, *et al.*,

        Plaintiffs,

    v.

UBER TECHNOLOGIES, INC., *et al.*,

        Defendants.

_____/

No. C-13-3826 EMC

**AMENDED ORDER DENYING
DEFENDANT'S MOTION FOR
RECONSIDERATION**

**[Revision in green highlight]**

**(Docket No. 79)**

## I.   INTRODUCTION

    Plaintiffs Douglas O' Connor and Thomas Colopy ("Plaintiffs") filed a class-action complaint against defendants Uber Technologies, Inc. ("Uber") and two of its executives, Travis Kalanick and Ryan Graves, alleging violations of statutory employee reimbursement and California Business and Profession Code § 17200 *et seq*., and other causes of action for unremitted gratuity.

    Before the Court is Uber's Motion for Reconsideration (the "Motion") of the Court's order (the "Order") granting in part Plaintiffs' Renewed Emergency Motion for Protective Order to Strike Arbitration Clauses. The Court **DENIES** Uber's Motion for Reconsideration for the reasons set forth below.

    Also before the Court are the parties' proposed corrective notices submitted pursuant to the Order. The parties shall submit revised proposed corrective notices consistent with this order, as set forth below.

///

///

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## II.  FACTUAL & PROCEDURAL BACKGROUND

Uber licenses a software application (the "Uber App" or "App") used by drivers and riders to facilitate an "on demand" car service.  Complaint ("Compl.") ¶ 1.  Riders and drivers begin by downloading the App to their mobile phones.  Riders can request rides via the Uber App and the fare is assigned to the first driver within the geographic area to respond to the rider's request via the App. Hearing Transcript (Docket No. 56) at 35-37.

Plaintiffs are former drivers and users of the Uber App.  They allege that Uber advertises to riders that gratuity is included in the total cost of the service, but does not remit the full amount of gratuity it receives from riders to the drivers.  Compl. ¶¶ 14-16.  Plaintiffs seek to recover the full amount of gratuity they believe they are owed.

Prior to the instant case, Uber drivers in Massachusetts filed a similar class action lawsuit alleging unremitted gratuities.  *See* Renewed  Emergency Motion for Protective Order to Strike Arbitration Clauses ("Renewed Motion") at 6 n. 11 (citing *Lavitman v. Uber Technologies, Inc.*, Mass. Super. Ct. (Suffolk), C.A. No. 12-4490).  Uber riders in Illinois also filed a class action lawsuit (subsequently brought before this Court, *Ehret v. Uber, Technologies, Inc.*, 14-cv-0113-EMC[1] similarly alleging that Uber misrepresented the nature of the "gratuity."  *See id.*

On July 22, 2013, while the Massachusetts and Illinois lawsuits were pending, Uber informed drivers that they would receive within two weeks an electronic notification asking them to approve three new agreements. Opposition to Renewed Motion, Colman Declaration  ("Colman Decl.")  (Docket No. 36-2) ¶ 10.  Continued use of the Uber App was conditioned on approval of these agreements.  *Id.*  One of the agreements was a Software Licensing and Online Services Agreement (the "Licensing Agreement").  *See id.* Exh. A.  The Licensing Agreement was emailed to Uber drivers; drivers were instructed that they could accept the Licensing Agreement by swiping a button on their cell phones.  Renewed Motion at 3.  The Licensing Agreement governs the relationship between Uber and a driver.  *See* Licensing Agreement.  On pages 11 through 15 of the Licensing Agreement is an arbitration provision.  *See id.*  The arbitration provision requires all

---

[1] The Illinois court dismissed the action based on a forum selection clause in Uber's terms and conditions.  *See* 14-cv-0113-EMC, Docket No. 1.

1    disputes to be resolved through binding arbitration instead of in a court of law, effectively requiring

2    drivers to waive their right to participate in litigation, including any class action. *Id.* ¶ 14.3.i.

3         Drivers are given thirty (30) days to opt out of the arbitration provision. *Id*. ¶ 14.3.viii.

4    However, opting out requires drivers to hand deliver or send via overnight mail to Uber's general

5    counsel, a letter clearly indicating an intent to opt out. *Id*. Otherwise, drivers are bound by the

6    arbitration provision, prohibiting them from bringing suit against Uber.

7         Plaintiffs filed the current action on August 16, 2013. They seek to represent "all drivers

8    who have worked for Uber anywhere in the country, except in Massachusetts." Compl. ¶ 25.

9    Plaintiffs filed the Renewed Motion[2] shortly after filing the Complaint. In the Renewed Motion,

10   Plaintiffs sought to strike the arbitration clause in the Licensing Agreement, or, alternatively, to

11   require Uber to (1) give notice of the current pending class action to its drivers; (2) explain that

12   opting out of the arbitration provision is necessary to participate in the putative class; (3) extend the

13   opt-out period beyond 30 days; and (4) provide a less onerous means of opting out. Renewed

14   Motion at 4.

15        The Court granted Plaintiffs' Renewed Motion in part. The Court held:

16            Uber drivers must be given clear notice of the arbitration provision,
              the effect of assenting to arbitration on their participation in this
17            lawsuit, and reasonable means of opting out of the arbitration
              provision within 30 days of the notice. These requirements shall apply
18            to new drivers (prospectively) and past and current drivers
              (retrospectively). As for arbitration provisions which have already
19            been distributed after the filing of the complaint in this action (August
              16, 2013) to past and current drivers who have approved the
20            arbitration provision without opting out (or for whom approval during
              the 30 day notice period has begun to run but is still pending), Uber
21            must seek approval of the arbitration provision for these drivers anew,
              giving them 30 days to accept or opt out from the date of the revised
22            notice.

23
24   Order (Docket No. 60) at 11. As to arbitration agreements distributed before the filing of this suit,

25   the Court denied relief. *Id*. at 10. The Court ordered the parties to meet and confer "to discuss and

26   stipulate to the appropriate form, content, and procedures of the corrective notices," for the Court's

27       [2] Plaintiffs initially filed an filed an Emergency Motion for Protective Order to Strike
     Arbitration Clauses, but it was denied because they had not yet served the defendants. Docket Nos.
28   4, 14.

United States District Court
For the Northern District of California

1   approval. *Id.* at 12.  The Court forbade Uber from "issui[ng] to Uber drivers or prospective drivers

2   the Licensing Agreement or any other agreement containing an arbitration provision which waives

3   putative class members rights," until revised notices and procedures were approved by the Court. *Id.*

4   at 12.

5          On December 20, 2013, the parties submitted separate proposed corrective notices (Docket

6   Nos. 64, 66), as they could not come to an agreement, but simultaneously submitted a stipulated

7   request that the Court postpone issuing any corrective notice, so that the parties might engage in

8   mediation.  Docket No. 65.  The Court granted the request, requiring the parties to submit by March

9   31, 2014 a report on the status of the mediation.  Docket No. 67.  It also granted Uber leave to file a

10  motion for reconsideration of the Order.  *Id.*  The parties reported that mediation would take place

11  on April 1, 2014.  Docket No. 82.  Evidently, this suit was not resolved in mediation.  Hearing for

12  this Motion and a case management conference were held on April 18, 2014.

13         In the Motion, Uber requests the Court to reconsider the Order to the extent that it applies to

14  prospective drivers.  In practical effect, these are individuals who have downloaded (or will

15  download) the Uber App but have not yet driven for Uber.  Uber believes the Court exceeded its

16  authority under Federal Rule of Civil Procedure 23(d) by regulating communications with

17  prospective drivers who are not currently members of the putative class.

18                                **III.   DISCUSSION**

19  A.    Legal Standard: A Court's Powers Under Rule 23(d)

20         Federal Rule of Civil Procedure 23(d) provides that "the court may issue orders" that

21  "require – to protect class members and fairly conduct the action – giving appropriate notice to some

22  or all class members of any step in the action," "impose conditions on the representative parties," or

23  "deal with similar procedural matters."  Fed. R. Civ. P. 23(d)(1).  "Subdivision (d) is concerned with

24  the fair and efficient conduct of the action . . . ."  Fed. R. Civ. P., Adv. Comm. Notes.

25         "Because of the potential for abuse [presented by class actions], a district court has both the

26  duty and the broad authority to exercise control over a class action and to enter appropriate orders

27  governing the conduct of counsel and parties."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).  In

28  particular, a district court has the power to "limit[] communications between parties and potential

4

class members." *Id.* at 101. *Gulf Oil* noted the "obvious potential for confusion" and adverse effect on the "administration of justice" that misleading communications may cause. *Id.* at 100 n. 12 (quoting *Waldo v. Lakeshore Estates, Inc.*, 433 F.Supp. 782 (E.D.La.1977)). The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process.

> A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class. Certainly communications that seek or threaten to influence the choice of remedies are . . . within a district court's discretion to regulate.

*In re Sch. Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988). In *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S.Ct. 74 (2011), the Ninth Circuit similarly noted, "Rule 23(d) gives district courts the power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation." *Cf. Soskel v. Texaco, Inc.*, 94 F.R.D. 201, 203 (S.D.N.Y. 1982) (the court exercised its power to disapprove a settlement with the named plaintiffs in order to protect the other putative class members).

B.     Uber's Motion for Reconsideration

Uber seeks reconsideration of the Order to the extent that it prohibits issuing arbitration agreements to individuals who have not yet used the Uber App to drive for Uber. Were the Order not in place, the arbitration agreements would be issued to individuals when they download the App; they would be bound by the Licensing Agreement (and its arbitration provision) before they actually drive for Uber. Since these individuals are not drivers at the time they receive the communication and bind themselves to the Licensing Agreement, Uber reasons they are not "putative class members" at the time they receive the communication.[3] Uber thus asserts that "Rule 23 provides no

---

[3] The Court uses the term "putative class member" to refer to an individual who satisfies the definition of the class as stated in the Complaint: "all drivers who have worked for Uber anywhere in the country, except in Massachusetts." Compl. ¶ 6. The "putative" merely refers to the fact that the class has not yet been certified.

United States District Court
For the Northern District of California

5

basis for 'correcting' or restricting communications with persons who are not putative class members at the time of communication." Mot. at 7. The Court disagrees.

As noted, Rule 23(d) grants a court "broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties" so that it may ensure "fair . . . conduct of the action" and "protect the integrity of the class and the administration of justice." *Gulf Oil*, 452 U.S. at 100; Fed. R. Civ. P., Adv. Comm. Notes; *In re Sch. Asbestos Litig.*, 842 F.2d at 683. The scope of the Court's authority – though certainly not unlimited, as *Gulf Oil* explains – is not confined by the wooden approach advocated by Uber. Such an approach ignores the broad purpose of Rule 23(d). *See Gulf Oil*, 452 U.S. at 102 ("the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23 . . .") (quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977), cert. denied, 434 U.S. 985 (1977)); *id*. at 99 ("the question for decision is whether the limiting order entered in this case is consistent with the general policies embodied in Rule 23"). Consistent with that purpose, the Supreme Court has recognized that a court's authority over communications under Rule 23(d) extends beyond "actual class members" to "potential class members" because "the possibility of abuses in class-action litigation . . . may implicate communications with potential class members." *Id.* at 104.

Uber does not claim that "potential class members," as used in *Gulf Oil*, are restricted to current putative class members. Nothing in *Gulf Oil* indicates the Court intended such a limitation. Significantly, courts have regulated pre-certification communications that were not confined to putative class members. *See, e.g.*, *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1002, 1007 (11th Cir. 1997) (holding that the district court abused its discretion in allowing the plaintiffs to "publish notices of the ongoing litigation in publications nationwide and solicit information about potential class members and their alleged experiences with discrimination at Motel 6 motels," when the "communications would be nationwide in scope and would cause serious and irreparable injury to the defendant, when a decision on class certification was not imminent, and when [one of the proposed classes] was clearly not certifiable"); *Recinos-Recinos v. Express Forestry, Inc.*, 2006 WL 197030, *11 (E.D. La. Jan. 24, 2006) (entering protective order restraining defendants from contacting, among others, families of potential class members in an attempt to obtain the class

member's contact information and warn of adverse consequences, were the potential class member

to join the suit). Furthermore, classes may be defined to include future class members. *See*

*Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010) ("The inclusion of future class members in

a class is not itself unusual or objectionable.") (citing *Probe v. State Teachers' Ret. Sys.*, 780 F.2d

776, 780 (9th Cir.1986), which upheld class certification of a class "consisting of all male certified

employees who were . . . , are or will be employed in positions entitling them to membership in

STRS . . ." (quotation marks omitted)).[4]

The Court has authority to regulate communications which jeopardize the fairness of the

litigation even if those communications are made to future and potential putative class members. To

constrain the authority of the court under Rule 23(d) to regulating only communications between an

employer and current class or putative class members, to the exclusion of future class members,

would undermine the court's ability to insure the "fair . . . conduct of the action," and "protect the

integrity of the class and the administration of justice." Fed. R. Civ. P., Adv. Comm. Notes; *In re*

*Sch. Asbestos Litig.*, 842 F.2d at 683. It would also undermine the court's ability to control

communications which "threaten to influence the choice of remedies" in class actions. *In re Sch.*

*Asbestos Litig.*, 842 F.2d at 683. Under Uber's proposed rule, defendants could unilaterally limit the

size and scope of the class to be certified without being subject to court supervision. For instance,

what if after the commencement of a class action alleging an unlawful company-wide employment

practice brought on behalf of all current and future employees, the employer required all job

applicants to sign a waiver agreeing to arbitration and prohibiting participation in the lawsuit in a

conscious effort to limit the size of the class and truncate the scope of the class to preclude all future

employees? What if the employer included in its employment application a distorted and misleading

characterization of the pending lawsuit and sternly warned job applicants against joining the

lawsuit? Would the court be powerless to respond and regulate such communications under Rule

---

[4] To the extent Uber argues that the class definition in the instant case is limited to those who have already driven for Uber, Plaintiffs have clarified that their class definition was intended to include all those who have driven through the time of class certification – *i.e.*, it includes future drivers. Hence, this case encompasses not only current drivers but future drivers, at least through class certification.

7

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

23(d) simply because the recipients are job applicants and not yet employees?  Moreover, why should the precise timing and sequence of events leading up to employment of future drivers of Uber matter as Uber argues?  What difference does it make whether an individual swipes the button on her cell phone (thereby accepting the Licensing Agreement) one minute before rather than at the same time she starts to drive her first customer?  Uber's attempt to place dispositive significance on the precise sequence of events in the employment of new drivers makes no practical or policy sense in light of the broad purpose of Rule 23(d).

The Court further notes that in affirming its power to regulate communications herein, it is not ruling on the conscionability of the arbitration provision or its general enforceability as a matter of substantive law.  It is merely treating the Licensing Agreement promulgated to current and future class members as a communication subject to regulation under *Gulf Oil* – the Court has evaluated whether that communication is so misleading or coercive that it threatens the fair and efficient administration of this class action lawsuit.  As discussed in the prior Order and below, the issue before the Court is not enforceability or singling out of arbitration under *AT&T Mobility LLC v. Concepcion,* 131 S.Ct. 1740 (2011), or *American Express, Co. v. Italian Colors Restaurant*, 133 S.Ct. 594 (2012), but regulation of communications with the class under Rule 23(d) as interpreted by *Gulf Oil* and its progeny.

Uber relies on *In re Currency Conversion Fee Antitrust Litig*., 361 F. Supp. 2d 237 (S.D.N.Y. 2005), appeal granted, order amended, 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005) and *Balasanyan v. Nordstrom, Inc*., 294 F.R.D. 550, 573 (S.D. Cal. 2013) to establish the contrary.  In both cases, arbitration agreements were promulgated after litigation commenced, and in both cases, the courts held that the agreements were not enforceable as to those who were putative class members before the agreements were promulgated, but not enforceable as to those who were not.  However, neither case is persuasive.

In *In re Currency*, the plaintiffs were credit card holders, who sued banks for allegedly price fixing currency conversion fees for foreign transactions made with credit cards.  The court held:

> When arbitration clauses were included in the credit card agreements for these categories of cardholders, they were not putative class members.  As a result, they had no rights in this litigation. . . . [T]here

8

United States District Court
For the Northern District of California

1            is no basis for restricting a defendant from communicating with
2    persons who are not putative class members. *Cf. Kahan*, 424 F.2d at
     169 (noting that a putative class members' rights in a litigation are
3    protected as of the filing date of the complaint). Accordingly, this
     Court holds that because the non-putative class members agreed to
4    arbitration before they became putative class members in this
     litigation, the arbitration clauses in their cardholder agreements can be
5    enforced.

6    *In re Currency*, 361 F. Supp. 2d at 258. The court provided no clear legal basis for its conclusion

7    that "there is no basis for restricting a defendant from communicating with persons who are not

8    putative class members." *Id*. *Kahan*, cited by the court, merely noted that a putative class member

9    has rights in a litigation even before certification, an uncontroversial proposition. *Kahan* did not say

10   that those who became putative class members after litigation commenced had no rights in the

11   litigation, nor did it say that a court has no authority to communicate with future class members.

12           In *Balasanyan*, the plaintiffs were Nordstrom employees, who sued Nordstrom alleging

13   violations of federal and state labor laws by failing to adequately compensate them for non-

14   commission-producing activities. *Balasanyan* likewise provided no legal basis for its conclusion.

15   Its analysis was conclusory:

16           Nordstrom cites no authority that would permit a defendant to reduce
     their liability by having new potential Class Members sign arbitration
17   agreements. Nevertheless, the court concedes that Nordstrom was
     engaging in a standard practice that many companies engage in when
18   hiring new employees. Accordingly, the court holds that new
     employees who signed the DRA [Dispute Resolution Agreement]
19   upon becoming employed by Nordstrom may be properly excluded
     from the class.
20

21   *Balasanyan*, 294 F.R.D. at 573-74.

22           Neither *In re Currency* nor *Balasanyan* confronted the question why communications with

23   "potential class members" who are future but not yet putative class members cannot be regulated

24   under Rule 23(d) where those communications threaten the integrity of the class action and the fair

25   administration of justice.

26           Moreover, the Court notes that *Balasanyan* is distinguishable on its facts. There, as noted by

27   the court, Nordstrom's implementation of the DRA for new employees was consistent with a

28   "standard practice that many companies engage in when hiring new employees." Hence, it may be

inferred that the implementation of the DRA in that case was for normal business purposes, and not an attempt to thwart the pending class action lawsuit. In the instant case, as this Court previously noted, the timing of the promulgation of the Licensing Agreement by Uber and the inexplicably onerous nature of the opt out option strongly suggests the Agreement was motivated as a response to the class action suit filed in Massachusetts. Furthermore, the *Balasanyan* court ruled on the enforceability of the DRA; it did not address the prophylactic power of the court to regulate prospective communication with future employees under Rule 23(d), which is arguably less intrusive than invalidating an existing agreement between the parties.[5]

The Court concludes it has authority to regulate under Rule 23(d) communications with future class members. Thus, the Court DENIES Uber's Motion for Reconsideration.

C.     The Proposed Corrective Notices

During the hearing, the parties reported that mediation had been unfruitful. Therefore, the Court lifts its stay to permit the issuance of a corrective notice (*see* Docket No. 67) and now considers the corrective notices proposed by each party.

1.     Legal Standard: Limits on Communications Under Rule 23(d)

The Supreme Court has provided guidance for limiting communications:

> [A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Gulf Oil*, 452 U.S. at 101-02.

Courts have limited communications that encourage potential class members not to join the suit. *See, e.g., Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985) (holding

---

[5] As to those current Uber drivers who were already part of the putative class who received the Licensing Agreement after this suit was filed, *In re Currency* and *Balasanyan* are on point. The Court undoubtedly has the power to deem those communications coercive and misleading and issue corrective relief.

10

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  that the district court had authority under Rule 23(d) to forbid the defendant bank from soliciting

2  exclusion requests from potential class members); *Hampton Hardware, Inc. v. Cotter & Co., Inc*.,

3  156 F.R.D. 630, 632-33 (N.D. Tex. 1994) (holding that letters from the defendant to potential class

4  members warning of potential costs of litigation and advising not to participate in the suit were an

5  improper "attempt to prevent member participation in the class action").

6       Courts have also found procuring waiver, settlement, or arbitration agreements without

7  providing adequate information about the pending class action are misleading communications

8  which the court may limit. *See Gonzalez v. Preferred Freezer Services*, LBF, LLC, 2012 WL

9  4466605, *1 (C.D. Cal. 2012) (finding that a communication procuring a waiver was misleading,

10 where it only mentioned that a former employee had brought a lawsuit against the defendants, and

11 did not provide further information about the pending action that would "provide the potential

12 plaintiffs with adequate notice of this case in order to make an informed decision regarding waiver

13 of their rights"); *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 763 (N.D. Ohio 2010) (finding that

14 a communication procuring a settlement was misleading, where the defendant did not inform

15 putative class members that they were possibly giving up participation in the pending putative class

16 action); *In re Currency*, 361 F. Supp. 2d at 251-52 (finding that communication of an arbitration

17 agreement to putative class members was misleading, where the defendant omitted the "critical

18 information" that there was ongoing litigation and that "by failing to reject the arbitration clause,

19 they were forfeiting their rights as potential plaintiffs").

20      Courts may require corrective notices to remedy improper communications already made.

21 *Guifu Li v. A Perfect Day Franchise, Inc*., 270 F.R.D. 509, 518 (N.D. Cal. 2010) (invalidating opt-

22 out forms obtained through coercion and requiring corrective notice that gave notice of the class

23 action, the invalidation of the opt-outs, and the law prohibiting retaliation against them by the

24 defendant employer); *Goody v. Jefferson County*, 2010 WL 3834025, *1, *3 (D. Idaho 2010)

25 (finding corrective notice was necessary "to ensure that all putative plaintiffs know about their right

26 to join the collective action," based on the plaintiff's confusion about whether he could join the suit,

27 following a letter and check sent by the defendant, which stated the payment was to ensure the

28 plaintiff had been "adequately paid" in "compliance with all State and federal laws").

## 2. Uber's Proposed Corrective Notice

### a. Uber's Proposal to Disallow Opt Out

The Court previously ordered:

> Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration provision within 30 days of the notice. These requirements shall apply to new drivers (prospectively) and past and current drivers (retrospectively). As for arbitration provisions which have already been distributed after the filing of the complaint in this action (August 16, 2013) to past and current drivers who have approved the arbitration provision without opting out (or for whom approval during the 30 day notice period has begun to run but is still pending), Uber must seek approval of the arbitration provision for these drivers anew, giving them 30 days to accept or opt out from the date of the revised notice.

Order at 11.

Uber has submitted a proposed corrective notice ("Uber's Proposed Corrective Notice") and a new Licensing Agreement ("New Licensing Agreement") it intends to issue in conjunction with its corrective notice. Setting aside adjustments to the language that might be needed, Uber's New Licensing Agreement complies with the Court's Order in that gives clear notice of the arbitration provision at the beginning of the document, and gives notice later within the arbitration provision itself, that agreeing to the arbitration provision precludes participation in any lawsuit against Uber. *See* Docket No. 66-2 at 10 of 28. The Proposed Corrective Notice gives notice of that a New Licensing Agreement will ensue, that actions against Uber are pending before the Court and in Massachusetts, and that assenting to the New Licensing Agreement precludes participation in these or any other lawsuits against Uber. *See id.* at 5 of 28.

However, the Licensing Agreement does not comply with the Court's Order in that it does not give any means of opting out. Contrary to the prior Licensing Agreement that gave 30 days to opt out of the arbitration provision (by hand delivery or overnight mail), the New Licensing Agreement allows no opt out. The New Licensing Agreement provides: "IF YOU CHOOSE NOT TO ACCEPT THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISIONS SET FOR IN SECTION 14.3), YOU WILL NO LONGER HAVE ACCESS TO THE UBER SERVICES AND SOFTWARE." Docket 66-2 at 10 of 28. Uber's Proposed Corrective Notice essentially states the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   same.  Uber proposes to issue the New Licensing Agreement to all drivers 30 days after issuing

2   Uber's Proposed Corrective Notice.  It would apply to all claims, going forward.  *See* Docket No.

3   66-2 at 5 of 28.

4          Uber argues that conditioning access to its services and software on accepting the arbitration

5   provision is "perfectly lawful," citing cases which held that an arbitration agreement was

6   enforceable despite being a condition of employment.  Docket No. 66 at 9.  While it may be that

7   employment can be conditioned on assenting to an arbitration agreement, the considerations are

8   different when arbitration agreements are imposed in the midst of a pending class action in an

9   attempt to limit participation in the suit.  Conditioning use of its App on accepting the arbitration

10  provision is clearly an attempt to discourage participation in the class action.  It imposes on drivers a

11  stark choice: participate in the suit or forego working for or with Uber.  This is an improper

12  communication.  *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d at 1203;  *Hampton Hardware,*

13  *Inc. v. Cotter & Co., Inc.*, 156 F.R.D. at 632-33.  While this class action remains pending, Uber must

14  allow reasonable means for opting out of the arbitration provision (thereby allowing drivers to

15  participate in the suit as putative class members should they so choose), as the Court previously

16  ordered.

17         Uber also argues that providing drivers who already agreed to the arbitration agreement a

18  further opportunity to opt out "would run afoul of the Federal Arbitration Action, which provides in

19  part that arbitration agreements are 'irrevocable.'"  Docket No. 66 at 3 n.4.  This, of course, assumes

20  that the initial communication of the arbitration agreement was proper.  However, the Court

21  previously found that it was not:

22              it would be particularly inappropriate to insulate the subject
                communications from review under Rule 23(d) where, as here, there is
23              a distinct possibility that the arbitration provision and class waiver
                imposed by Uber was motivated at least in part by the pendency of
24              class action lawsuits which preceded the new Licensing Agreement.
                Suspicion that the new Licensing Agreement's arbitration provision
25              was intended by Uber as a means to thwart existing class action
                litigation is heightened by the misleading nature of the communication
26              and the unusually onerous procedures for opting out discussed *infra*.

27  Order at 7.  Thus, the Court may exercise its authority to order corrective notices to remedy these

28  prior improper communications.  *See Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. at 518;

13

United States District Court

For the Northern District of California

1  *Goody v. Jefferson County*, 2010 WL 3834025 at *1, *3. Uber must provide these drivers a renewed

2  opportunity to opt out of the arbitration provision that the Court approves, as the Court previously

3  ordered.

4     As for Uber's allusions to *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) and

5  *American Exp. Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304 (2013) during the hearing, the Court

6  already addressed their relevancy in the Order. *See* Order at 5-6. As noted above, the issue here is

7  not enforceability of an arbitration agreement in the face of state law on unconscionability. Instead,

8  the question is whether the communication in the context of a class action was misleading or

9  coercive so as to be regulable under *Gulf Oil*.

10          b.    Affirmation of the Court's Order

11     Lest there be any doubt, Uber must comply with the Order. The Order imposes limitations

12  narrowly tailored so that communications of the arbitration agreements do not mislead – by omitting

13  material information necessary to make an informed decision about whether to join the suit or waive

14  the right (*see Friedman v. Intervet Inc*., 730 F. Supp. at 763; *Gonzalez v. Preferred Freezer*

15  *Services*, LBF, LLC, 2012 WL 4466605 at *1;  *In re Currency*, 361 F. Supp. at 251-52) or by

16  improperly discouraging participation in this suit. The Order applies to prospective drivers.

17       3.    Plaintiffs' Proposed Corrective Notice

18     Plaintiffs' Proposed Corrective Notice is also problematic. The Supreme Court has

19  specifically noted that communications that "'drum up' participation in the proceeding" are among

20  the "potential abuses associated with communications to class members." *Gulf Oil*, 452 U.S. at 101

21  n.12 (quoting *Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 782 (E.D. La.1977)). "The Court's

22  primary purpose in supervising communications is . . . to ensure that potential class members receive

23  accurate and impartial information regarding the status, purposes and effects of the class action."

24  *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011) (citing

25  *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d at1203).

26     Plaintiffs' Proposed Corrective Notice tends more to urge participation rather than provide

27  impartial information. First, the statement that begins Plaintiffs' Proposed Corrective Notice takes a

28  partial tone:  "**IMPORTANT INFORMATION ABOUT YOUR RIGHT TO CLAIM THAT**

1  **YOU SHOULD HAVE BEEN PAID TIPS AND REIMBURSEMENT FOR GAS AND OTHER**

2  **VEHICLE EXPENSES AS AN UBER DRIVER**."  Second, the statements about the Court's

3  rulings may give the impression that the class is likely to prevail, which is far from certain at this

4  time.  Third, it is inappropriate to include the website address www.uberlawsuit.com, the contents of

5  which the Court will not oversee.  Finally, the proposed method of opting out, "**you can 'opt out' of**

6  **the arbitration clause by CLICKING HERE or responding to this e-mail with the words, 'I opt**

7  **out**,'" may, as Uber notes, require Uber to expend undue resources to engineer, which the Court is

8  unwilling to order.

9       The parties are ordered as below to submit a revised proposed corrective notice.  The revised

10  corrective notice may follow language along the lines of Uber's proposed notice but must contain a

11  fair opt out procedure.  Such a procedure should provide the same kind of clarity and facility as an

12  effective opt out provision in a Rule 23(b)(3) class action.

13               **IV.**   **CONCLUSION**

14       The Court **DENIES** Uber's Motion for Reconsideration.

15       With regard to the proposed corrective notices, the Court orders as follows:

16            (a)     The parties shall meet and confer within seven (7) days of this order to discuss

17                and stipulate to the appropriate form, content, and procedures of the corrective notices

18                consistent with this order.  If the parties are unable to agree on a proposed corrective

19                notice, they shall notify the Court by submitting their respective proposed notices and

20                procedures for review and decision by the Court within fourteen (14) days of this

21                order.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

15

(b)     Until revised notices and procedures are approved by the Court and sent to drivers, Uber shall not issue to Uber drivers or prospective drivers the Licensing Agreement or any other agreement containing an arbitration provision which waives potential class members' rights herein.

This order disposes of Docket No. 79.

IT IS SO ORDERED.

