UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE UBER FCRA LITIGATION

Case No. 14-cv-05200-EMC

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Docket No. 223

## I. INTRODUCTION

Plaintiffs in these consolidated cases brought putative class actions alleging that they were denied employment or were terminated on the basis of information contained in background checks that Uber procured in violation of the Fair Credit Reporting Act ("FCRA") and related state laws. Now pending before the Court is Plaintiffs' motion for preliminary approval of a class action settlement. Docket No. 223 ("Motion"). The Court **GRANTS** the motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. <u>Litigation History</u>

Plaintiff Mohamed first filed a putative class action complaint against Uber and Hirease, LLC, on November 24, 2014, asserting claims based on alleged violations of FCRA, as well as California and Massachusetts Consumer Credit reporting statutes. Motion at 2. Shortly thereafter, Plaintiff Gillette filed another putative class action complaint asserting similar claims, as well as seeking civil penalties under California's Private Attorney General Act ("PAGA"). In January and February 2015, Uber filed motions to compel arbitration in the two cases. On June 9, 2015, the Court denied the motions, holding that the arbitration clauses in the 2013 and 2014 versions of Uber's contracts with its drivers "are both procedurally and substantively unconscionable, and

therefore unenforceable as a matter of California law." Docket No. 70 at 3. Uber appealed the Court's enforceability order to the Ninth Circuit.

On June 29, 2015, Plaintiff Nokchan filed a third putative class action complaint asserting claims under FCRA and related state statutes. On October 1, 2015, the Court consolidated the Mohamed, Gillette, and Nokchan actions into the present case entitled *In re Uber FCRA Litigation*. The parties filed the operative Amended Master Consolidated Complaint on April 13, 2016. Docket No. 171. In this complaint, Plaintiffs allege that Uber failed to: (i) provide proper notice that complied with FCRA and the related state laws regarding its intention to procure background check reports; (ii) obtain proper authorization from Plaintiffs and other Class Members allowing Uber to procure the background check reports; and (iii) provide required information and copies of the reports to Plaintiffs and other class members before taking adverse employment actions against them. *Id.*; Motion at 6.

On June 15, 2016, the parties filed a Notice of Settlement; the terms of the settlement were dependent on the Ninth Circuit's pending ruling in the appeal regarding the enforceability of the arbitration provisions. On September 7, 2016, the Ninth Circuit reversed the Court's orders denying the motions to compel arbitration. The Ninth Circuit subsequently denied Plaintiffs' Petition for Rehearing En Banc. On April 25, 2017, Plaintiffs filed the instant motion for preliminary approval of a class action settlement.

B. The Settlement Agreement

The terms of the settlement are as follows: First, in exchange for Plaintiffs' release of claims, Uber agrees to pay $7.5 million into a Settlement Fund, which will be used to pay Class Members who submit timely claim forms. Motion at 6. The agreement allocates $7,500 for the settlement and release of the PAGA claims in this case. Docket No. 221-6 ("Settlement Agreement") ¶ 20. 75% of the PAGA settlement amount, or $5,625.00, will be paid to the California Labor and Workforce Development Agency, with the remaining 25% distributed to the class members.

The Settlement Class is defined as "all persons who were subject to a background check

and/or consumer report request by Uber before January 3, 2015."[1] Docket No. 221-6 ("Settlement Agreement") ¶ 37. According to Uber, there are 1,025,954 potential class members. *Id.* ¶ 70. The Class is divided into two subgroups, those who accepted and did not opt out of an arbitration provision that was the subject of the Ninth Circuit enforceability ruling ("the ADR Group"), and those did not accept such a provision ("the Court Group"). There are 424,125 members of the ADR Group, and 601,829 members of the Court Group. *Id.*

The funds will be allocated between the two groups according to a formula which results in payments to members of the Court Group that are roughly twice the amount of payments to members of the ADR Group. *Id.* App. A; Motion at 7. The actual payments to class members depend on the number of each group who submit claim forms. Plaintiffs have included a table of estimated payments. According to this table, if 5% of each group submits claims, then each member of the ADR Group will receive $55.27 and each member of the Court Group will receive $125.01. As the number of claimants increases, the payment, of course, decreases, so that if 15% of each group makes claims, the payments are $18.09 and $41.67, respectively.[2] Motion at 26.