Dated:  May 2, 2014

_____
EDWARD M. CHEN
United States District Judge

Exhibit C

Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

DOUGLAS O'CONNOR, et al,          )
                                  )
              Plaintiffs,         )
                                  )
  VS.                             ) NO. C 13-3826 EMC
                                  )
UBER TECHNOLOGIES, et al,         )
                                  )  San Francisco, California
              Defendants.         )  Thursday
                                  )  November 14, 2013
_____  )  1:30 p.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          LICHTEN & LISS-RIORDAN, P.C.
                             100 Cambridge Street
                             20th Floor
                             Boston, Massachusetts 02114
                    **BY:  SHANNON LISS-RIORDAN, ESQ.**

                             DUCKWORTH PETERS LEBOWITZ OLIVIER, LLP
                             100 Bush Street
                             Suite 1800
                             San Francisco, California 94104
                    **BY:  MONIQUE OLIVIER, ESQ.**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

```
1   APPEARANCES (CONTINUED)
    :
2
    For Defendants:          MORGAN, LEWIS & BOCKIUS LLP
3                            One Market Street
                             Spear Street Tower
4                            San Francisco, California 94105
                        BY:  STEPHEN TAEUSCH, ESQ.
5                            ROBERT HENDRICKS, ESQ.

6                                 – – –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# P R O C E E D I N G S

NOVEMBER 14, 2013                                          1:40 p.m.

       THE CLERK:  Calling Case C13-3826, O'Connor versus Uber.

   Counsel, please come to the podium and state your name for the record.

       MR. HENDRICKS:  Good afternoon, your Honor.  R.J. Hendricks with Morgan Lewis and Bockius on behalf of defendants.

       THE COURT:  All right.  Thank you, Mr. Hendricks.

       MR. TAEUSCH:  Good afternoon, your Honor.  Stephen Taeusch of Morgan Lewis and Bockus on behalf of defendants.

       THE COURT:  Good afternoon, Mr. Taeusch.

       MS. LISS-RIORDAN:  Good afternoon, your Honor. Shannon Liss-Riordan for the plaintiffs.  Along with me is...

       MS. OLIVIER:  Monique Olivier, your Honor.

       THE COURT:  Good afternoon, Ms. Riordan, Ms. Olivier.

   Let me address the motion regarding -- to strike the arbitration clause first.

   Explain to me, one who has to opt out of his arbitration clause has to do it within 30 days, is that right, and has to do that with a notice providing for hand delivery or overnight mail to general counsel?  Is that correct?

       MS. LISS-RIORDAN:  Yes, your Honor.

       THE COURT:  Do I have that wrong?

1    **MS. LISS-RIORDAN:**  Yes, your Honor.  That is correct.

2  And I actually have a decision that was just issued two days

3  ago by the Federal Court in Chicago addressing this very

4  situation, which I could hand up for your Honor if you would

5  like to take it.

6       It was a case in which there was an arbitration agreement

7  and there was a similar opt-out provision in which there was a

8  30-day opt-out period, but although the arbitration agreement

9  was emailed out to the potential class members and it was

10  buried in attachments, the class members had to print it out,

11  sign it and mail it in to the company.  The Court found that it

12  was unenforceable and struck the --

13       **THE COURT:**  Unenforceable on unconscionability

14  grounds?

15       **MS. LISS-RIORDAN:**  Yes.

16       **THE COURT:**  All right.  Is that procedural or

17  substantively unconscionable?

18       **MS. LISS-RIORDAN:**  Well, the focus was on that

19  procedural nature of it.  I just got this case this morning, so

20  I'm looking at it quickly to see if it addresses both

21  procedural and substantive, but it addresses many of the same

22  cases that we have cited in our briefing.

23       I believe, like in this case, there was no notice about

24  what the potential rights would be that the class members would

25  be waiving if they did not go through the steps to opt out of

1  the agreement.

2       And, also, the Court seems to be focusing on the cases,

3  many of which we've cited, involving the Court's power to

4  regulate communications with class members under Rule 23.

5            THE COURT:  I'm going to get there, all right?

6            MS. LISS-RIORDAN:  Okay.

7            THE COURT:  The first question -- that was my factual

8  question.  And I take it from defendants you don't -- I stated

9  it correctly, right?

10            MR. HENDRICKS:  You state correctly that there is a

11  30-day opt-out period, that's right, your Honor.

12            THE COURT:  That requires either hand delivery to

13  either the general counsel in San Francisco or overnight

14  delivery?

15            MR. HENDRICKS:  That's correct, per the terms --

16            THE COURT:  Regular first class mail, registered

17  mail, email, fax won't do it?

18            MR. HENDRICKS:  Per the terms, that would be the

19  process by which you would opt out.

20            THE COURT:  So I don't know if you had a hand in

21  drafting this or not, but other than trying to make it

22  extremely difficult, what is the purpose of such a requirement?

23            MR. HENDRICKS:  Well, overnight delivery does give

24  you a means of tracking --

25            THE COURT:  So does email.  We have ECF here, right?

1          **MR. HENDRICKS:**  That's true.

2          **THE COURT:**  So if you're worried about verification,

3    there is nothing better than email.

4          **MR. HENDRICKS:**  And -- but, your Honor, one thing to

5    put in perspective.  We're not dealing with a situation where

6    either of these two plaintiffs were claiming that somehow

7    because they emailed it, as opposed to submitting it, that the

8    opt-out wasn't accepted or was deemed --

9          **THE COURT:**  Yeah.  I'm not talking about them

10   necessarily.  I'm talking about the overall conscionability of

11   this.  I'm just trying to ascertain why this was done.

12         **MR. HENDRICKS:**  It's a legitimate means of

13   communication.  And the fact that that -- you know, before

14   email existed, folks used mail or overnight mail.  And it's a

15   legitimate means of communication and that does not -- that

16   process does not make it unconscionable.

17         **THE COURT:**  All right.  Let me ask the plaintiff.  It

18   seems to me this is classic procedural unconscionability.  You

19   may take issue with that, but I've looked at the record.

20         The problem is under California law, you need both:

21   Procedural and substantive unconscionability.  That is not

22   necessarily the law in every state.  And I don't see much in

23   your brief and I don't see much discussion from your end about

24   what is substantively unconscionable here.

25         **MS. LISS-RIORDAN:**  Well, there are two things that I

1  would say are substantively unconscionable.

2       One is -- well, I'm not sure which order to put these in,

3  but one is that there isn't any mention of potential claims

4  that would be given up.  And I understand that we filed this

5  case just after this was distributed to a number of the Uber

6  drivers, but the reason that I was rushing in trying to get

7  expedited relief several times so quickly is because we were

8  still within the time period that the class members could opt

9  out.

10      So once the case was on file, we were attempting to get a

11 ruling that at that point usually should have notified people

12 that if they didn't opt out, these were the rights they were

13 going to be giving up.

14      And just another thing I want to say on this --

15           **THE COURT:**  That is a surprise factor, which is a

16 procedure under procedural conscionability.  I'm asking about

17 substantive.

18      Like the case you just submitted.  There was a substantive

19 thing that you had to pay half the fee as an employee, in the

20 Ninth Circuit decision that just came down, and you had to pay

21 5,000 bucks to even be heard and the Court said:  No, that

22 ain't going to cut it.

23           **MS. LISS-RIORDAN:**  Exactly.  That was the second

24 point I was going to make.

25      Here the agreement is arguably similar to what the Ninth

1  Circuit said wouldn't cut it in the *Ralph's Grocery* case,

2  because it's -- like the *Ralph's Grocery* case, the agreement is

3  a little ambiguous about who is going to pay the arbitration

4  fees.  It says that Uber will pay them if the law requires,

5  which says to me, and I think most importantly says --

6          **THE COURT:**  Can you tell me what paragraph that is?

7          **MS. LISS-RIORDAN:**  Yes.  That is -- it's on

8  Page 11 -- no, I'm sorry.  Okay.  Fee provision is on Page 14.

9  It says in paragraph small number six:

10          "In all cases where required by law Uber will pay

11      the arbitrators and arbitration fees."

12      But if you're an Uber driver who somehow got to Page 14

13  and read that sentence, that tells you you're not so sure

14  whether you might get stuck with arbitration fees, which are

15  going to be -- is going to be deterring because that's going to

16  being expensive and you're going to have to pay a lot of money

17  to pursue a potential claim.

18      I think that similar to the *Ralph's* case where in that

19  case the Ninth Circuit said that the -- the agreement was a

20  little ambiguous about fees, but said that the arbitrator was

21  going to allocate the fees at the beginning; meaning, someone

22  looking at that -- looking at that clause deciding whether or

23  not they wanted to or could make a claim is facing this risk

24  that they may get stuck with arbitration fees, and that's

25  really the same thing that you're seeing in this provision of

1   the Uber agreement.

2         **THE COURT:** Your response to that?

3         **MR. HENDRICKS:** Our response is this particular

4   provision is nothing like the case that was cited.  It does not

5   bring any substantive burden on behalf of someone that would be

6   party to it from the driver perspective.  It merely is a

7   statement that we will do what we're obligated to do and that's

8   not substantively unconscionable.

9         To the extent that counsel is suggesting that it may be

10  ambiguous or confusing or what-have-you, that, again, would

11  fall into the bucket of, at best, procedural issues, but

12  it's -- it doesn't represent any substantive unconscionability.

13  And this was not something that was argued in the moving papers

14  or in the supplemental papers.  This is --

15        **THE COURT:** How does it work?  If one wants to

16  implement arbitration, start arbitration, who -- do you have to

17  pay something upfront?  How would you know this is a case

18  required by law?

19        And I guess that means that the default -- if it's not

20  required by law, fees will be apportioned between the parties

21  in accordance with said applicable law, whatever that is.  I

22  don't even know if there's a law that allocates expressly in

23  arbitration who pays?  It's usually a matter of contract.

24        **MR. HENDRICKS:** You would apply the rules of the

25  procedure.  They would send a notice requesting arbitration

1   and --

2           THE COURT:  And who pays?

3           MR. HENDRICKS:  In a situation where the company is

4   obligated to pay, the company would pay.

5           THE COURT:  Okay.  In California who pays?

6           MR. HENDRICKS:  Well, it would depend -- in this

7   context, given we're dealing with independent contractors, I

8   believe absent a showing of employee status, each party would

9   probably bear their own expenses.

10          THE COURT:  All right.  So your position if somebody

11  were to invoke arbitration now, is that -- and the issue they

12  want to arbitrate, for instance, is employee versus independent

13  contractor since they start in a -- and the contract does

14  nominally state they are independent contractors, they would

15  have to pony up the first half, or whatever it is --

16          MR. HENDRICKS:  My position would be that the --

17  pursuant to the arbitration agreement, to the extent that was a

18  question, that would be something that the arbitrator would

19  ultimately decide pursuant to the terms of the agreement.

20      You know, the agreement provides for, in it's terms, that

21  all disputes, including issues of enforcement, revocation,

22  compliance, et cetera, are resolved by the arbitrator.  And so

23  in the first instance the -- it would be -- if there was a

24  question regarding this, that's an issue that the arbitrator

25  would ultimately have to decide.

```
1          THE COURT:  So this is one of those Rent-a-Center
2    cases where the agreement provides for even questions of
3    arbitrability go to the arbitrator.
4          MR. HENDRICKS:  That's correct, your Honor, which go
5    to one of our threshold arguments that we've made regarding
6    this entire motion, and it's sort of, you know, three-fold.
7          One, that these particular plaintiffs who have opted out
8    of the arbitration program don't have standing to be
9    challenging it and seeking it to be rewritten.
10         Two, since we have not yet moved to compel arbitration,
11   all of these questions are premature and not ripe for the
12   Court.
13         And, three, pursuant to Rent-a-Center, by the express
14   terms of the arbitration agreement, all of these issues are
15   issues that must be decided by the arbitrator.
16         THE COURT:  Let me get your response, Ms. Riordan, on
17   the fact that the arbitration clause is broadly worded and
18   arguably encompasses even the question, the threshold question
19   of arbitrability and unconscionability.
20         MS. LISS-RIORDAN:  Well, for the very reason that you
21   were just pointing out, I would say it's unconscionable because
22   no one -- someone is not going to get his foot even in the door
23   because he's going to be deterred even from going to an
24   arbitrator to find out whether he has to pay arbitration fees
25   to pursue the claims.
```

```
1      What happens when you go to these arbitration services and
2   you start an arbitration process, is that the first thing that
3   happens is they ask you to put down big deposits to pay these
4   arbitrators.  And given what I suspected, and now has been
5   confirmed by Uber's counsel, that Uber will take the position
6   that it does not have to bear the whole fees and that the Uber
7   driver would have to pay half of the fees, then that -- the
8   driver is not even going to be able to get his foot in the door
9   to get that preliminary arbitration ruling as to who has to
10  pay.
11          THE COURT:  Which is an issue not addressed by
12  Rent-a-Center.
13          MS. LISS-RIORDAN:  Right.
14          THE COURT:  All right.
15          MR. HENDRICKS:  If I may be heard about that, your
16  Honor?
17          THE COURT:  Yeah.
18          MR. HENDRICKS:  Again, I think the Supreme Court has
19  been pretty clear that issues of enforceability, to the extent
20  that the arbitration agreement provides for that, that those
21  are issues that must be decided by an arbitrator and that to
22  the extent a motion to compel arbitration was brought, which
23  would be the proper context in which all of these issues would
24  get joined, that the arbitration agreement should be enforced
25  in accordance with its terms.
```

1      **THE COURT:**  Has the Supreme Court addressed the

2   situation where even the threshold question of arbitrability

3   where that would otherwise presumptively belong to the

4   arbitrator under the *Rent-a-Center* case, the party invoking

5   arbitration can't even afford it, what happens then?

6      **MR. HENDRICKS:**  Well, I think that -- this becomes

7   circular.  There has been no showing whatsoever that any

8   particular person can or cannot afford any particular fee.  You

9   asked me a question in a broad context about who would pay and

10   I said:  Well, it would depend upon the circumstances.  And

11   that's true.

12      One thing that you're not entitled to do is have a

13   presumption that these are, quote/unquote, employees and,

14   therefore, apply some sort of standard that you may have seen

15   under *Armendariz* or other state law standards dealing with

16   employees and how fees need to be split amongst employees.

17      In true commercial settings commercial entities split

18   costs and there is nothing unconscionable about that.  The only

19   way you reach some sort of assumption on unconscionability is

20   to presuppose we're dealing with employees and a whole host of

21   other --

22      **THE COURT:**  There are other situations.  Consumer,

23   consumer contracts.  If you had a consumer contract that

24   required a consumer to put down $10,000 in order to arbitrate a

25   $60 claim, my guess is that some Courts would find that

1  somewhat problematic.

2        MR. HENDRICKS:  There is nothing here -- I think that

3  a part of *Concepcion* and those cases did speak in terms of

4  that; you know, the cost of proving up the claim, the cost of

5  litigating the claim may be such that for certain individuals,

6  they may choose to pursue it, others they may choose not to

7  pursue it.

8        THE COURT:  I'm familiar with that.  I'm familiar

9  with the *Italian Colors* decision that says, essentially, if the

10  cost -- the fact that the adjudication costs may make it

11  uneconomical in order to vindicate a claim is not necessarily a

12  reason to avoid FAA preemption.

13      But the ability to even get in the door is a different

14  question; that is, if you can't even pay to get in arbitration.

15  Let's say there was a rule you have to deposit $100,000 just to

16  get in arbitration.  That's a little different than saying:

17  Well, it costs attorneys and, therefore, you know, you have to

18  make your own judgment whether it's worth it or not.

19        MR. HENDRICKS:  If you have -- if you have commercial

20  entities, commercial entities -- and that's through our

21  perspective what we're dealing with here.  These are people who

22  have entered into bona fide agreements and they have entered

23  into them as commercial entities, respective commercial

24  entities.  No one was obligated to enter into these agreements.

25  They made choices to do so.

1          First, I reject the premise that this agreement

2    specifically provides for that amount.  The case that counsel

3    cited, it was very clear that the party moving for arbitration

4    would have a significant upfront cost.

5          Our agreement here is not that specific.  It simply says

6    that each party is obligated to bear those expenses unless the

7    law requires a different result.  And that, quite frankly,

8    makes this where it's not unconscionable.

9          And the notion that economically sophisticated parties --

10   and there is no evidence to suggest these individuals are not

11   that, and there is no basis to presume that -- that would

12   create a certain, quite frankly, class action specific sort of

13   standard of unconscionability that I think under *Concepcion*

14   would not be appropriate.  That's the only way that you get to

15   that conclusion.

16         Right now we have a bona fide agreement.  On a substantive

17   basis the parties are treated very comparably.  On a procedural

18   basis, especially given the fact of the opt-out provision, we

19   don't believe there is really procedural unconscionability.

20   Even with respect to the Court's notion regarding the notice.

21         You know, there has been no factual showing that there's

22   any material difficulty in people walking in -- where is the

23   declaration from someone saying:  You know something?  I would

24   have liked to opt out, but the difficulty of walking in and

25   delivering my notice was such that it created a burden.  I

1  would have liked to opt out, but, you know, the difficulty of

2  getting overnight mail delivered to this location was such a

3  burden for me that I -- that I couldn't exercise those rights.

4      The mechanism for opting out was made clear.  We know

5  that it can be followed because the two plaintiffs that

6  you're dealing with here, in fact, followed the appropriate

7  mechanism.  And, therefore, even the suggestion that that is

8  procedurally --

9          **THE COURT:**  They had counsel, didn't they?

10         **MR. HENDRICKS:**  What's that?

11         **THE COURT:**  They had counsel?

12         **MR. HENDRICKS:**  I don't know that they had counsel at

13  the time that they did that, you know.  And I don't know when

14  they got the counsel.

15         **THE COURT:**  How many people have actually opted out?

16         **MR. HENDRICKS:**  I don't have those numbers, your

17  Honor, you know, but the point is this:  Within 30 days anyone

18  who wanted to look for counsel could have, you know.  When you

19  have --

20         **THE COURT:**  So they can eat cake.  Go ahead and find

21  counsel in 30 days and pay counsel whatever it takes to go

22  through a 15-page single-spaced document to find -- to find on

23  page four Roman numeral VIII your right to opt out, which the

24  only bold is "Must be postmarked within 30 days."

25      So, yeah, I'm sure that's very easy for most people to do.

1          **MR. HENDRICKS:**  It begs the question.  There is a

2    pre-assumption that they may not already have counsel.

3          What I am challenging right now is the assumption here

4    that underlies that conclusion of unconscionability; that we're

5    dealing with unsophisticated individuals.

6          The individuals that we are contracting with are

7    transportation companies.  They have employees, many of them

8    do.  They may have their own legal staff.  They may have

9    already legal relationships.  They choose to have, you know, a

10   fleet of cars or other operations.  You know, they vary.

11         And so the notion, the presumption that somehow we're

12   dealing with unsophisticated individuals, there's nothing in

13   this record to support that inference.

14         **THE COURT:**  All right.  Is that true, counsel?  That

15   a lot of the drivers are actually companies, independent

16   contractor, traditional -- one might be deemed a classic

17   independent contractor?

18         **MS. LISS-RIORDAN:**  Well, there are some.  There are

19   some relationships that are -- that look more like bigger

20   companies.

21         What we're talking about here, the class here are drivers,

22   who are individuals, who are -- who are driving for Uber, who

23   are getting their direction from Uber.  They are getting their

24   business from Uber.  They are getting rated by Uber and they

25   get fired if they don't meet a certain rating standard and --

```
1         THE COURT:  I don't understand --

2         MS. LISS-RIORDAN:  (Continuing) -- they are largely

3    immigrant drivers, many of whom are not English speaking as

4    their first language.

5         THE COURT:  What percentage of the driver population

6    in Uber is comprised of that profile that you just mentioned,

7    individuals that are not tied to a company?

8         MS. LISS-RIORDAN:  Well, I don't know specifics.  We

9    haven't done discovery yet, but from talking to many Uber

10   drivers, my understanding is that the majority of them are what

11   I just described.

12        There may also be some of these companies that look more

13   like classic independent contractor relationships, but that the

14   majority are what I've described and that's the class that

15   we're seeking to have covered by this case.

16        THE COURT:  All right.  Let me ask this question

17   about the timing of the arbitration policy.  Now, this was --

18   post-dated the Massachusetts lawsuit.

19        MS. LISS-RIORDAN:  Yes.

20        THE COURT:  Right?

21        MS. LISS-RIORDAN:  Yes.

22        THE COURT:  Was there any attempt -- I don't know if

23   Massachusetts -- that's in state court, correct?

24        MS. LISS-RIORDAN:  Yes.

25        THE COURT:  Does Massachusetts have an equivalent of
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

1  Rule 23?

2        **MS. LISS-RIORDAN:**  Yes.

3        **THE COURT:**  Was there an effort -- I'm getting now to

4  the notice question, the communication with the class.

5        Was there any order or any effort in Massachusetts to get

6  out some kind of regulatory order with respect to

7  communications?

8        **MS. LISS-RIORDAN:**  No, no, because the case had not

9  gotten to that point yet.

10        Just one thing I would like to add is something that I

11  have learned even since the briefing was done in this case, is

12  that it's come to my attention that it appears that Uber has

13  been rolling out this arbitration clause over the course of

14  this year.  When I filed these papers, I was aware of the one

15  that they sent to many drivers in July.

16        I was contacted by an Uber driver just yesterday who got

17  sent this agreement last week.  So, again, part of the reason

18  we were seeking expedited relief here is that we were concerned

19  that Uber would continue to engage in these discussions with

20  class members and that appears to be what they have done.

21        So I don't know all of the dates upon which these

22  agreements were sent out, but I am now aware that there were at

23  least several dates over the course of this year, one as

24  recently as in the last couple weeks, in which they have been

25  sent out.

1          THE COURT:  Was this lawsuit in this Court preceded
2    by any demand notice or any prelitigation communication?
3          MS. LISS-RIORDAN:  This particular case, no.  There
4    was simply the fact that similar claims had been raised in
5    Massachusetts.  There was also similar types of claims raised
6    in a case in Illinois.
7      So what we have on that basis is that it seems evident
8    that Uber saw these claims coming toward it and it started
9    rolling out this clause in order to ward off the risk of a more
10   broad case being brought against it raising these types of
11   claims.
12         THE COURT:  What's the Illinois case and what's the
13   status of that?
14         MS. LISS-RIORDAN:  I have it cited in our papers.  I
15   don't know the current status because I think it was filed
16   sometime around or maybe after the Massachusetts case.  I don't
17   know -- I don't know the current status of it.  I think it's in
18   early stages as well.
19         THE COURT:  That's a class action?
20         MS. LISS-RIORDAN:  Yes.
21         THE COURT:  And you don't know what the stage of that
22   is?
23         MS. LISS-RIORDAN:  Well, when I last checked awhile
24   back, it didn't look like anything much of substance had
25   occurred yet.

```
 1        I think that's a case that was actually brought by
 2   consumers raising these claims about tips; that they thought
 3   they were paying tips to drivers --
 4        THE COURT:  So it's a consumer, not a labor case.
 5        MS. LISS-RIORDAN:  Exactly.  It's a similar kind of
 6   allegation, but brought on behalf of the consumers rather than
 7   the drivers.
 8        THE COURT:  Well, let me ask:  The cases that you
 9   cite and the cases that I found in which there has been either
10   some kind of coercive conduct or some kind of misleading
11   communication on the part of a class action defendant are such
12   that the action is filed and then there is the offending
13   communication.  Here the policy preceded this case.
14        So, first of all, I would like to know:  Are there any
15   cases in which -- I understand it has ongoing effects and I
16   understand your position that there is continuing
17   communications, as evidenced by recent roll-outs and other
18   things, but the policy itself was instituted before the suit
19   was filed.  So the idea this was done not necessarily to thwart
20   the class interests in this case is a little harder to make,
21   isn't it?
22        MS. LISS-RIORDAN:  Well, I do agree it's a little
23   more of an extension of what those other cases have been about.
24   That's why -- again, that's why I was trying so hard to jump in
25   there and do something as soon as I got wind of it and got
```

1  retained.

2          **THE COURT:**  Even then it was well over a month after

3  the policy had been implemented --

4          **MS. LISS-RIORDAN:**  No, no.  Actually, it wasn't.  As

5  we spelled out in our papers, I believe it's in our reply brief

6  and motion for protective order, when we filed the case and

7  when we filed the emergency motion, it was still within the 30

8  days.  It looks like the 30 days didn't expire for that -- for

9  the July roll-out until September 4th.

10          **THE COURT:**  We're talking about two different things.

11          **MS. LISS-RIORDAN:**  Yes.

12          **THE COURT:**  The 30 days won't help you because with

13  respect to the relief of requiring clarifying communication and

14  issuances of warnings and things, that wouldn't have helped.

15      What you're talking about is the substantive relief from

16  30 days, getting relieved from the opt-out period, invalidated,

17  which could be done now, which is one reason I think no relief

18  was granted.  To the extent that that is awardable relief,

19  assuming you get past *Concepcion*, *Italian Colors*, the

20  substantive law and everything else, the timing there -- I

21  guess I should make myself clear.

22      I'm now talking about your request for some kind of

23  clarifying notice or warning notice or know-your-rights kind of

24  notice.

25          **MS. LISS-RIORDAN:**  Right.

 1          **THE COURT:**  And those usually occur when there has

 2    been tainted or offending communication after the class action

 3    was filed.

 4          **MS. LISS-RIORDAN:**  Right.  I agree that's what the

 5    prior cases addressed.

 6          The point that I was trying to make was this was an

 7    unusual situation in which we jumped in there, filed the case,

 8    filed for emergency relief while there was still ongoing

 9    communications going on.  And once the case was filed, they

10    were asking that Uber be required to go forward at least, let

11    the drivers know about the pendency of the action.

12          And then as further background, we have this backdrop that

13    there were similar claims filed in Massachusetts and somewhat

14    similar claims also already filed in Illinois.  So it -- it

15    appears evident that this was rolled out in order to contain

16    such claims and prevent such broader claims from going forward.

17          But I agree, that does go beyond what prior cases were

18    about.

19          **THE COURT:**  Well, let me ask defense counsel.  Are

20    there notices that -- I mean, how was this being disseminated,

21    this policy and people signing onto the arbitration policy?

22          **MR. HENDRICKS:**  Well, there was the initial roll-out.

23    And to the extent you have a new driver sign up, when they

24    initially -- before they have -- you know, take their first

25    ride, they are then presented with the licensing agreement and

1    the driver addendum and the other paperwork that comprises the

2    licensing agreement, which includes the arbitration provision.

3         THE COURT:  So everybody who has been working for

4    Uber, let's say more than a month or two, has already received

5    this agreement?

6         MR. HENDRICKS:  I believe that would be correct, yes.

7         THE COURT:  So it's the new drivers that come on that

8    might or might not be affected by any --

9         MR. HENDRICKS:  Again, I don't want to limit it to

10   this notion of drivers.  It is the -- the entities that are

11   contracting with Uber.  That may include individual drivers,

12   but it also includes transportation companies and the people

13   that they work for.

14        THE COURT:  All right.

15        MR. HENDRICKS:  And the people that work for them.

16        THE COURT:  We'll call them transportation companies.

17   That's what this contract calls them.

18        MR. HENDRICKS:  That's right.

19        THE COURT:  So the issue of what the plaintiff is

20   seeking, sort of notice or warning or know your rights,

21   whatever it is, at this point would only affect prospectively

22   new transportation companies as they sign on.  The people who

23   have already been there have now already gotten this and has

24   either opted out or not opted out.

25        MR. HENDRICKS:  That would be correct.

```
1        Again, let me address, again, a fundamental sort of
2   premise that is underlying the plaintiff's argument here.  That
3   premise is is that the fact that individuals, either
4   transportation companies or drivers, would agree to an
5   arbitration process is somehow representing misconduct or
6   conduct that needs to be addressed by the Court.  And we just
7   fundamentally reject that notion.
8        The Federal Arbitration Act represents a policy that
9   favors arbitration agreements.  The Supreme Court has made
10  clear that class action waivers are not some sort of bad, you
11  know, thing.  In fact, they restore litigation to its normal
12  state, which is one claimant bringing a claim against another
13  claimant.
14       And so the suggestion that that conduct, that business
15  conduct represents some misconduct that requires court
16  intervention, we reject that.
17            THE COURT:  Well, what if you had a situation where a
18  putative class action is filed and in response to that is a
19  broad-based class action waiver provision, which would be
20  upheld and preempted against an unconscionability claim under
21  Concepcion.
22       Are you saying that even if this was done with the purpose
23  of trying to decimate the class and reduce its number and size
24  and perhaps undermine the class action before one could get to
25  class certification, that a Court under Rule 23(d) would have
```

1  no power to do anything about it?

2          MR. HENDRICKS:  Let me say two things.  One, that was

3  not the purpose here, but going with your hypothetical --

4          THE COURT:  Yeah.

5          MR. HENDRICKS:  (Continuing) -- I would say that the

6  intentionality makes no difference.  Because what's going on,

7  your Honor, is a validation and a vindication of a federal

8  right manifest in the FAA.

9      Regardless of what my intent is, I have a right to attempt

10  to enter into arbitration agreements.  I have a right to do

11  that under federal law.  The Congress has said that.  The

12  United States Supreme Court has validated that, repeatedly now,

13  saying:  You know something?  Even if there is a class action

14  waiver -- in fact, it's such an important right that we don't

15  even have to have agreements specifically address the issue of

16  whether there is an affirmative class action waiver or not.

17  Unless there is something specifically saying you intend to

18  include class action within arbitration, we're going to presume

19  that they are excluded, okay?  That's the right we're dealing

20  with here.

21      Most of the cases what we're talking about where the Court

22  takes some sort of corrective action, you're dealing with

23  eliminating substantive rights.  You're dealing with releases,

24  people trying to get releases in the context, trying to settle

25  claims.

1           Nothing that Uber has done affects a substantive right.

2    As the Supreme Court in *Gilmer* said way back in 1991, the fact

3    that you agree to arbitrate a claim does not affect substantive

4    rights.  It only changes the form in which those rights are

5    being addressed.

6           So the suggestion that a defendant, a business, looking

7    at, you know, litigation, looking at its interest, the very

8    nature of arbitration is to avoid litigation and court.  That's

9    its very nature.

10          **THE COURT:**  It seems to me it's one thing to have an

11   arbitration clause and have it apply prospectively as a means

12   of reducing costs, et cetera, et cetera, and all things we were

13   talking about in *Concepcion*.  It seems to me something

14   different -- and I understand this is arguably not the facts

15   here.

16          If you had a pending case in the middle of a prior -- in

17   order to preempt in a different direction, effectively preempt

18   class certification, Rule 23(d) does give the district judge

19   certain powers over that process.  So Rule 23(d) wasn't

20   involved in *Concepcion*.

21          **MR. HENDRICKS:**  But the issue is, as the Court

22   pointed out in its own preliminary order when it denied the

23   emergency motion, the showing that the Supreme Court has

24   required is a specific factual showing demonstrating the harm

25   and attempting to balance the communication interest.

1     Let me tell you why this is also different, why this

2  entire notion of regulating communication under Rule 23 is very

3  problematic in the context of arbitration.

4     You're not dealing simply with communications.  What the

5  Court -- what counsel is seeking is the attempt to rewrite

6  these agreements.  I mean, that's really what the request has

7  been.  Modify the opt-out period.  Invalidate them in some sort

8  of way.

9     Again, our position is, is that under the FAA the Court's

10  ability to rewrite or to modify or change in any respect the

11  arbitration provision is -- does not exist.  The Court's

12  obligation is to enforce them in accordance with their terms.

13     And you can't allow the Court's authority under Rule 23 --

14  and there is authority under Rule 23, but you cannot allow that

15  to attempt to circumvent the restrictions that have been placed

16  on Courts with respect to arbitration agreements.  So you can't

17  use --

18     **THE COURT:**  Well, it depends how that notice is

19  framed.  If it is simply a notice:  Dear Prospective Putative

20  Class Member.  Please look carefully at Paragraph VIII because

21  if you don't exercise your rights thereunder, among other

22  things, you will not be able to participate in this class.