Finally, in addition to the monetary relief described above, the settlement provides for stipulated injunctive relief preventing Uber from "deliberately return[ing] to the form of background check disclosure that had been provided to the Plaintiffs in or before 2014." Settlement Agreement ¶ 54. This term expires one year after the Court enters final approval the settlement. *Id.* ¶ 55.

Uber states that it is "in possession of the names, last known e-mail address, and last known physical mailing address of all Potential Settlement Class Members." *Id.* ¶ 70(a)(iii). The settlement administrator will initially email notice of the settlement to each potential class member, and then follow up with a postcard sent the last known mailing address for those members whose initial emails were "determined to be blocked." Docket No. 222 Ex. H

---

[1] The cutoff date for the settlement class "coincides with the time when Uber changed its practices with respect to the background check procedures at issue." Motion at 9.

[2] These payments are based on the assumption that counsel receives its full requested fee award of $2,500,000. That figure is subject to revision when the Court considers counsel's motion for attorneys' fees.

3

(Declaration of Settlement Administrator). The settlement administrator will also establish a website at www.UberFCRASettlement.com and a toll-free phone number that class members can call to obtain information about the settlement and request a physical copy of the long-form notice. Class members may submit claim forms, opt-out, or object by mail, email, or through the settlement website.

In exchange for the consideration provided in the settlement, class members agree to release all claims actually brought in this suit, as well as "all background check claims that could have been asserted based on the allegations included in the Amended Master Complaint." Motion at 9. Specifically, class members release all claims

> Arising out of or relating to any allegations made in the Action, any legal theories that could have been raised based on the allegations in the Action, and all claims of any kind relating in any way to, or arising out of, background checks and/or consumer reports of any kind presented in the Action based on the facts alleged in the Complaint, including but not limited to claims under the Fair Credit Reporting Act ("FCRA"), California Consumer Reporting Agencies Act, California Investigative Consumer Reporting Agencies Act, California Private Attorney General Act ("PAGA") claims pursuant to Cal. Labor Code § 2699, based on alleged violations of California Labor Code § 1024.5, California Business and Professions Code section 17200, and Massachusetts CORI related claims. "Settlement Class Members' Released Claims" includes claims for actual, statutory, liquidated, punitive or any other form of damages, as well as for attorneys' fees and costs. "Settlement Class Members' Released Claims" shall be construed as broadly as possible to affect complete finality over this Action. Settlement Class Members' Released Claims do not include, and Settlement Class Members are not releasing, any PAGA claims that are not based on background checks and/or consumer reports.

Settlement Agreement ¶ 41.

Lastly, Uber agrees to pay all settlement administrative costs directly to the settlement administrator; these costs do not come out of the settlement fund. In the event that any of the settlement fund is not paid to class members – *i.e.*, if any class members who submit claim forms do not cash their checks within 90 days – the remaining funds will go first towards settlement administration costs (*i.e.*, reimbursing Uber for any payments made towards settlement administration costs), and then, if there are still funds remaining, to a *cy pres* award to Legal Services for Prisoners with Children, "a non-profit organization that conducts policy work and

4

impact litigation on behalf of people who are frequently denied employment based on the now ubiquitous practice of procuring of background checks for job applicants." Motion at 13.

### III. DISCUSSION

A. Class Certification

Because a class has not yet been certified in this case, before determining the fairness of a class action settlement agreement, the Court must determine whether the settlement class meets the requirements for class certification under Federal Rule of Civil Procedure 23. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The Court must first "ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Id.*

1. Numerosity

The numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is plainly met in this case, where there are over 1,000,000 potential class members.

2. Commonality

A class has sufficient commonality "if there are questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient." *Hanlon*, 150 F.3d at 1019. Here, Plaintiffs allege that all class members suffered the same injuries: "violation of statutorily guaranteed rights concerning Uber's use of background checks in its hiring and firing process." Motion at 15. Specifically, because all members of the putative class were, by definition, subject to Uber's background checks, and because Plaintiffs allege that Uber systematically failed to comply with FCRA's notification requirements, all class members suffered the same deprivation of their rights under the statute. Under *Hanlon*, this constitutes sufficient commonality to satisfy Rule 23.