23     You're not touching the class.  It still goes, you're

24  giving people warning.

25     **MR. HENDRICKS:**  Very good.  So let's look at what

1    that's doing.

2        The rhetorical question is:  Why is the Court being asked

3    to place its thumb on the scale?  The entire purpose of that is

4    to encourage individuals not to participate in the arbitration

5    process.  It's to encourage them --

6        **THE COURT:**  No.  Arguably one purpose is to make sure

7    they know what the consequences are that they are alerted to

8    this very material term that is now proven material in light of

9    legal developments, i.e., the pendency of a class action.

10       **MR. HENDRICKS:**  But this is the point.  By its very

11   nature, an arbitration agreement always means that.  It's fully

12   disclosed to them already.

13       You know, whether or not there is an action pending or not

14   pending, whether one might develop later down the road --

15       **THE COURT:**  We're ships passing through the night.

16   You're ignoring the context of Rule 23(d).  It's very

17   different.

18       Now, your best argument is that it doesn't come into play

19   here because this preceded it.  I, frankly, would have a very

20   clear view if this happened in response to this action and,

21   therefore, the power of this Court to act under Rule 23 is to

22   give notice so that people know what they are doing, just as I

23   would supervise a class notice to make sure that the opt-out

24   and opt-in provisions are clearly stated.  They are bolded,

25   et cetera, et cetera, et cetera.  This is not much different

 1  than that.  Making people know their rights, okay?

 2       But, so the issue is not *Concepcion* versus Rule 23 versus

 3  something else.  I don't see it that way and you've argued that

 4  now about six different ways.

 5       The issue is in light of that, I'm not sure what power

 6  this Court has to order notices when there is a preexisting

 7  policy before the suit.  I mean, I haven't found a case where

 8  the Court has done that.

 9       **MS. LISS-RIORDAN:**  Well, I would just emphasize

10  again, your Honor, the fact here that the -- the agreement had

11  not been consummated when this case was filed.

12       So, in other words, you're saying that it preceded it

13  because the agreement was emailed out to the drivers a couple

14  weeks before we filed the case.  But because it wasn't going to

15  be consummated, that arbitration agreement wasn't binding on

16  them until 30 days went by and they didn't opt out.  The case

17  was pending before that agreement was consummated and that's

18  why we believe there is the power of this Court under Rule 23

19  to at that point step in and regulate communications with class

20  members.

21       **THE COURT:**  Well, but I think the bigger point is

22  that -- I do think intentionality counts in a Rule 23 analysis,

23  and it's hard to say that there was an intentional effort

24  undermining this case when -- and that's why I asked you

25  whether there has been pre-litigation.

1          If there had been a threat to sue back in April or

2   something and negotiations -- it's almost like an anticipatory

3   lawsuit.  Then Uber were to issue this.  Then one could say:

4   Yeah, this was sort of done in anticipation to specifically

5   thwart this lawsuit or thwart the class action and kind of

6   exterminate any possible class certification.

7          But that didn't happen here.  Apparently, there was no

8   pre-litigation communication.  This lawsuit came and was filed

9   without any particular notice that, it appears to me,

10  pre-litigation notice.

11         And so when the time that they enacted this, maybe it was

12  in response to the Massachusetts case or something, which is

13  why I asked whether the Massachusetts -- it seemed like that

14  would be the court where one would try to seek some Rule

15  23-type notice, but this preceded it.  And there is not a case

16  so far that I've seen that applies, that gives the Court

17  authority to do something about that.

18         **MS. LISS-RIORDAN:**  Well, again, I would just rest on

19  the fact that this particular fact pattern has not emerged in

20  the cases, but the backdrop of this is the same in that it

21  just -- it appears evident that they started -- they saw these

22  claims starting to pop up in the country and they wanted to

23  ward off the possibility that drivers might collectively try to

24  bring such claims in a broader -- of a broader scope.

25         **THE COURT:**  Do you have a response to the -- let me

1  go back, then, to the unconscionability question, to the

2  argument that given the breadth of this arbitration clause,

3  that under *Rent-a-Center* this has -- this is an issue for the

4  arbitrator to decide?

5       **MS. LISS-RIORDAN:**  Well, I think my argument there is

6  what we were already discussing that the drivers here wouldn't

7  be able to get their foot in the door.  They would be deterred

8  from even getting their foot in the door to bring the issue to

9  an arbitrator as to whether or not they have to abide by this

10  arbitration agreement.

11      **THE COURT:**  What showing has there been of that, you

12  know, given the vagueness of the fee splitting provision?

13      **MS. LISS-RIORDAN:**  Well, I mean, looking at it

14  closely the vagueness of the fee splitting provision is really

15  similar to what the Ninth Circuit just said wouldn't work in

16  the *Ralph's* grocery case because there it was going to be based

17  on what the Supreme Court had said.  I mean --

18      **THE COURT:**  If there been any cases that found an

19  exception to *Rent-a-Center* on this basis, that is, one of the

20  parties couldn't even get to arbitration to determine

21  arbitrability because they -- because it was cost prohibitive

22  or the way it was structured, there was just too many barriers

23  even to get to that arbitration.

24      **MS. LISS-RIORDAN:**  There is a case that I have been

25  litigating for a long time where I believe -- it's very

1  complicated procedurally, but I believe the Court agreed with

2  us that even after *Rent-a-Center*, it was still the Court's duty

3  to address these preliminary issues.  It's a case pending in

4  Massachusetts against Coverall North America.

5  I would have to go back and check the docket on that

6  particular issue, but I do believe the Court agreed that even

7  after *Rent-a-Center*, the preliminary issue as to whether or not

8  the class members would be deterred from -- could even get to

9  an arbitrator to get started with a question of whether they

10  could challenge the arbitration agreement was going to be

11  decided by the Court.

12  **THE COURT:**  All right.  Well, that gives me a hint if

13  there is one out there.

14  **MS. LISS-RIORDAN:**  I can --

15  **MR. HENDRICKS:**  And, your Honor, we've not found any

16  such authority.  We think that the *Rent-a-Center* authority is

17  controlling here and would require threshold questions of

18  enforceability, the very issues that are being raised here to

19  be addressed by the arbitrator.

20  And we still, again, reaffirm, at least when it gets to an

21  issue of substantively challenging the arbitration provisions,

22  moving aside now from perhaps any Rule 23 analysis, that these

23  individuals who have opted out did not have standing to

24  challenge arbitration agreements to which they're not a party.

25  We've cited for you authority to that effect, that they need to

1 be a party to the agreement.

2      The *Britain Company versus Coop Banking Group* case, no

3 standing to enforce arbitration agreement because it's not a

4 party to it.

5      We cited a number of cases on Page 9 --

6      **THE COURT:**  Have any of those cases addressed the

7 situation where the plaintiffs are named representatives of a

8 putative class, to be able to have standing on behalf of the

9 putative class?

10      **MR. HENDRICKS:**  You know, I -- I believe they do.  I

11 believe in our discussion of them, we point out that they were

12 not parties to the arbitration agreements they were attempting

13 to address.  And if memory serves me *Britain* might even

14 implicate that fact pattern as well.

15      You know, they need to be parties to it.  And they are

16 not.  And they are not legal agents of any of these folks.

17 There has been no class certified here.  No one has given them

18 authority to stand on their behalf, to challenge agreements --

19      **THE COURT:**  So who could ever -- under that construct

20 who could ever have standing?  If you opted out, you're no

21 longer within the regime.  You have no standing to challenge

22 it.  If you stayed in, you're now stuck and you're now bound by

23 arbitration, you'll never get a chance to go to court to

24 challenge it.

25      **MR. HENDRICKS:**  Sure.  Someone could come back and

1    say that I had wanted to -- all of the issues of

2    unconscionability that are being raised, someone could try to

3    raise that to an arbitrator.  They have could say:  I'm

4    challenging the validity of this agreement.  I want to be in

5    court.  And they could challenge it in front of the arbitrator.

6    And they would have standing to do so in front of the

7    arbitrator and the arbitrator could say:  You know, looking at

8    circumstances I don't think that the method of opting out was

9    appropriate, or I don't think this was right or that was right,

10   and I agree with you, and I conclude that it's not enforceable

11   as to you and you can go file your lawsuit.  Absolutely.

12   That's exactly how that process would play out.

13        Again, nothing that is done by this agreement avoids

14   substantive rights.  You know, these -- any party who would be

15   subject to the arbitration agreement has a forum through

16   arbitration to address not only their substantive claims, but

17   also any sort of procedural attacks or challenges to the

18   arbitration agreement.

19            THE COURT:  All right.  Let me ask a couple questions

20   about the substantive issues, if we were to get there.  I have

21   some factual questions.

22        How does it work in terms of how drivers are assigned

23   customers?  Is it at the driver's option to take up an

24   assignment or how does that work?

25            MR. HENDRICKS:  The driver is not assigned anything.

1   What happens is is that you have a transportation company that

2   are -- that may have access to the software.  You have

3   potential passengers that have access to the software.  And a

4   potential passenger, using their mobile device, indicates that

5   they would be interested in a fare.  That information is

6   distributed and it's made available to the transportation

7   providers or the users of the software and then they decide

8   whether or not they are going to select that particular ride or

9   not.

10          THE COURT:  So the request for a ride goes out to

11  everyone?

12          MR. HENDRICKS:  I believe it's geographically.

13          THE COURT:  Whoever is in the geographic area?

14          MR. HENDRICKS:  Sure, sure.  And various people can

15  either choose to accept it or not.

16          THE COURT:  The software is set up so that if

17  one -- the first bidder gets it?

18          MR. HENDRICKS:  Yes.  Whoever locks it in, that's

19  the -- they can choose to -- they can choose to decline it at

20  some point in time as well.

21          THE COURT:  So if a driver declines, obviously, the

22  driver doesn't pick up the fare or revenue from that.  There's

23  no consequence.

24          MR. HENDRICKS:  Absolutely none.

25      And let me add something further to it.  You know, Uber

1  has no control over which drivers are on at which particular

2  time in terms of whose looking for these leads.  This is all

3  determined by the end users.  Uber has no involvement in that.

4      **THE COURT:**  Okay.  Let me ask another question.  It's

5  stated in Paragraph 17 of the complaint that there are some

6  situations where there is an actual amount stated by Uber in

7  terms of the amount of the alleged gratuity.  I'm not sure what

8  to make of that allegation.  It's number 17.

9      It says:

10          "In some instances Uber has advertised that the

11          gratuity is a set amount, such as 20 percent of the

12          fair that it charges."

13      I take it at other times it just says "gratuity included"

14  with no designation?

15      **MS. LISS-RIORDAN:**  That's correct.

16      **THE COURT:**  So there is a mixed practice?  That's the

17  allegation here.

18      **MS. LISS-RIORDAN:**  That's paragraphs 17 and 18, yes.

19      **THE COURT:**  All right.  The last question I have is

20  with respect to potential liability of individual defendants.

21      It seems to me that that is something that would turn on

22  which particular cause of action we're talking about.  It may

23  vary from a statutory claim, who may be liable under a

24  particular statute versus a contract claim, and generally you

25  can't be liable unless you're a party to a contract, to a tort

1  claim.  There is not much briefing on that frankly.

2      And, frankly, I'm debating whether I should order more

3  briefing or wait until this develops a little further and see

4  what's left before ordering that briefing, but there is not a

5  lot of discussion here about that.

6      And you're not asserting an alter-ego theory, right?

7          **MS. LISS-RIORDAN:**  We've asserted in the complaint

8  that these individuals are responsible for the pay practices

9  that we're challenging.  At this point before discovery there

10 is not much more detail we have to say about it other than

11 that, but we contend that under the statutes, they may be

12 statutorily liable.  Under the common law, as we have alleged,

13 they were, in, fact responsible for these policies.  They are

14 the ones who committed the common law violations as well.

15     So at this stage I don't really know what more we can say

16 about that until we've done some discovery.

17         **THE COURT:**  Do you have any comments on that?

18         **MR. HENDRICKS:**  At this stage the individual

19 defendants should be dismissed.  There are not specific

20 allegations to them, as to any of the specific causes of

21 action.  There is no allegation specific that either of the

22 individual defendants ever met either of these named plaintiffs

23 or specifically what their conduct was.

24     All they are alleged to have been are employees.  And, you

25 know, merely being an employee does not mean somehow that

 1  you've engaged in tortious interference of contractual

 2  relations or that you have some implied contract.  There are no

 3  specific factual allegations as to the conduct, the specific

 4  conduct of either of these individual defendants that under

 5  *Iqbal* and *Twombley* would make these claims plausible as to

 6  them.

 7       And, again, your Honor -- and we can address the specific

 8  claims as it relates to Uber as well, but take, for example,

 9  the fourth cause of action.  There is no private right of

10  action for 351 in California.  Our Supreme Court, the state

11  Supreme Court in *Lou versus Hawaiian Gardens* made that clear.

12       You go to the issue of the third causes of action --

13            **THE COURT:**  What about the sixth cause of action?  I

14  understand that there is a -- at least as -- with respect to

15  whether there is an unfair or unlawful business practice, that

16  may turn on the substantive counts, but there also appears to

17  be a claim of unfair business practice.  But whatever it is,

18  can an individual who directs the company's activities, the

19  corporation's activities, be held liable under 17200?

20            **MR. HENDRICKS:**  I don't believe so.  I don't believe

21  there is any authority for that proposition.

22       The act -- you know, when you're dealing with employees

23  acting within the scope of their employment, they are the

24  agents of the employer, which is the principle.  And it's the

25  principle that ultimately is responsible.

```
 1        In fact, if you were to analogize to basic discrimination
 2   law, under the FEHA it's very clear.  Acts, managerial acts
 3   don't create individual liability unless a statute very clearly
 4   articulates that.  That's why an individual supervisor would
 5   not be liable for discrimination even if he is the individual
 6   or she is the individual that made the termination decision.
 7        Okay.  I mean, that's a classic example as how the State
 8   of California and why, again, we should be really focused on
 9   the case law, the statutes, the requirements of California law.
10   Why under the State of California an individual supervisor or
11   manager is not liable under Reno v Baird, for acts of
12   discrimination.  That's another statutory framework.
13             THE COURT:  There are common law cause of actions,
14   too.
15        And let me ask Ms. Riordan:  Are there cases that say that
16   the president of a corporation can be held liable absent --
17   absent some alter-ego theory for a common law claim?
18             MS. LISS-RIORDAN:  Well, if the president of the
19   corporation was responsible for a practice in which the drivers
20   are not reimbursed for their expenses and for which the company
21   is going to charge an gratuity to customers that's not paid in
22   full, if that is the person who put that into place, then I
23   don't see any particular reason why that could only be
24   liability that a company could bear rather than an individual.
25             THE COURT:  That's why there is a corporate
```

```
 1  structure.  Because when you say who made the decision,
 2  presumably there was a Board of Directors that may have been
 3  involved.  There are other corporate officers.
 4      The corporate entity is a legally recognized entity and
 5  that's normally who you look to because that's the company that
 6  implemented the -- that's the entity that implemented the
 7  policy, whether people behind it influenced it.
 8      I have a very specific question.  Do you have a case cite
 9  where somebody was held liable for, let's say, tortious
10  interference --
11          MS. LISS-RIORDAN:  Yeah.  Well, we have two sites on
12  Page 22 of our opposition.  One is a case from this year which
13  the Federal Court held that an individual defendant could be
14  personally liable under 17200.  That's a statutory claim,
15  another cite for the proposition that an individual can be
16  personally liable for tortious interference.
17          THE COURT:  That's *Steiner* and *Klein*, the Oakland
18  Raiders cases?
19          MS. LISS-RIORDAN:  Yes, yes.
20          THE COURT:  Where they -- were the individuals who
21  were held prospectively liable acting only in their capacity as
22  president of some corporation?
23          MS. LISS-RIORDAN:  I don't know that as I stand here
24  today.  And, again, because we haven't done discovery in the
25  case, I don't know what corporate approvals these individual
```

1   defendants had in enacting these policies.  Not having done

2   discovery, we just don't know very much yet.

3       I think that could be fleshed out further when we have

4   discovery and that could be through briefing as to whether they

5   have met a standard to attain liability against them

6   personally.

7           **THE COURT:**  Okay.  I'm going to take the matter under

8   submission.

9           **MR. HENDRICKS:**  Your Honor, if we could, there is an

10  additional issue here, and that relates to this issue of the

11  non-California putative class members.

12      We believe that there is this attempt to apply extra

13  territorially --

14          **THE COURT:**  I understand the issues, the dormant

15  commercial clause and the extra territorial clause.  I have

16  read the briefs.  I will take it under submission.

17      Thank you.

18          **MR. HENDRICKS:**  Thank you, your Honor.

19          **MS. LISS-RIORDAN:**  Thank you, your Honor.

20          (Proceedings adjourned.)

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, December 2, 2013

.

Exhibit D

Pages 1 - 100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

DOUGLAS O'CONNOR, THOMAS COLOPY,      )
MATTHEW MANAHAN, and                  )
ELIE GURFINKEL, individually and      )
on behalf of all others similarly     )
situated,                             )
                                      )
               Plaintiffs,            )
                                      )
  VS.                                 )  No. C 13-3826 EMC
                                      )
UBER TECHNOLOGIES, INC.,              )
                                      )  San Francisco, California
               Defendant.             )  Friday
_____)  January 30, 2015


**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiffs:         Lichten & Liss-Riordan, P.C.
                        100 Cambridge Street, 20th Floor
                        Boston, Massachusetts 02114
                  By:   Shannon Liss-Riordan, Esquire
                        Adelaide H. Pagano, Esquire


For Defendants:         Morgan, Lewis & Bockius LLP
                        One Market, Spear Street Tower
                        San Francisco, California 94105
                  By:   Robert Jon Hendricks, Esquire
                        Sacha M. Steenhoek, Esquire
                        Caitlin V. May, Esquire


Reported By:   Katherine Powell Sullivan, CSR #5812
               Official Reporter - U.S. District Court

1                      **P R O C E E D I N G S**

2     JANUARY 30, 2015                              2:34 P.M.

3             **THE CLERK:**  Calling Case C-13-3826, O'Connor versus

4     Uber.

5         Counsel, please come to the podium and state your name for

6     the record.

7             **MR. HENDRICKS:**  Good afternoon, Your Honor.

8     R.J. Hendricks with Morgan Lewis & Bockius on behalf of

9     defendant.

10            **THE COURT:**  Good afternoon, Mr. Hendricks.

11            **MS. STEENHOEK:**  Sacha Steenhoek, also on behalf of

12    defendant.

13            **THE COURT:**  Good afternoon.

14            **MR. HENDRICKS:**  And, for the record, Caitlin May is

15    also at counsel table.

16            **THE COURT:**  Good afternoon, Ms. May.

17            **MS. LISS-RIORDAN:**  Good afternoon, Your Honor.  For

18    the plaintiffs, I'm Shannon Liss-Riordan.  And with me is --

19            **MS. PAGANO:**  -- Adelaide Pagano.

20            **THE COURT:**  All right.  Good afternoon, everyone.

21        Let me start off by making a couple of observations about

22    the general framework of things as I see it.

23        Obviously, we're here on defendant's motion for summary

24    judgment, so all facts, disputed issues of fact have to be

25    resolved in favor of the nonmoving party.  And all reasonable

1    inferences are to be drawn in favor of the nonmoving party.

2         So to the extent that there are conflicts in the evidence,

3    obviously I have to assume that the plaintiffs' facts are true

4    for purposes of this motion.

5         Second, there's this question about whether the

6    presumption of employee status applies where one is in the

7    service of another.  And I know that that is an issue, in my

8    view, that that test is met here.  And we can talk about that.

9         But the idea that Uber is simply a software platform

10   service provider and nothing else, I don't find that a very

11   persuasive argument.  But I'll give you your chance to reargue

12   that.

13        But, assuming that that issue gets resolved, for purposes

14   of this motion, in favor of the plaintiff, then there is a

15   presumption that applies.  And the burden of proof then lies

16   with the employer to prove otherwise.

17        And then, when we get to the substantive test, it is a

18   multifactor test -- I think everybody would concede that --

19   with degree of control being the primary factor.  And although

20   that test has evolved over time arising out of the workers'

21   compensation context and migrating its way into the statutory

22   context, I think most courts -- nearly all the Courts now have

23   adopted pretty much a similar articulation of the test with

24   articulation of the 10, 11, 12, 13 factors, but all with a

25   primary emphasis on degree of control.

1          What I find that's interesting is, contrary to my, you

2     know, visceral reaction, which I had stated on the record that

3     I thought that plaintiff seemed to have a hard case to make, is

4     that when you look at the cases it's -- one conclusion you can

5     reach is that it's very rare to find any one factor

6     dispositive, either any indicia of control or any of the other

7     12 factors.

8          So, as one example, I would have thought in the old days

9     if you owned the truck, if you owned the shovel, if you owned

10    the backhoe, if you owned the broom and all the equipment,

11    that's a pretty good indicator of an independent contractor

12    status and non-employee status.

13         Well, I don't think that's the case.  There are a number

14    of cases now, whether it's FedEx or some of these other

15    delivery cases where people provide the truck, the limousine,

16    the car, and that did not stand in the way of the Court

17    concluding employee versus independent contractor status.

18         Degree of supervision, you would have thought, sort of in

19    the old days, that, you know, if you left someone else to do

20    work in the way they want to and you only look at the results

21    with minimal or no field supervision, that's another pretty

22    good indicator.  But the cases take a more subtle approach.

23         You look at the nature of the job.  And there are certain

24    jobs that are inherently less susceptible to supervision,

25    particularly if you're out in a field, particularly if you're

1   driving a car or a truck.  Many of the cases afford a

2   substantial amount of flexibility to the driver or to the

3   person in the field without losing employee status.

4        So simply to -- I mean, simple fact, seems to me, is that

5   it's never easy.  It's not just one factor you can point to and

6   say, boom, that's it.

7        And the fourth observation I want to make is that -- both

8   of you are probably against me on this point, but is this a

9   question of law or fact?

10        The ultimate inference to be drawn, once you've

11   crystallized the facts and whether on summary judgment drawing

12   them in favor of the nonmoving party or at trial, once you've

13   resolved it as a finder of fact would resolve any conflicts

14   regarding, for instance, degree of control, terminability, et

15   cetera, et cetera, is the ultimate inference drawn whether one

16   is an employee or an independent contractor, is that a question

17   of law for the Courts or fact for the fact-finder of the jury?

18        And although there is some language in the *Borello* case, I

19   think it's now clear that it is a question -- the ultimate

20   question is a mixed question of law and fact.  And the issue,

21   therefore, on summary judgment is whether a reasonable jury

22   could conclude -- could only conclude in one direction.

23        And there, I think, in the *Narayan* case, certainly the

24   Ninth Circuit made that very clear and, indeed, articulated --

25   borrowing from Judge Eastbrook, explained the rationale for

1    that.

2         There are more recent California Court of Appeal cases,

3    including *Arzate vs. Bridge Terminal Transportation* in 2011,

4    that have applied the reasonable trier of fact standard post

5    *Borello*, and a series of other cases that so hold, including, I

6    think, the *Mission* case that the defendants cite, saying it's a

7    mixed question of law and fact.

8         So that means the standard here, where we're not dealing

9    with cross motions for summary judgment -- I did preclude the

10   plaintiff from bringing a cross motion -- where we have a

11   single motion for summary judgment, I would have to find that,

12   viewing the facts in plaintiffs' favor, drawing all reasonable

13   subsidiary inferences in favor of the plaintiff, that no

14   reasonable jury could conclude that the drivers are employees.

15        That's a pretty tough standard to meet.  I understand your

16   arguments and the overarching -- and we can talk about that.

17   But that's how I see things as a framing proposition.  And

18   against the backdrop of finding that, there's in addition to

19   that a presumption of employment, of employee status here,

20   because I do think drivers are serving Uber.

21        So through that lens, I would then look at all the facts.

22   And we can line up the facts and talk about the facts.  And, of

23   course, we can talk about the cases and how they've interpreted

24   them and which way they go.

25        And, frankly, you know, you could probably distinguish

1    just about every case on some level.  But when you look at the

2    overall question that's before the Court, viewed through this

3    procedural framework, it seems to me a very tough argument at

4    this juncture to show that no reasonable jury could find that

5    drivers are employees when all the facts and conflicts are

6    drawn in favor of the plaintiff.

7        So before we get into the actual facts, I would like to

8    hear your comments if you think that I'm on the wrong track

9    with respect to the framing.

10        **MR. HENDRICKS:**  Your Honor, I think that you have

11    generally framed the issues correctly.  I do believe, as a

12    threshold question, there is the issue of whether they're

13    providing us a service.

14        I do believe that -- that if they were found to be

15    providing a service, that we would go then, and only then, to

16    looking at whether they would be employees or independent

17    contractors.  So I think there is some level of agreement

18    there.

19        **THE COURT:**  Okay.  And I know you argued in a footnote

20    to the contrary, sort of agreeing with the defendant that your

21    initial take was that this is a question -- the ultimate

22    question is one of law for the Court.  I don't know if you're

23    still of that view.

24        **MS. LISS-RIORDAN:**  Well, I am.  And let me just speak

25    briefly to that before we get into the other matters.

1    I understand what you're saying and agree that the cases

2    are somewhat mixed.  But I think the modern tendency has been,

3    in the most recent cases, that when there are not -- especially

4    when there are not material disputes regarding material facts,

5    courts have applied the law to the facts and made the

6    determination, as of course the Ninth Circuit did last year in

7    two cases, both the *Alexander* case and *Ruiz vs. Infinity* case.

8        It's also true for other FedEx cases, as I'm sure the

9    court is aware.  The *Craig vs. FedEx* case in Kansas; the

10   *Slayman vs. FedEx* case in Oregon, on the Ninth Circuit.

11       The Nevada Supreme Court last year decided on facts that

12   could also be arguably mixed in the *Terry vs. Sapphire Adult*

13   *Entertainment* case found, as a matter of law, that the dancers

14   were employees.

15       A couple of the cases -- pertinent cases that said it was

16   a fact issue for trial, the *Narayan* case from the Ninth Circuit

17   2010, and Your Honor's case in *Harris*, it appeared from those

18   cases that there was only a motion filed, as here, by the

19   defendant for summary judgment and that the plaintiffs had not

20   cross moved.

21       Now, I understand that, for procedural reasons, you

22   decided you didn't want the plaintiffs to move for summary

23   judgment at this time.  And, of course, because we're before a

24   class certification I would hope that you would consider

25   allowing us to move at a later stage, assuming this case goes

1    to a later stage.

2        But I think, in light of these recent cases, there is

3    reason to -- there is reason to believe that the Court could

4    decide this is a legal matter because it is a mixed question of

5    law and fact.

6        But if the underlying facts that are really important are

7    not so disputed, which I think may be well the case here, it's

8    the Court's role to apply the law to those facts.  So that's --

9    that's what I have to say about that.

10       **THE COURT:**  So is it your view that *Narayan* was wrong,

11   the Ninth Circuit decision in 2010 was wrong?

12       **MS. LISS-RIORDAN:**  Well, I -- I don't know if in

13   *Narayan*, whether the plaintiffs had cross moved for summary

14   judgment.  It looks from the decision like they hadn't --

15       **THE COURT:**  Well, why does that make any difference?

16   Whether there's a cross motion or not, the standard applied to

17   each motion and cross motion is the same.  Why should that

18   change it?

19       **MS. LISS-RIORDAN:**  Well, I -- I believe because there

20   was simply a consideration of whether or not the defendant's

21   motion for summary judgment should have been granted, and the

22   Ninth Circuit, I believe, reversed that, that the Court didn't

23   have the opportunity to determine, as a matter of law, that a

24   plaintiff's motion should have been granted.

25       **THE COURT:**  But it went into a detailed exposition as

1    to why these kinds of issues are properly one of -- so long as,

2    you know, a reasonable jury could so find.  You could find that

3    a reasonable jury can't when the facts -- even drawn in favor

4    of the nonmoving party, that doesn't preclude summary judgment.

5        But just like many other mixed questions of law, mixed

6    questions such as whether under undisputed facts somebody is

7    negligent, whether there was excessive force under the Fourth

8    Amendment, there's all sorts of situations where it is

9    ultimately for the jury, even though there's not much dispute

10   as to the underlying subsidiary facts, because particularly as

11   *Narayan* points out, where you have a multifactor test, that is

12   almost peculiarly one appropriate for the jury.

13       **MS. LISS-RIORDAN:**  Well, it's not clear because there

14   wasn't -- it does not appear there's a cross motion for summary

15   judgment by the plaintiffs.  It might not have been argued in

16   that case that summary judgment should be entered for the

17   plaintiffs.

18       In the more recent *Alexander vs. FedEx* case, the Ninth

19   Circuit concluded that the factors pointed in different

20   directions, yet still the Court applied the law to those facts.

21       **THE COURT:**  Well, the Ninth Circuit was conspicuously

22   silent on exactly what standard it was applying there, frankly.

23   It didn't adopt either standard.  It didn't say this is a

24   question of law -- ultimate question of law for us to decide,

25   and that's why we're deciding, or whether it was really saying

1   no reasonable jury -- even though there are some facts going

2   the other way, when all is said and done, a reasonable jury

3   could go the other way.  So it's a little ambiguous.

4          MS. LISS-RIORDAN:  Right.  And then again, last year

5   in the *Ruiz vs. Infinity* case, again the Ninth Circuit said as

6   a matter of law that plaintiffs were employees.

7          THE COURT:  Well, let me just answer your question.  I

8   don't want to get too far afield.

9          MS. LISS-RIORDAN:  Sure.

10         THE COURT:  But I also am interested, thinking ahead,

11  if this case does go to trial, for instance, if I don't grant

12  summary judgment in either direction, how do you handle this?

13         When you have disputed issues, subsidiary issues, and you

14  have lots of issues, you've got 13 factors, and many factors on

15  control, for instance -- and one of them we'll talk about is

16  whether or not somebody really could refuse, when they sign in,

17  whether they could refuse to take a ride without any

18  consequence or not, how terminable they were, how much

19  monitoring there really is of some of these suggestions, et

20  cetera, et cetera.

21         What do you do?  Do you submit, under your scenario, 40

22  interrogatories, special interrogatories to a jury to decide

23  each micro fact, subsidiary fact, and then the Judge then takes

24  that all in and then does a Gestalt analysis?  Is that how it

25  works?

1          **MS. LISS-RIORDAN:**  I think it's worked different ways

2     in different courts.  Either that type of specific jury form

3     versus just asking the jury the final ultimate question.

4          I mean, I will note that since we --

5          **THE COURT:**  You can't -- under your scenario, if it's

6     the ultimate question before the Court, a question of law, I

7     wouldn't be able to just throw it to the jury like a negligence

8     case.

9          **MS. LISS-RIORDAN:**  Well, that's correct.  In other

10    words, I think if you think that there are material disputes of

11    fact regarding material factors here -- in other words, we

12    haven't or they haven't proven overwhelmingly that they win

13    based on some factors, even though other factors might be

14    disputed but they're not so important, then perhaps it would be

15    appropriate to have the jury decide each of those factors and

16    then send it back to the Court.