3. <u>Typicality</u>

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. This requirement is satisfied here, as the claims of the named Plaintiffs are the same as those brought on behalf of the Class as a whole. There is no assertion of defenses unique to the named Plaintiffs.

4. <u>Adequacy of Representation</u>

The adequacy requirement is satisfied where "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Here, there is no evidence of any conflicts of interest between the named Plaintiffs and their counsel and the rest of the class. As Plaintiffs point out, here "the named Plaintiffs have the same interest as all Class Members in obtaining redress for the same claims." Motion at 16. In addition, counsel has vigorously pursued the action up to this point, both before this Court and the Ninth Circuit. The adequacy requirement is therefore satisfied.

5. <u>Rule 23(b)</u>

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under" Rule 23(b). *Hanlon*, 150 F.3d at 1022. Plaintiffs argue that certification is appropriate under Rule 23(b)(3), under which the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); Motion at 16. The Court agrees. With respect to the first requirement, "[c]ommon issues predominate over individual issues when the common issues 'represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Edwards v. First Am.*

*Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015) (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1778 (3d ed.1998)). Here, predominance is satisfied because all of Plaintiffs' claims arise from allegations of Uber's systemic practices and policies, and accordingly, liability may be determined on a classwide basis. For that reason, the core issue of this case "can be resolved for all members of the class in a single adjudication." Second, a class action is superior to other methods for adjudicating this controversy, since individual actions would involve relatively small claims for damages, and thus "would prove uneconomic for potential plaintiffs," since "litigation costs would dwarf potential recovery." *Hanlon*, 150 F.3d at 1022. Indeed, Plaintiffs are likely correct that "no realistic alternative exists." Motion at 17.

The Court therefore provisionally certifies the class under Rule 23 for settlement purposes.

B.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." As the Ninth Circuit has explained, "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Accordingly, before a court approves a settlement, it must conclude that the settlement is "fundamentally fair, adequate, and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008); *see also Allen v. Bedolla*, 787 F.3d 118, 1222 (9th Cir. 2015). This inquiry requires that the Court balance factors such as the strength of the plaintiffs' case, the risk and expense of further litigation, the risk of maintaining class action status, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a government participant, and the reaction of the class members of the proposed settlement. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing factors to determine fairness and adequacy). "In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer." *Cotter v. Lyft, Inc.*, Case No. 13-cv-4065-VC, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016) (internal quotation omitted).

7

Prior to formal class certification, "[t]he dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)." *Hanlon*, 150 F.3d at 1026; *see also Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). The Ninth Circuit has therefore explained that "where . . . the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1026). This more "exacting review" is warranted "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Id.* (internal quotation marks omitted).

Because the parties have agreed to the present Settlement Agreement prior to class certification, this Court must apply the more "exacting" standard in determining whether this settlement is fair, adequate, and reasonable. Taking this more exacting standard into account, this Court has previously explained that "[a]t the preliminary approval stage, the Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011). But because the settlement must be carefully scrutinized even at the preliminary approval stage, the Court, in applying the *Harris* test – particularly the question whether the settlement falls within the range of possible approval – must fully and closely consider all of the applicable factors enumerated in *Hanlon* and *Churchill Village*. *See Hanlon*, 150 F.3d at 1026; *Churchill Vill.*, 361 F.3d at 575.

This order will first address whether the settlement falls within the range of possible approval, placing particular weight on "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; [and] (4) the amount offered in settlement," *Churchill Vill.*, 361

8

F.3d at 575, before turning to the remaining *Harris* factors.

C. <u>Whether the Settlement Falls Within the Range of Possible Approval</u>

The Court first considers whether the Settlement Agreement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Harris*, 2011 WL 1627973, at *9.