17         But one point I do want to make is remember we have UCL

18    claims here.  And both of our statutory claims are brought

19    under the UCL, which, of course, would be tried to the bench

20    anyway.  So that is something to think about, that it may

21    possibly be --

22         **THE COURT:**  If you have a mixture of jury and judge

23    questions, my recollection from first year of civil procedure,

24    the *Dairy Queen* or *Beacon Cedar* case, the Seventh Amendment

25    prevails and you have to let the jury decide all the factual

```
 1   questions before the Court can issue equity decisions, et
 2   cetera, et cetera.
 3       So that doesn't help the fact that there's a UCL claim,
 4   which is normally a question for the Court.  It would still
 5   have to await resolution of underlying facts by the jury.
 6           MS. LISS-RIORDAN:  But, Your Honor, I think once you
 7   hear -- once you let me make my very first argument, I think
 8   you might even be convinced that this first argument is
 9   dispositive, period.  But I'll wait until you're ready to hear
10   that argument.
11           THE COURT:  All right.
12       MR. HENDRICKS:  And we come back and say that, again,
13   there is a threshold question here that we believe disposes of
14   the further inquiry into whether they're employees or
15   independent contractors.
16           THE COURT:  Why don't we go ahead and address that
17   since that's your threshold question.
18       MR. HENDRICKS:  Your Honor, I don't think there's any
19   dispute that the law requires that sort of showing, that, as a
20   factual matter, that the individuals claiming to be employees
21   must first demonstrate that they provided service.  Okay?
22       We see that under the Narayan case and other cases that
23   articulate the standard.  Even in Borello you hear language
24   about that when you look at control you're looking at it that
25   they were under the control of the person they were providing
```

1    service to.  That becomes a very important component.

2         THE COURT:  And does that question here turn on

3    whether one characterizes Uber as a software provider as

4    opposed to a transportation provider?

5         MR. HENDRICKS:  No.

6         THE COURT:  No?

7         MR. HENDRICKS:  No.

8         THE COURT:  So if I conclude that, like the PUC did,

9    that Uber is in the business of providing transportation, you

10   don't think that drives that first question?

11        MR. HENDRICKS:  I do not.  I think it can be a factor.

12   And that is to say, because we are a software company that

13   develops an app, I think that strengthens the fact that they're

14   not in this instance providing a service to us.

15        But more importantly is the nature of the obligation and

16   what's actually taking place.  You have to step back and look

17   at this not as elements and a punch list.  You have to step

18   back and take a look at what is the actual relationship.

19        The cases that you are probably relying on are

20   particularly dispatch cases where people are delivering goods,

21   transportation cases where you have FedEx or JHK, where the

22   entity that is being viewed as the employer has already entered

23   into some sort of contractual relationship where they are

24   obligated to deliver a product.  Okay?  A package.

25        You know, I go to the FedEx station, I give you my ten

1    bucks and say deliver it by tomorrow.  Okay?  That is a

2    different kind of situation than what we have here.

3         Under our agreements with the transportation providers, as

4    well as with riders, Uber never assumes that obligation.  No

5    rider can come to Uber and say, you know something, the app was

6    down, you owe me.  You know, that driver didn't show up, you

7    owe me.

8         We never obligate ourselves to be a transportation

9    provider.  The agreements, which are the first step in the

10   analysis here, don't create that sort of obligation on the part

11   of Uber.  Uber disclaims it as to passengers.  It disclaims it

12   as to the plaintiffs in this particular case.

13        **THE COURT:**  So could Uber operate and be an ongoing

14   company with revenue if it weren't providing -- essentially,

15   responding and providing and connecting people who ride rides?

16        **MR. HENDRICKS:**  Our product is intellectual property.

17   We get licensed in a variety of different ways.  We assume

18   different revenue models relative to that.  You see

19   applications all the --

20        **THE COURT:**  Well, if all you were doing was selling an

21   app, you could sell an app and sell it at the app store.

22        **MR. HENDRICKS:**  And we download it from the app store.

23   Nothing precludes us -- the manner --

24        **THE COURT:**  But Uber does a little more than that,

25   doesn't it?

1          **MR. HENDRICKS:**  The manner in which we are compensated

2    for the intellectual property does not change the inquiry as to

3    whether or not these individuals are providing a service to us.

4    That is not the proper inquiry.

5          Secondly --

6          **THE COURT:**  Well, no, the inquiry is how do you make

7    your money?  Do you make your money by selling an app at the

8    app store?  Or do you make your money from people buying a

9    service, i.e. getting a ride?

10          **MR. HENDRICKS:**  No, no, no.  We make our money from

11   licensing software.  That's what we do.  And giving them the

12   right to use it.  And we happen to have a compensation model

13   that, when they use it successfully, we get compensated.

14          Look, *Martinez vs. Combs*, the Supreme Court, when

15   analyzing a suffer and permit standard, made very clear -- and

16   this is the thing I want to make clear here -- there is a

17   difference between benefiting from something, benefiting from a

18   transaction, and someone actually being in service to provide a

19   service or providing a service to that individual.

20          The fact that we benefit from these individuals using our

21   apps simply makes them a customer.  That is our view of it.

22   That's what the evidence supports.

23          Take a look at Mr. Manahan's testimony.  Mr. Manahan

24   testified that he pays us a service fee for using the app.

25   That is our connection.  We promote.  We market.  That's

1    correct.  We assist with the transaction in some respects in

2    terms of processing the payment.

3        But, fundamentally, the commercial relationship between

4    these drivers and transportation providers and Uber is one

5    where they are our customer, where we license to them our

6    software, and we receive a fee for doing that.

7        That is not them --

8            **THE COURT:**  The fact that you screen drivers, select

9    them, the fact that you, Uber, sets the fare, not the drivers,

10   the fact that the company could not operate and exist as a

11   company and make money without drivers, you think that does not

12   establish, among other things, that these drivers serve Uber?

13           **MR. HENDRICKS:**  First to which, where -- we are in

14   summary judgment.  I know that --

15           **THE COURT:**  And, therefore, all the inferences are to

16   be drawn in favor of the drivers even on the subsidiary

17   question.

18           **MR. HENDRICKS:**  Inferences as to evidence in fact.

19   Where is the evidence -- this is their burden to show that they

20   provide service to us.  Counsel, in her motion, said, oh, God,

21   of course, that's the case.

22       Where is the evidence of that?  Where is the declaration

23   of that?  Where is the fact of that upon which is drawn --

24           **THE COURT:**  The three things that I just mentioned are

25   undisputed, correct?  Uber does select -- there's some

1   screening process.  I hope you do.  There's some screening,

2   correct?

3            **MR. HENDRICKS:**  Sure, sure, sure, sure.

4            **THE COURT:**  Right.

5            **MR. HENDRICKS:**  Sure.  That's right.

6            **THE COURT:**  And you have certain requirements of

7   drivers.  May be minimal, but you have some requirements.

8            **MR. HENDRICKS:**  We make decisions about who we give

9   access to our software, that's correct.

10           **THE COURT:**  So it's not like Craigslist, where anybody

11  can get on and sell whatever they want.  Well, even there,

12  there are some restrictions.

13       You exercise some quality control.  And there is some

14  feedback and some right to terminate people who don't follow

15  the rules in respect to their driving performance and their

16  performance as drivers.  That's undisputed, right?

17       You do have a 5-star rating situation.  You may not sit

18  somebody, as in the FedEx situation, and drive around four

19  times a year with somebody, but you do solicit feedback and you

20  rate drivers and you warn drivers if they fall below a certain

21  standard or if they do certain things while they're driving

22  that they're not supposed to do.

23           **MR. HENDRICKS:**  The ultimate standard -- there is a

24  standard that's provided for quality.  That's the standard.

25  And the cases say that that does not create an employment

1   relationship.

2          **THE COURT:**  I'm not talking about relationship right

3   now.  I'm talking about whether they're in the service.

4          **MR. HENDRICKS:**  Okay.

5          **THE COURT:**  And whether your business -- your client's

6   business is merely providing a software platform or providing a

7   transportation service.

8       So if they're only providing software, why would they be

9   concerned with who's buying it, whether they're qualified, how

10  they're doing on the job?  And why would they have control over

11  the pricing, and whether to implement surge pricing or not, et

12  cetera, et cetera.

13      Why are they setting the rates by which drivers are

14  getting compensated?  Why do they have a right to terminate

15  drivers under certain circumstances?

16         **MR. HENDRICKS:**  So let's --

17         **THE COURT:**  It sounds like a little more than just

18  selling something on the app store.

19         **MR. HENDRICKS:**  But, Your Honor, that's a far --

20  that's a far leap.  The implicit notion within your suggestion

21  is, if those are true, that must mean they're providing a

22  service.

23      And I'm telling you, even if all those things were true --

24  and I will walk through them and explain why they don't

25  establish any sort of service relationship, but even if they

1    were true, they don't mean that we are now receiving a service

2    within the meaning of the law.

3        And let's walk through this for a moment.  I am a

4    concierge.  I work at a hotel.  I have hotel guests that come

5    up to me all the time and say, you know something, I really

6    would like a referral for a dog -- I brought my dog in, do you

7    have a dog walker?

8        And because of what I do, I have connections with people.

9    I have dog walkers.  I have restaurants.  I have drivers.  You

10   know, a lot of drivers stay at hotels.

11       And I sit back and say, you know something, I can pick

12   between a lot of different folks.  If you give me ten bucks,

13   the next time someone asks for a referral, I'll refer you.

14       And if you give me that ten bucks, Your Honor, and I refer

15   you to a hotel guest, I'm not your employer.  You are not

16   providing a service to me.

17       The service you are providing is still to that hotel

18   guest, getting them from point A to point Z.  And all I've

19   done --

20            **THE COURT:**  So Uber is nothing more than a concierge

21   working for tips?

22            **MR. HENDRICKS:**  Uber is nothing more than providing

23   opportunities and lead generation services, which these

24   plaintiffs have certified in their contracts with us.

25            **THE COURT:**  What about the price setting?  What about

1   the fact that Uber sets the price?   That's a little different

2   than a concierge asking for a tip.

3          **MR. HENDRICKS:**   I could give you different examples.

4          **THE COURT:**   Well, what about that example?   I'd like

5   you to address that.   Isn't there a difference there?

6          **MR. HENDRICKS:**   Let's assume that I say that.   Let's

7   assume I come to you and say, hey, you know something, I get a

8   lot of people -- this is a good business, wait a second, I have

9   someone who's paying me to refer them to someone else, and I

10  think there's a market out there that if folks were to price

11  their services at this bucket, a lot of people would do it.

12  And I get a lot of money by connecting people.

13      It still does not mean that I am providing transportation

14  services.   What I'm doing is a referral service, a lead

15  generation service.   And my business is creating opportunities.

16      Not one of these drivers, not one of these plaintiffs are

17  obligated to take any of these leads.   When that person comes

18  to me and asks for the reference, I'm not obligated to give

19  them one.   And even if I tell them, hey, go with

20  Ms. Liss-Riordan, they're not obligated to do it.

21      So it's not as though I'm providing the service or have

22  accepted a duty to provide the service or that my business is

23  doing that.   I don't own a fleet of vehicles.   Okay?   The

24  *Yellow Cab* --

25          **THE COURT:**   So the logo about being everybody's

1    private driver really doesn't -- that has no bearing on this

2    question, how Uber presents itself to the public?

3         **MR. HENDRICKS:**  I think it has no legal bearing to the

4    question, particularly in light of the fact that people are

5    entering into specific agreements that set forth that

6    relationship.

7         Those sort of communications are marketing.  It is

8    designed to generate interest in the application.  We can do

9    that without becoming a transportation provider.

10        Let me give you another example.

11        **THE COURT:**  What happens if somebody's credit card

12   bounces?  Uber collects, right, and remits a portion to the

13   driver.  What if that credit card bounces?

14        **MR. HENDRICKS:**  We don't have an obligation to ensure

15   that -- if it doesn't get paid, it doesn't get paid.

16        **THE COURT:**  So the driver doesn't get paid?

17        **MR. HENDRICKS:**  We're not the insurer, the guarantor.

18        **THE COURT:**  So it is done on a per-transaction basis

19   of payment?  So if something fails --

20        **MR. HENDRICKS:**  If the card's not good, the card's not

21   good.

22        **THE COURT:**  Who bears the risk, is what I'm asking?

23        **MR. HENDRICKS:**  The driver would bear the risk of

24   that.  We may -- so, for example, through contract, we've

25   agreed under certain circumstances to charge the passenger for

1   a cancellation fee, but that's a fee that goes to the driver.

2   Okay?

3              THE COURT:  And who collects that?

4         MR. HENDRICKS:  It's passed through, but it's for the

5   driver or the transportation --

6              THE COURT:  The actual collection is done by Uber.

7         MR. HENDRICKS:  Per agreement, yeah.  They've asked us

8   to do that.  That's another service that we're providing to

9   them.

10             THE COURT:  A little more than a concierge would

11  normally do.

12        MR. HENDRICKS:  But still, where's the direction of

13  activity?  Yeah, Uber is doing that.  We're doing it as a

14  service.  It's a part of why we get our fee.  We get a

15  commission.

16     What's that commission for?  It's giving you the access to

17  the intellectual property.  It's giving you access to the

18  credit card processing to some extent.  It's giving you access

19  for dealing with issues that may come up.

20     And that's just like what happened in *Rabanal*.  In

21  *Rabanal*, the Court of Appeal in that case made that same sort

22  of conclusion.  It's the exact same conclusion that happened in

23  Massachusetts, where the Court said, gee, all they're doing is

24  providing service.  And --

25             THE COURT:  So let me ask you --

1              **MR. HENDRICKS:**  One more point, Your Honor --

2              **THE COURT:**  -- you think the *Yellow Cab* case --

3              **MR. HENDRICKS:**  One more point, Your Honor, if I

4     could.  One more point.  One more point.

5         If you take a look at the insurance cases, the *Arnold*

6     case, for example, that's a case where you have an insurance

7     provider, right, entering into an independent contractor

8     relationship with a marketer, an agent of sorts.

9         And the fact that they may be related in some fashion,

10    complementary in some fashion, doesn't suddenly convert them

11    into an employee.  In this instance, the mere fact that this

12    application, the particular usage --

13             **THE COURT:**  You're conflating.  I'm not at the

14    employee.  I'm at the threshold question, a simple threshold

15    question of whether there's enough semblance of a service being

16    provided as to trigger the presumption.

17             **MR. HENDRICKS:**  And this is my --

18             **THE COURT:**  The ultimate for these cases that you cite

19    the ultimate question, that's not the question I'm asking.

20             **MR. HENDRICKS:**  But --

21             **THE COURT:**  That's not the question we're discussing.

22             **MR. HENDRICKS:**  Understood, but I'm making an analogy.

23    And the analogy is this:  The mere fact that we may be

24    tangentially related, we make the point that we are a

25    application company, a software company.

1      The Court said, Well, I see that you're --

2          **THE COURT:**  The PUC is wrong by categorizing you as a

3  transportation company?

4          **MR. HENDRICKS:**  Well, first of which, it doesn't

5  categorize Uber in that sense.  I believe that it was making

6  reference to, sort of, Raiser or other software operators.

7      And, moreover, the PUC does not say by virtue of that

8  status we are employers.  It doesn't go to that connection

9  either.  Okay?

10      The point is that -- is that the mere fact that we may be

11  tangentially related in some fashion, at least this

12  manifestation, doesn't mean that they are providing a service

13  to us.  You have to go beyond that.

14      And, again, there is no evidence to that fact.  The

15  evidence from Manahan is he pays us for use of the intellectual

16  property and the other services that we provide.  The

17  passengers pay them.  It's their fare.

18      We take a cut of that fare for our services.  They're not

19  obligated to take any particular ride.  We don't control when

20  they do those sorts of things.

21      So the suggestion somehow, as you go through this list of

22  items and say, well, that must mean they're providing you a

23  service, no, it doesn't.

24      It means that we have an intellectual property.  It is the

25  application.  We market that.  Guess what, we market it to

1   customers as well, to the rider side of things.

2            THE COURT:  All right.  Let me ask you to respond.

3            MS. LISS-RIORDAN:  Uhm, certainly.  There are a lot of

4   ways to respond, but let me just start out be saying --

5            THE COURT:  Give me your best argument, because I want

6   to move on, frankly.

7            MS. LISS-RIORDAN:  Okay.  I'll try to jump the gun

8   quickly.  Uber holds itself out to the public as a car service.

9   We've cited Exhibit 3, "everyone's private driver."  Uber

10  refers to "our chauffeur."  It refers to what Uber drivers do.

11       A number of courts have said that the way companies hold

12  themselves out to the public shows what their business is.

13  This does merge into the factor regarding what the nature of

14  the business is.  But in *Estrada* the Court said, "Without the

15  drivers, there would be no company."

16       In the *Yellow Cab* case -- it's interesting that in the

17  *Yellow Cab* case they were found to be employees and provide

18  service to the cab company when there the payments that were

19  made were for what the company said was renting the cab.  So

20  unlike Uber, it wasn't getting a revenue off of each ride.

21       Of course, in the *Yellow Cab* case, just as Mr. Hendricks

22  is arguing, there was no obligation by the company to provide

23  any ride for any particular customer.  If a customer needed a

24  cab and there was a cab available, they would get the ride.

25  They weren't obligated to give them the ride.

1     The Courts have pretty uniformly rejected defendant's

2  attempts to deny the obvious and try to recharacterize what

3  they are.

4     In the FedEx cases, FedEx tried to make the same argument,

5  that it wasn't a package delivery company; that it was a

6  logistics network that simply connected people and businesses

7  who wanted to send packages with independent businesses who

8  wanted to deliver them.

9     And the Courts now, in a number of states, including in

10  the *Alexander* case, have rejected that.  In the Massachusetts

11  case, the Court noted that that was an interesting metaphysical

12  argument, but it's clear from the way they hold themselves out

13  that they are a delivery company.  That's what customers would

14  believe.

15     The *Kubinec vs. Top Cab* case, the defendants cite from

16  Massachusetts -- first of all, it's a lower court case.  And an

17  appeals court case has since said that cab drivers there are

18  likely to be able to prove they are employees and that they

19  provide services for the company, not the other way around.

20          **THE COURT:**  Which -- in that case?

21          **MS. LISS-RIORDAN:**  The *Kubinec vs. Top Cab* case is a

22  trial court -- a recent trial court decision from

23  Massachusetts --

24          **THE COURT:**  Yeah, I'm familiar.  You said there was a

25  subsequent Court of Appeal in Massachusetts?

1        **MS. LISS-RIORDAN:** Yes, that we cited. It's *Sebago*

2  *vs. Tutunjian*.

3        **THE COURT:** All right. Well, to tell you the truth,

4  with all due respect to the Superior Court of Massachusetts

5  interpreting Massachusetts law, which appears somewhat distinct

6  from California law, I don't think that case is particularly

7  persuasive, particularly since in that case the company

8  received a set amount no matter what, and it was not dependent

9  on whether rides were given. Nor do they set cab fares in that

10  case.

11      But, in any event, let's move on to -- I think the more

12  interesting question here is whether or not the facts, and if

13  disputed, at least those facts drawn in favor of the plaintiffs

14  are sufficient to establish at least a jury question.

15      And so I'd like your comments on the following. I mean,

16  seems like one of the main arguments here is that drivers are

17  not obligated -- I mean, they are so free and so free from

18  control that the only obligation is to work once every -- is it

19  180 days or something? If you're Uber Black, it's one every 30

20  days or something like that?

21        **MR. HENDRICKS:** If you're peer-to-peer Raiser, one

22  trip every 180 days. If it's Uber Black, it will be one trip

23  per every 30 days.

24        **THE COURT:** Right. And that -- therefore, that

25  certainly doesn't look like your typical employment

1    relationship when somebody can decide, "I'm not going to work

2    at all except once every half year, and I'll show up when I

3    want."

4           Now, once they're on duty, whether they have to take a

5    call or a ride or not, that's the second question I want to

6    address.  But the first question is, this sure doesn't look

7    like a typical employment relationship.

8           **MS. LISS-RIORDAN:**  Well --

9           **THE COURT:**  Can you think of any other analogy, any

10   other situation where courts have said, yeah, that's an

11   employment relationship?

12          **MS. LISS-RIORDAN:**  Yes, I absolutely can.  *Borello*.

13          The California Supreme Court held that the farm workers

14   were employees despite the fact that they could work whenever

15   they wanted, as much or as little as they wanted.  And rather

16   than providing direct supervision in the field to them, the

17   company operated -- the farm operated by putting incentives

18   into place that would simply encourage the farmers to do the

19   work.

20          *Borello* is really quite right on point.

21          Other cases as well, more recent cases, the *Air Couriers*

22   case, the Court of Appeals noted that the drivers could work

23   when they wanted, however long they wanted; their schedules

24   were flexible; they could choose --

25          **THE COURT:**  But, in fact, didn't they work pretty much

1    on a regular basis?  Isn't that what some of the evidence

2    showed?

3         **MS. LISS-RIORDAN:**  Well, the evidence was that they

4    generally did.  And a lot of the Uber drivers drove on a

5    regular basis, but they were free to work when and however much

6    or little as they wanted.

7         They were also free to work for other companies.  There

8    was no prohibition on that.  They were not required to accept

9    every job that was offered.  And there were no repercussions if

10   they didn't accept a job.  They were paid by the job.  They

11   didn't have formal training.  They didn't have uniforms, et

12   cetera.

13        But in *Borello*, the California Supreme Court, if you read

14   that decision, is really so much akin to this case.  I mean,

15   it's interesting, as I was going back and rereading the

16   cases -- it's funny, *Borello* sort of stands for -- is commonly

17   considered to stand for the proposition that control is the

18   ultimate issue.

19        But, really, what the Court was getting at in *Borello* is

20   that control is not everything.  We're going to look at all

21   these secondary indicia.  In *Borello*, there was very little

22   control.  There was -- there was one employee who was generally

23   seeing how the farmers were doing their work.

24        But the farmers were on their own to decide how to do

25   their work, when to do their work, whether to do the work at

1   all or not.  So on that issue I don't think there's anything

2   unusual about this situation.

3       I don't think there's anything unusual about a company

4   claiming that its workers aren't employees simply because they

5   can work as much or as little as they choose.  So that's that

6   point.

7           THE COURT:  All right.  Let me get your response to

8   that, Mr. Hendricks.  What about *Borello*?

9           MR. HENDRICKS:  Several points, first of which, the

10  actual product that was being grown on the land belonged to

11  *Borello*.  And so these individuals, when performing their

12  harvesting functions, were servicing *Borello*'s interests.  They

13  were performing work for *Borello*.  That is the first point that

14  distinguishes this from this case.

15      In this case, Uber is under no obligation to provide any

16  transportation services to any rider.  And the riders are free

17  to have the discretion, and have the discretion by contract,

18  whether to accept or not accept.

19      So when they accept or not accept, they are doing it for

20  their benefit.  And not only their benefit, but they're doing

21  it at their own discretion, not ours.

22          THE COURT:  Well, but that discretion point is the

23  very point that was just made.

24          MR. HENDRICKS:  But the difference --

25          THE COURT:  The discretion whether to work or not.

1    Sure, the crops may belong to *Borello*, but no agricultural

2    worker was obliged.

3         **MR. HENDRICKS:**  But, Your Honor, at some point the

4    crop had to be harvested, and that's the key.  It had to be

5    harvested.  Here, there is never any particular obligation on

6    any driver or any transportation provider to do anything, quite

7    frankly.  And that's a fundamental qualitative difference in

8    the level of control.

9         The reality of it is that, because you know that they're

10   going to have to harvest it at some point, there is some level

11   of control implicit within that relationship that doesn't exist

12   in this particular fact.

13        Uber -- individuals using the Uber application ultimately

14   really don't have to use it.  It's completely left up to them.

15   There's not this necessary point in connection with the

16   harvest, which was *Borello's* product, that they have to service

17   in some sort of way.

18        Here there is no particular thing that the Uber drivers

19   have to do for Uber.  And that's not the nature of the

20   relationship.

21        There's further control, Your Honor.  The fact -- if you

22   go back to the contracts -- and again, you know, if you look at

23   *Ayala*, it says look at the right of control, look at the

24   contract.  That's going to be the initial dispositive factor.

25        In our contracts we, in fact, disclaim any obligation to

1    provide ultimate service.   There's no duty on the part of the

2    drivers or the transportation providers relative to Uber to

3    take any particular rides or trips.   We don't set their

4    schedules.

5        We don't -- in terms of pricing, let's talk about pricing

6    for the moment.   If we had control over drivers in that

7    respect, if we really set their wages in that sense, we

8    wouldn't need to have surge pricing.

9        We would simply say, you know something, we want you out

10   on the road at this point in time, and if you're not we're

11   going to deactivate you.   We don't have that right under the

12   agreement.   We've never communicated that fact.

13       All of the evidence indicates that everything we do is to

14   incentivize because we don't, in fact, have the ability to

15   control Uber drivers.

16       There's a marketplace out there regarding pricing.   The

17   Court tried to suggest that we set, in essence, the wages here.

18   We have some influence in terms of the rates.   There's a

19   formula that parties agree to when using the application, that

20   they're going to agree to these rates.

21       There's language in the partner agreement that

22   specifically identifies that the rider can attempt to negotiate

23   a lower rate and the driver can agree to a lower rate.   There's

24   a mechanism for fare adjustment in the application.

25       But understand what you have in terms of pricing.   Okay?

```
 1   You have a dynamic marketplace taking place.  Because we lack

 2   the control to say when they're going to use the Uber app,

 3   okay --

 4          THE COURT:  When who's going to use the Uber app?  The

 5   drivers?

 6          MR. HENDRICKS:  Both.  Either the rider or the driver,

 7   okay?  They're really setting the pricing here.  If there's

 8   high demand and low supply, the prices go up.  And the

 9   driver --

10          THE COURT:  They don't have to go up.  You're

11   maximizing profits.  There's no law that requires -- just

12   because demand rises -- of course, every producer is subject to

13   the laws of supply and demand.  Nobody sets it unilaterally

14   unless you're a total monopolist and you're selling air or

15   water, so --

16          MR. HENDRICKS:  No, the point is this, Your Honor --

17          THE COURT:  -- let's be real.  You're acting as if

18   Uber is some passive entity.

19          MR. HENDRICKS:  I'm not acting like that at all.

20          THE COURT:  You're maximizing profit.  New Year's Eve,

21   they're going to jack it up and charge triple surcharge rates.

22          MR. HENDRICKS:  And, Your Honor --

23          THE COURT:  They don't have to.

24          MR. HENDRICKS:  Your Honor, if a driver feels at any

25   given time that the rates that are being charged are too low or
```

1    too high, they can make the choice when to enter the

2    marketplace, the price where they feel their services are at.

3         If a rider feels that the surge pricing is too high, they

4    can decide --

5              **THE COURT:**  That's right, it takes two to tango.  But

6    you're an active party.  Uber is an active party.

7              **MR. HENDRICKS:**  I'm not suggesting that we're not an

8    active party.  What I'm suggesting is, is that the driver and

9    the transportation provider has the ultimate discretion as to

10   when they utilize the service.

11        They're the ones that are making the determination as to

12   the value of their services and what they're willing to receive

13   as compensation for providing those services.  Not us.

14        It's a different situation --

15             **THE COURT:**  Well, let's go back to where we got here.

16   I asked you a simple question.  I'm trying to isolate the

17   factors.

18        One of the factors -- one of the key things you have

19   repeated thematically in your papers is that drivers can work

20   anytime they want; they're not obligated to do anything;

21   there's not a regular time to work.  And that is true.  That is

22   one indicia.

23        The more regularized it is -- and that is one difference,

24   for instance, between this and the *Alexander* case, where it's

25   clear you had to show up at 8 o'clock, to the center, pick up

1    the -- you know, if you didn't do it, you're going to miss out
2    on that day's work.  And you had to come back and return the
3    tracker and all that sort of stuff.  It seemed more regularized
4    because there were hours, you had to get it done within a
5    certain amount of time.
6        Of course, here people can check in and check out as much
7    or little as they want.  But the come-back to that is that
8    there are cases that say, well, that is true in, at least
9    theoretically, in *Borello* and *Air Couriers*, that people could
10   volunteer to work anytime they wanted.
11       And the simple point is, again, it's not dispositive.  The
12   mere fact that the putative employee can, sort of, choose his
13   or her hours, days of work, frequency, does not necessarily end
14   the debate.
15           **MS. LISS-RIORDAN:**  Your Honor --
16           **MR. HENDRICKS:**  I think --
17           **THE COURT:**  That's all -- you know --
18           **MR. HENDRICKS:**  The problem, Your Honor, is I feel as
19   though the Court is going through isolated aspects of cases and
20   not looking at the cases from the factual posture that they
21   arise.  Okay?
22       *Air Courier* is a different case from the Uber posture.  So
23   whatever weight they've given particular factors must be
24   considered in the context of that case.  *Air Couriers* was a
25   workers' compensation case.  This is not.  So the presumption

1   that's occurring in that case does not occur here.

2        **THE COURT:**  Well, what do you mean by that?  If I were

3   to find that drivers, contrary to your argument, do serve Uber,

4   that presumption applies.

5        I understand that *Borello* and other cases talk about

6   applying the employee versus independent contractor status in

7   the context of the statutory purpose and sometimes in the

8   liberality of that purpose in terms of protecting workers or

9   ensuring workers' compensation, et cetera, et cetera.  But here

10  we have a Labor Code that's just as solicitous of workers, I

11  think, as any of these other provisions.

12       And I have not seen any case that suggests that the

13  *Borello* test and the derivative from that is going to be

14  applied significantly differently in this context compared to

15  workers' comp or unemployment insurance or anything else.  I

16  have not seen a case that suggests a totally different

17  analysis.

18       **MR. HENDRICKS:**  Well, but, again, understand the

19  posture of this particular case.

20       This case was a case where there had been an underlying

21  administrative proceeding where the Court of Appeal -- and I

22  think you have to be cautious in cases that are being done not

23  in the context of summary judgment, but cases that are being

24  done on the substantial evidence standard, because there the

25  appellate review is to find substantial evidence and even

1    inflate further the inferences that go a certain way.

2         And in the particular case here, unlike in the case with

3    Uber, the Court found that there were not, for example,

4    contracts with these particular drivers indicating independent

5    contractor status, contrary to the representations.

6         In our case, there are contracts.  Where there are

7    contracts indicating independent contractor status and the

8    record supports that inference, courts have also said the

9    Courts should not easily disrupt those relationships.

10        In our instance, I --

11             THE COURT:  Well, the Courts have also said that the

12   labels applied to other parties and even the parties'

13   expectation, for instance, is only one of some 12 factors in

14   the secondary list, not even in the primary list.

15             MR. HENDRICKS:  Sure, sure.

16             THE COURT:  So it is a factor.  But it seems to be

17   pretty low on the hierarchy of factors.