As explained above, the settlement agreement provides for a recovery for the class of $7.5 million, less attorneys' fees and named plaintiffs' service awards. This figure represents a very large discount on the possible value of the claims. The large majority of the possibility recovery stems from Plaintiffs' FCRA claims. FCRA provides for statutory damages between $100 and $1000 per violations for willful violations. 15 U.S.C. § 1681n(a)(1)(A). Plaintiffs maintain that Uber's violations were willful. If they were to prove willful violations at trial then, with over 1 million class members, Uber's liability on the FCRA claims would be between $100 million and $1 billion.[3] Given these figures, it is clear that $7.5 million is a small fraction of the total potentially at stake.

It is true, however, that "value of a settlement cannot be assessed in a vacuum," but rather "must be considered in light of the strength of the plaintiff's case and the risks in pursuing further litigation." *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2016 WL 5907869, at *7 (N.D. Cal. Oct. 11, 2016). As Plaintiffs argue, in this case there are substantial risks involved in proceeding with litigation that weigh in favor of a significant discount. First, some 40% of the class members are subject to arbitration provisions that the Ninth Circuit has now held to be

---

[3] As explained in Plaintiffs' supplemental briefing, the potential recovery on Plaintiffs' state claims is quite limited. Plaintiffs state that statutory damages under California's ICRAA are unavailable in a class action, so that damages would be limited to $10,000 per named plaintiff, for a total of $50,000. Docket No. 229 at 2. As to Plaintiffs' Massachusetts claims, Plaintiffs acknowledge the substantial risk that they are preempted by FCRA. *See* 15 U.S.C. § 1681t(b)(1)(C) (providing for preemption with respect to "any subject matter . . . relating to the duties of a person who takes any adverse action with respect to a consumer"); *see also Goldberg v. Uber Techs., Inc.*, No. CIV.A. 14-14264-RGS, 2015 WL 1530875, at *3 (D. Mass. Apr. 6, 2015) ("The allegations of violations of the MCRAA stumble out of the gate on Goldberg's recognition that the FCRA expressly preempts the relevant state law."). Plaintiffs accordingly state that "the verdict value of this claim is low." *Id.* at 3. As discussed in more detail below, discovery revealed that Plaintiffs' PAGA claim was meritless, so that claim has no value.

9

enforceable. Thus, immediately, a large portion of the class would be excluded from this litigation, and would be forced to arbitrate their claims individually. Given the small amount of potential recovery per individual, there is a strong likelihood that few would pursue individual arbitration. This fact alone accounts for a significant discount on the potential recovery.

Second, and even more significantly, Plaintiffs explained at the hearing on the present motion that discovery has revealed their case to be significantly weaker than they had believed at the outset of the litigation, because Uber had generally complied with its obligations under FCRA. For example, Plaintiffs learned through discovery that Uber in fact had in place a formal policy mandating disclosure of background checks in compliance with FCRA, including both Uber's intention to perform background checks and the required disclosures prior to any adverse actions. Uber disclosed evidence showing that it had generally complied with these policies. Similarly, Plaintiffs discovered that their PAGA claim was wholly without merit. The PAGA claim was based on Uber's alleged violation of California Labor Code § 1024.5, which prohibits employers from using consumer credit reports "for employment purposes," except in limited circumstances. Only one of the named plaintiffs, Meghan Christenson, advanced a claim under this statute. Discovery revealed, however, not only that Uber did not perform a credit check on Ms. Christenson, but that it generally had no policy of performing such checks on any of its prospective employees. In short, there appears to be very little, if any, factual support for Plaintiffs' claims, indicating that "if the case were prosecuted, there is a very highly likelihood that no class recovery would be obtained." *Viceral*, 2016 WL 5907869, at *8.

Furthermore, there are also legal issues that present significant risks for Plaintiffs on the merits of their claims. For example, the relevant provisions of FCRA and the similar state statutes at issue here pertain to background checks performed for "employment purposes." *See, e.g.*, 15 U.S.C. § 1681b(b)(2)(A); Cal. Civ. Code § 1785.20. Courts have divided on whether the disclosure requirements thus imposed are limited to employees or whether they also apply to independent contractors. *See* Motion at 19-20 (collecting cases). If the Court were to accept Uber's position that these statutes apply only to employees, then Plaintiffs would have to prove that they were employees rather than independent contractors. This is obviously a difficult factual

10

question as this Court noted in *O'Connor v. Uber Technologies, Inc.*, No. 13-CV-03826-EMC, 2016 WL 4398271 (N.D. Cal. Aug. 18, 2016).