18             MR. HENDRICKS:  Well, since we're on that point, I'd

19   like to raise that point that you just raised to respond to

20   another issue.  And that is, you talked about Uber's marketing.

21   You know, again, I think the Court has to look at, actually,

22   the relationship between the parties and not necessarily

23   characterizations of that.

24        And, you know, to the extent the parties' characterization

25   of their relationship in a contract as being independent

```
1   contractor status, Uber providing lead generation is not
2   controlling, I don't know how Uber's statement in internal
3   marketing materials, and for which foundation has not fully
4   been laid as to when they were distributed, and those sorts of
5   things, somehow should be controlling here.  I think that would
6   be unfair to say Uber's statements matter, but yet the
7   statements of the drivers and the contracts they signed with us
8   don't matter in some sort of fashion.
9            THE COURT:  Oh, I didn't say none of that matters.  I
10  think all of that matters.  The question is, at the end of the
11  analysis, when you look at it all and you have to draw all the
12  inferences, again, in favor of the nonopposing party, do you
13  find yourself in a situation where no reasonable jury could
14  find otherwise?
15           MR. HENDRICKS:  But the further inference here is --
16  again -- and it's important that you keep in mind the
17  distinctions as you analyze these cases.  This is another
18  delivery case.  Okay?
19       It's another delivery case where the company at issue has
20  already committed to a customer:  We're going to get your
21  package.  We're in the business here.  We're going to get your
22  package.  And then I go to someone and say:  Hey, I have to
23  deliver this package, I'm obligated to deliver this package.
24  Will you do it for me?
25       In that situation, going back to our service argument,
```

```
 1    there is a clear line of service.   In this case, that was one

 2    of the considerations.

 3           THE COURT:  Well, I don't know how dispositive that

 4    is.  In the Yellow Cab situation, Yellow Cab didn't have to

 5    respond when somebody calls a cab.

 6           MR. HENDRICKS:  The difference in Yellow Cab is they

 7    had a fleet of taxis.  They had a fleet of vehicles.  The

 8    central instrumentality of transportation is the vehicle.

 9       Take a look at Mr. Colopy's testimony --

10           THE COURT:  Well, the vehicle is no good if you don't

11    have a driver.

12           MR. HENDRICKS:  Take a look at Mr. --

13           THE COURT:  That's pretty central.  Unless you have

14    driverless cars, I guess, maybe in the future.

15           MR. HENDRICKS:  Or if you don't have a rider.  Or if

16    you don't have a rider.  We treat riders and drivers in

17    similar --

18           THE COURT:  The fact that they own the cars is one

19    factor.  They supplied one of the equipment.  It's one of the

20    12 secondary factors.  I acknowledge that.

21           MR. HENDRICKS:  It's not simply that they supplied the

22    vehicles.  It is evidence of the nature of their business.

23       When I have a fleet of vehicles and I have a dispatch

24    operation and I have you paint your cars a certain way and I

25    have a --
```

1          **THE COURT:**  That's a different point.  Your point --

2      you were trying to make the point that you can only have an

3      employment relationship where the alleged employer has a

4      contractual obligation to do something, like deliver packages.

5      That's what you've been saying.

6          That's how you distinguish *Air Courier*.  In a way, that's

7      how you distinguish *Borello*.  And I'm saying, well, maybe

8      that's a factor.  But, like I said in the beginning, it's not a

9      dispositive factor because we have other models where the

10     employment relationship has been found where there is no

11     preexisting exterior obligation.

12         **MR. HENDRICKS:**  I've not seen that case.  I've not --

13     I've not seen that case.

14         **THE COURT:**  Well, *Yellow Cab* is a case where they're

15     not obligated in advance to give anybody a ride.

16         **MR. HENDRICKS:**  But the difference -- again, you have

17     to look at the facts.  What *Borello* tells us is it's very

18     dangerous to simply take one aspect of a case and then apply it

19     to a different --

20         **THE COURT:**  That's why I'm discussing one fact at a

21     time.  And I'm saying the fact that you want to emphasize --

22     you've emphasized several times now that these cases, like the

23     *Courier* cases, are different because there's a preexisting

24     obligation to perform package delivery, and that's why there

25     was an employment relationship.

1    Number one, I don't see that as a factor.  That's not been

2    articulated in any one of the *Borello* progeny cases, the fact

3    of whether who owns the land, who owns the crop.  But, in any

4    event, that factor is not dispositive, as evidenced by the

5    *Yellow Cab* kind of situation.

6        **MR. HENDRICKS:**  The weight --

7        **THE COURT:**  Maybe it's a factor, but it's not a

8    dispositive factor.

9        **MR. HENDRICKS:**  The question is not necessarily

10   dispositive, because no factor is.  The question is what weight

11   do you give the factors.  And that changes depending upon the

12   factual context of the case.

13       And my point simply is, is that in a case where we have no

14   obligation to provide any transportation service to a rider,

15   and a driver has no obligation to provide any transportation

16   service, the factor of that sort of control and the fact that

17   we're not obligated to do that is significant in analyzing are

18   they integral to our business?  It's significant in analyzing

19   whether they're providing a service to us.  Okay?  That's the

20   issue.

21       And so in the context of *Yellow Cab*, where they have a

22   fleet of vehicles that if they are not used they lose money off

23   of that proposition, we are not dealing with that situation

24   here.  Okay?

25       They have instrumentalities that have to be used.  They

 1  have capital that they're trying to use.  We are not dealing

 2  with where we generate our revenue based upon making sure these

 3  cars are being utilized in performing a service that we also

 4  give dispatch service to, we have marketing logos on the

 5  vehicles, and have a medallion and other sorts of aspects in

 6  that regard.

 7       What we say is we create opportunity.  Okay?  People can

 8  take it or leave it.  And in our situation, for example --

 9       THE COURT:  Well, you're also invested, besides, in

10  software development costs, which I'm sure are not

11  insubstantial itself.  And you also provide the iPhone or the

12  phone.

13       MR. HENDRICKS:  And you know something, that's so

14  fungible in terms of the phone, because at present, you know,

15  there are people that can utilize the app using their own

16  phone.

17       The providing of the phone was not a function of providing

18  equipment.  It was a function of that's how the intellectual

19  property was transmitted.  That was the best way, at the time,

20  to protect the property.

21       THE COURT:  Well, at least under the facts here, the

22  phone is part of the deal.

23       MR. HENDRICKS:  What's that?

24       THE COURT:  There's evidence that the phone is part of

25  the deal.

1          **MR. HENDRICKS:**  And they pay us a fee for it.  It's

2     not like we're giving them the phone.

3          **THE COURT:**  Well, still you're providing the phone.

4          **MR. HENDRICKS:**  But we're not giving it to them.

5          **THE COURT:**  You have an investment.  You have

6     property.  What good is the phone and app?  And the app has,

7     I'm sure, a fairly high developmental cost figure, sunk cost.

8     I'm sure it's no small thing.

9          So the idea, well, we're nothing more than a broker

10    that -- we're introducing a rider, and we have nothing invested

11    in this thing is a bit of misnomer.  You may not own the cars,

12    but you own the property, including intellectual property.

13         **MR. HENDRICKS:**  But the fact that we have something

14    invested does not mean, therefore, that -- my difficulty is the

15    inference.  And I'm trying to determine -- to be responsive how

16    the Court goes from the fact that you have an investment or may

17    benefit from a transaction means that, therefore, they're

18    providing a service to you.

19         I'll give you another example.  I'm a recruiter.  Okay?  I

20    work with companies who pay me a fee to successfully recruit

21    candidates for them.  I go out in the marketplace and I

22    cultivate candidates.  I spend money on advertising.  I spend

23    money on promoting the company that I'm trying to get them

24    placed for.  I talk them up.  Okay?

25         And when I get those candidates -- right? -- I even talk

1    to them.  When you going on the interview, make sure you talk

2    to this person this way.  They like this.  You know, I think

3    this is what they're looking for.  You know, you shouldn't wear

4    that suit.  Maybe you should dress this way.  No, they're a

5    casual company.  This is how you should respond to them.  I

6    give all sorts of feedback and suggestions in all of those

7    things.  Okay?

8        And I only get paid if they get hired.  But if they get

9    hired, the fact that they were looking for work, the fact that

10   they actually got work, you know, the fact that they continue

11   to work doesn't mean that I'm their employer.

12       And, in fact, my recruiting contract often will say if

13   they quit within six months, I don't get my fee.  So all of my

14   energies and efforts in marketing my operation and marketing

15   them and giving them information and giving them suggestions

16   for the purpose of recruitment, which is my distinct

17   undertaking -- okay?-- giving them an opportunity does not mean

18   that now they're my employee, even though I benefit if they get

19   the job and perform the services.

20           **THE COURT:**  Well, one could easily come back and say

21   one of the factors -- the subsidiary factors is whether one is

22   in a specialized industry, a specialized skill exercised in an

23   industry.  Recruitment, as we all know, is not something people

24   do just right off the streets.  It is very specialized.  You

25   have to have a certain amount of talent and skill to be a

```
1    recruiter.  And it is an industry unto itself.
2             MR. HENDRICKS:  Okay.
3             THE COURT:  A little more specialized skill, I think,
4    than driving a car.
5             MR. HENDRICKS:  I disagree.  And let me explain why.
6        Again, you're looking at the shipping cases where people
7    are driving packages.
8        Here people are driving people.  The very ratings that
9    they're talking about and the variations in the ratings --
10   okay? -- the very fact that people are expected to give
11   excellent service so the customer is happy, the rider is happy,
12   and the fact that some people can't do that, this is not
13   necessarily a simple thing to do.
14       In any human undertaking, when you're interacting with
15   people versus packages, it takes some level of skill.  There's
16   no evidence here --
17            THE COURT:  Which is exactly why I assume Uber has a
18   very extensive list of dos and don'ts and suggestions and
19   feedback to assure that that quality is maintained.
20            MR. HENDRICKS:  But in your example of the recruiter,
21   where you say it takes skill, Uber is the recruiter.  Uber is
22   the one that's connecting the two.  Uber is the one that's
23   benefiting from its intellectual property, its skill, its
24   efforts in being able to understand what one market wants --
25   okay? -- and provide them with folks that might be able to
```

1    satisfy them.

2         The ultimate decision-making process of whether they work

3    and whether that transaction takes place, that's between the

4    recruiter -- between the employer, right, the person wanting

5    the recruitment, and the -- the potential employer and the

6    applicant.  That's their relationship even though I'm very

7    much, as the recruiter, involved in it.

8         Uber is the recruiter in that example.

9         **THE COURT:**  Let me ask you, Ms. Liss-Riordan, what's

10   wrong, if anything, with the recruiter analogy?

11        **MS. LISS-RIORDAN:**  Well, recruiters typically don't

12   have, then, an ongoing supervisory relationship with the people

13   they recruit into a position.  I think that's the main

14   distinction there.

15        If I could just go back to a little bit of what has just

16   been said, very briefly.

17        **MR. HENDRICKS:**  Your Honor --

18        **THE COURT:**  No, let her finish.

19        **MR. HENDRICKS:**  Okay.

20        **MS. LISS-RIORDAN:**  I still never heard from defense

21   counsel any real distinction in *Borello*.  In *Borello*, the farm

22   wasn't obligated to provide the pickles to Vlasic.  It just

23   sold as many pickles as it was able to.

24        **THE COURT:**  His distinction is that the pickles

25   belonged to *Borello*.  They had to be harvested and somehow

1    that, therefore, is a factor in -- some indicia of an

2    employment relationship as opposed to an independent

3    contractor.

4         It's lost on me because one could hire independent

5    contractors to pick the pickle just as much as an employee.   I

6    don't know why it makes any difference who owns the crop.

7              MR. HENDRICKS:  Because it goes --

8              MS. LISS-RIORDAN:  If I could speak --

9              THE COURT:  Let her continue.

10             MR. HENDRICKS:  Okay.

11             MS. LISS-RIORDAN:  Yes, thank you.

12        Okay.  So in *Borello*, my point is just going to the factor

13   that there is no -- what he's arguing is there's no obligation

14   for Uber to provide a service to a passenger, there's no

15   obligation for the pickles to actually get harvested and be

16   sold to Vlasic.  They were sold when and if they grew and when

17   and if they met Vlasic specifications.

18        In addition to the *Air Couriers* case and the *Borello* case,

19   on this issue that we're talking about regarding workers being

20   able to work as much or as little as possible, I just also

21   wanted to highlight the *JKH* case, where there were route

22   drivers and there were special drivers.  And the appeals court

23   noted that the special drivers simply call in each day to

24   inform the dispatcher whether they want to work that day.  They

25   can work whenever they want.  They don't have to work.

1     The Court also said, this is on 569:

2         "The drivers are free to decline to perform a

3     particular delivery when contacted by the dispatcher even

4     if the driver has indicated his or her availability for

5     the day.  The special drivers are not required to work

6     either at all or on any particular schedule."

7     Later, on page 1052, the Court notes that all drivers set

8  their own schedules and choose their own driving routes.  Their

9  work is not supervised. It has only a vague idea of where its

10 working drivers are during the business day.  They don't have

11 to report to the office.

12     So, anyway, you asked for cases, so I have *Borello*, *Air

13 Couriers*, *JKH*, working as much or as little as you want.  It

14 does not mean that you're not an employee.

15     **THE COURT:**  Let me ask you this, Ms. Liss-Riordan.

16 Let me take it one step deeper, and that is:  What is your

17 contention as to when a driver is in the employ of Uber?

18     Is it somebody who does it occasionally?  Is it at all

19 times, or when they decide to drive and turn on the app and

20 make themselves available?

21     At what point -- in other words, one could also say, in

22 response to the irregularity question and the occasionalness

23 question, that that does not mean necessarily that somebody who

24 only works occasionally or somewhat rarely, that doesn't

25 necessarily preclude them from being an employee when they do

ЗЗЗ

```
 1    go to work.
 2         So whether it's a day laborer being picked up and being
 3    told exactly how to handle a particular task when they're
 4    brought to the site, or whether it's a reserve officer or
 5    reserve firefighter who only works once every six months, but
 6    once he or she reports, arguably, is in the employ.
 7         So is it a fair construct to say that in a way it doesn't
 8    necessarily matter how often they work, when they work; the
 9    question is:  When they're at work, that's when the employment
10    relationship kicks in and the Labor Code kicks in.  Is that
11    your construct?
12         MS. LISS-RIORDAN:  Yes, yes, absolutely.
13         Employees may work occasionally.  Employees may work
14    part-time.  Employees may just fill in on shifts when they're
15    needed or when they want to work.  There's nothing really
16    unusual about that.
17         And just while we're on that topic, I just want to point
18    out one, I think, pretty significant point.
19         THE COURT:  Well, when do they -- when does one become
20    an employee?  When you turn on the app and you make yourself
21    available?
22         MS. LISS-RIORDAN:  Well, you first become an employee
23    after you go through Uber's on-boarding process and follow all
24    of its steps to -- that's like going through the hiring
25    process.
```

1    But then just because you get hired, you don't necessarily

2    start working that day.  You might not start until next

3    Tuesday.  You might not start 'til next month.  You start

4    whenever you start.  But you're actually on duty.

5         And, in fact, Uber has referred to it as being on duty or

6    off duty.

7              **THE COURT:**  So there's an employment relationship even

8    if you only work 1 out 180 days; all 180 days you're still in

9    the employ of Uber, you're just not working?

10             **MS. LISS-RIORDAN:**  Well, I mean, let's just say a

11   restaurant server, who fills in shifts now and then, once every

12   six months gets called in to do a shift.  They're an employee,

13   but they're only obligated to be paid, obviously, when they

14   work.

15        I don't really understand what's so unusual about that.

16   And, like you said, the day laborers, who might get hired for a

17   day, they're employees while they're working.  And they're

18   entitled to the benefits of the wage laws while they're

19   working.  Same thing for Uber.

20        While we're on this topic, I just wanted to point out

21   something somewhat significant that, I think, has been

22   misstated in defendant's papers, because one of the arguments

23   they make, I'm sure, about -- the next thing that might be

24   coming out of Mr. Hendricks' mouth -- is that Uber allows its

25   drivers to work simultaneously for other companies.

1    And, of course, in a number of the cases that we've

2  already talked about there was no prohibition on working for

3  other companies.  I believe that was true as well in the -- in

4  the *Air Couriers* case as well as in other cases.

5    But I want to point out in particular that even though

6  Uber claims that it has no -- and it makes a big point of

7  drivers actually being simultaneously logged into Uber and Lyft

8  at the same time, that's actually prohibited by Uber's

9  contract.

10    In their papers, defendant --

11         **THE COURT:**  While they're driving a customer.

12         **MS. LISS-RIORDAN:**  No, it's broader than that.

13    In Uber's papers, they say that there's no prohibition on

14  them using the same apps simultaneously.  But if you look at

15  Plaintiffs' Exhibit 15, page 3, which is 1679 Bates stamped, in

16  the bottom paragraph --

17         **MR. HENDRICKS:**  One moment, Counsel.

18         **THE COURT:**  Yes.

19         **MR. HENDRICKS:**  What page?

20         **MS. LISS-RIORDAN:**  I'm on -- this is Plaintiffs'

21  Exhibit 15.  It's page 3 at the bottom.  It's Bates stamped

22  1679, Uber 1679.

23    In the bottom paragraph, about halfway down, it says in

24  the contract:

25         "During the time that you are actively signed into the

1        software, you shall perform transportation services only

2        for requests received by you via the software."

3        So, in other words, in their contract they're saying that

4   while you have the Uber app open, you can't accept rides from

5   anyone else.

6        So I just wanted to make that point because that

7   contradicts what defendant has said in a number of its filings.

8        MR. HENDRICKS:  Well, first to which, the testimony

9   from Mr. Manahan and, quite frankly, the declarations we've

10  submitted, and the testimony from the other plaintiffs indicate

11  differently.

12       That agreement is speaking, which has been consistent,

13  that if you're transporting -- it's intended to speak to if

14  you're transporting a passenger, a rider that you --

15       THE COURT:  Yeah, but we're now on summary judgment.

16  So now you're asking me to draw an inference and take your

17  counter affidavits as true.  And maybe you can present that at

18  trial.  But, again, this is an example of a conflict.

19       You know, it says what it says.  It doesn't say "while

20  you're driving."  It says "while you're actively signed into

21  the software."

22       MR. HENDRICKS:  "Actively."

23       THE COURT:  It says that, so --

24       MR. HENDRICKS:  "Actively signed into the software."

25       THE COURT:  Okay.

1              **MR. HENDRICKS:**  Well, let me say this.  Let me come

2      back to a couple of these distinctions as well.  And this does

3      go to the issue of Lyft and the simultaneous -- and in terms of

4      the evidence and in terms of all the declarations and the

5      testimony from the plaintiffs themselves.

6          The plaintiffs' understanding of what those obligations

7      were -- and that's always relevant -- you're not seeing a

8      distinction -- while counsel is making an argument, you're not

9      seeing a conflict in the evidence relative to what the

10     plaintiffs have testified to and the evidence that we've

11     submitted.

12             **THE COURT:**  Well, and by the way, as we all know, the

13     test is the potential control, the authority to control; not

14     actual exercise of control.

15         So, again, even if somebody has an understanding to the

16     contrary, even if Uber says, well, we never did it that way,

17     but if they had the right to do it per contract, I have to

18     consider that.

19             **MR. HENDRICKS:**  But what you have -- the issue is, is

20     there a dispute?  And the issue is, what is the evidence of the

21     dispute?

22         All of the parties, the drivers themselves -- let's

23     exclude counsel's characterization.  But the testimony from the

24     drivers themselves and the evidence presented by Uber, our

25     declarations indicate that people can simultaneously use that

```
 1   software so long as they're not actually transporting someone
 2   in particular.  That's the only limitation.
 3        But it's understood and it's known and it's accepted.  And
 4   when you look at issues of contract, it's a question of what
 5   did the parties understand and intend.  You don't have a
 6   dispute between the intent of the parties relative to that.
 7        Counsel is making an argument, but it's not counsel's
 8   intent that matters --
 9        THE COURT:  But the ultimate question is whether Uber
10   had the ability to exercise the power to restrict people, even
11   if the practice wasn't to do so, or the custom had been that
12   way.
13        Even if one could say, well, these plaintiffs didn't
14   understand it that way, if, as an objective fact, one could
15   find that Uber had that power, the potential power, I have to
16   evaluate that under the Borello test, not the actual exercise.
17   And the Courts have emphasized that.  It's the potential for
18   power.
19        MR. HENDRICKS:  Your Honor, the issue is counsel is
20   attempting to argue an interpretation of the agreement.  When
21   you're dealing with interpretations, you look at the intent of
22   the parties.  She needs evidence as to the intent of the
23   parties.
24        The parties, Mr. Manahan and the other --
25        THE COURT:  It seems to me the question is whether or
```

1    not the contract can be reasonably construed in light of the

2    evidence that's before me now in a certain way.  Again --

3         **MR. HENDRICKS:**  And the evidence before you now

4    includes the deposition testimony and declarations of the

5    parties subject to the agreement.  And if you're going to reach

6    an inference as to what that means, you must look at that

7    evidence.

8         **THE COURT:**  And what do they say?

9         **MR. HENDRICKS:**  They say, "I understood that I could,"

10   and, in fact, with Manahan, "I did use the Lyft application

11   simultaneous."  That is our interpretation and understanding of

12   it as well.

13        **THE COURT:**  Okay.  Ms. Liss-Riordan, what's your

14   response?

15        **MS. LISS-RIORDAN:**  Well, my response is the contract

16   speaks for itself.  The fact the Uber may or may not have

17   enforced that provision of the contract, as we've said --

18        **THE COURT:**  What about your clients?  What about the

19   driver's own intent in this case?

20        **MS. LISS-RIORDAN:**  Well, I mean, first of all, he

21   didn't have both an Uber client and a Lyft client in the car at

22   the same time.

23        We also do have evidence in the record of a driver being

24   reprimanded for having Lyft branding visible while driving an

25   Uber client, which is also prohibited by the contract.

1          So the fact -- so even though Mr. Manahan may have,

2     against the contract, had both apps on at the same time, he was

3     either only driving an Uber passenger or a Lyft passenger at

4     that time.

5          But we also have evidence that Uber was discouraging

6     drivers from driving for the competition.  And Exhibit 48L

7     shows the driver who was reprimanded for having the -- the Lyft

8     branding available.

9          But the point is that all of this goes to this issue in

10    *Air Couriers* again.  There was no prohibition on the drivers

11    working for other companies.

12             **THE COURT:**  All right.  So here there is some

13    prohibition.  The exact scope of that may be in dispute, but it

14    is not extreme where you're totally free.  On the other hand,

15    you're not totally prohibited.

16         It's a gray area that, you know, one has to resolve

17    exactly to what extent the limitations are.  It's a gradation

18    question.

19             **MS. LISS-RIORDAN:**  Right.  And also --

20             **MR. HENDRICKS:**  Going to the *Air Couriers* case -- and

21    this is important -- there have been characterizations of these

22    cases.  The facts have to be looked at very, very carefully.

23         If you look at that case, *Air Couriers*, the finding that

24    the Court was limited to was the following:

25         "The Court also rejected Sonic's claim that the drivers

1  themselves controlled the hours they worked."

2      So you talk about distinctions in cases, this is why I say

3  you have to look at the factual posture.  In that proceeding,

4  the agency -- and I'm reading from page 937 of that case.

5      So in that situation you have the fact where the evidence

6  that -- that was found and upon which the Court of Appeal had

7  to consider in this decision was that, in fact, the Sonic

8  drivers did not control the hours that they worked.  Okay?

9      There are other distinctions.  At trial, a Sonic manager

10 testified that drivers, as a practical matter, did not turn

11 down jobs.  Each driver testified he infrequently turned down

12 jobs.  So there's these characterizations of certain aspects of

13 these cases.

14     But when you look at them closely, this is dealing with

15 delivery of packages that Air Courier, Sonic, had already

16 agreed to deliver.  They did not have freedom regarding their

17 hours or circumstances.  And that's not the record involved in

18 this particular case.

19     In addition, the Court noted the evidence was

20 uncontroverted that Sonic's drivers were performing an integral

21 and entirely essential aspect of Sonic's business.

22     We dispute that.  Okay.  That is something that -- that,

23 in fact, we've presented evidence in terms of the economic

24 relationship between transportation providers, riders, and

25 Uber.  And there is no real evidence speaking to that.  There

```
1    really is no evidence saying, you know something, you have to

2    deliver these -- you have to transport these passengers because

3    you're obligated to do so.  We're not.  You know, or that you

4    have such an investment -- and remember this, Your Honor, going

5    back to Yellow Cab.

6         You know, if my capital investment is all these taxis,

7    okay, I really can't be doing too much other with that.  I'm

8    really in the taxi business when I'm leasing these taxis.

9         Uber, its technology which connects people together in

10   real time can be used in other applications, as it is.

11        People demand ice cream.  We have vendors, vendors who

12   produce ice cream that are able, through our software,

13   demanded -- on demand to people that want ice cream.  We

14   facilitate that transaction.  We're not in the ice cream

15   business, you know.

16        THE COURT:  You mean there's something called Uber Ice

17   Cream?

18        MR. HENDRICKS:  Yeah.  Yeah, yeah.  I mean --

19        THE COURT:  I've never heard of it.

20        MS. LISS-RIORDAN:  Uber Kittens.  They deliver kittens

21   too.  These are not core parts of their business.

22        MR. HENDRICKS:  Well, see, then this --

23        THE COURT:  But we're going this business right now.

24   The fact that you have other enterprises that -- you know.

25        MR. HENDRICKS:  We're talking about the application
```

1    and the intellectual property and -- and the use of that.  And

2    we're rebutting the notion that somehow the only application of

3    it deals in this particular space.  That's not the evidence

4    that's been presented.

5         Counsel has presented no specific evidence that somehow

6    that --

7              THE COURT:  Well, let me ask you this question.

8    Here's another factor that may inform what you just said, but

9    also informs the control factor, and that's this dispute over

10   whether there's a requirement or any sanctions for not -- for

11   rejecting calls.

12        And Uber claims that you can reject any proposed fare

13   without penalty.  But there is some evidence that's been

14   submitted by the plaintiffs -- Exhibit 48 is an example, 48J is

15   an example -- of a driver who's threatened with suspension if

16   he didn't raise his acceptance rates towards the 80 percent,

17   which is consistent with Exhibit 17, which, I guess, is the

18   handbook or something that says we expect you to maintain an

19   80 percent acceptance rate.  If you go below that, you know,

20   red flags will go up.

21        And so that suggests that there are consequences,

22   potential consequences if you go below the 80 percent

23   acceptance rate.

24        Now, again, you may dispute that.  You may say that that's

25   inaccurate or that's a misreading of the handbook.  But, again,

1   assuming all the facts proffered by the plaintiff are true, and

2   drawing all inferences therefrom, why doesn't that suggest that

3   there is, certainly, at least an incentive, if not a

4   requirement, to pick up fares or at least not reject fares at a

5   rate greater than 20 percent?

6       **MR. HENDRICKS:**  Okay.  One, the contracts provide that

7   drivers can reject -- and transportation providers can reject

8   fares.  That's the first point.

9       **THE COURT:**  Yes.

10      **MR. HENDRICKS:**  So to the extent -- and I want to get

11  to this issue about control.

12      To the extent plaintiffs are claiming that we've exercised

13  control beyond what the contract provides, then that's a

14  different kind of claim.  The consequence of that is not to

15  make them employees.  It may mean that if someone were

16  deactivated in contravention of the contract, they have a

17  breach of contract claim.  So that's one issue.

18      Second, let's look at the underlying issue.  Drivers are

19  not expected to accept any number of rides.  The acceptance

20  rate issue -- as explained by Mr. Coleman in his declaration,

21  and as the plaintiffs themselves have testified to -- it's

22  simply about if you are going to be online then you should be

23  accepting a certain number of requests, because if you don't it

24  affects the service and the experience of others using the

25  application.

 1          **THE COURT:**  Well, I understand the reason for that.

 2   But that does suggest that it's not so free -- that Uber does

 3   have an interest in the behavior and acceptance and the

 4   volunteer acceptance of the drivers, because if they don't

 5   volunteer and accept when they get the call --

 6          **MR. HENDRICKS:**  No.

 7          **THE COURT:**  -- it creates a problem.

 8      And, therefore, that's why, in this Exhibit 17, which I

 9   assume is some kind of handbook, it says if we get -- we'll

10   take more serious action if we get a report of more than one

11   issue every 45 trips.

12      And one of those issues is not responding to client or

13   Uber phone call or rejecting too many trips.

14          **MR. HENDRICKS:**  Okay.  First of which, not one of the

15   plaintiffs in this case has said that they were exposed to that

16   particular document or were subject to it or understood it.

17   There is no foundation as to who it was sent to, whether it was

18   a draft, how long it was in use, et cetera.

19      So, as an evidentiary matter, I'm very concerned that

20   that's being relied upon in some sort of fashion.  But it's

21   important --

22          **THE COURT:**  So Exhibit 48, the declaration of Taj

23   Korea, which shows a reprimand letter, you dispute the

24   authenticity of that?

25          **MR. HENDRICKS:**  I dispute that any of these particular

1  plaintiffs ever -- the plaintiffs ever received those kinds of

2  notices.  I'm referring to the handbook.

3       You know, if he indicates that he received some sort of

4  document, I'm not going to suggest that he didn't receive it.

5  The question is what is the significance here.

6       You know, the acceptance rate issue, Your Honor, is not

7  about accepting trips.  It's about being online only when you

8  decided that you, in fact, want to accept trips.

9       The reason why that's not a sanction is because the

10  transportation provider, or the driver, doesn't have to be

11  logged in.  Just don't log-in.  That's all that's being said

12  here.  It's not saying you have to make sure you take a hundred

13  trips in a month.

14       **THE COURT:**  I understand that.  But once you log-in,

15  there's a degree of control that's being exercised, because if

16  you're not logged in, you're not reasonably working.

17       **MR. HENDRICKS:**  But the point of that control is not

18  to increase their activity.  The point of that control is to

19  ensure that riders and other --

20       **THE COURT:**  Oh, I understand.  I understand why.  It

21  would be a disaster if you just, oh, I don't want to go that

22  neighborhood, I'm not going to pick this person up, and then

23  people start waiting 20 minutes.  You might as well catch to

24  Yellow Cab at that point.

25       (Laughter)

1     **MR. HENDRICKS:**  I would never suggest that.  But it's

2  not --

3     (Laughter)

4     **THE COURT:**  I didn't think you would.

5     **MR. HENDRICKS:**  Always Uber.  Always Uber.

6  But, you know, the fact of the matter is -- and this is

7  why I think it's so important.  Judge Chhabria made an

8  interesting point yesterday, in the hearing in connection with

9  Lyft, about how the laws seem not quite fit for this sort of

10  new, sort of, technology.

11     We come back --

12     **THE COURT:**  I don't necessarily disagree with that.