In addition, as explained above, Plaintiffs' potential recovery under FCRA depends on proving that any of Uber's violations were "willful," rather than negligent. Uber states that it would argue that any violations could not have been willful; given the split of authority on this question, Uber has a strong argument that it had a good faith belief that the statutes applied only to employees, and that its drivers were independent contractors. The Supreme Court, in construing FCRA's willfulness requirement, has explained that where "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007). Plaintiffs cite several cases in which district courts determined that, under *Safeco*, the law regarding FCRA's disclosure provisions "was too muddled to support" a finding of willfulness. Motion at 22; *see also, e.g.*, *Just v. Target Corp.*, 187 F. Supp. 3d 1064, 1069 (D. Minn. 2016) (noting that "federal courts of appeals have provided no guidance as to the parameters of the stand-alone disclosure requirement"); *Landrum v. Harris Cnty. Emergency Corps.*, 122 F. Supp. 3d 617, 625 (S.D. Tex. 2015).

Assuming that Plaintiffs could not establish that Uber's violations were willful, the damages would be limited to actual damages. Uber contends that Plaintiffs did not suffer any actual harm, given that any alleged violations were merely technical; there is no claim that the FCRA violations were in any way causally related to Plaintiffs' terminations. For their part, Plaintiffs concede that the "verdict value of actual damages stemming from FCRA violations on a class wide basis is $0." Docket No. 229 at 4.

Finally, Uber states that it would pursue dismissal of the FCRA claims for lack of standing, noting that Courts have "split on the issue of whether claims regarding disclosure violations of FCRA can establish concrete injury." Motion at 25 (collecting cases). Uber bases its argument on the Supreme Court's statement in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) that a plaintiff's allegation of a "bare procedural violation, divorced from any concrete harm, and satisfy

11

the injury-in-fact requirement of Article III." *Spokeo* was, itself, a case concerning FCRA's disclosure requirements. The Court held that the Ninth Circuit's analysis of the standing question was incomplete for failing to consider whether the plaintiff has suffered any concrete harm.

In the wake of *Spokeo*, the Ninth Circuit has recently held that allegations of violations of FCRA disclosure requirements do satisfy the *Spokeo* concreteness requirement. FCRA creates a "right to information" and a "right to privacy," and Congress, by creating a private cause of action for violations of the statute, "recognized the harm such violations cause, thereby articulating a 'chain[] of causation that will give rise to a case or controversy." *Syed v. M-I, LLC*, 853 F.3d 492, 499 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 580 (1992) (Kennedy, J., concurring)). But numerous other district courts have reached the opposite conclusion. *See, e.g.*, *LeGrand v. Intellicorp Records, Inc.*, No. 1:15 CV 2091, 2017 U.S. Dist. LEXIS 26156, at *7 (N.D. Ohio Feb. 24, 2017) (collecting cases and noting that, "post-*Spokeo*" a "majority of courts" reviewing claims of violations of the FCRA disclosure requirement have held that plaintiffs "lack standing to pursue their claim"). Despite a favorable Ninth Circuit ruling, since *Spokeo* left the issue open, the question of standing in FCRA disclosure cases has not been clarified by the Supreme Court.

In light of these substantial risks and obstacles, and in light of the inevitable expense of litigating a large, complex case through trial, it is clear that a substantial discount is warranted. Similarly, in *Viceral*, 2016 WL 5907869, earlier this year the Court approved a settlement that was worth just 8.1% of the expected verdict value where it was clear that Plaintiffs' case had virtually no merit. The settlement in this case may represent a smaller percentage of the total possible verdict than that in *Viceral* (7.5% or less), but in this case, the legal and factual obstacles Plaintiffs face are even more substantial. Given the overall weakness of their case, the Court concludes that the proposed settlement falls within the range of possible approval.[4]

---

[4] For the same reason, the Court approves the PAGA settlement of just $7,500. In *Viceral*, the Court explained that despite its duty to be mindful of the "temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class," *O'Connor v. Uber Technologies*, *Inc.*, No. 13-CV-03826-EMC, 2016 WL 4398271, at *18 (N.D. Cal. Aug. 18,

12

D.  Settlement Process

An additional factor the Court examines is the means by which the parties arrived at settlement. "An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Harris*, 2011 WL 1627973, at *8 (internal quotation omitted); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution").