13  But I'm stuck with the precedent right here.

14     **MR. HENDRICKS:**  But a part of that is we presented you

15  with a model that explains why -- how it works.  And I've not

16  heard facts.  I've heard feelings from Counsel.  But I've not

17  heard facts that explain why this is not the case.

18     Drivers are our customers.  This is a commercial platform.

19  Okay?  If you go to a restaurant, right, you're a customer.  If

20  you start yelling at other patrons, if you disrupt the ability

21  of others to enjoy their meal, I have the right to refuse

22  service, okay, in that sort of commercial relationship.  It

23  maintains the integrity of the business.

24     What you are seeing is commercial and business control,

25  not employment control.  And that's why I invite the Court to

1   go back and analyze the actual relationships between these

2   parties.

3           **THE COURT:**  But if I find that they are serving Uber,

4   then they're not just restaurant customers.  They're more than

5   that.  And, therefore, the control at that point is a control

6   that's designed to ensure that the service is being provided in

7   a way that is -- meets the standards of the employer, the

8   putative employer.

9           **MR. HENDRICKS:**  No, it's not dictating.  It's not

10  dictating anything about -- remember that's a denial of a trip.

11  They've just decided not -- that they're not going to accept

12  it.  It's not dictating the actual service of getting from

13  point A to point B.

14      As you pointed out, the service that the riders receive is

15  getting from point A to point B.  This particular control is

16  not impacting specifically what's taking place in that vehicle

17  once that rider gets in.

18          **THE COURT:**  But it does impact how long it takes for

19  somebody to get a car, because if you don't have this rule and

20  people are --

21          **MR. HENDRICKS:**  But that's a different kind of

22  control.  That's a different kind of control.

23      You know, when *Borello* talks about the control of the

24  manner and means of carrying out the work -- remember, you just

25  indicated that -- that when they're online, they're not

1   necessarily employed or engaged even under that model.

2         That issue about acceptance rates is all before they

3   accept the trip.  So it's not in connection with providing the

4   service to a rider that -- that the concern of acceptance rates

5   arises.

6         **THE COURT:**  I want to say they're at work once they

7   turn on the app and say they're ready to receive calls.  That's

8   when it starts.

9         **MR. HENDRICKS:**  And that's when they have both the

10  Lyft app on and both the Sidecar app on.

11        **THE COURT:**  That's disputed.

12        **MR. HENDRICKS:**  That's not disputed.  The evidence is,

13  in fact, that's what they do.  That's what they have.

14        **THE COURT:**  That's what they do, but there's also

15  evidence that the contract prohibits that.

16        But it goes to another point that I was going to go back

17  to.  To the extent there is some control, an 80 percent rule or

18  a soft 80 percent rule or don't reject too many trips, that

19  again goes back to our first point.

20        Doesn't that underscore an interest beyond just selling a

21  software application?  It goes to running a transportation

22  service --

23        **MR. HENDRICKS:**  No.

24        **THE COURT:**  -- because you're concerned -- your client

25  is concerned with making people wait too long.  And the way

1   that they prevent that is to have enough drivers, set the right

2   pricing, and impose a benchmark that you're not to reject too

3   many trips.

4        And in the case of this one individual in Exhibit 48J, I

5   think it is, got a warning letter.  And that's in the interest

6   of how well it is responding in providing transportation, not

7   in just providing software.

8        I'm only simply making the point that Uber has done so

9   many things to make sure that the transportation that people

10  are partaking in, purchasing, is a good one, a responsive one,

11  a quality one, which transcend the mere sale of a piece of

12  software.

13        **MR. HENDRICKS:**  Your Honor, it's about the experience

14  of using the software.  And, you know, that's a distinct

15  aspect.  The functionality and the experience of using the

16  application is a distinct -- is a distinct aspect --

17        **THE COURT:**  Well, you can characterize it that way,

18  but you're totally ignoring the fact that using the software

19  leads to a ride somewhere.

20        **MR. HENDRICKS:**  Okay.  So let's go through this then.

21  You have a rider who requests a trip.  A driver shows up.  The

22  rider says, "Take me to this location."  The rider says, "Turn

23  the radio off."  The rider says, "Oh, wait, stop, I want to go

24  here."  The rider says, "Oh, could you turn the air

25  conditioning down?"

1    The rider is controlling the means and manner of the

2    service actually being provided to the rider.  That is the

3    control that's relevant in *Borello* and these other tests.

4    That's what's really going on here.  The rider is dictating

5    those specific aspects.

6        If the rider says, you know something, I decided that, as

7    opposed to this stop, I want to go to a different direction or

8    I want to take this particular route because it's going to take

9    me near a friend and I want to say hello to them, okay, the

10   rider is doing that.

11       Under plaintiffs' theory and that notion, all riders who

12   request a service, pay a fee, get the service, direct the

13   driver where to go are now employers.  Okay?  That's not --

14   that's not what's at issue.

15       In this case you have the plaintiffs who -- take, for

16   example, O'Connor and Colopy.  They work for transportation

17   companies.  They negotiated their rate with them.  These are

18   companies that had trips to Napa, that had accounts with Apple,

19   that had other sort of things that could have used Lyft,

20   Sidecar, any sort of lead generation service they wanted to in

21   order to increase their business.

22       And suddenly, because they use an application to increase

23   an aspect of their business, we're now the employer?

24       I come back to you and tell you that *Martinez* -- the Court

25   in *Martinez v. Combs* made clear that simply because you benefit

1    from something does not mean that you are in service or

2    receiving service for that.

3        The fact that we gained economic --

4        **THE COURT:**  If you find more than just a benefit, if

5    one were to find a reasonable jury could find that, under the

6    facts of this case construed in favor of the plaintiff, that an

7    employment relationship could be found, that there's sufficient

8    indicia of control and some of the other factors -- they go

9    both ways, but some of the other factors, that -- what would

10   preclude them from -- just because they're employed, they've

11   leased these limousines or Mercedes from this other -- these

12   other companies who share in the revenues, why would that

13   negate the otherwise *Borello*-type finding with respect to Uber

14   over these drivers who do sign the contract?  Right?

15       There's a driver addendum?

16       **MR. HENDRICKS:**  The driver addendum is a contract

17   between the transportation provider and the driver merely

18   acknowledging that they will honor the licensing agreement and

19   some other sort of characteristics, that's correct.

20       **THE COURT:**  Right.  They agree to be bound by the

21   terms of the Uber --

22       **MR. HENDRICKS:**  Your Honor, the notion that -- if you

23   take a look at the facts of Colopy and O'Connor, that

24   negotiated their wages, that received a vehicle, their hours of

25   work were set and controlled by these other entities and what

1  vehicles they had or did not have under those situations,

2  there's no -- from our perspective, there's no way that, under

3  *Borello* or any of these other cases, there could be the

4  argument that O'Connor or Colopy are our employees.  There's

5  just none.

6       **THE COURT:**  But they're still subject to the same

7  rules.  They're still subject to the -- once they're on duty

8  and they have the app on if they get a call --

9       **MR. HENDRICKS:**  No, no, Your Honor.

10      Your Honor, they can still work with L&S Limo or any of

11  the other limo companies they're working for, and simply not

12  use the Uber -- in fact --

13      **THE COURT:**  Well, but my point is even if they're

14  working for the limo company while they have their Uber app on,

15  they cannot -- you would concede that they cannot then turn on

16  the Lyft app while they've got a customer -- an Uber customer

17  in the backseat, right?

18      **MR. HENDRICKS:**  I think we're talking --

19      **THE COURT:**  No, no, answer my question.

20      That rule applies whether they're on their own or working

21  through a limousine company, correct?  If they're an Uber

22  driver and they've got an Uber passenger in the backseat, they

23  cannot turn on the Lyft application in the middle of that trip,

24  correct?

25      **MR. HENDRICKS:**  The transportation company has agreed

```
 1   that they would honor the --

 2          THE COURT:  And that driver is bound by that through

 3   the driver addendum.

 4          MR. HENDRICKS:  Ultimately -- ultimately, the only

 5   thing -- I think this is a very good point, yes.

 6       And so to that extent, what would happen, we disallow use

 7   of the service, right?  They're still driving.  They're still

 8   picking up the same Apple customers --

 9          THE COURT:  They're not driving for Uber.

10          MR. HENDRICKS:  They never were driving for Uber.

11          THE COURT:  They're not driving -- they're not able to

12   use a driver app.

13          MR. HENDRICKS:  Oh, so now we've created an

14   application and we're obligated to make sure people use it on

15   their terms?

16          THE COURT:  I'm just saying once you exercise control,

17   the fact that somebody else exercises some additional control

18   over that doesn't negate the initial control.

19          MR. HENDRICKS:  Oh, Your Honor, I mean, again, the

20   premise of your question is, somehow once we've created this

21   application that helps people connect people together and the

22   moment we once give them use to it under certain terms and

23   conditions that made them our employees.

24       There are terms of service agreements all the time with

25   intellectual property in software.  And the fact of the matter
```

```
 1    is, is that simply because they're not using the Uber
 2    application -- which many of them were not using in the first
 3    instance; they were working for other transportation
 4    companies -- does not now convert them into employees.
 5         We don't control any aspect of whether they continue to
 6    provide services for the company that they are ostensibly
 7    employed for.
 8         And I do think this is an important -- this is an
 9    important distinction.  You have agreement for people who have
10    indicated that they are in an independent contractor
11    relationship.
12         I believe the standard when weighing those factors is, is
13    that if there is evidence supporting that that is a bona fide
14    designation, that that should be honored by the Court.  Here we
15    have the most essential element --
16         THE COURT:  So you're elevating that now to a
17    presumption that if there's a contract that sets forth -- that
18    labels this an independent contractor situation, that now
19    becomes a primary factor and your burden of -- the burden of
20    persuasion shifts?
21         MR. HENDRICKS:  I've never said that.
22         THE COURT:  Sounded like you're saying that.
23         MR. HENDRICKS:  I'm not saying that it creates a
24    presumption.  What I'm saying is -- I mean, Borello tells us
25    that the weight you give to factors will vary depending upon
```

1    the factual context.  Okay?

2        I'm saying in a context like this where you have, in fact,

3    a bona fide driving industry out there, Uber did not create

4    black car service.  Uber did not create taxis.  Uber did not

5    create ride sharing.  Okay?  This is a bona fide industry

6    that's out there.

7        What we've done is we've implemented an application that

8    riders and drivers find attractive to utilize their vehicles

9    where they would otherwise be unutilized.  It's a benefit to

10   them; it's a service to them.

11       That view of what Uber does is consistent with the

12   deposition testimony of Mr. Manahan, who characterized Uber as

13   a platform like eBay, who acknowledged he pays us a fee.  All

14   he does is pay us a fee to use our application.

15       We don't provide him with a vehicle.  We don't tell him

16   where to show up, when to show up, whether to show up.  None of

17   those things.

18       In an instant, he makes a choice.  What's his testimony?

19   "I decided to use Lyft one day because of my mood.  And, you

20   know, if I'm in a good mood or a chatty mood, I'll use Lyft.

21   If I'm not so much, I'll just Uber."  That is not an employment

22   relationship.  Okay?

23       And if you go to *Borello*, as for harvesting these pickles,

24   this crop, they're not at the same time saying, you know, oh,

25   man, I'm going to do this crop right now.  They're at a

1  physical location, the property of *Borello*, the crop of

2  *Borello*, okay?  The crops --

3         THE COURT:  They could get up and leave.

4         MR. HENDRICKS:  What's that?

5         THE COURT:  They could get up and leave.

6         MR. HENDRICKS:  Yeah.  But what's the implication of

7  that?

8         THE COURT:  The implication of that is even if they

9  have a great deal of freedom deciding when to work, how long to

10  work, does not prevent them -- these agricultural workers,

11  migrant workers -- from being employees within the meaning of

12  the law.

13         MR. HENDRICKS:  I think they can.  I'm saying we're

14  not.

15         THE COURT:  I know what you're saying.  I'm just

16  saying that -- it's my initial opening point.  Yeah, there are

17  a lot of factors.  And that fact tends to support the

18  employer's view.  But it is not dispositive, as the *Borello*

19  case itself points out.

20         MR. HENDRICKS:  In a case -- in a case where you don't

21  have the same overlay that we have here, where they're using

22  multiple applications, where in O'Connor and Colopy they're

23  already working for another company, these are not our

24  employees in that situation and we don't exercise control in

25  that situation.

1           **THE COURT:**  Right.  Let me ask Ms. Liss-Riordan.

2       Your response on this last point about the joint employer

3   situation, doesn't that -- does that present a problem?

4       The fact that you've got another potential employer

5   exercising some control, does that tend to negate the

6   employment relationship -- the putative employment relationship

7   between Uber and the driver?

8           **MS. LISS-RIORDAN:**  No, no, because --

9           **THE COURT:**  Isn't the contract between the

10  transportation company and Uber?

11          **MS. LISS-RIORDAN:**  And the drivers themselves have to

12  sign on to this contract.  There are many points to be made

13  here.

14      But to respond to that, Exhibit 17, which defense counsel

15  just said that there is no evidence was even shown to any of

16  the plaintiffs, this is -- if you look at Exhibit 17, it's an

17  email from Uber to Douglas O'Connor.  It's "Your Guide to the

18  Rating System."

19      Despite the fact there are these intermediary

20  transportation companies, this is one of many emails that Uber

21  drivers receive that describes, among other things, on page

22  101, several pages into this exhibit, the last page of this

23  exhibit, "What else does Uber use to evaluate drivers?"

24      And it describes how, in addition to the whole rating

25  system, which we haven't even touched upon today very much, it

1    explains how, at the bottom, "You should remember a user's

2    experience begins from when they request you, not just when

3    they get in your vehicles.  That's why we monitor things like

4    acceptance rate, cancellation rates, and ETAs."

5              **THE COURT:**  Well, and acceptance rates is bullet item

6    number 2, at the top of the page.

7              **MS. LISS-RIORDAN:**  Yes.  And also, to go back to some

8    of the points that were made before -- I haven't had a chance

9    to respond to many of them -- Exhibit 48A is a declaration from

10   Guy Gottlieb and a series of emails showing that he was

11   deactivated or -- apparently several times, due to his

12   cancellation rate, that he was calling -- allegedly, he was

13   calling up customers to find out where they were going, and

14   then canceling because he didn't want to take those trips.

15        So remember, of course, the drivers, when they're on duty,

16   they are expected to accept most of their trips.  They don't

17   know where the passenger is headed, so they have to take the

18   trip whether or not they like the destination it's going to.

19   And they terminate or threaten to terminate drivers who then

20   cancel when they find out where they are going.

21        I also want to highlight Exhibit 2020 in response to

22   Uber's saying, no, this is all just about the customer

23   experience.

24        Now, of course, any service industry is going to care

25   about the customer experience and is going to rely in part on

1    customer feedback to evaluate its service employees.

2        If you look at Exhibit 20, it's not talked about in terms

3    of how much the customer will like this or that.  It uses these

4    words:  Do this; not that.  Do this; not that.

5        It talks about issues of cleanliness, timeliness, proper

6    appearance, wearing a nice suit jacket, nice slacks, button-up

7    shirt, dress shoes.  Don't have an untucked shirt.

8        It goes into detail about customer pick-up details, that

9    you should be on the correct side of the street, that you

10   should do this.  Pick the customer up on the correct side of

11   the street.

12        **THE COURT:**  Well, let me ask you this,

13   Ms. Liss-Riordan.

14        **MS. LISS-RIORDAN:**  Yes.

15        **THE COURT:**  How are the "do this and do thats and not

16   do that" enforced and monitored?

17        **MS. LISS-RIORDAN:**  Okay.  Well --

18        **THE COURT:**  Other than -- I understand there's

19   customer ratings.  Customer ratings gives 1 through 5.  Was

20   there a -- a survey that says, Was the seat clean?  Was there

21   no clutter?  No paper in the visor?

22        **MS. LISS-RIORDAN:**  We have -- we have a lot of

23   evidence in the record it's constantly monitored.

24        At one point, in fact, the *FedEx* case -- the FedEx

25   drivers, they had very detailed instructions, but they had

1    managers who drove along with them four times a year.

2         In contrast, Uber is monitoring these drivers every single

3    day.  They work in real time.

4         **THE COURT:**  Via customers.

5         **MS. LISS-RIORDAN:**  Well, how else can a customer

6    service company know what they're doing?  And they do -- and it

7    goes beyond the customer service rating.

8         That's why in the exhibit that I just read to you they

9    say, "We go beyond the customer service rating to look at

10   things like acceptance rates, cancellation rates, and ETAs."

11   They explain what else Uber does to evaluate their drivers.

12        We have -- well, getting into the evidence of the

13   deactivation -- I haven't gotten to my major points yet, but

14   trying to respond to what you're asking for now.

15        We have ample evidence through the declarations we've

16   submitted and the evidence in -- I believe it's Exhibits

17   approximately 21 through 27, showing that Uber deactivates

18   drivers for a whole lot of reasons.

19        One reason is the -- this rating that the customers give

20   them.  But, of course, Uber decides, and the 30(b)(6) deponent,

21   Matthew Coleman -- whose deposition excerpts are in Exhibit

22   2 -- agree that the general manager for each city has

23   discretion to determine whether or not to deactivate drivers.

24        Even based on these customer ratings, the managers decide

25   on what the minimum rating is, which varies from location to

1    location under the manager's discretion.  It even varies from

2    week to week.  And we have evidence in here showing the minimum

3    rating has changed at various times from 4.6 to 4.7 to 4.5.

4         So -- and that also we have evidence showing that the

5    managers don't automatically -- in fact, Mr. Coleman testified

6    that there's no automatic deactivation for drivers when they

7    hit below a certain rating.  It's in the discretion of the

8    managers to decide whether or not to deactivate them.

9         We also have lots of evidence that when the drivers have

10   gotten -- whose ratings have gotten lower, they've been

11   given -- some but not all have been given an opportunity to

12   take a refresher class to refresh them about Uber.  And then

13   Uber has, in its discretion, decided whether or not to rehire

14   these drivers.  It's also used its discretion to decide whether

15   to rehire the drivers.

16        Based on some of the declarations we have, Uber managers

17   have deactivated drivers to reflect on what you could do better

18   and how you could be a better Uber driver.  And based on the

19   responses, some drivers have been given another chance.

20        So we have a lot of evidence that they're using -- they're

21   using their discretion.  It's not solely based on ratings.

22   It's not solely based on feedback from customers.  But,

23   obviously, customer feedback is going to be an important

24   criterion for a company that provides customer service.

25        We also obtained -- through the sample deactivations that

1   we obtained -- retained a sampling of them through the

2   discovery process, we've also gotten further evidence in

3   Exhibits 21 through 27 of Uber using its discretion, managers

4   using their discretion, based on a number of factors, to decide

5   that drivers are going to be terminated.  Not just the rating

6   system but individual customer complaints.

7          And then, also, we have -- in Exhibit 13, Uber explains

8   their -- the different levels of infractions.  There's the zero

9   tolerance infractions.  There's majors, minors, and cites.

10         And in Exhibit 13, on page 5, which is Uber 3426, it

11  explains we categorize issues into four categories, zero

12  tolerance, major, minor, and cites, and we try to follow up on

13  every quality issue.

14         Uber is watching every driver every day when they are

15  working for Uber.  I would argue even more so than the FedEx

16  managers who do ride-alongs four times a year.

17              **MR. HENDRICKS:**  There's simply no --

18              **THE COURT:**  Hold on.  Let her finish.

19              **MS. LISS-RIORDAN:**  Now, if I may, Your Honor, get to

20  what -- they also talk about how -- going back to Exhibit 20,

21  it explains "We have developed an extensive quality framework

22  for which we assess our drivers."  And, again, it puts things

23  in terms of Uber drivers should do this, Uber drivers should do

24  that.

25         But if I can get to the main point -- actually, let me

just discuss the joint employment issue with O'Connor and
Colopy for a moment, then if I can get to the main point that
I've been wanting to make today.

The evidence shows that O'Connor and Colopy worked for
Uber through different transportation companies.  So Uber was
the constant, and these intermediary companies changed.

So Colopy, for example, he was working for Uber through
one company.  But he was upset he wasn't able to get access to
a vehicle to work for Uber enough, so he switched to another
company which was referred to him.  Uber gave him the name of
another company to go to where he could work full-time for
Uber.  And he did that.

There's also evidence that Elie Gurfinkel, one of the
plaintiffs, was sent lists of these intermediary companies who
were looking to employ Uber drivers.

O'Connor worked for Uber through several different
intermediary companies.  He switched among them.  But it was
Uber he had to apply for.  He went and showed up and did an
interview for them.  He was reprimanded because he wasn't
dressed well enough at the interview.

When O'Connor was deactivated eventually, because he
refused to submit to the background test, he was out of his
company.  Uber then says, well, he was obviously an independent
contractor because he went on to work for a limo driver -- as a
limo driver somewhere else.

1          Yes, he went and he got another job as a limo driver.  But

2     it was when he was deactivated for refusing to submit to Uber's

3     background test that he was out of the job at that intermediary

4     company.

5          Now, if I can go to the main point that I've been --

6          **THE COURT:**  If you would close with that, I'd

7     appreciate that.

8               **MS. LISS-RIORDAN:**  Excuse me?

9               **THE COURT:**  If you would close with that, I'd

10    appreciate it.

11              **MS. LISS-RIORDAN:**  I would very much like to.

12         Your Honor, if you look at the contracts that Uber has

13    with both its Uber Black drivers, the drivers who -- well, the

14    addendum that applied to Uber Black drivers, such as O'Connor

15    and Colopy, as well as the contract with the uberX drivers,

16    such as Manahan and Gurfinkel, Uber retains -- and I'm looking

17    now at Exhibit 16, on the second page, which is at the bottom

18    1137, it says in the contract:

19              "Uber reserves the right at all times and at Uber's

20         sole discretion to reclaim, prohibit, suspend, limit or

21         otherwise restrict the subcontractor from accessing or

22         using the driver app or the device if the transportation

23         company or its drivers fail to maintain the standards of

24         appearance and service required by the users of Uber

25         software."

1          And it says that Uber may deactivate the drivers in its

2     sole discretion.

3          And then if you look at Exhibit 15, which is the contract

4     for drivers such as Manahan and Gurfinkel -- in fact, this is

5     Manahan's contract.  And if you look at the bottom of page 7,

6     which is Bates stamped 1683, again, it says:

7               "The company reserves the right to withhold or revoke

8          its approval and authorization of any driver at any time

9          in its sole and unreviewable discretion."

10         This is exactly what the California Supreme Court last

11    year, in *Ayala*, said is the preeminent factor; the ability to

12    terminate at will.  The ability of the employer to terminate in

13    its discretion.

14         And we have it right there in the contracts.  We have

15    ample evidence of it being exercised.

16         But, as this Court knows, what's significant under

17    California law is the right to control; most significantly, the

18    right to terminate in its discretion.

19         Now, I'm expecting that Uber might point to another

20    provision.  And I expect it will point to it because they cite

21    it in its brief.  But it actually favors plaintiffs.

22         If you look a little further down, in Exhibit 15, there

23    are -- there's a list of -- it's under -- the caption under the

24    heading "Termination of Agreement."  If you go on to the next

25    page, page 10, which is 1686, it says:

1          "This agreement shall remain in effect until

2      terminated as follows:"  Number 3 is:  "By either party

3      without cause upon 30 days' prior written notice to the

4      other party."

5      Now, Uber cited that as somehow an argument in favor of

6  independent contractor status.  But if you look at *Ayala*, *Ayala*

7  said that -- an identical provision -- that termination without

8  cause with 30 days' notice is a strong indicator of employee

9  status.

10     And if you look at *Narayan*, on page 903, the Ninth Circuit

11 said the same thing.  I'm looking at page 903.

12         "Significantly, the contract signed by the plaintiff

13     drivers contained automatic renewal clauses and could be

14     terminated by either party upon 30 days' notice or upon

15     material breach of the agreement.

16         "Such an agreement" -- that's without cause, with 30

17     days' notice.  "Such an agreement is a substantial

18     indicator of an at-will employment relationship."

19     Citing *Estrada*.  Citing an earlier *Antelope Valley* case.

20     When I opened today -- when I opened today, I said that I

21 thought there was a factor that could very well be dispositive

22 here, and that is the factor.  It's right here in Uber's

23 agreements.  They can't run away from their own contract.  It

24 shows that ultimate right to control because they can terminate

25 in their discretion.

1    In Exhibit 2, Mr. Coleman, who was their 30(b)(6)

2    deponent, admitted and agreed multiple times that Uber managers

3    could decide in their own discretion when to terminate.  Some

4    of the examples we have here of termination shows Uber managers

5    using language saying, "We're exercising our right to terminate

6    you."

7    That -- under California law, under *Ayala*, under *Narayan*,

8    under *Estrada*, that is the end of the story.  Could be the end

9    of the story right there.

10    We have all these other factors we've been talking about.

11    We have ample evidence of control.  So I don't see how Uber

12    could possibly get summary judgment, given all of this ample

13    evidence.

14    Given that we have that undisputable control right there

15    in the contracts, I submit, Your Honor, that that is most

16    important to the California Supreme Court.

17    **THE COURT:**  All right.  So besides citing the *Brown*

18    decision, which is a "but see" in the -- in the *Narayan* case as

19    an example where the Court finds that a 14-day termination

20    requirement is consistent with either employment at-will

21    relationship or parties in a continuing contractual

22    relationship, I'd like you to respond to that last point about

23    the right of termination, both that it appears, in one part of

24    the contract, to be -- at least deactivation can be at-will at

25    any time, or at least certain termination of the agreement

1   without cause on 30-day notice.

2        Why does that not support a finding of employment

3   relationship here?

4        **MR. HENDRICKS:**  Well, for a lot of reasons, the first

5   of which I go back to the threshold question that they are not

6   providing a service to us.

7        I go to the second premise that they are not integral to

8   the business based upon the contracts.

9        And then I go specifically to the case law.

10  *Beaumont-Jacques vs. Farmers Group, DeSimone* case, the *Arnold*

11  case, the *Hennighan* case, *Varisco v. Gateway* -- these are all

12  cases we cited on page 9 of our brief, including the *Brown*

13  case -- all speak in the context of these kinds of

14  relationships, the fact that parties have a mutual ability to

15  terminate or even on, you know, 14 days' notice or in some

16  other capacity, is not necessarily indicative of an employment

17  relationship.

18       How do I say that?  You have an accountant.  You find out

19  your accountant made a mistake in preparing your taxes.  You

20  fired him.  Okay.  Are they now your employee versus an

21  independent contractor?

22       You know, the standard that counsel is presenting with

23  respect to the ability to terminate is an inherent right in any

24  sort of commercial relationship.

25       People have the freedom of contract and the freedom to,

1    you know, decide for themselves the circumstances under which

2    they want to engage in a relationship and when they want to end

3    that relationship.

4         And that's consistent with independent contractor status,

5    or in some regards not.  But the fact is I don't think it's

6    dispositive by any means.  Every independent contractor

7    relationship that we exist in -- you hire a lawyer.  You hire

8    an accountant.  You hire -- you go to a barber to get your

9    haircut.  Any service like that.  A gardener.  If they don't

10   perform good service, you can end the relationship.  And that

11   doesn't mean that they become your employee.

12        That goes to the threshold question.  Counsel is

13   presenting the false notion that because there are quality

14   controls, because we have standards in place that says this is

15   what we think is providing good service, and we expect that

16   you'll provide good service as measured by rider feedback means

17   that somehow we've converted them to employees.

18        Drivers evaluate riders.  Riders can be deactivated from

19   the service as well.

20        And the fact that there is an ultimate quality, i.e.,

21   don't get into arguments with riders, don't hit a rider, if you

22   hit a rider, we won't let you use our service again, under

23   counsel's premise, if we had the knowledge that someone was

24   using our application for nefarious purposes, under their

25   theory we're put into the rock and the hard place of, well, if

1    you deactivate and don't let them use that service anymore,

2    you've now converted them into an employee.

3        **THE COURT:**  Well, except that's not their argument.

4    They're not saying any degree, any control or deactivation that

5    affects quality suddenly converts you into an employer.  You

6    look at the degree and the nature and the specificity of the

7    standards and the control.

8        And, obviously, the more specific it is, the more it

9    begins to look like control, and the more it only is focused on

10   larger issues and ultimate quality of the end product, the more

11   it arguably looks like an independent contractor.  So it's a

12   scale, it's a gradation.

13       **MR. HENDRICKS:**  And the fact --

14       **THE COURT:**  And they have pointed out a number of

15   things that seem quite specific in terms of the dress that you

16   wear; et cetera, et cetera; how and where to put the bottled

17   water; whether to carry an umbrella.

18       **MR. HENDRICKS:**  So let's walk through that.

19       You know, the California Supreme Court, in *McDonald vs.*

20   *Shell*, said making suggestions or recommendations as to the

21   details of work does not convert an independent contractor

22   relationship to an employee relationship.

23       **THE COURT:**  And couple that with the right of

24   termination and some monitoring mechanism, and perhaps we have

25   something different.

1      **MR. HENDRICKS:**  Okay.  So, again, I go to my

2  accountant and say -- you know, this is the interesting thing.

3  An accountant, a professional who is -- is servicing a lot of

4  different people and preparing their taxes.  Under plaintiffs'

5  rubric, what happens is this:  Well, I didn't know what

6  deductions to make.  They came in with all these receipts, and

7  so they were telling me what deductions to make.  And, you

8  know, so the person seeking my services really employs me.

9  They know it's going to take time for me to review it.  They

10  authorize me to review it.  And suddenly, you know something, I

11  got them an audit because I screwed up and now I'm their -- I'm

12  their employee.

13      The fact that you have an independent -- what would

14  otherwise be an independent contractor relationship doesn't

15  change simply because, hey, could you look at this --

16      **THE COURT:**  No, but you look at many factors.  And

17  that's where the degree of skill is important, because you

18  don't expect -- you know, you expect a certain level of

19  deference and -- in that situation.  And it doesn't convert it

20  into an employment relationship.

21      **MR. HENDRICKS:**  So we look to all the factors.  And

22  this is my point with the review system.  The very fact that

23  you have standards -- I think this was the *Millsap* case.  And I

24  could be wrong.  I think it was *Millsap*.  The very fact that

25  you articulate standards underscores the fundamental lack of

control.  What would happen is, if someone didn't do a certain
thing, you just terminate them.  That's not what happens here.
    The right --
        **THE COURT:**  Wait a minute.  How could you otherwise
control somebody who's a driver?  Are you going to have to sit
somebody right there in the car with them?  I mean --
        **MR. HENDRICKS:**  I could sit back and say every time --
at the beginning of a day when you are utilizing the app, I
want you to send me a picture of your trunk and show me that
you have bottled water there.  I --
        **THE COURT:**  All right.  All right.  The cases also say
you look at the nature of the task and the job, and that
calibrates the level of supervision one would expect.  It's a
bit of a sliding scale.
    So when somebody's out in the field driving a truck,
driving a limousine or driving a Honda, you don't expect the
same level of supervision as you would somebody working under
your nose and putting bottles in a cart or whatever.
        **MR. HENDRICKS:**  Well, Your Honor, Counsel is taking
what the plaintiffs have said were suggestions.
    I want to come back to this point as a matter of evidence.
We made certain objections to her declaration because she
attaches documents without any foundation as to their
application or their circumstance.
    And I know that none of particular plaintiffs have

1  submitted declarations regarding these documents and how they

2  impacted them.  Okay.  That's -- that's an important fact on

3  summary judgment.  They have testified that these things --

4       **THE COURT:**  Although, on summary judgment, the test is

5  not admissibility of the evidence being proffered.  The

6  question is whether the content of that evidence could be

7  admitted.