Here, the parties' settlement was the product of an arm's length negotiation, over the course of several months and including two in-person sessions with a mediator, Mark S. Rudy, who has served as a mediator in several other cases cited by Plaintiffs. Motion at 29. "The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Exp. Corp.*, No. C 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007). There is also no "clear sailing" provision with respect to Counsel's fee award, which the Ninth Circuit has identified as a sign of possible collusion. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). The Court finds that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel.

E.  The Presence of Obvious Deficiencies

The next factor the Court considers is whether there are obvious deficiencies in the

---

2016), a PAGA award of just $20,000 – out of a total settlement of $6,000,000 – was justified in light of the weakness of the plaintiffs' case. Here, as explained above, discovery revealed the PAGA claim to be entirely without merit. Thus, while the PAGA allocation is even smaller in this case, the Court concludes that it does not justify denying settlement approval. The Court further notes that this settlement overlaps slightly with the proposed PAGA settlement in *Price v. Uber Technologies* now pending before the Los Angeles Superior Court. Although the parties in that case did not allege a PAGA claim predicated on violations of Labor Code § 1024.5, the settlement includes a broad release of PAGA claims, including those predicated on § 1024.5. The Court's approval of the PAGA settlement in this case is not intended as any statement or view on the other issues in *Price* or *O'Connor*, which remain unaffected by the present case. The Court has also reviewed the amicus brief filed in *Price* by the California Labor Commissioner, in which the Commissioner reiterates that an appropriate PAGA settlement must include sufficient penalties to create an effective disincentive for employers to engage in unlawful and anticompetitive business practices. However, because the Court has determined that the PAGA claim in this case is effectively worthless, the small value of the settlement approved herein is not inconsistent with the views of the Labor Commissioner.

13

Settlement Agreement. There are two potentially problematic aspects of the Agreement.

### 1. The Claims Process

At the hearing on this motion, the Court asked the parties to discuss, and ultimately submit supplemental briefing, on the necessity of the claims process, given Uber's representation that it has contact information for all potential class members. As the parties have explained, the claims process is necessary for a number of reasons. First, while Uber does have contact information for all potential class members, it does not have "verifiably current contact information." Docket No. 240 at 1. Given the very large size of the potential class, and the fact that all of the information was current only as of January 2, 2015, it is likely that much of the information is now outdated. In such circumstances, Uber maintains, "it would be inefficient, counterproductive, and potentially harmful to PSCMs to direct mail checks into the vast unknown, without a claims process to first generate current and reliable contact information." *Id.* at 3. Moreover, as explained at hearing, using a direct mail approach, rather than a claims process, would increase the administration costs from an estimated $312,000 to over $800,000. While Uber has agreed to pay for settlement costs under the current approach, that agreement would not extend to such increased costs. In short, the overall recovery of the class would likely be lessened for a highly uncertain benefit, given the likelihood that much of the available contact information is outdated. Finally, Plaintiffs point out that, given the large size of the settlement class, if checks were mailed to all class members, the amount sent to each would be very small, making it likely that many class members would not bother to cash the checks and thus leading to further delays and inefficiencies.

The Court has also reviewed the content of the proposed notices, and finds that they adequately inform prospective class members of "**(i)** the nature of the action; **(ii)** the definition of the class certified; **(iii)** the class claims, issues, or defenses; **(iv)** that a class member may enter an appearance through an attorney if the member so desires; **(v)** that the court will exclude from the class any member who requests exclusion; **(vi)** the time and manner for requesting exclusion; and **(vii)** the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). As the Ninth Circuit has explained, "[n]otice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate

14

and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). The content of the proposed notice here meets that standard.