8       **MR. HENDRICKS:**  I would take issue.

9       I think they have an obligation of presenting competent

10  evidence.  And a part of competent evidence is -- I think

11  Judge Orrick reached that same conclusion in the -- in the

12  *Hennighan* case, where the declarations there he found lacked

13  the foundation of context to give the evidence any meaning --

14       **THE COURT:**  You presented no -- nothing to suggest

15  that the documents that you are now objecting to as a matter of

16  admissibility are not authentic.

17       **MR. HENDRICKS:**  Authenticity is a different question.

18  Authenticity -- is this a document at some point that Uber

19  created?  I'm not necessarily disputing that.  But that's not

20  material for analyzing it for summary judgment.

21       The issue is who got it, what was the circumstances --

22       **THE COURT:**  But if it's authentic and it had Uber's --

23  and you're not disputing that it has Uber's letterhead on it

24  and it comes from Uber, that's a party admission.  It's

25  admissible.

1          **MR. HENDRICKS:**  We're mixing two different issues.

2     These -- these drivers, for example, began using the Uber app

3     some in 2013, some in 2011.  Some of the documents -- and I

4     don't have a complete memory of everything, but some of the

5     documents that they are referring to no longer were in use as

6     of the time that these particular plaintiffs were at issue.

7          It's plaintiffs' burden to demonstrate, if she's going to

8     refer to specific documents, when were they in use?  How were

9     they communicated?  Were they communicated to these plaintiffs,

10    et cetera?

11         That's the foundation that's missing.  That's why this

12    doesn't provide any material dispute here.  It's a defect in

13    the evidence that's been submitted.  And that's the problem.

14    And that's the basis of the objections --

15         **THE COURT:**  All right.  Let me get a response to that.

16         What about that?  What about the fact that -- how do I

17    know these documents are relevant in time, the various manuals

18    and things?

19         **MS. LISS-RIORDAN:**  Okay.  Well, let's look at

20    Exhibit 17.  This was an email that was sent to Douglas

21    O'Connor September --

22         **THE COURT:**  Okay.  That has a date on it.  What

23    about -- is it 48?  Or which one that has -- the handbook, the

24    handbook that has all this and -- the list of do's and don'ts

25    and things.  How do we know that those were in effect at the

```
 1   relevant time period?
 2          MS. LISS-RIORDAN:  Well, I mean, they were produced by
 3   Uber.  We requested documents relevant to this case.  They
 4   objected to many, many things.  They produced this document for
 5   us, among others.
 6       The documents that they're objecting to are -- pretty much
 7   almost all of them are documents that they produced or emails
 8   back and forth between drivers and Uber.  For Uber to somehow
 9   claim that the Court can't look at them just seems a little --
10   seems --
11          THE COURT:  Well, let's talk about a specific example.
12       Give me an example of a critical document that she's
13   relied upon to show, for instance, control or some other aspect
14   that you think is -- should not be considered.
15          MS. LISS-RIORDAN:  I mean, we'll point out that the
16   contracts that we submitted are the contracts with the
17   plaintiffs.  And, again, I think the contracts, under *Ayala*,
18   are of --
19          THE COURT:  Well, I understand that.
20          MS. LISS-RIORDAN:  -- utmost importance.
21          THE COURT:  It shows it's directly applicable if it's
22   a contract signed by the parties.
23          MR. HENDRICKS:  This is -- take, for example, Exhibit
24   No. 3, that they submitted.
25          MS. LISS-RIORDAN:  Okay.  Exhibit No. 3, if you look
```

1   at the Bates stamp at the bottom, it's labeled "Colopy 901."

2   That means we produced it because Thomas Colopy received this

3   document.

4        **MR. HENDRICKS:**  And where is the declaration or

5   evidence from Mr. Colopy that he received it, and the impact it

6   had and the context of his receipt of it?

7        **THE COURT:**  So this was not produced by Uber.  This

8   was --

9        **MS. LISS-RIORDAN:**  Well, it was produced by Uber.  We

10  both produced it.  It's not in evidence in this record, but the

11  exact same document was produced by Uber.  It was also produced

12  by Mr. Colopy.

13       **MR. HENDRICKS:**  I don't know where he got it.  I don't

14  know when he got it.  I don't know whether he got it yesterday

15  or --

16       **THE COURT:**  Well, if it was produced by Uber, then --

17       **MR. HENDRICKS:**  Well, it doesn't mean -- take, for

18  example, the logo on this.  This logo is not a contemporaneous

19  logo.  We know that this logo, probably as of 2011, maybe even

20  2010, at some point was no longer used.

21       Mr. Colopy and O'Connor and other people began their

22  activities using the application in 2012, 2013.

23       You know, granted, we're a startup company.  They made

24  requests for documents.  We've produced what we have.  But,

25  quite frankly, on some of these things we don't know whether

1    they were drafts or actually disseminated; which city they were

2    disseminated in.  And we provided the best information we have.

3        But if Counsel is going to use it in the context of

4    summary judgment, then it's Counsel's burden to explain the

5    foundation so that it is clear how it's pertinent and relevant.

6    And that's been the core of our objection with that.

7        But, Your Honor, again, you know, the Supreme Court has

8    made clear that making suggestions in terms of approaches does

9    not convert the independent contractor relationship into an

10   employment relationship, that you can do that.  You can have

11   standards.

12       Our standard is we want to make sure that there's

13   excellent service that's being provided to riders.  And riders

14   become the ultimate measure of that.

15       I go back to my concierge example.  I referred you, Your

16   Honor, to -- to a hotel guest to provide a particular service.

17   And, unfortunately, I got word back from that guest that they

18   didn't necessarily like that service.

19       The next time someone asks me to refer someone out, I may

20   not refer you because of that.  That doesn't interfere at all

21   at that point when you are providing the service.  You actually

22   did the job, you got compensated, all the rest.  That was

23   between you and the other hotel guest.

24       But in a commercial setting, which we believe this

25   relationship is, a nonemployment commercial setting, we can

 1    assess whether or not someone is able to provide the result

 2    that's being sought.  And that is excellent service.

 3          And if we believe that they're not able to provide that

 4    result, we don't have to continue to refer them subsequent work

 5    in that sense, or tips in that sense.  Okay?  And that's what

 6    takes place here.

 7          We're simply saying we're a lead generation business.  A

 8    part of what we market and promote --

 9              THE COURT:  I understand what you're saying.  Case is

10    submitted.

11          Let's talk about the CMC for a moment here.

12          If I were to deny defendant's motion for summary judgment,

13    are the parties interested in going back to the mediator and

14    having discussion prior to moving forward to the class cert

15    process?

16              MS. LISS-RIORDAN:  I think that's up to Uber.

17              MR. HENDRICKS:  Uhm, Your Honor, may we take a short

18    recess?

19              THE COURT:  Sure.

20              MR. HENDRICKS:  Okay.

21          (Recess taken from 4:36 to 4:39 p.m.)

22              THE COURT:  Okay.

23              MR. HENDRICKS:  Thank you, Your Honor.  I did need to

24    get some water.

25          We think it's probably best that we just continue to

1  proceed with the current path.  If, during the course of

2  whatever else, the parties come to think that that might be

3  productive, we can address it at that time.

4      But we think that we should necessarily defer other

5  aspects of the case pending some sort of mediation or anything

6  like that.

7          **THE COURT:**  All right.  And you have proposed a

8  timetable, if I were to deny summary judgment, that the motion

9  for class cert be filed 90 days thereafter, and a briefing

10  period that you've set forth here.

11      So the only question is, the defendant wants an

12  opportunity to file a motion to deny class cert.  And I guess

13  my question is:  What's the purpose of that?  How is that

14  anything different from a full opposition to class cert?

15          **MR. HENDRICKS:**  Well, you know, we may just take a

16  different focus on how the issue is framed.  And we think that

17  having the ability to do that might be helpful.

18      If we conclude in further discussions that it didn't make

19  sense, you know, we could choose not to.  But we want to

20  preserve our ability to be able to do that in concurrent

21  briefing.

22          **THE COURT:**  Well, if you want to do that, you're going

23  to have to seek leave.  I'm not going to allow that.  Seems to

24  me that's just asking for two sets of briefs.  And I don't need

25  two sets of briefs.

1          You know, if you could point out something unique about

2     the procedure or something, especially given that you've now

3     elongated the briefing schedule to get 28 days instead of the

4     normal 14 days, you know, if you need another -- if you need

5     more time -- and I hate to offer any page enlargement, but, you

6     know, I would be -- I would consider that request.  Hopefully,

7     it's not going to be that complicated.

8          So let's cross that bridge when we get there.

9          As I said, I've taken it under submission.  And I will

10    take a second look at the record and the cases.

11         And, you know, it's clear that there are cases, frankly,

12    that kind of go on any particular point.  One seems to tug one

13    way, and one seems to tug the other way.  And so it's not the

14    easiest thing to reconcile all these cases.  But I will do

15    that.

16         But if I do deny, I will set forth a briefing schedule and

17    we'll proceed to the next stage.

18              **MS. LISS-RIORDAN:**  Your Honor --

19              **MR. HENDRICKS:**  Yes, Your Honor.

20              **MS. LISS-RIORDAN:**  -- there was one more matter that

21    we noted in the case management conference that we sought your

22    guidance on.

23              **THE COURT:**  Yeah.

24              **MS. LISS-RIORDAN:**  There are discovery issues that are

25    still outstanding.  And Uber has requested that we not have to

1    pick those up again until you've ruled.

2        I understood that you had ordered we should be continuing

3    with discovery.  There's still much that we want to do.

4        **THE COURT:**  Oh, yeah.  There is no stay on discovery

5    at this point.  If there were one -- I didn't think there was

6    one, but if there were one, it's not my intent to keep that in

7    place.

8        I want to move forward.  If we're not going to resolve

9    this case by summary judgment, I want this -- we're going to

10   move forward.

11       **MS. LISS-RIORDAN:**  Thank you.

12       **THE COURT:**  You do have a discovery judge if there's

13   an issue here.  So, just to be clear, there is no stay on

14   discovery.

15       **MS. LISS-RIORDAN:**  Thank you.

16       **MR. HENDRICKS:**  The only issue was simply whether we

17   should wait until getting a ruling.  There has been no stay.

18   We understand there was no stay.

19       **THE COURT:**  Okay.

20       **MR. HENDRICKS:**  The only issue is whether we should

21   wait to get a ruling, to see how that ruling turns out, before

22   we start writing motions and other sorts of things.  That was

23   the only -- that was the only indication.

24       **THE COURT:**  All right.  Well, I would not stop on

25   discovery.  Continue on discovery.  All right?

1          **MS. LISS-RIORDAN:**  Thank you.

2          **THE COURT:**  All right.  Thank you.

3          **MS. LISS-RIORDAN:**  Thank you, Your Honor.

4      (At 4:42 p.m. the proceedings were adjourned.)

5

6

7

8                     <u>**CERTIFICATE OF REPORTER**</u>

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:   Wednesday, February 4, 2015

13

14

15                     *Katherine Sullivan*

16      _____

17      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter

18

19

20

21

22

23

24

25

Exhibit E

NOTIFY

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss**

**SUPERIOR COURT**
**CIVIL ACTION**
**NO. 2012-04490**

## DAVID LAVITMAN[1]

**vs.**

## UBER TECHNOLOGIES, INC. & others[2]

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT

Plaintiff David Lavitman ("Lavitman") brought this lawsuit to recover damages suffered

by himself and a purported similarly situated class for alleged violations of the Massachusetts

Wage Act, Mass. Gen. L. c. 149, §152A. The defendants, Uber Technologies, Inc. ("Uber"), its

President Travis Kalanick, and its Vice President Ryan Graves (collectively, "Defendants"), have

developed and rolled out a dispatch application (the "Uber App") that allows taxi drivers such as

Lavitman to locate and pick up riders and to receive payment from them via smartphone. The

complaint alleges that the Defendants improperly retained a portion of the 20% fee the Uber App

charges each rider in addition to that rider's fare.

The case is now before me on the Defendants' Motions to Dismiss and for Partial

Summary Judgment. After two hearings, and a careful review of the parties' many submissions,

I will deny the Defendants' motions for the reasons that follow.

Notice Sent
01.29.15
MM
LMPC
HS
FWPC
SELR
LTL-RPL
ELM
KPJMPC
SS
QEU(MM)

---

[1] Individually and on behalf of all others similarly situated

[2] Travis Kalanick and Ryan Graves

1

## PROCEDURAL HISTORY

Lavitman originally filed this case in Suffolk County Superior Court in December 2012. In January 2013, the Defendants filed a Notice of Removal to the United States District Court for the District of Massachusetts, pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) and 1441(b). In August 2013, the District Court remanded the case to this court.

While the case was pending in federal court, Uber moved to dismiss it on several grounds. That motion to dismiss was pending when the case was returned to Superior Court.

On March 10, 2014, I heard argument on the motion to dismiss. I then reviewed the extensive materials submitted by the parties. One of Uber's theories was that Lavitman was bound by a forum selection clause to bring suit in California, not Massachusetts. As to that theory, Uber and Lavitman had put before me factual materials which I could not consider when deciding a motion to dismiss. I agreed with Uber, however, that it made sense to decide this forum selection clause argument at the outset, so that the remaining issues could be decided in the correct forum.

For that reason, by order dated June 6, 2014, I converted the forum selection clause issue raised by the motion to dismiss into a summary judgment motion. As required by Mass. R. Civ. P. 56, I allowed all parties to file all additional factual material they deemed relevant to the forum selection clause, and I allowed further briefing as well. I specifically asked the parties to brief the issue of the enforceability of the forum selection clause in light of *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565 (2013), a recent Appeals Court decision that was the only Massachusetts authority on the enforceability of contracts entered into by clicking "I Agree" on an electronic screen, which was the process by which, according to Uber, Lavitman had agreed to the forum selection clause.

2

On September 19, 2014, the parties filed the motion for partial summary judgment that I requested, as well as a sizable package of factual materials and various briefs in support of and in opposition to that partial summary judgment motion. Further briefing followed in October 2014. On December 18, 2014, I heard argument for the second time, this time limited to the enforceability of the forum selection clause.

## FACTS

A review of the facts not in dispute shows that in October 2012, Lavitman signed up to use the Uber App as a driver. Lavitman signed a written, paper two-page "Partnership Agreement" that, among other things, listed his contact information, hackney number, and medallion number.

In addition to signing the Partnership Agreement, Uber alleges that Lavitman had to register as a driver using Uber's online sign-up page. As part of the online registration process, each prospective driver must click an "I Agree" button, indicating agreement to the "Uber Partner Terms and Conditions" (the "Terms and Conditions"). The Terms and Conditions include a forum-selection clause providing, in pertinent part, that "any disputes, actions, claims, or causes of action arising out of or in connection with this Agreement or the [Uber] Service or Software shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California," where Uber has its national headquarters. Lavitman, however, alleges that he only gave his registration information to his son, Gary Lavitman ("Gary"). Gary then took down the information, scanned it, and electronically sent the scan to Uber. An Uber employee then completed Lavitman's online registration process for him. Lavitman further alleges that, at the time, Gary was recruiting taxi drivers on Uber's behalf.

3

Lavitman then began using the Uber App to find riders. After he did so – indeed, after Lavitman filed this suit in Superior Court in December 2012 – Uber updated the Terms and Conditions at least three times.

Uber distributes such updates in the form of a notification that appears when a driver, here Lavitman, attempts to access the Uber App to find potential passengers. The driver is required to view a screen containing three hyperlinked contracts, including the updated Terms and Conditions, and to click two "Yes, I Agree" buttons acknowledging that the driver has read and agrees to the updated Terms and Conditions. A driver cannot access the Uber App, and therefore cannot locate potential riders, without going through this process.

It is undisputed that these three versions of updated Terms and Conditions all contained the same forum-selection clause quoted above, and that Lavitman clicked "Yes, I Agree" when he accessed the Uber App on August 5, 2013, December 10, 2013, and July 24, 2014.

## DISCUSSION

### 1.  Summary Judgment Motion Concerning Forum Selection Clause

"Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Highlands Ins. Co.* v. *Aerovox, Inc.*, 424 Mass. 226, 232 (1997). A court considering a motion for summary judgment must view the facts, and the inferences that can reasonably be drawn from them, in the light most favorable to the nonmoving party. *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 (1983). Material facts are those "facts that, if true, [would] provide a basis for a reasonable jury to find for a party." *Carey* v. *New Eng. Organ Bank*, 446 Mass. 270, 278 (2006).

4

## I. The Original Online Registration

As a general matter, "[a] plaintiff's choice of forum should rarely be disturbed." *New Amsterdam Casualty Co.* v. *Estes*, 353 Mass. 90, 95 (1967) (citation omitted). However, a party to a contract may exercise this forum-selection privilege in advance by agreeing to a forum-selection clause. See *Atl. Marine Constr. Co.* v. *United States Dist. Ct.*, 134 S. Ct. 568, 582-583 (2013) (holding that agreement to forum-selection clause constitutes exercise of "plaintiff's venue privilege," such that plaintiff's later choice to bring suit in a different forum "merits no weight" and is not entitled to deference).

It is a basic principle of contract law that an enforceable contract requires a "meeting of the minds," consisting of "agreement between the parties on the material terms of that contract, and . . . a present intention to be bound by that agreement." *Situation Mgmt. Sys.* v. *Malouf*, 430 Mass. 875, 878 (2000). The Appeals Court has held that a party seeking to enforce a forum-selection clause in an online contract (here, Uber), which the other party allegedly entered into by clicking something on an electronic screen (here, Lavitman), "has the burden of establishing, on undisputed facts, that the provisions of the [contract] were reasonably communicated and accepted" by the party to be bound (here, Lavitman again). *Ajemian* v. *Yahoo! Inc.*, 83 Mass. App. Ct. 565, 576 (2013). In particular, the enforcing party must show an "unambiguous manifestation of assent." *Id.*

In this case, Lavitman has presented facts from which a reasonable finder of fact could conclude that Lavitman never saw the Terms and Conditions at the outset of the Uber-Lavitman relationship. Such a finding would preclude the "unambiguous manifestation of assent" that is required for the electronically communicated forum-selection clause to be enforceable, because, on this view of the facts, Uber failed to communicate that clause to Lavitman.

5

The Defendants respond that, because Gary transmitted Lavitman's registration information to Uber, Uber was Gary's sub-agent for the registration, and was empowered to bind Lavitman to the forum-selection clause. This argument is unavailing, for several reasons.

The first problem concerns an open issue of fact. When Gary took down Lavitman's information and transmitted it to Uber, it is unclear whether Gary was acting as Lavitman's agent (because was signing up his father Lavitman as an Uber driver) or as Uber's agent (because he was recruiting drivers for Uber).

The second problem is a failure of factual proof. Even if Gary was acting as Lavitman's agent, Lavitman has presented evidence that Gary, just like Lavitman himself, did not click "Yes, I Agree" in the sign-up process, and that an Uber employee handled this part of the registration. Specifically, Gary states in his affidavit that he only scanned his handwritten version of Lavitman's information and sent it to Uber, and did not complete any online registration.

The third problem is legal rather than factual. Uber is correct that a sub-agent may bind a principal to an agreement with a third party. *Rayden Engineering Corp.* v. *Church*, 337 Mass. 652, 661-662 (1958) (act of sub-agent may bind principal). So, in this case, if Gary was Lavitman's agent, and Uber was Gary's sub-agent, Uber could have bound Lavitman to an agreement with a third party. But that is not what Uber is arguing; Uber suggests that, acting as a sub-agent for Lavitman, Uber bound Lavitman to a contract with Uber itself, not with a third party. But Uber cannot bind Lavitman to an agreement *with itself*, because there can be no "meeting of the minds" where only one "mind" is involved in the transaction.

At the December 2014 oral argument, counsel for Uber conceded that there is a genuine issue of material fact as to whether Lavitman assented to the Terms and Conditions at the time he

6

signed up to use the Uber App as a driver.[3] He was right, and so Uber is not entitled to partial summary judgment based on the original online registration.

## II. Lavitman's "Assent" to the Updated Terms and Conditions

The Defendants argue that even if Lavitman did not agree to the Terms and Conditions at the time he originally registered with Uber, he agreed to the forum selection clause on each of the three occasions when he later (it is undisputed) clicked on the "Yes, I Agree" buttons when presented with Terms and Conditions containing the forum selection clause. Lavitman had already filed this suit by then, but Uber argues that I should give retroactive effect to his post-lawsuit "agreements," in August 2013, December 2013, and July 2014, to sue Uber only in California.

However, such a retroactive application would nullify altogether Lavitman's right, as plaintiff, to choose the forum in which to press his claims. Here, Lavitman is not attempting to take a second bite of the apple by disregarding a pre-existing forum-selection clause. To the contrary, he exercised his "venue privilege" when he brought this suit in October 2012. Uber then asked him to undo that choice later, when it told him that he could not continue to use the Uber App unless he now agreed, for the first time, to updated Terms and Conditions containing a forum selection clause that would, if enforced, prevent him from continuing to prosecute his already-filed lawsuit in Massachusetts.

The Defendants rely on two federal cases in which courts have upheld post-filing forum-selection clauses: *Newhall v. Chase Home Fin. LLC*, 2010 U.S. Dist. LEXIS 115690 (D.N.J.,

---

[3] Counsel for Lavitman suggested that Uber's counsel was being overly generous to Uber's position even in this concession; there is no factual dispute at all, she asserted, because all the facts in the summary judgment record on this point support Lavitman's position that he agreed only to the terms of the written Partnership Agreement (which did not contain a forum selection clause) when he signed up with Uber. I need not decide if she is right, because Uber has conceded, and I have found, that Lavitman has presented facts that preclude the entry of summary judgment in Uber's favor based on the original registration.

Oct. 2010), and *Baqui* v. *Burlington Ins. Co.*, 2011 U.S. Dist. LEXIS 35897 (D. Haw., Mar. 2011). However, those cases are factually distinct from this case. In the former, the court found that transferring the case was "clearly warranted . . . independent of the [forum-selection] Agreement. *Newhall* at *17. In the latter, the forum-selection clause was part of a stipulation negotiated by the parties while the suit was ongoing that was approved by the court.

Here, in contrast to *Newhall*, there is no independent reason to transfer this case to California. Also, in contrast to *Baqui*, the updated Terms and Conditions were manifestly not the product of further negotiation between Lavitman and Uber. Therefore, bearing in mind that Massachusetts recognizes strong protections for claims brought under the Wage Act, *Crocker* v. *Townsend*, 464 Mass. 1, 14 (2012) (rejecting "the view that the strong protections afforded by the Wage Act could be unknowingly frittered away under the cover of a general release in an employer-employee termination agreement"), I find that the post-filing forum-selection clause in this case is not enforceable and the Defendants are not entitled to summary judgment on that basis.

### 2. **The Motion to Dismiss**

In addition to the Defendants' Motion for Partial Summary Judgment, I also have before me the Defendants' initial Motion to Dismiss. For the reasons previously discussed, the Defendants are not entitled to dismissal based on the forum-selection clause in the Terms and Conditions. The Defendants raise two additional arguments for dismissal: first, that Lavitman's Wage Act claim (Count I) must be dismissed because he is not an Uber employee and therefore is outside the protection of that statute; and second, that Lavitman's common law claims (Counts II-IV) must be dismissed because they are preempted by the Wage Act's comprehensive legislative scheme.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), "the facts alleged in the . . .
complaint are assumed to be true, and all reasonable inferences from those facts are to be granted
to the plaintiff," here Lavitman. *Commonwealth* v. *One 2004 Audi Sedan Auto.*, 456 Mass. 34,
43 (2010). In addition to the complaint itself, the court may also consider "matters of public
record, orders, items appearing in the record of the case, and exhibits attached to the complaint."
*Schaer* v. *Brandeis University* 432 Mass. 474, 477 (2000). The court must "look beyond the
conclusory allegations in the complaint," *Curtis* v. *Herb Chambers I-95 Inc.*, 458 Mass. 674, 675
(2011), and determine if the plaintiff has pled "factual allegations plausibly suggesting (not
merely consistent with) an entitlement to relief." *Iannachino* v. *Ford Motor Co.*, 451 Mass. 623,
636 (2008) (citation omitted).

### I. Lavitman's Wage Act Claim

The Wage Act creates a private right of action for "employee[s] claiming to be aggrieved
by a violation of sections 33E, 52E, 148, 148A, 148B, 150C, 152, 152A or 159C or section 19 of
chapter 151." Mass. Gen. L. c. 149, § 150. In this case, Lavitman's claim rests on an alleged
violation of § 152A(d), which among other things requires an "employer or person" who collects
a "service charge or tip" to remit the full amount of the tip to the "service employee" who
performed the service.

The Wage Act defines an "employee" as "an individual performing any service . . .
unless: (1) the individual is free from control and direction in connection with the performance
of the service, both under his contract for the performance of service and in fact; and (2) the
service is performed outside the usual course of the business of the employer; and, (3) the
individual is customarily engaged in an independently established trade, occupation, profession
or business of the same nature as that involved in the service performed." Mass Gen. L. c. 149, §

148B(a). This provision operates "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees," in accordance with the Wage Act's "broad remedial purpose." *Depianti* v. *Jan-Pro Franchising Int'l Inc.*, 465 Mass. 607, 621 (2013).

A "service employee" is "a person who works in an occupation in which employees customarily receive tips or gratuities, and who provides service directly to customers or consumers, but who works in an occupation other than in food or beverage service, and who has no managerial responsibility." Mass. Gen. L. c. 149, §152A(a). The Massachusetts Attorney General has provided further interpretive guidance, explaining that "[e]xamples of service employees are hairdressers, taxicab drivers, baggage handlers and bellhops." Advisory 2004/3, An Advisory from the Attorney General's Fair Labor Division on an Act Protecting the Wages and Tips of Certain Employees. This interpretation is entitled to "substantial deference and [the court] will not disturb it where [it] is reasonable." *DiFiore* v. *American Airlines, Inc.*, 454 Mass. 486, 496 n. 11 (2009).

In this case, the Defendants contend that Lavitman is an independent contractor, not an Uber employee, and therefore cannot maintain a claim under the Wage Act. They also contend that even if Lavitman is an Uber employee, he is not a "service employee" entitled to protection under §152A. The Defendants support their position with a number of allegations related to the nature of Uber's business model, Lavitman's ownership of an independent taxi company, Lavitman's ability to determine his own work schedule and passengers, and Lavitman's use of dispatch services other than the Uber App.

However, I cannot properly consider these "disputed issues of fact and extrinsic evidence
. . . at this early stage of the litigation."[4] *RFF Family Partnership, LP* v. *Link Development,
LLC*, 849 F.Supp.2d 131, 135 (D. Mass. 2012). It is the Defendants' burden to prove that
Lavitman meets all three prongs of the independent contractor test; it is not Lavitman's burden to
plead that he does not. *Athol Daily News* v. *Bd. of Review of the Div. of Employment and
Training*, 439 Mass. 171, 175 (2003). Likewise, in light of the Attorney General's interpretive
guidance, it is the Defendants' burden to prove that, unlike other taxicab drivers, Lavitman has
managerial responsibilities or is otherwise disqualified as a service employee.[5] Therefore,
viewing the facts in the light most favorable to Lavitman, the complaint does not fail to state a
claim upon which relief can be granted with respect to Count I.

## II. Lavitman's Common Law Claims

Lavitman also claims that, due to Uber's practice of keeping a portion of the service fee,
he has suffered tortious interference with the advantageous tipping relationship between himself
and his passengers (Count II); Uber has been unjustly enriched (Count III); and Uber has
breached an implied contract to remit to him the full service fee (Count IV). The Defendants
argue that all three of these claims must be dismissed under *Melley* v. *Gillette Corp.*, 19 Mass.
App. Ct. 511 (1985), because they are duplicative of Lavitman's claim under the Wage Act, and

---

[4] I have not converted these aspects of the motion to dismiss into a summary judgment motion, because, unlike the forum selection clause issue: (1) these arguments depend on many facts rather than a few, and therefore their resolution would benefit from full development of those facts through discovery; and (2) a decision in Uber's favor on these issues would not result in this case being litigated in a different forum.

[5] I also note that these aspects of the Wage Act are currently in flux. On January 8, 2015, the Supreme Judicial Court heard oral argument in the case of *Sebago* v. *Tutunjian*, SJC-11757, which raises similar issues about the employment classification of taxi drivers by taxi companies. Accordingly, and given that today's case is still in the early stages of litigation before this court, it is prudent to allow the case to proceed while awaiting a decision that may significantly impact the controlling law.

there can be no common law claims of the sort where the legislature has enacted a comprehensive statutory scheme to protect employees' wages.

However, the Defendants' reliance on *Melley* is mistaken. In *Lipsitt* v. *Plaud*, 466 Mass. 240 (2013), the Supreme Judicial Court ruled that the Wage Act does not preempt common law public policy claims for unpaid wages, despite the existence of the comprehensive statutory scheme found in the Wage Act.[6]

In addition, Lavitman's common law claims advance the Commonwealth's strong public policy favoring the proper payment of employees, including reserving tips and other service charges for the employees who perform the services. *Lipsitt*, 466 Mass. at 248 (Wage Act "was designed to *enhance* the rights of employees with respect to the payment of wages") (emphasis in original). Therefore, by the reasoning in *Lipsitt*, Lavitman's three common law public policy claims for unremitted tips can be coupled with his Wage Act claim and cannot be dismissed as duplicative.

The Defendants also argue, with respect to Counts II and III, that Lavitman has not pled sufficiently detailed factual allegations. However, Mass. R. Civ. P. 8(a) does not require Lavitman to plead facts related to every element of every claim; it only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The "purpose of this requirement is to give fair notice of the claim to the parties." *Bank* v. *Thermo Elemental, Inc.*, 451 Mass. 638, 665 (2008). Even under the more stringent "particularity" requirement of Mass. R. Civ. P. 9(b) – which does not govern the claims in these two Counts – a plaintiff is not required "to set out in detail all of the facts upon which he bases his claim, nor . . . to plead detailed evidentiary matter[s]." *Lazarro* v. *Holladay*, 15 Mass. App. Ct. 108, 110 (1983). The

---

[6] To be fair to Uber, when it filed its motion to dismiss during the sojourn of this case in federal court, the Supreme Judicial Court had not yet issued its decision in *Lipsitt*.

allegations in the complaint as to Counts II and III are sufficient to give the Defendants "fair notice" of the claims against them, and accordingly those Counts cannot be dismissed.