As indicated at the hearing on this motion, however, the Court remains concerned that many class members may not receive the notice. This is especially concerning where email notice is used as a substitute for mail notice, which appears to be practicable absent cost consideration. Because the Settlement Agreement provides for notice only by email, it puts a premium on the effectiveness of such notice; if the email is captured by a recipient's "spam" filter, he or she would likely remain unaware of his or her rights under the settlement, and the effectiveness of email notice will be compromised. In supplemental briefing on this point, the parties explain that they will "implement best practices on the front end to ensure that the chances of the email notice being designated as 'spam' are minimized." Docket No. 240 at 7. As an example, the settlement administrator "designs the email notice to avoid common 'red flags' that might otherwise cause a potential settlement class members' spam filter to block or identify the email notice as spam," such as including links to relevant documents, rather than including them as attachments. *Id.* at 8. The parties acknowledge, however, that there is no way to determine whether any individual email notice has ended up in a recipient's spam folder.

The Court recognizes the efficiency gains that weigh in favor of email notice over conventional mail, but efficiency must be balanced against the need to ensure adequate notice. Accordingly, the Court will require the parties, before sending the notice in this case to the class, to evaluate whether the notice is likely to be blocked as spam. To that end, the parties shall devise a test trial run (*e.g.*, notice to a sufficiently large sample of dummy email addresses at different domains) to ascertain what percentage are likely to be blocked as spam.[5] A design for such a test shall be submitted to the Court within seven (7) days from the date of this order for approval.

2. Counsel's Fees

At hearing, the Court also raised substantial questions about Counsel's fees. Class counsel indicates that it will request an award of attorneys' fees equaling 1/3 of the settlement fund, or

---

[5] The Court leaves it to the parties to determine how large this sample should be.

15

$2,500,000, plus expenses of $47,512.18. Counsel states that its current lodestar is $2,793,768.20, on the basis of 4,707.7 hours. Counsel thus maintains its fee request represents a negative multiplier of 0.895 on their current lodestar, but the Court is doubtful that that the results in this case warrant an upward departure from the standard benchmark of 25% of the settlement fund. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). As the Court explained in *Viceral*, such a departure is not warranted given the risks of the case, because that "rationale would have the perverse effect of rewarding counsel for taking on weak or otherwise dubious cases. Under this reasoning, the worse the case, the higher the risk, and thus, the higher the acceptable fee multiplier." 2016 WL 5907869, at *10.

However, while the Court has serious concerns about the fee award, the requested award is not a basis for denial of settlement approval at this juncture. The motion for fees will be dealt with at the appropriate time.

### F. Preferential Treatment

Lastly, the Court examines whether the Settlement Agreement provides preferential treatment to any class member. The Court concludes that it does not. It is true that the Court Group will receive payments that are roughly twice the size of those given to the ADR Group, but absent this settlement the ADR Group would likely be left with virtually nothing at all given the likelihood that few would pursue arbitration. Accordingly, the disparate treatment is warranted.

## IV. CONCLUSION

In light of the substantial risks to Plaintiffs, the Court finds that the proposed settlement, though sharply discounted, is sufficiently within the range of reasonableness. The Court therefore **GRANTS** preliminary approval of the parties' proposed Settlement Agreement. The Court also **GRANTS** provisional certification of the class, and **APPROVES** the proposed notice procedures.

Tina Wolfson, Robert Ahdoot, and Theodore W. Maya, of Ahdoot & Wolfson, PC, and Laura Ho, Andrew Lee, and William Jhaveri-Weeks of Goldstein, Borgen, Dardarian & Ho, whom the Court finds are experienced and adequate counsel for purposes of these settlement approval proceedings, are hereby designated as Class Counsel. Plaintiffs Ronald Gillette, Abdul Kabir Mohamed, Shannon Wise, Brandon Farmer, and Meghan Christenson are designated as

16

representatives of the provisionally certified Class.

Finally, the Court directs the parties to file an updated proposed order setting forth all relevant dates and deadlines.

The parties' motion to file under seal portions of the motion for preliminary approval, Docket Nos. 221 and 224, is **DENIED** as moot.

This order disposes of Docket Nos. 221, 223, and 224.

**IT IS SO ORDERED**.

Dated: June 29, 2017

_____
EDWARD M. CHEN
United States District Judge