## ORDER

For these reasons, Defendants' Motion for Partial Summary Judgment (Paper No. 30) is **DENIED**, and Defendants' Motion to Dismiss or, in the Alternative, to Transfer (Paper No. 7) is also **DENIED**. The Joint Motion of the Parties to File Documents Under Seal (Paper No. 31) requires a hearing under Trial Court Rule VIII, and that hearing will be held in **Courtroom 1015** (not Courtroom 1008) at Suffolk Superior Court at 2:00 P.M. on February 9, 2015. The parties are to file the affidavit required by that rule if they have not already done so, and a proposed form of the findings required by that rule as well.

Paul D. Wilson
Justice of the Superior Court

January 26, 2015

Notice sent
01.29.15
(mw)

13

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VILMA ZENELAJ, et al.,

               Plaintiffs,

      v.

HANDYBOOK INC.,

               Defendant.

Case No. 14-cv-05449-TEH

**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION**

This matter is before the Court on Defendant's motion to compel the arbitration of Plaintiffs' complaint. After carefully considering the arguments presented in the Parties' written and oral submissions, Defendant's motion to compel arbitration is hereby GRANTED, for the reasons set forth below.

**BACKGROUND**

Defendant Handybook is a technology company that offers an online platform through which customers in need of cleaning services can connect to independent cleaning professionals. Plaintiffs Vilma and Greta Zenelaj are independent cleaning professionals and users of this platform that have filed a class action lawsuit alleging that cleaners using the platform are misclassified as independent contractors, unlawfully denying them access to the employment benefits and protections required by California law. Oct. 30, 2014 Compl. (Docket No. 1-1). As a result of this misclassification, Plaintiffs allege that Defendant failed to pay overtime and minimum wages, reimburse required business expenses, provide meal periods and rest periods, furnish accurate itemized wage statements, pay earned wages upon discharge, and remit gratuities. Plaintiffs additionally allege that Defendant engaged in unfair business practices. Finally, the Complaint seeks penalties under the Private Attorneys General Act ("PAGA") for violations of the California Labor Code.

On December 15, 2014, Defendant removed this action to federal court based on diversity jurisdiction.  (Docket No. 1).  On December 22, 2014, Defendant filed the present motion to compel arbitration of Plaintiffs' claims.  (Docket No. 8).  Plaintiffs responded (Docket No. 16), and Defendant timely replied (Docket No. 17).  On February 23, 2015, the Court heard oral argument on Defendant's motion.

**LEGAL STANDARD**

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); 9 U.S.C. § 2.  Section 4 of the FAA ensures that "private agreements to arbitrate are enforced according to their terms."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  Accordingly, a party to an arbitration agreement can petition a United States District Court for an order directing that "arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  In addition, the FAA contains a mandatory stay provision.  *Id.* § 3.

Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[T]he FAA's purpose is to give preference (instead of mere equality) to arbitration provisions."  *Mortensen v. Bresnan Communications, LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013).  Nonetheless, arbitration "is a matter of consent, not coercion."  *Volt*, 489 U.S. at 479.  In accordance with this principle, the Supreme Court has held that parties may agree to limit the issues subject to arbitration, and to arbitrate according to specific rules.  *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Volt*, 489 U.S. at 479.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (internal citations omitted).  A court must defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that

2

United States District Court
Northern District of California

1  covers the asserted dispute," and "doubts should be resolved in favor of coverage." *AT&T*

2  *Tech, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

3

4  **DISCUSSION**

5          Plaintiffs argue that the arbitration provision of the Parties' Agreement is

6  unconscionable and cannot be enforced. Opp'n at 9-23. Plaintiffs further argue that even

7  if the arbitration provision is valid, their employment misclassification claims are not

8  covered by the provision because they do not "relate to" the Agreement. *Id.* at 3-6.

9          Conversely, Defendant contends that this Court cannot decide whether the

10  arbitration provision in this case is unconscionable or applicable, because the arbitration

11  provision delegates those threshold issues to an arbitrator. Mot. at 7. In light of prevailing

12  case law, this Court is obligated to agree. Consequently, the Court need only determine

13  whether Defendant's assertion of arbitrability is "wholly groundless." *Qualcomm Inc. v.*

14  *Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006) (applying Ninth Circuit law). The

15  Court finds that it is not. However, the Court also finds that the Agreement's waiver of

16  Plaintiffs' representative PAGA claims is invalid under state law, although an arbitrator

17  must determine the proper forum in which those representative claims should proceed.

18

19  **I.      The Scope, Validity, and Application of the Arbitration Provision Must Be
          Decided by the Arbitrator.**

20          Generally, in deciding whether to compel arbitration, a court must determine two

21  "gateway" issues: (1) whether there is an agreement to arbitrate between the parties; and

22  (2) whether the agreement covers the dispute. *Howsam v. Dean Witters Reynolds*, 537

23  U.S. 79, 84 (2002). However, these gateway issues can be expressly delegated to the

24  arbitrator where "the parties <u>clearly and unmistakably</u> provide otherwise." *AT&T*, 475

25  U.S. at 649 (emphasis added); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S.

26  938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability

27  unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."). In cases where the

28  parties "clearly and unmistakably intend to delegate the power to decide arbitrability to an

3

United States District Court
Northern District of California

1    arbitrator," a court's inquiry is "limited ... [to] whether the assertion of arbitrability is

2    'wholly groundless.'"  *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir.

3    2006) (applying Ninth Circuit law).

4         Defendant contends that the Parties "clearly and unmistakably" agreed to allow an

5    arbitrator to decide the arbitration provision's validity, scope, and application, because the

6    arbitration provision expressly incorporates the AAA Commercial Arbitration Rules.[1]

7    Mot. at 7.  Within the AAA Rules, Rule 7(a) delegates all jurisdictional questions,

8    including arbitrability and validity, to the arbitrator.[2]  Plaintiffs respond that a mere

9    reference to the AAA Rules does not constitute a "clear and unmistakable" agreement to

10   arbitrate arbitrability in the context of this case.  Opp'n at 7.  Plaintiffs additionally argue

11   that the Ninth Circuit decision on point limits delegation by incorporation to "sophisticated

12   parties."  *Id.*

13        The Court recognizes that the question of whether the incorporation of the AAA

14   Rules is *always* "clear and unmistakable" evidence of the parties' intent to arbitrate

15   arbitrability is not a clearly settled question of law in the Ninth Circuit.  Nonetheless, the

16   overwhelming consensus of other circuits, as well as the vast majority of decisions in this

17   district, support Defendant's claim that, in the context of this case, incorporation of the

18   AAA Rules effectively delegates jurisdictional questions, including arbitrability and

19   validity, to the arbitrator.

20        In *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069 (9th Cir. 2013), the

21   Ninth Circuit determined that incorporation by reference to a set of rules analogous to the

22   AAA Rules delegated jurisdictional questions to an arbitrator.  *Id.* at 1073-75.

23   Specifically, *Oracle America* held "that as long as an arbitration agreement is between

24   _____

25   [1] The Agreement provides, in relevant part: "The arbitration will be commenced and
     conducted under the Commercial Arbitration Rules (the 'AAA Rules') of the American
26   Arbitration Association ('AAA') and, where appropriate, the AAA's Supplementary
     Procedures for Consumer Related Disputes ('AAA Consumer Rules'), both of which are
27   available at the AAA website www.adr.org."  Ex. A to Dua Decl. at 5-6 (Docket No. 8-1).
     [2] Rule 7(a) states: "The arbitrator shall have the power to rule on his or her own
28   jurisdiction, including any objections with respect to the existence, scope, or validity of the
     arbitration agreement or to the arbitrability of any claim or counterclaim."

                                                4

1 sophisticated parties to commercial contracts, those parties shall be expected to understand

2 that incorporation of the UNCITRAL rules delegates questions of arbitrability to the

3 arbitrator." *Id.* at 1075. Plaintiffs rely upon this language to argue that delegation of

4 arbitrability through incorporation of the AAA Rules is *only* effective where the parties are

5 sophisticated. Opp'n at 7. However, when read as a whole, *Oracle America* does not

6 appear to foreclose a finding of clear and unmistakable delegation of arbitrability in other

7 contexts. In fact, the reasoning provided by the court suggests just the opposite.

8      In arriving at its narrowly worded holding, *Oracle America* notes: "Virtually every

9 circuit to have considered the issue has determined that incorporation of the American

10 Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable

11 evidence that the parties agreed to arbitrate arbitrability." *Id.* at 1074 (citing *Petrofac, Inc.*

12 *v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Republic*

13 *of Argentina v. BG Group PLC*, 665 F.3d 1363, 1371 (D.C. Cir. 2012); *Fallo v. High–Tech*

14 *Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366,

15 1373 (Fed. Cir. 2006); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th

16 Cir. 2005); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005)); *see*

17 *also Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 10–12 (1st Cir. 2009) (finding same); *but*

18 *see Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 777 & n. 1, 780 (10th

19 Cir. 1998)). Importantly, none of these cases limit themselves to sophisticated parties.

20      Furthermore, before providing the narrow language of its holding, *Oracle America*

21 stated: "We see no reason to deviate from the prevailing view that incorporation of the

22 UNCITRAL arbitration rules is clear and unmistakable evidence that the parties agreed the

23 arbitrator would decide arbitrability." *Id.* at 1074-75. It is therefore an appropriate

24 interpretation of *Oracle America* that the Ninth Circuit issued a narrow holding limited to

25 its facts - sophisticated parties to a commercial contract - but favorably acknowledged the

26 "prevailing view" expressed in the cited cases, all of which found clear and unmistakable

27 delegation of arbitrability regardless of the parties' sophistication.

28

United States District Court
Northern District of California

This understanding of *Oracle America* is additionally supported by nearly every subsequent decision in the Northern District of California, which has consistently found effective delegation of arbitrability regardless of the sophistication of the parties. *See, e.g.*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:14-CV-02510-SC, 2014 WL 7206620, at *4 (N.D. Cal. Dec. 18, 2014) (finding delegation in the context of antitrust litigation); *Bernal v. Sw. & Pac. Specialty Fin., Inc.*, No. 12–CV–05797–SBA, 2014 WL 1868787, at *4 (N.D. Cal. May 7, 2014) (same, in online loan agreement); *Crook v. Wyndham Vacation Ownership, Inc.*, No. 13–CV–03669–WHO, 2013 WL 6039399, at *4, 16 (N.D. Cal. Nov. 8, 2013) (same, in time share agreement). Despite all being issued after *Oracle America*, none these cases applied a "sophisticated parties" limitation, and all of them found that a contract's application of the AAA Rules "clearly and unmistakably" delegated questions of arbitrability to the arbitrator.

Moreover, these post-*Oracle America* decisions by the Northern District of California largely comport with the pre-*Oracle America* decisions in this district. *See, e.g.*, *Kimble v. Rhodes Coll., Inc.*, No. 10-5786-EMC, 2011 WL 2175249, at *2-4 (N.D. Cal. June 2, 2011) (finding that reference to the AAA Rules manifests "clear and unmistakable evidence of the parties' agreement to arbitrate arbitrability"); *Clarium Capital Mgmt. LLC v. Choudhury*, No. 08–5157-SBA, 2009 WL 331588, at *5 (N.D. Cal. Feb. 11, 2009) ("When the arbitration agreement explicitly incorporate[s] rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *Visa USA, Inc. v. Maritz, Inc.*, No. 07–05585-JSW, 2008 WL 744832 (N.D. Cal. Mar. 18, 2008) (holding the same); *Anderson v. Pitney Bowes, Inc.*, No. 04-4808-SBA, 2005 WL 1048700, at *2-4 (N.D. Cal. May 4, 2005) (same).

This articulation of the rule is also found in a number of notable California state court cases. *See, e.g.*, *Rodriguez v. American Technologies, Inc.*, 136 Cal. App. 4th 1110, 1123 (2006) (holding that although the scope of an arbitration clause generally is a question for the court, parties clearly and unmistakably agreed to have the arbitrator

6

determine the scope of the clause where the contract mandated arbitration in accordance with AAA Rules); *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 550 (2004) (same).

Consequently, when viewed within the context of the decision's reasoning, as well as the great weight of prevailing case law, it is likely that while *Oracle America*'s holding limited itself to sophisticated parties, it does not support Plaintiffs' contention that *only* sophisticated parties can "clearly and unmistakably" delegate the issue of arbitrability by incorporating the AAA Rules. Put another way, *Oracle America* does not foreclose the possibility that unsophisticated parties can clearly and unmistakably delegate arbitrability to an arbitrator through the incorporation of the AAA Rules.

However, this issue is not without argument to the contrary. In a recent decision in this district, Judge Lucy Koh wrote that *Oracle America* "expressly limited its holding" to (1) commercial contracts (2) that are between sophisticated parties. *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014). Although dicta,[3] *Tompkins* went on to explain:

> There is good reason not to extend this doctrine from commercial contracts between sophisticated parties . . . . Indeed, the Supreme Court held that by default, courts should decide arbitrability because the question of "who (primarily) should decide arbitrability" is "rather arcane," and "[a] party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers." The "clear and unmistakable" test thus established a "heightened standard" to evince delegation.

*Id.* (internal citations omitted). *Tompkins* also noted that in at least one decision, a California Court of Appeal has expressed "strong doubts" about whether a "mere reference" to these rules provides adequate notice to an individual employee. *Id.* (citing *Ajamian v. CantroCO2e, L.P.*, 203 Cal. App. 4th 771, 790 (2012)).

---

[3] *Tompkins* ultimately found a lack of "clear and unmistakable" evidence of the parties' intent to delegate arbitrability because of the nature of the contract, not the sophistication of the parties.

United States District Court
Northern District of California

United States District Court
Northern District of California

Additional support for this position is found in *Moody v. Metal Supermarket Franchising Am., Inc.*, No. 13–CV–5098–PJH, 2014 WL 988811 (N.D. Cal. Mar. 10, 2014). In that case, while the court did not cite *Oracle America* or even address the sophistication of the parties, it nonetheless refused to find the delegation of arbitrability in a series of franchise agreements because the "agreements themselves d[id] not quote this portion of Rule 7, nor d[id] they even refer specifically to Rule 7." *Id.* at *10. *Moody* determined that a reference to the "then current commercial arbitration rules of the AAA" was insufficient evidence of "clear and unmistakable" intent to delegate arbitrability, contrasting the contract's language with an express delegation provision that directly quotes Rule 7. *Id.* at *11.

Despite the analysis provided in *Tompkins* and *Moody*, those cases are nonetheless at odds with the prevailing trend of case law as described above. Further, *Tompkin*'s discussion of the alleged "sophisticated parties" limitation was merely dicta, and *Moody* neither references *Oracle America* nor discusses sophistication. Consequently, regardless of their sophistication, the Court finds that the Parties in this case clearly and unmistakably delegated the question of arbitrability to the arbitrator when they expressly incorporated the AAA Rules into their Agreement. As a result, any questions regarding the arbitration provision's validity, scope, or application to this dispute must be decided by the arbitrator.

Should the Ninth Circuit clarify its decision in *Oracle America* and expressly limit delegation by incorporation to sophisticated parties, it is unclear whether this Court would decide the issue differently. *Oracle America* provided no guidance to the district courts on how to determine whether a party is sufficiently "sophisticated," and similar discussions of sophistication in other legal contexts is largely unhelpful. Certainly, Plaintiffs are not as sophisticated as the large corporations that litigated the case in *Oracle America*. However, Defendant contends that Plaintiffs are experienced businesswomen, in addition to professional cleaners, and can therefore be expected to have some level of sophistication in the area of employment contracts. Reply at 3-4. At the hearing, this Court raised a number of questions, including whether the involvement of experienced attorneys imputes

8

United States District Court
Northern District of California

1  sophistication to the parties, and whether the parties need to be experienced in the area of

2  contract law, or merely in the handling of contracts. All of these questions remain. For the

3  moment, however, this Court finds insufficient support to interpret *Oracle America* in the

4  uniquely restrictive manner suggested by Plaintiffs, and therefore leaves these difficult

5  questions for another day.

6

7  **II.    Defendant's Claim of Arbitrability Is Not Wholly Groundless.**

8          In cases where the parties "clearly and unmistakably intend to delegate the power to

9  decide arbitrability to an arbitrator," the district court's inquiry is "limited . . . [to] whether

10  the assertion of arbitrability is 'wholly groundless.'" *Qualcomm Inc. v. Nokia Corp.*, 466

11  F.3d 1366, 1371 (Fed. Cir. 2006) (applying Ninth Circuit law) (citing *Dream Theater, Inc.*

12  *v. Dream Theater*, 124 Cal. App. 4th 547 (2004)). The "wholly groundless" inquiry allows

13  the court to prevent a party from "asserting any claim at all, no matter how divorced from

14  the parties' agreement, to force an arbitration." *Id.* at 1373 n.5. In conducting this inquiry:

15

16          [T]he district court should look to the scope of the arbitration
            clause and the precise issues that the moving party asserts are
17          subject to arbitration. Because any inquiry beyond a "wholly
            groundless" test would invade the province of the arbitrator,
18          whose arbitrability judgment the parties agreed to abide by in
            the [agreement], the district court need not, and should not,
19          determine whether [plaintiff's claims] are in fact arbitrable. If
            the assertion of arbitrability is not "wholly groundless," the
20          district court should conclude that it is "satisfied" pursuant to
            section 3 [of the FAA].

21  *Id.* at 1374. If a court finds that the assertion of arbitrability is not "wholly groundless," it

22  should stay the action pending a ruling on arbitrability by the arbitrator. *Id.*

23          The arbitration provision in this case is broad, providing the arbitration of "any

24  dispute, controversy or claim related to this Agreement." Ex. A to Dua Decl. at 5 (Docket

25  No. 8-1). A review of the complaint does not foreclose the possibility that Plaintiffs'

26  claims relate to the Agreement. *See United Steelworkers of Am. v. Warrior & Gulf*

27  *Navigation Co.*, 363 U.S. 574, 582-83 (1960) ("An order to arbitrate the particular

28  grievance should not be denied unless it may be said with positive assurance that the

1  arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

2  Doubts should be resolved in favor of coverage.").

3          Plaintiffs' dispute could plausibly "relate to" the Agreement for a number of

4  reasons. First, Plaintiffs assert that they were employees of Defendant when they provided

5  cleaning services arranged through Defendant's platform, while the Agreement expressly

6  disclaims the existence of an employment relationship, stating: "Handybook.com is not an

7  employment service and does not serve as an employer of any User." Ex. A to Dua Decl.

8  at 3. Second, Defendant "supplies a medium for the exchange of money," including the

9  money paid to Plaintiffs, and the Agreement is the only contract that governs this

10  exchange. *Id.* at 2. Plaintiffs' claims relate, in part, to the money they earned or were

11  entitled to for the cleaning services they offered through Defendant's platform. Finally,

12  much of the evidence that will be considered to determine whether Plaintiffs were properly

13  classified as independent contractors is found in the provisions of the contract, including

14  clauses that detail Defendant's right to terminate Plaintiffs' employment, Plaintiffs' right

15  to and method of payment, and Defendant's liability for disputes between Plaintiffs and

16  individual clients. *See S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48

17  Cal.3d 341, 350-51 (1989) (providing factors considered in employment classification).

18          Plaintiffs respond by highlighting cases that found employment misclassification

19  claims were not covered by the disputed contract's choice-of-law and forum selection

20  provisions. Opp'n at 4-6 (citing *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010);

21  *Cotter v. Lyft, Inc.*, No. 13-04065-VC, 2014 3884416 (N.D. Cal. Aug. 7, 2014); *Quinonez*

22  *v. Empire Today, LLC*, No. 10-02048-WHA, 2010 WL 4569873 (N.D. Cal. Nov. 4, 2010)).

23  The essential reasoning of these decisions was that employment misclassification claims

24  are statutory in nature and therefore do not concern, and are not governed by, the

25  underlying contract. While this reasoning is compelling, and may indeed be convincing to

26  the arbitrator, it can be argued that choice-of-law and forum selection provisions do not

27  benefit from the same strong presumption that favors the arbitration of disputes. *See, e.g.,*

28

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1  *Mortensen v. Bresnan Comm'n, LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013) ("[T]he FAA's

2  purpose is to give preference (instead of mere equality) to arbitration provisions.").

3        Because the Court has found that an arbitrator should determine the issue of

4  arbitrability, it reserves judgment as to whether the arbitration provision actually covers

5  Plaintiffs' causes of action, applying instead the "wholly groundless" standard required by

6  case law.  To this end, the Court finds that Defendant's argument that the preferential

7  nature of arbitration provides some basis for a finding that the employment

8  misclassification claims "relate to" the Parties' Agreement is not "wholly groundless."

9  However, this should not be interpreted as the Court endorsing Defendant's position, as it

10 might have arrived at a different conclusion under a less forgiving standard.  Nonetheless,

11 the Court must now consider whether the Agreement's class and representative action

12 waivers change this assessment.

13

14 **III.  The Class Arbitration Waiver is Valid.**

15        The Ninth Circuit has expressly endorsed sending individually named plaintiffs'

16 claims to arbitration despite class allegations, and has found class waivers in arbitration

17 agreements enforceable.  *Murphy v. DirectTV, Inc.*, 724 F.3d 1218, 1226 (9th Cir. 2013)

18 ("Section 2 of the FAA, which under *Concepcion* requires the enforcement of arbitration

19 agreements that ban class procedures, is the law of California and of every other state.");

20 *accord Kairy v. Supershuttle, Int'l*, No. 08-02993-JSW, 2012 WL 4343229, at *3 (N.D.

21 Cal. Sept. 20, 2012) ("[C]ourts must compel arbitration even in the absence of the

22 opportunity for plaintiffs to bring their claims as a class action.").

23        The arbitration provision at issue in this case contains a valid class action waiver.

24 Ex. A to Dua Decl. at 6 ("To the full extent permitted by law, (a) no arbitration will be

25 joined with any other; (b) there is no right or authority for any Dispute to be arbitrated on a

26 class-action basis or to utilize class action procedures[.]").  Consequently, if the arbitrator

27 determines that Plaintiffs' substantive claims are arbitrable (*i.e.*, that they "relate to" the

28 Agreement), named Plaintiffs can be required to arbitrate their claims on an individual

1    basis.  Accordingly, the class claims are stayed pending a decision on arbitrability by the

2    arbitrator.

3

4    **IV.  The Representative Action Waiver is Invalid.**

5          In addition to the class action waiver, the Agreement in this case also contains a

6    representative action waiver.  Ex. A to Dua Decl. at 6 ("To the full extent permitted by law

7    . . . there is no right or authority for any Dispute to be brought in a purported representative

8    capacity on behalf of the general public or any other persons.").  Defendant contends that

9    this waiver requires the Court to dismiss Plaintiffs' representative PAGA claims.  Mot. at

10   13-15.  Conversely, Plaintiffs argue that the waiver is invalid under state law, and the

11   representative PAGA claims should proceed in this Court.  Opp'n at 24-25.

12         The Private Attorneys General Act permits individuals to bring representative

13   claims for an employer's violation of the California Labor Code.  Cal. Lab. Code §§ 2699

14   et seq.  These individuals essentially act as private attorneys general, and can seek

15   penalties for violations "that could otherwise only be assessed by California's Labor and

16   Workforce Development Agency."  *Cunningham v. Leslie's Poolmart, Inc.*, No. 13-2122-

17   CAS, 2013 WL 3233211, at *5 (C.D. Cal. June 25, 2013).  In *Iskanian v. CLS Transp.*

18   *L.A., LLC*, 59 Cal. 4th 348 (2014), the California Supreme Court held that arbitration

19   agreements cannot waive the ability to pursue representative PAGA actions because a

20   "PAGA representative action is . . . a type of *qui tam* action," and the "government entity

21   on whose behalf the plaintiff files suit is always the real party in interest in the suit."  *Id.* at

22   382.  Responding to the argument that the Federal Arbitration Act preempts the state

23   policy invalidating PAGA waivers, the court concluded "that the rule against PAGA

24   waivers does not frustrate the FAA's objectives because . . . the FAA aims to ensure an

25   efficient forum for the resolution of *private* disputes, whereas a PAGA action is a dispute

26   between an employer and the state Labor and Workforce Development Agency."  *Id.* at

27   384 (emphasis in original).

28

United States District Court
Northern District of California

12

United States District Court
Northern District of California

Defendant correctly asserts that this Court is not bound by *Iskanian* and cites a number of decisions in this circuit that have declined to follow the California Supreme Court. Mot. at 14 n. 4 (compiling cases). The cases cited by Defendant have generally found that California's policy barring representative PAGA waivers frustrates the objectives of the FAA, which is prohibited by *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1751 (2011). This Court disagrees.

Defendant identifies two decisions from the Northern District of California that have found California's policy preempted by the FAA. Mot. at 14 (citing *Parvataneni v. E*Trade Fin. Corp.*, 967 F.Supp.2d 1298 (2013)); Def.'s Admin. Mot. at 2 (Docket No. 21) (citing *Estrada v. CleanNet USA Inc., et al.*, No. 14-01785-JSW (N.D. Cal. Feb. 24, 2015)). In response, Plaintiffs' cite to a recent decision in this district that determined California's policy was not preempted by the FAA. Pls.' Stmt. of Recent Decision at 1 (Docket No. 18) (citing *Hernandez, et al. v. DMSI Staffing, LLC, et al.*, No. 14-1531-EMC, 2015 WL 458083 (N.D. Cal. Feb. 3, 2015)). The Court is therefore presented with persuasive authority in support of either outcome. After careful consideration, and with full awareness that this issue may soon be resolved by the Ninth Circuit Court of Appeals, this Court chooses to follow Judge Chen's well-reasoned decision in *Hernandez*.

In *Hernandez*, the court agreed with *Iskanian*'s conclusion that the FAA does not preempt California's policy barring PAGA waivers, and found that *Concepcion*, which was about class action waivers, does not apply. *Id.* at *6. The court explained that *Concepcion* was focused on the largely procedural attributes of class actions that make them inconsistent with the FAA's objective of ensuring the efficient resolution of disputes - attributes that are not shared by PAGA actions. *Id.* (citing *Concepcion*, 131 S.Ct. at 1751); *Baumann v. Chase Inv. Services Corp.*, 747 F.3d 1117, 1123 ("[U]nlike Rule 23(a), PAGA contains no requirements of numerosity, commonality, or typicality."). *Concepcion* emphasized the formality of class certification, such as the requirement for the opportunity to be heard and opt-out rights - time-consuming processes that frustrate the objectives of the FAA and are not present in representative PAGA actions because PAGA does not bind

United States District Court
Northern District of California

1   other employees. *Hernandez*, 2015 WL 458083, at *6 (citing *Concepcion*, 131 S.Ct. at

2   1751); Cal. Lab. Code § 2699(g)(1). Consequently, *Hernandez* reasoned, "[t]he due-

3   process-related procedural requirements of formal class actions do not obtain in PAGA

4   representative actions. Thus, the *Iskanian* rule against waiver of PAGA claims does not

5   threaten to undermine the fundamental attributes of arbitration." 2015 WL 458083, at *6.

6       In addition to the many reasons that PAGA waivers are not analogous to class

7   action waivers, and therefore not contemplated by *Concepcion*, PAGA claims cannot be

8   waived because of their unique *qui tam*-like nature and the manner in which they implicate

9   federalism concerns. *Herandez* explained that the real party in interest in a PAGA claim is

10  the state, not the parties that concede to the waiver and agree to arbitration. *Id.* at *7.

11  Where the objective of the FAA is to guarantee the efficient resolution of *private* disputes,

12  that objective is not frustrated when the dispute is between the employer and the State, as

13  with PAGA claims. *Id.* (explaining that in a PAGA action, the government exercises

14  initial control over the action, receives the lion share of the statutory recovery, and is

15  bound by any judgment obtained). Finally, *Hernandez* noted the federalism concerns that

16  strongly advise against a finding of preemption in this context, explaining that "[l]abor law

17  enforcement falls squarely within a state's police powers." *Id.* at *8-9 (citing *Metro. Life

18  Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)). Like the court in *Hernandez*, this

19  Court is hesitant to intrude upon the State's law enforcement activities, which are "central

20  to state sovereignty." *Metro Life Ins. Co.*, 471 U.S. at 756; *see also Printz v. United

21  States*, 521 U.S. 898, 928 (1997) ("It is an essential attribute of the States' retained

22  sovereignty that they remain independent and autonomous within their proper sphere of

23  authority.").

24      The Court therefore concludes that barring the waiver of representative PAGA

25  claims and requiring such claims to be arbitrated does not interfere with the objectives and

26  fundamental attributes of arbitration as provided in the FAA. *Cf. Concepcion*, 131 S.Ct. at

27  1748. Defendant in this case has not shown that arbitration of these claims would be

28  particularly complex, cumbersome, time-consuming, or expensive. Furthermore, where

1    federalism concerns weigh heavily upon the Court's determination, absent clear direction

2    from the Ninth Circuit, the Court denies Defendant's request to enforce the waiver of

3    Plaintiffs' representative PAGA claims.

4        As noted by *Hernandez*, "The fact that the waiver provisions of the arbitration

5    clauses at issue cannot be enforced to bar PAGA representative claims does not necessarily

6    dictate which forum is proper for their adjudication."  *Hernandez*, 2015 WL 458083, at *9.

7    While the arbitration clause at issue in this case is broadly constructed, the inclusion of the

8    representative action waiver suggests that the Parties did not anticipate that PAGA

9    representative claims would be arbitrated.  *See id.* (citing *Iskanian*, 59 Cal. 5th at 391).

10   While it sounds in reason to the Court that these representative claims should not be

11   subject to arbitration, as the real party in interest is a third party (the State of California),

12   which did not concede to the arbitration of its disputes, the question of arbitrability is

13   nonetheless left to the decision of the arbitrator, pursuant to AAA Rule 7(a).  Accordingly,

14   Plaintiffs' representative PAGA claims are stayed along with the rest of this action,

15   pending a decision on arbitrability of those representative claims by the arbitrator.

16

17   **CONCLUSION**

18        In light of the Parties' decision to conduct the resolution of their dispute in

19   accordance with the AAA Commercial Rules, the Court leaves the question of arbitrability

20   to be decided by the arbitrator in accordance with the clear and unmistakable intent of the

21   Parties as defined by prevailing case law.  Additionally, the Court finds that the

22   Agreement's waiver of Plaintiffs' statutory right to pursue representative PAGA claims is

23   invalid as a matter of state law.  However, as with the other causes of action asserted by

24   Plaintiffs, the arbitrability of these representative claims must be decided by an arbitrator.

25   Therefore, the Court hereby GRANTS Defendant's motion to compel arbitration.

26        Additionally, in accordance with Section 3 of the FAA, the Court STAYS these

27   proceedings pending a decision on arbitrability by the arbitrator.  The Parties shall file a

28

United States District Court
Northern District of California

15

1    joint status statement within **one week** of the arbitrator's decision on arbitrability or by

2    **June 1, 2015**, whichever is sooner.

3

4    **IT IS SO ORDERED.**

5

6    Dated:   03/03/15

     THELTON E. HENDERSON
7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28