Judicate West
Commercial Arbitration Tribunal

---

Adonnis Biafore and Sothyson Pa,

Claimants

v.

Uber Technologies, Inc.; Rasier, LLC; and
Rasier-CA, LLC

Respondents

Final Award
Case Number 455564

---

I, THE UNDERSIGNED ARBITRATOR, having been duly designated in accordance with executed Arbitration Agreements entered into by the above-named parties on January 25, 2017 and April 18, 2017, respectively, and based upon the evidence and argument presented at a three-day hearing conducted on November 6, 8 and 9, 2017, conclude that a Final Award in favor of RESPONDENTS is warranted in accordance with the terms set forth below.

## I. **Essential Facts**

This Award recites facts found by the Arbitrator to be true and necessary to this Award. To the extent that this recitation differs from any party's position, that is the result of the Arbitrator's determinations as to credibility, determinations of relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

This is a case brought by two "Uber drivers" who contend they performed services as employees for Uber,[1] but were improperly classified as "independent contractors," and were therefore wrongfully deprived of certain[2] employee benefits to which they were entitled under

---

[1] Both Claimants contracted with Respondent Rasier-CA, LLC. In their evidentiary presentation, the parties did not differentiate among the three related Respondents to identify their respective rights and duties toward Claimants, and the need to do so is, in any event, obviated by the determination in this Award that there was no fault by any Respondent with respect to the issue submitted. For convenience of presentation, the three named Respondents, which are collectively referred to in this Award in the singular and as "Uber."

[2] The benefits at issue here are wage and hour benefits, and not workers' compensation benefits.

Final Award
Biafore et al v. Uber Technologies et al
January 10, 2018
Page 1 of 20

California Law. It is undisputed that Respondent in fact classified Claimants as independent contractors. The sole issue submitted for this adjudication[3] is whether they were wrong to have done so.

Each Claimant performed work – that of driving paying customers to their chosen destinations. Each did so using his own insured vehicle, for which he paid all expenses. Each also made use of a sophisticated, internet-based, application (the "App") designed by Uber to accomplish four things:

1.   Enable App-using persons seeking rides ("Riders") to find nearby App-using persons willing to provide rides ("Drivers") at a pre-estimated fare agreeable to both.[4]

2.   Enable adjustments to fares above a minimum base ("price surges") during periods or places of anticipated peak demand, thereby increasing Riders' likelihood of finding drivers when most needed, by (1) reducing demand from competing Riders and (2) increasing the supply of willing Drivers.

3. Enable easy payment of fares by pre-authorized automatic deduction from credit cards posted by Riders as a condition for their right to use the Rider App.

4.   Enable Riders to rate Drivers, and Drivers to rate Riders, as a means for Uber to eliminate the extreme "bad apples" from both groups (i.e., very low-scoring people in either group), by "deactivating" the App as to them.[5]

Apart from the benefit of gaining access to screened, willing, nearby Riders to transport at a pre-arranged, financially covered, market-adjusted rate, App-using Drivers received one other, often indispensable, benefit as part of a package of Uber Services – the ability to transport the Riders under Uber's livery license, without the need to incur the cost or effort of obtaining one on their own.

The means by which Claimants acquired the use of the App was not complicated. The

---

[3] This is the first phase of a bifurcated case. Whether there is a need for a second phase is yet to be determined.

[4] The estimated fare was (1) directly provided to the customer through the App, and (2) derived from a mileage/time formula exposed and known to the drivers, before either elected to undertake the journey.

[5] The purpose served by the scoring feature was that of providing a means of assuring both groups they are less likely, when arranging future rides through the Uber App, to be subject to the most extreme cases of dangerous, rude or otherwise offensive drivers or riders. This assurance, in turn, presumably enhanced the market for the Uber App; it raised the number of drivers willing to drive and riders willing to ride.

Final Award
Biafore et al v. Uber Technologies et al
January 10, 2018
Page 2 of 20

App was made available to any adult with a driver's license and insurance, and a sufficiently new and sufficiently safe[6] car of virtually any model, who passes a driver and criminal background check,[7] actually intends to put the App to some minimal usage,[8] and is prepared to accept the terms of a "Software License and Service Agreement". Claimants met those conditions and signed such an agreement (the "Agreement").[9]

Under the Agreement, Uber drivers had to agree to a number of things plainly designed to protect or enhance the App itself. That is, to make the App **usable** (by letting Uber show information about them to Riders)[10], **improvable** (by letting Uber collect and use certain personal data about the Drivers for business purposes, including marketing and service improvements), **more efficient** (by turning the App off during periods of time when they did not wish to drive Uber Riders at all, rather than leaving the App on and fail repeatedly to accept the resulting ride requests)[11] and **less vulnerable** to pilferage (by shielding the information they receive about Riders[12] from any use *other than* to provide transportation services through the App, and

---

[6] As determined by a simple, half-hour, 19-point, Jiffy Lube inspection.

[7] Uber imposed vehicle safety and driver background checks as a condition for applying to become a user of the App in order to comply with requirements the California Public Utilities Commission imposed on it. Uber neither interviewed those applying to use the Uber-App, nor imposed any conditions for approval of the App other than those conditions needed to be compliant CPUC regulations.

[8] Those who obtained, but did not use the App to provide even one ride for an entire month, would find their App deactivated, to save Uber the inefficiency of servicing unused Apps.

[9] Pa electronically accepted "Software License and Online Services Agreement" (Exhibit 3) on January 25, 2015. Biafore electronically accented the same agreement on April 18, 2015. On December 10, 2015, Pa electronically accepted a slightly modified agreement (Exhibit 4). The two agreements did not materially differ as to any terms relevant to the analysis of this case. For simplicity, therefore, both are referred to herein collectively as "the Agreement."

[10] Upon the driver's acceptance of the request, the rider receives the driver's first name, license plate number, make of car, cell phone number and star rating

[11] Rampant use of the "ignore requests" rather than "turn off the App" method of rejecting Uber ride opportunities (during periods when a Driver was not seeking riders) would seriously slow down the time period for Riders to find willing Drivers, because the App is programed to give the opportunity to only one Driver at a time, letting time pass before the unaccepted opportunity passes from one driver to the next.

[12] Upon accepting the request, the Driver receives the customer's first name, cell phone number, location and destination.

refraining from sharing the App, or App data, with others).

The Agreement also set forth certain common commercial provisions designed to protect the Uber business generally. Specifically, Drivers could not disclose, or misuse, confidential information about Uber, or disparage it, or otherwise harm its "brand, reputation or business." They were required to indemnify Uber against claims by third parties for their own acts or omissions, and to maintain either worker's compensation insurance or occupational accident insurance of their own. Finally, unless they timely exercised an opt-out opportunity, they had to arbitrate, rather than litigate, a broad range of potential claims.

Finally, *in those circumstances when* Drivers chose to accept a potential passenger's Uber-App request for Transportation Services, they had to:

1. Pay a fee proportionate to the revenue the driver makes through its use – specifically, 20% of the gross fare, exclusive of tips (which were permitted).

2.   Report any accidents occurring while transporting a Customer.

3   Meet minimal common sense standards of passenger driving. Specifically, (i) please the passengers enough to avoid falling below minimum average star-ratings from them, (ii) maintaining a driver's license and using it to (iii) drive Uber-App Riders or those they authorize, and only them, (iv) directly to their destination, without interruption or unauthorized stops, (v) in a clean and sanitary vehicle that is (vi) kept registered, insured, and in good and safe operating condition, and otherwise suitable to transport people, while (vii) maintaining high standards of professionalism, service and courtesy.

The Agreement did not, however, require the Drivers, expressly or by implication, to drive passengers or even make themselves available to do so. When Drivers did provide transportation services, they did so at their own behest, not Uber's. When, where, and even whether they drove Uber Riders was entirely the Driver's decision, without the need to obtain permission, or even provide notice of the decision, and without greater exposure to the risk of de-activation.

Nor did the Agreement require Drivers to devote the time they did drive to Uber. They could spend the time they are not transporting Uber App using customers by making money driving for passengers using an App of one of Uber's direct competitors, such as Lyft, and do so without violating any duty owed to Uber. The Agreement not only did not prohibit such activity, it expressly permitted it:

"For the sake of clarity, you understand that you retain the complete right to … use other software application services in addition to the Uber Services."

Many, including Claimant Biafore, did just that. Pa did not, but only because of his own preference not to be inconvenienced by the effort to use competing applications

Final Award
Biafore et al v. Uber Technologies et al
January 10, 2018
Page 4 of 20

Finally, the Agreement neither specified, nor required or restricted, the hours a driver may spend driving. Drivers would decide minute to minute whether to spend the next minute "on the App," with the decision being determined by nothing other than their own whim or sense of their needs, or their adherence to their own private business plans, without any consideration of the effect of their plans on Uber or its welfare. Uber made those matters none of its business.

Claimants presented no evidence to the effect that the actual contractual obligations as practiced were in any way more onerous than those set forth in the Agreement. In practice, adherence to the Agreement was less demanding than what some of the ambiguous terms of the Agreement might otherwise indicate. "Maintaining high standards of professionalism, service and courtesy" meant, in context of its application, that Drivers needed to avoid being so abysmally bad that the market rating of customers they service put them in the ranks of the lowest 3% of their colleagues, and avoid angering individual customers to the point of the Driver becoming subject to serious or and/or repeated complaints of egregious conduct.

During the course of their contractual relationship with Uber, both Claimants pursued primary endeavors other than working as drivers – Pa to pursue courses leading to his goal of becoming a medical technician, Biafore to pursue his nascent musical career – and both used the App's complete scheduling flexibility as means of making money without interfering with their primary pursuits. Notably, they took advantage of this flexibility in almost opposite ways. Biafore would leave his home in Barstow to engage in spurts of 3-5 days of binge driving throughout the more lucrative area of Los Angeles and Orange Counties, alternating between the Uber App and the Lyft application in accordance with his own sense or instinct of which application would be more profitable at the moment. He viewed them, in his own words, as "interchangeable apps." Pa used the App less aggressively, preferring to restrict his location to the Long Beach territory where he lived, and to restrict his time to certain periods during the week that were compatible with his need to attend class and complete homework.

Neither Claimant gave thought to what it meant to be an independent contractor or an employee. Neither concluded that Uber had conducted itself in a way that was either unfair or contrary to their expectations.

Neither Claimant drove passengers for long. Biafore voluntarily stopped driving passengers after about five weeks, because he found it was profitable for him. Pa involuntarily stopped driving passengers after about 13 months, when Uber deactivated his App after discovering that Pa had a record of two drug-related misdemeanor convictions.[13]

Throughout the period of Claimants' contractual relationships with Uber, Uber was subject to a September 19, 2013, order issued by the California Public Utilities Commission that determined that Uber was a Transportation Network Company (a "TNC"). Among the requirements imposed on Uber as a TNC was the need to carry $1 million per occurrence liability insurance, the need to screen and refrain from contracting with specified criminal or adverse

---

[13] The propriety of this deactivation is an issue that has been resolved in another setting, and is not part of the submission for this arbitration.

Final Award
Biafore et al v. Uber Technologies et al
January 10, 2018
Page 5 of 20

driving records, and the need to have Drivers use a window placard as "trade dress" identifying their car with Uber during periods of time the Driver is using the App. Uber, in the words of its PMK, Mathew Sawchuk, complied with CPUC requirements "to a tee." Public Utilities Code section 5432(a) defines a TNC as an organization that "provides prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle."

## II. Legal Analysis

To be an employee, one must meet two distinct conditions. At a minimum, that person must render services for an employer. *See*, S.G. *Borello & Sons Inc.* v. *Dept. of Industrial Relations, supra,* 48 Cal.3d 341, 349 (1989) ("One seeking to avoid liability has the burden of proving that *persons whose services he has retained* are independent contractors rather than employees") (emphasis added). In addition, that person must provide those services in a capacity other than that of an independent contractor. Labor Code Section 3357 is implicitly premised on both conditions. It provides: "Any person rendering service for another, other than as an independent contractor…, is presumed to be an employee."

Uber contends, at bottom, that Claimants met neither condition. Claimants provided services, but to Riders only, and not to Uber. Alternatively, even if they did provide services to Uber, they did not do so in a way that meets the criteria of an employee.

### A. Claimants Never Rendered Services for Uber

Claimants failed to prove the essential element that they provided services to Uber at all. The services in this case are those of a ***driver***. Only two kinds of persons would have a need for (or interest in) obtaining driver services at all:

(1) Riders themselves (the ultimate consumer of those services); or

(2) Those who have created a business commitment to transport Riders, and need to fulfill that commitment by engaging Drivers as agents to perform the task.

Claimants contend Uber's conduct precisely fits the latter description – that it obtained driving services as the means to fulfill ***its own*** business commitment to transport Riders. But the evidence does not support that contention.

Uber was not, precisely speaking, in the business of providing rides, any more than a broker is in the business of providing property. It provided, instead, only exposure (albeit, very effective exposure) to the possibility that a rider will find a driver willing to provide a ride, and a driver will find a rider willing to be driven. The distinction is material. If an App-using Rider did not get a ride, he or she had no contractual entitlement to look to Uber for relief. That is because Uber never made a commitment to give Riders a ride nor Drivers a rider. Compare *JKH Enterprises v. Dep't of Industrial Relations* 142 Cal App. 4th 1046 (2006) (Defendant had contractual commitment to deliver packages to recipients who were its customers, and used

drivers to fulfill that commitment); *Ware v. Workers' Comp. Appeals Board*, 226 Cal. App. 3d 1288 (1991) (Golf caddies were employees of the golf club in part because "caddies were provided by the Club for its members").

The only persons who took on any contractual commitment to transport Riders in our case were the ***Drivers***. They made this commitment each time they accepted a request (offer) from a Rider to be driven pursuant to the App-revealed price estimate or formula. ***They*** are the ones in the business of transporting riders, however rudimentary that business may be. It is not Drivers who serviced Uber, but Uber who serviced Drivers. The Drivers, therefore, are not its employees, but its customers.

Uber's manner of connecting Drivers to Riders was therefore not authoritarian. It did not need to be. Having no obligation to give Riders rides, it had no need to assign Drivers to Riders. Instead of assignments, it issued leads. It did not make drivers give rides to Uber riders; it let them. The difference is basic. A driver given an assignment receives a task he or she must perform. A driver given a lead receives an opportunity he or she may freely chose to use or discard. Among the more significant provisions of the Agreement is the one that was not there. There were multiple contractual obligations imposed on Drivers; none consisted of an obligation to drive the Riders.

All of the contractual requirements pertaining to the activity of driving itself come down to this summary: If driver chooses to do the job, he or she takes on specified obligations to do the job right, but the Driver's relationship with Uber is not one where he or she has to do the job to at all. Even the specified driving obligations are minimal,[14] and perfectly consistent with what a rational driver would do on his own as an entrepreneur to please customers and maximize his own business within the confines of the law.[15] More importantly, they are, on inspection,[16]

---

[14] Claimants correctly contend not that the provisions are very restrictive, but that they do not have to be, when the work activity at issue is simple enough to be performed without significant control. It is only because we are in the realm of these seriously reduced standards of control that the minimal provisions rationally needed to protect the value of an App could even potentially take on the appearance of directives strong enough to give rise to purported employment.

[15] One driving requirement, that the Driver display a placard with the Uber icon when using the App, was set forth in the Agreement in order to comply with CPUC requirement that Uber drivers do so. The law is clear that controls instituted by the company to remain in compliance with the law do not count as indicia of control for purposed of determining the employment status of the worker. *SIDA of Hawaii, Inc. v. NLRB*, 512 F.3d 853, 862-863 ("the fact that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship").

[16] See page 3 of this Award, hereinabove.

perfectly consistent with what a rational App-provider would want a Driver to do to meet the App-provider's limited interest in protecting the value of the App. That is, the App's value is inherently commensurate with both the willingness of both Riders and Drivers to use it, and Riders will be less likely to use it to the extent they are burned by bad experiences with Drivers.

The language of the Agreement presented for review and signed by Claimants, is consonant with this understanding. It is labeled, without straining credulity, a "Property Use and Services Agreement." The "Services" referred to are not those of Drivers to Uber, but always the converse: Uber services the Drivers. What Claimants attempt to characterize as conditions of employment, are, in the language of the Agreement, consistently framed as conditions for continued entitlement to use the App. It is not unusual in intellectual property license agreements to specify conditions for the continued right to use the license, to the extent needed to protect the value of the intellectual property. The Agreement itself makes reasonably clear that this is the policy behind the conditions for use – the Drivers are referred to throughout the agreement as "Users" (of the App); and the omnibus provision is a requirement that Users refrain from any conduct "harming the brand."

Claimants correctly point out that Uber made money only if a ride occurred. They ask that the Arbitrator draw the conclusion from this that Uber had a need (or interest in) making drivers provide rides -- Uber, after all, is certainly in the business of making money. Cf., *Yellow Cab, supra*, 226 Cal.App.3d at pp. 1293–94. ("The enterprise could no more survive without them [the drivers] than it could without working cabs.") However plausible that conclusion may be in ordinary circumstances, it cannot be drawn here. The distinctive feature in this case is that discarded leads did not materially impair Uber's opportunity to make money. *Its revenue literally did not depend on any given driver providing a ride.* It depended only on the likelihood that *some* driver would do so. That is, it could make rides occur (or at least highly likely to occur) without making any driver provide a ride. And it could (and did) make rides more likely to occur by strategically adjusting the rates upward ("surging the price") when needed to increase the pool of willing drivers.[17] Surges happened frequently, and some drivers strategically adjusted their schedules and locations to take entrepreneurial advantage of them when they did. When they did so, they did so by choice, because it fit their own business needs, and not by contractual compulsion. Without such compulsion, the truism that Uber's survival depended on enough Drivers collectively engaging in the act of driving has no greater bearing on the question of the

---

[17] Uber also occasionally instituted guaranteed minimum hourly rates as a separate incentive to increase the number of drivers in a given high-demand time period or location. The fares in these circumstances were ordinarily great enough that the driver's income per hour could be expected to exceed the guaranteed hourly rate price in any event. It was only for purposes of meeting the conditions for eligibility for the minimum guarantee that Drivers ever faced a "requirement" that they drive the full hour for which they would be seeking a guaranteed minimum. This was not a prominent enough part of the Uber model to support a contention that Drivers were hourly workers, or that Uber, and not the passenger, was the "payor."

drivers' employment status than the equally accurate truism that Uber's survival depended on enough Riders collectively engaging in the act of riding.

Claimants also correctly point out that the Drivers did not control the price.[18]  No private party, not even a perfectly free agent, ever does.  Drivers did control the price *at which they will work*, and that is what matters.  Like a bidder for goods in an auction, (or like an App-using Rider) they had the option of withholding the "sale" of their service until the price, for them, was right.[19]

Apart from the challenges otherwise referred to herein, Claimants present two primary challenges to the contention that they were not employees because they did not service Uber.

> 1. They challenge the core premises that Uber neither provided rides to Riders, nor had any need or interest in engaging the services of any Driver, by pointing out that a CPUC Order to which Uber is subject defines Uber as a Provider of Transportation Services, and CPUC Orders are   binding on the parties subject to them.
>
> 2. They argue that the salient features Respondent use to resist the employment classification in this case also exist in analogous cases, in particular, *Borello, Yellow Cab and Linton*, which specifically found that the workers were employees.

## 1. Claimants' CPUC-Based Argument

In 2013, the California Public Utilities Commission issued an order (the Order) that, among other things, classified Uber as a transportation network company ("TNC").  Public Utilities Code section 5432(a), in turn, defines a TNC as an organization that:

> "provides prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle"

---

[18] Respondent's characterization of the App-generated price as merely the "default price" is not supported by the evidence.  There was anecdotal evidence of rare occasions in which Riders bargained Drivers down from the stated price, none in which Drivers bargained Riders up, and the propriety of any bargaining up would appear doubtful in light of the fact that the bargaining would have had to occur after the Rider had accepted the ride in reliance on the stated estimate.

[19] Unlike the typical employment situation, and more like a broker or even a joint-venture situation, the parties had no adverse interests with respect to the price – both had an aligned interest in the price being as high as the market would reasonably bear.  This factor is not dispositive – an aligned interest in high prices exists in sharecropper settings, such a *Borello*, where an employment relationship was nonetheless found, at least for workers' compensation purposes.  It did, however, contribute to *Borello* being a closer case on the merits than otherwise.

Claimants note that the findings set forth in a CPUC order are binding on the organization to which it is directed, and contend that the finding that Uber is a TNC bars it from contending that it is not in the business of providing rides to passengers.

The problem with this contention is this. Whether Uber provided rides to passengers is an empirical question, addressed at the hearing, and the evidence is that Uber did not. This evidence can be reconciled with the Order by recognizing that the statutory definition "provides...transportation services...using an application...to connect passengers with drivers...." does not necessarily imply that a TNC provides rides to passengers. The definition, properly construed, is entirely consistent with the more limited role Uber in fact played.

Specifically, the statutory definition uses the phrase "provides...services" without specifying "to whom?" The proper answer is, "to Drivers and Riders."

Moreover, the "services" were "transportation services" in the sense that they played a part within the transportation industry, to wit, the limited part thereafter specified in the definition itself: "[connecting] passengers with drivers," and only that.

Finally, while Uber did not "*use* the application" (emphasis added) in the ordinary sense of the phrase, neither side in this case contends that it did. This phrase, in context, is an inartful way of saying what Uber indisputably *did* do: provide an application for use by the passengers and drivers to be connected.

In recognition of its own limited purpose for classifying Uber as a TNC – that of giving it regulatory jurisdiction so as to promote public safety – the CPUC expressly commented that that it did not intend that classification necessarily imply that the drivers associated with the TNC's are the TNC's employees. This comment is not dispositive of the issue. It nonetheless carries some weight in that the only likely basis on which the CPUC would have been concerned that its ruling *may* relate to the employment classification issue would be if a party were to mistaken the statutory phrase "provides transportation services" to mean the App provider took on duties toward passengers for which it would have the need to hire drivers.

For these reasons, the Arbitrator finds Claimants' CPUC based argument to be unpersuasive.

## 2. Claimants' Case Authority Based Arguments

### a. *Borello*

*Borello, supra,* is an extreme example of how little control an employer can exercise, and still have its workers classified as employees. But it is not as extreme as our case. There, workers had complete discretion over how they picked cucumbers, and when precisely they would do so. But they did not have the discretion not to pick cucumbers at all. In the words of *Borello* itself,

they were "engaged" to pick cucumbers. Picking cucumbers was their "function." Not so with Claimants herein. Without any arguable breach of their Agreement, Claimants could freely choose not only how and when to work, but whether to work at all.

### b. *Yellow Cab*

A stronger, but still unavailing, case for Claimants is *Yellow Cab Coop. Inc. v. Worker's Comp. Appeals Bd.*, 226 Cal. App. 3d 1288 (1991). Yellow Cab leased cabs to drivers in uniform ten-hour shifts, on an automatically renewable weekly basis, for a daily rate of $56 (about $125 in current value). The payment covered use of the cabs, plus all maintenance and medallion fees, and dispatch services. In that case, as here, there was no contractual provision making drivers work. The company had a plausible argument that it was not in the business of providing rides; it was in the business of renting cabs. Not only did it not contractually control the way their "lessees" drove, or whether they did so, it appeared to be positioned, at least in the short run, to be indifferent to whether riders were driven at all – the source of the company's payment, unlike Uber's, came directly from the cabbies, at the front end, not from riders, at the back end.

*Yellow Cab* can nonetheless be distinguished by the stated rationale of the case itself. Economic compulsion of the rental fee, combined with the inability to use the rented cab for any purpose *other than* cab driving, was, the court found, the equivalent of a contractual obligation to drive. Yellow Cab Drivers could not refrain from working, and working a full shift, whether they felt like it or not, without the penalty of a certain and substantial loss. (Uber drivers, by contrast, could refrain from driving, anytime, with impunity.) Moreover, the actual requirements imposed on the drivers, though not set forth in the agreement, were quite controlling and restrictive. Among other things, drivers could be terminated if the cab were returned more than two hours late. They were directed by dispatchers where to go, and rejection of such direction would make them ineligible for the next available assignment, the Court commenting, "This was apparently designed to coerce drivers into accepting assignments whether or not they found them profitable enough to deserve their attention." Drivers would sometimes be told to "bring the cab back to the yard," and be subject to termination if they disobeyed. Finally, unlike our case, they were prohibited from working for other companies, leading the Court to note: "A mere lessor has no interest in restricting the lessee's freedom to render service to another." Based on this evidence, the Court found that "the parties' relationship contemplated more than the performance of their formal agreement." Specifically,

> If Yellow were only contracting for the "particular result" set out in the lease, it would be concerned with little more than collecting rent and protecting the leased property. Instead, it had an obvious interest in the driver's performance as drivers. To protect that interest, it treated them as employees.

There is an oddity in *Yellow Cab*, in that the Court finds from the defendant's conduct that it had an obvious interest in the drivers' performance as drivers, without telling us what that interest was. Its not telling us does not detract from the fact that it found there was such an interest, a key distinguishing feature from our case.

### c. *Linton v. DeSoto*

Similarly, in *Linton v. DeSoto Cab Company, Inc. No. A146162m 2017b LEXIS 873(2017)*, the California Court of Appeal found an employment relationship in circumstances in which defendant, DeSoto, leased cabs to drivers on a monthly basis in 10 hour shift increments, with a "gate fee" of approximately $100, to cover the cab and dispatch services, payable at the end of each shift. The agreement was expressly denominated a "lease agreement," and contained language disclaiming any employment relationship. The drivers were required, as a condition of their use of the cab, to perform some services on a discounted basis, but in two major respects, they appear to have enjoyed, if anything, more freedom of action than the drivers in *Yellow Cab*: the drivers could freely reject specific rides assigned to them by the DeSoto dispatch service; and they may have been free to compete -- the Court did not address (and therefore did not rely upon) the competition factor. Nonetheless, the economic compulsion inherent in shift work (with each shift beginning with the driver having to check in to get the keys for the cab), the company's monitoring of drivers' conduct via internal and external monitoring devices, and a mandatory (albeit short) three-hour training program, were, the Court concluded, sufficient control to warrant an employee classification.

At first blush, *Linton* would appear to challenge the core principle that to be an employee, one must, by definition, render services to the employer. The Court recites the defendant in *its* case understating the consequence of a failure to prove such service. "Defendant contends it did not bear the burden of proof because plaintiff did not prove he rendered service to defendant." To the extent that rendering such services is definitional, of course, the absence of that element does not just shift the burden of proof, it determines the issue, and does so regardless of what "other factors" may be present. The *Linton* case itself resolves the issue not by issuing a revolutionary holding that one can be an employee without being a service provider to the employer, but by the less exceptional means of finding that the plaintiff in its case in fact rendered such services.[20]

---

[20] *Linton* also arguably rejects the distinction between workers' compensation cases and wage & hour cases for purposes of determining employment status, noting that both kinds of cases, unlike third party claim cases, apply more liberal standards for determining employee status, in deference to the remedial nature of the statutes giving rise to the determination. It is unclear whether *Linton* holds that worker's compensation and wage and hour cases should yield identical results in all circumstances. Its primary reference to the issue is more couched than that: simply that the factors set forth in *Borello*, a worker's compensation case, are still relevant to *Linton*, a wage & hour case, despite the distinction. The policies underlying the two statutory schemes, while sharing the common characteristic of being remedial, are certainly not identical. This Award, in any event, does not rely upon a material distinction between the two policies in any event, in part because the issue does not need to be reached in order to resolve this case.

### d. *Alexander* and *JKH Enterprises*

The cases of *Alexander v. FedEx Ground Transportation Systems, 765 Fed3d 981 (9th Cir.2014)* and *JKH Enterprises, supra,* are even more readily distinguished. *Alexander* involved driving in shifts in a FedEx branded truck, delivering packages on a preset schedule, meeting deadlines as an indispensable way of enabling the employer to meet contractually specified time commitments it had made to its customers. *JKH Enterprises* involved drivers servicing a set group of the employer's customers to whom the employer had guaranteed deliveries, either in shifts or on 2-4 hour special deliveries, all within the same route or territory, as directed by the employer.

Neither case comes close to the free-lance opportunity of the Uber drivers to retain control each day over how he or she spends that day.

The absence of service to Uber arguably supports a conclusion that the Drivers' relationship to Uber did not even rise to the level of independent contractor. The Arbitrator stops short of that conclusion for two reasons: (1) the parties themselves defined their relationship as that of independent contractor in their Agreement, and, for reasons set forth in more detail later this Award, there are particular reasons to give significant weight to the parties contractual expressions in this case; and (2) Uber otherwise honored at least one of the important formalities consonant with the premise that the Drivers were independent contractors – it issued them 1099 forms for their earnings.[21]

### B. The Drivers Did Not, in any Event, Service Uber as Employees

As an alternative ruling, the Arbitrator finds that the Drivers did not, in any event, meet the applicable test of acting in the capacity of employees, even if their role could somehow be construed as rendering services to Uber. This conclusion is necessitated by the application of the so-called *Borello* factors, even if we were to begin, for argument's sake, with the assumption that Uber bears to burden of proving the independent contractor relationship.

The application of the factors is not highly administrable. Factors, by their nature, are less administrable than standards. Moreover, the weight given to each factor is itself subject to contextual variation. As was recited in *Borello* itself (citing earlier authority), the individuals factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." Id. at pp. 350 – 351. Nonetheless, a reasonable application of the factors in this case points convincingly in the direction of an independent contractor status.

---

[21] The Arbitrator also takes note of the dispositive fact that the arbitration submission in this case is limited to that of determining which of the two categories – employee or independent contactor – is applicable to the parties' relationship.  The implicit stipulated premise is that the relationship is at least that of independent contractor, and the Arbitrator honors that premise.

*Borello* looks first to the key question of the principal's control over the details of the work, and then to so-called "secondary indicia," consisting of:

(1) Whether there is a right to discharge at will;

(2) Whether the one performing services is engaged in a distinct occupation or business;

(3) The kind of occupation, in particular, whether the work is usually done under the direction of the principal or by a specialist without supervision;

(4) The skill required in the particular occupation;

(5) Whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work;

(6) The length of time for which the services are to be performed;

(7) The method of payment, whether by the time or by the job;

(8) Whether or not the work is a part of the regular business of the principal; and

(9) Whether or not the parties believe they are creating the relationship of employer - employee.

(10) Whether the worker had an opportunity for profit or loss depending on his managerial skill.[22]

## 1. The Control Factor

The control of the worker over the details of his or her own work has traditionally been the most significant of the factors determining with nature of the relationship. *Borello* made a significant exception, drastically reducing the significance of the control factor in circumstances

---

[22] This final factor, listed here as one of the "secondary indicia," is presented in Borello itself as one of six factors in the "Six-Factor Test" from other jurisdictions that the Borello court recited and made use of in its own decision. This Award does not recite and separately analyze the other five factors of the "Six Factor Test" because the Arbitrator concludes those five factors are redundant with identical factors already included within the "secondary indicia" otherwise analyzed herein. Those factors caddies were provided by the Club for its members are: the worker's investment in the tools or equipment; whether the work requires special skill; the degree of permanence of the work; and whether the work is an integral part of the company's regular business.

where the nature of the work itself is simple enough that it can be readily done without either expertise of supervision. The facts of *Borello* supplied the extreme example of such simple work: harvesting cucumbers.

It is not seriously disputed that Uber had a "hands off" approach when it came to supervising the activities of the Drivers. Whether the acknowledged absence of control is a significant factor turns on the question of whether the work of the Driver was simple enough dispense with the need for control. Claimants contend that it was. They make a plausible case by defining the "work of the Driver" as limited to the activities they undertake once they pick up a rider. When the focus is limited to that aspect of the work, the job is accurately described as very rudimentary – it requires no more skills than those already possessed by any reasonably courteous 16 year old in California. Were this the proper focus, the control factor would be entitled to little weight.

The "work of the Driver" is, however, more reasonably defined as all those activities that affect the worker's earnings. Thus defined, the work is far less rudimentary. The difference between either suffering outright losses, or making relatively decent returns, depends on a number of entrepreneurial decisions that require at least some review of data, some analysis, and consistent strategic application of a plan of action. Even without reaching the higher levels of whether to invest in the higher returns of driving an "XL" vehicle, these decisions range from whether and what kind of car to invest in, to whether to seek out surges, and if so where and when to take advantage of them, to whether to "mix Apps" (e.g., the Lyft App vs. the Uber App), to whether the respond at all to a given lead, increasing wait times in return for possible more lucrative fares. Neither Pa nor Biafore succeeded at their jobs. Biafore invested in the wrong car and otherwise apparently had a bad business plan, and he folded his operation in about five weeks. Pa kept at it for a year, without intending to take advantage of a host of potential ways the Uber App could have made him wealthier with the same invested time. The possibility of failure, or of falling short of greater available potential, is symptomatic of a job with more inherent complexity than the *Borello* court faced in its case.

The control factor in this case should therefore be assigned at least a moderate level of importance, and the absence of control by Uber weighs in favor of Uber.

## 2. The Right to Discharge at Will Factor

It is undisputed that the Agreement provided Uber a right to terminate the Driver's use of App at will, upon one week's notice, and this is a factor weighing against Uber.

In the context of a case in which there is significant control over the worker, the Right to Discharge at Will carries significant weight as a factor. That is because the threat of being fired without recourse eliminates any ability of the worker to be lax in his or her compliance with the company dictates to which that worker is subject. See, *Ayala v. Antelope Valleys Newspapers, Inc.*, 59 Cal.4th 522 (Cal. 2014). But the weight of any factor needs to be judged in combination with other factors, and the right to fire at will, when considered in combination with the

extraordinarily "uncontrolling regime" of Uber, carries little weight. No Uber driver lives in fear of having the App deactivated for artificial infractions such as returning a cab two hours late, or refusing an order to return to base. As a practical matter, the only circumstances where the Right to Discharge is in fact exercised are those extreme circumstances of customer dissatisfaction great enough that there would be little prospect of the driver having a successful business as a driver in any event.

### 3. The "Distinct Occupation or Business" Factor

For the reasons set forth in section 1, hereinabove, each Uber driver had at least a "distinct business." This factor therefore weighs in favor of Uber. The magnitude of the weight is moderated by the fact that it overlaps somewhat with the control factor analyzed above, such that to give the "distinct business" factor full weight as a separate factor would be to overweigh it.

### 4. The Factor of Whether the Work is Usually Done under the Direction of the Principal or by a Specialist without Supervision

Neither driving passengers, nor making the entrepreneurial decisions needed to make one's own enterprise of driving passengers successful, is inherently complex enough to rise to the level where it ordinarily needs a specialty background or direction from a principal having that background. This factor therefore weighs against Uber. The relevance of this factor appears to be largely that the absence of control (the first factor) is more significant to the extent the work by its nature, is complex enough to require direction. To the extent that fact has been taken into consideration in discounting the weight of the control factor (and it has), the "direction of the principal" factor is entitled to little additional weight as an independent factor.

### 5. The "Required Skill" Factor

For the reasons stated above, the task of transporting passengers from one location to another requires no particular skill, but the job of devising and adhering to a business plan to maximize the financial potential of using the App to transport passengers requires at least a modicum of skill. The latter is nonexistent where the driving job takes place within set hours, at uniform rates, in a limited geographic territory. *Compare, Litton, supra,* ("No skill other than driving a car that is required in this case.")

It is not, however, the skill level that Uber can properly tout as a particular factor calling for an independent contractor status. As is true of small-business jobs generally, the skill level required for success is both above some jobs, and below other jobs, that are for other reasons readily classified as employee jobs. Its impact as a stand-alone factor on the ultimate determination of this case appears negligible.

### 6. The "Instrumentalities, Tools, and Place of Work" Factor

Uber supplied no car, no iPhone, and no place of work. It did supply the App, the license, and most of the insurance. The tools supplied by both parties were indispensable to the Drivers' ability to transport passengers.

Judged by cost on a per driver basis, the Driver's contribution of tools was greater. Claimants contend that it is only the marginal costs of driving the car (or the iPhone) that should "count" toward the drivers' contribution. The proper method, however, is to account for those costs on a fully allocated basis, adjusting ratably for any portion of mileage (or phone time) used privately or on other business.

The "tools" factor favors Uber. The significance of that factor is, however, substantially reduced by the fact that although the Drivers' contribution is greater, both sides contributed materially to the total assemblage of required tools.

### 7. The "Length of Time for which the Services were Performed" Factor

A key characteristic of the Drivers' job was that there were no season-long stretches between pockets of vacation, and even work on a given day could not be measured by standard shifts. The unit of "services performed" in the Uber context was the ride. It was only for the duration of any ride that Drivers had any arguable work obligations. The length of time for any "performance of service" was therefore about 20 minutes on average, a fact that weighs significantly in favor of Uber.

### 8. The Method of Payment Factor

The method of payment was by the job and not by the hour. While not unique to independent contractors (agricultural employees are often paid "piece rate"; professional independent contractors are often paid by the hour), this factor favors Uber. It is by virtue of payment by the job, combined with discretion over *which* jobs to undertake (when and where to pick up rides, and some discretion to reject particular rides) that the Drivers have more personal control over their economic destiny than is ordinarily true of employees). This factor favors Uber.

### 9. The Factor of Whether the Work Is Part of the Regular Work of Principal's Business

If we start with the premise adopted for purposes of this section of the Award – that Drivers were servicing Uber when they provided rides for which Uber earned a commission – that work was "part of the regular work of Uber's business." Indeed, it was tied to the only way in which Uber made money for this aspect of its multi-faceted enterprise.

This factor has less weight, however, than it would in the ordinary context where a business owner has regular work to be performed. An apartment complex manager who hires a handyman to perform the year-around work of assisting in the manager's business of maintaining the property would have a harder time classifying that handyman as an independent contractor than would a homeowner who engages the same person to perform the same kind of work to spruce up the home for the day.

The Uber-driver's work does not fall cleanly into either of those categories. The weight to be given this factor, therefore, is equivocal.

### 10. The Factor of Whether the Parties Believed They Had Created an Employer-Employee Relationship.

The next factor – what the parties in fact thought their relationship was at the time the work was being done – favors Uber, and is entitled to greater weight than it would receive in other contexts.

The nature of the Drivers' work experience as Uber drivers, in terms of the core issue of the freedom to determine how they spent their own time (not only from day to day but from minute to minute) was unlike anything either Claimant had experienced as part of earlier regular employment. There was nobody to "check in with," and nobody to "tell them what to do."

The Agreement was consistent with this experience. Its legal relevance remains the same whether they chose to read the language or not. The language not only recited that they were independent contractors; it contained no provision whatsoever imposing any service obligations on any of them. Its title was "Software License and Service Agreement." The "service" in question consisted entirely of Uber's services (for which it earned the 20% fee). The Drivers were consistently referred to as "Users" (of that license and those services). The only "principal-agency" provision consisted of the Drivers in the role of principals appointing Uber as their agents, for purposes of any needed fee collection vis-à-vis delinquent Riders.

Contract language is appropriately disregarded where it terms are inconsistent with the actual conduct of the drafter. See, e.g., *Yellow Cab, supra* ("Despite its recital to the contrary, the lease here did not fully and accurately define the parties' relationship.") That is not the case here.

### 11. The Factor of whether the Worker Had an Opportunity for Profit or Loss Depending on His Managerial Skill

As has been stated above, Drivers could either do poorly or reasonably well financially depending a range of decisions they made concerning among other things, the choice of the optimal vehicle and the timing and location of their driving activities. These decisions are not based on extraordinarily sophisticated analysis, but they are inherently managerial in nature. This final factor therefore weighs significantly in favor of Uber.

In sum, *Borello* factors number 1, 3, 6, 7, 8, 10 and 11 favor Uber. Factors number 2 and 4 favor Claimants. Factors number 5 and 9 are equivocal. Giving due consideration to the direction of these factors, and taking into account the weight to be assigned to each, the Arbitrator finds that Uber meets the burden of proof for a finding that Claimants acted in the capacity of independent contractors, not employees.

## III.  Status of this Final Award

This Final Award adjudicates the issue submitted at the November 2017 hearing. That issue is the determination of whether Claimants worked in the capacity of employees or of independent contractors. The November 2017 hearing, in turn, constituted the first phase of a bifurcated hearing. It is because this Award addresses only the issue submitted at the first phase that it is styled as a "Final Award." The intended effect of a final award is to (1) permit confirmation and enforcement of the award as to the claim adjudicated, while (2) retaining arbitral jurisdiction to address any remaining matters unrelated to the adjudicated claim.

The need for a second phase would have been obvious if the first phase had been resolved in Claimants' favor. In that circumstances there would have been a potential need to adjudicate the issue of damages, if any, resulting from a failure to treat Claimants as employees.

The Arbitrator has issued this award as a Final Award not because he has determined there are other issues to be addressed, but because he cannot preclude the possibility that there are. He therefore retains jurisdiction to address any remaining issues, unrelated to the issue resolved herein, that may exist. In the event both sides conclude there are no further matters to be resolved in this case, they are requested to submit written notice to that effect to the Case Manager, in which case the substantive content of this Final Award shall be issued as a Final Award.

### Final Award

Based on these considerations, the Arbitrator awards as follows:

1.      The Arbitrator hereby declares that Respondents Uber Technologies, Inc.; Uber Technologies, Inc.; Rasier, LLC; and Rasier-CA, LLC, and each of them (collectively "Uber"), at all times properly classified and treated Claimants Adonnis Biafore and Sothyson Pa ("Claimants"), and each of them, as "independent contractors" and not as "employees" in connection with the work each Claimant performed using the Uber application.

Final Award
Biafore et al v. Uber Technologies et al
January 10, 2018
Page 19 of 20

2.      The claim that Uber violated Claimants' rights by classifying Claimants as independent contractors and not as employees (the "Claim") is the sole claim submitted at the first phase of this bifurcated hearing. As to that Claim, this Final Award constitutes the full and final resolution.

3.      The Arbitrator reserves jurisdiction to adjudicate any remaining issues.

Dated: January 22, 2018

_____
John (Jay) McCauley
Arbitrator

Final Award
Biafore et al v. Uber Technologies et al
January 10, 2018
Page 20 of 20

1

2

3

**PROOF OF SERVICE**

4

I am employed in the county of Orange, State of California.  I am over the age of eighteen and not a party to the within action, and my business address is: 1851 E. First Street, Suite 1600, Santa Ana, CA 92705

5

On January 25, 2018, I served the following document: **FINAL AWARD** in the interested parties in the matter of **GILBERT AQUINO, ET AL. VS. UBER TECHNOLOGIES, INC., ET AL.** by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

6

7

**SEE ATTACHED SERVICE LIST**

8

_X_     I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa Ana, California, in the ordinary course of business.

9

10

11

_X_     By electronic mail on **January 25, 2018**

12

____     By Facsimile, on _____I faxed such document from our facsimile telephone number (714) 834-1344 to the offices of the parties as stated on the service list.  The document was transmitted by facsimile transmission and the transmission was reported as complete and without error.

13

14

_X_     (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

15

____     (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

16

17

Executed on **January 25, 2018**, at Santa Ana, California.

18

19

_Karina Mesa_
Karina Mesa
Judicate West

20

21

22

23

24

25

26

27

28

1

1

2

3   Thom E. Smith, Esq.
    Mark E. Burton, Esq.
4   Audet & Partners, LLP
    711 Van Ness Ave.
5   Suite 500
    San Francisco, CA 94102
6   EMail: tsmith@audetlaw.com
    EMail: mburton@audetlaw.com
7

8   Steven A. Groode, Esq.
    Keith A. Jacoby, Esq.
    Rachel S. Lavi, Esq.
9   Eric A. Cook, Esq.
    Littler Mendelson, P.C.
10  633 W. 5th St.
    63rd Floor
11  Los Angeles, CA 90071
    EMail: sgroode@littler.com
12  EMail: kjacoby@littler.com
    EMail: rlavi@littler.com
13  EMail: ecook@littler.com

14  Sophia Behnia, Esq.
    Littler Mendelson, P.C.
15  333 Bush St.
    34th Floor
16  San Francisco, CA 94104
    EMail: sbehnia@littler.com
17

18  Jennifer A. Goldberg, Esq.
    Littler Mendelson, P.C.
19  2049 Century Park East
    5th Floor
20  Los Angeles, CA 90067-3107
    EMail: JAGoldberg@littler.com

21  Alexander H. Scherbatskoy, Esq.
22  Dalene R. Bramer, Esq.
    Uber Technologies, Inc.
23  1455 Market Street
    4th Floor
24  San Francisco , CA 94103
    EMail: ahs@uber.com
25  EMail: dalene@uber.com

26

27

28

2

HON. JON M. MAYEDA, Ret.
JAMS
555 W. 5th Street
32nd Floor
Los Angeles, CA 90013
Tel: 213-620-1133
Fax: 213-620-0100

ARBITRATOR

IN ARBITRATION PROCEEDINGS AT JAMS

RANDOLPH SCOTT DORR,                )
                                    )
                Claimant,           )
                                    )     JAMS Ref No: 1210033721
        vs.                         )
                                    )     **INTERIM AWARD**
                                    )
UBER TECHNOLOGIES, INC.; RASIER,    )
LLC,                                )
                                    )
                Respondents.        )
_____ )

An arbitration hearing initiated by Claimant Randolph Scott Dorr's ("Dorr") Demand for Arbitration versus Respondents Uber Technologies, Inc., LLC, Raiser, LLC, and Raiser-Ca, LLC ("Respondents" or "Uber") was held at the JAMS Century City Resolution Center on September 12-14, 2017. The undersigned is the duly appointed arbitrator in this matter.  Claimant was represented by Caleb Marker and Ben Gubernick, Zimmerman Reed, LLP.  Respondents were represented by Keith Jacoby, Andrew Spurchise, and Sophia Behnia, Littler Mendelson, P.C.

The evidence presented at hearing establishes by a preponderance of the evidence that Dorr's use of the Uber app in California was as an independent contractor, and no employment relationship was established with Respondents.

I.    **FINDINGS OF FACT**
      A.    **Dorr's Employment History With Limousine Companies.**

Dorr began commercially driving as an employee for limousine companies before he ever

1

1  contracted with any Respondents.    Dorr's employment experiences were markedly and
2  substantively different from his experience licensing the Uber app, and Uber demonstrated that
3  employee chauffeurs can be subject to a larger degree of control, as well as a significant
4  reservation of the right of control that is incomparable to the relationship between Dorr and
5  Respondents.

6        Dorr was employed as a chauffeur for two limousine companies based in Los Angeles,
7  California, BLS Limousine and Music Express, Inc.  (Exhs. 275-76, *passim*; Tr., V.I., 183:19-
8  184:7.)  Dorr drove for BLS from at least June 2013 to June 18, 2015.  (Ex. 275, pp. 5, 76-86.)
9  BLS fired Dorr, stating that "his services were no longer needed." (Exh. 275, p. 6.)   Dorr
10  thereafter decided to try going into business for himself and began licensing the Uber app, but
11  paused his use of it and again took a job as an employee chauffer for Music Express for
12  approximately four months, from October 2015 to February 2016.  (Tr., V.I, 183:19-184:11.)
13  Dorr did not need to request time off from Uber in order to work for Music Express or tell
14  anyone at Uber; all that was required was to turn the app off.  (Tr., V. I, 227:21-228:7, 229:20-
15  25.)

16        Music Express required Dorr to complete an "Application For Employment."  Dorr was
17  required to list his prior employers on the Application, including the dates of employment, type
18  of work performed and rates of pay, as well as to explain periods of unemployment.  Dorr was
19  not required to report this type of information to Uber.  (Tr., V. I, 201:19-202:5, 202:17-203:15;
20  Ex. 276, pp. 30-38.)  Dorr had to specify whether he was available to work weekends, evenings,
21  days, or overtime, if requested.  Dorr checked that he was available to work all of those, but
22  wrote in "Sunday off."  Uber never asked for Dorr's availability.  (Tr., V. I, 208:13-209:3; Ex.
23  276, pp. 34.)  Dorr was required to submit personnel references as part of seeking employment
24  from BLS, which was not required by Uber. (Tr., V. I, 234:8-13; Ex. 275, p. 20.)  Uber has no
25  application or interview process for driver partners.  (Tr. V. II, 468:17-470:21, 472:1- 16, 473:3-
   8.)

        As an employee of Music Express and BLS, Dorr was required to call in the night before

2

his scheduled work day to find out what time he would begin working the next day, if at all. If he was told to come in, he would receive a schedule, with a start time. (Tr., V. I, 184:14-185:1.) Dorr was also required to complete and submit daily time sheets to Music Express and to punch a punch card at BLS. (Tr., V. I, 197:6-22, 225:12-20; Ex. 275, p. 13; Ex. 276, pp. 16-19.) Failure to submit the timesheets could lead to disciplinary action. No such timesheets were required by Uber. (Tr., V. I, 220:5-22; Ex. 276, p. 81.) Additionally, Music Express and BLS required Dorr to adhere to certain meal and rest break policies and procedures, and he executed a Meal Agreement with Music Express. (Tr., V. I, 212:14-2134; Ex. 276, pp. 70-74.) Uber does not have any policies pertaining to meal and rest breaks, because Dorr is in control of when to drive (if at all) and when to break.

Music Express and BLS paid Dorr an hourly minimum wage, double time, overtime and a service fee. (Tr., V. I, 185:2-186:2, 223:25-224:2; Ex. 275, p. 8.) Deductions, including for Medicare, Social Security and SDI were taken from Dorr's paychecks while employed by Music Express and BLS; no such deductions were taken by Uber. (Tr., V. I, 196:6-22, 224:3-5; Ex. 275, p. 8; Ex. 276, p. 10; Exs. 227-228.) If Dorr worked a shift for Music Express, he was paid his hourly rate of pay whether he was driving or not. (Tr., V. I, 199:3-6.) Dorr also completed W-4 forms in connection with his work at BLS and understood those are forms he would be required to complete as an employee. (Tr., V. I, 232:7-15, 233:6-25; Ex. 275, pp. 17-19.)

Additionally, Music Express and BLS both owned and provided Dorr with the vehicles that he drove as part of his employment; Dorr did not have to buy a vehicle to work for Music Express or BLS. (Tr., V. I, 186:5-8; 187:3-9.) Dorr acknowledged that providing his own car and paying for corresponding expenses was a big difference between his work as an employee and his use of the Uber app in connection with his own business. (Tr., V. I, 187:14-17.) Dorr also did not pay for vehicle maintenance or gas expenses incurred in connection with his employment for Music Express and BLS. (Tr., V. I, 254:7-14, 270:15-23.)

Dorr's essential functions as an employee chauffeur for Music Express included, in part, to communicate with dispatch via two-way radio on all problems, report codes in a timely

manner, keep mileage and records of vehicles and expenses encountered, and to complete a monthly expense report.  There was no Uber dispatcher for Dorr to communicate with, nor was Dorr required to track expenses or complete an expense report for Uber.   (Tr., V. I, 199:14-200:2; Ex. 276, p. 29.)  Dorr's additional duties at Music Express included attending all training meetings as required.  In fact, Dorr attended a course required by Music Express in defensive driving, accident avoidance and chauffeur safety and agreed to follow those rules. (Tr., V. I, 241:13-242:4; Ex. 276, p. 83.) Uber did not require Dorr to attend any training meetings.  (Tr., V. I, 201:4-10; Ex. 276, p. 29.)

When Dorr drove as an employee for Music Express, Music Express directed whom Dorr would drive, as well as where and when.  Dorr had no choice in the matter and could not turn down clients. (Tr., V. I, 286:8-17.)  Dorr had a supervisor at both Music Express and BLS who would provide Dorr feedback and a written review.  (Tr., V. II, 328:19-329:11.)

Music Express and BLS maintained dozens of policies to which Dorr was required to adhere.  (Tr., V. I, 210-246). Dorr was also subject to progressive discipline and ultimately termination at both employers. (Tr., V. I, 192:22-25; 193:22-194:4; 237:22-238:11; Ex. 275, p. 56, Ex. 276, p. 9.Ex. 276, pp. 5-7.) The collection of rules at BLS and Music Express had a significant impact on the way Dorr did his job there, both at and away from work. (Tr., V. I, 246:5-13.)

Although he was fired, Dorr testified that he decided to move from Music Express back to Uber because he thought he would have more of an opportunity to make money and grow than he would have had as an employee.  (Tr., V.1., 292:4-9.)  All he had to do to go back to using the Uber app was to turn it on and update his documentation.  (Tr. V. II, 356:23-357:8.)

Before Dorr licensed the Uber app, he incorporated his own private transportation business, RSD Luxury Limousine Company, LLC with the State of California on or about May 27, 2015 and paid the fees associated with incorporation.  (Tr. V. I, 275:19-24, 281:8-282:3; Exs. 244, 245, 246.)  In order to operate as a private limousine company, Dorr was required to hold a transportation charter permit ("TCP").  (Tr. V. I, 275:25-276:5.)  Dorr testified he could not

initially afford the $1000 investment required for the permit which limited his ability to do private jobs.[1] (Tr. V. I, 276:6-14, 279:5-280:10.)

**B.    Uber.**

**1.    The Uber App And How It Works.**

Uber is a software technology company that does not employ any drivers; rather driver partners who license the app are Uber's customers.  (Tr. V. II, 458:16-459:1, 460:19-462:11, 476:13-22.)  Uber's app enables riders and drivers to connect based on their locations and the rider's transportation budget and needs, creating a direct business relationship between the rider and the driver.  (Tr. V. II, 461:2-12; 475:8-22, 572:2-6.) Uber does not own or operate the vehicles used by drivers, nor does it provide any equipment or tools to drivers. Rather, Uber creates the software that riders and drivers (for a fee) can download if they want to find available drivers and riders, respectively. (Tr. V. II, 458:16-460:1, 535:11-13.)  If a rider and driver connect through the app, then a third party facilitates payment from the rider to the driver for the services provided by the driver. (Tr. V. II, 487:5-15.)  Uber is a two-sided marketplace, meaning those in need of the service (e.g., riders) are equally important to the ecosystem as those providing the service (drivers).  (Tr. V. II, 456:6-457:22, 511:13-21, 577:25-578:4.)

Uber offers riders the ability to send a ride request through a number of distinct products in the app. uberX connects riders with drivers typically in more cost-effective vehicles. uberXL connects riders with drivers of cost-effective SUVs and other large vehicles. UberSELECT allows riders to connect with drivers who drive mid-tier luxury sedans. In California, uberX, uberXL and UberSELECT are part of the peer-to-peer ("P2P") network.   (Tr. V. II, 461:16-465:13.)  UberBLACK connects riders with luxury sedans or town cars. UberSUV allows riders

---

[1] Eventually, when Dorr obtained a TCP permit in California, he did in fact use the Uber app to find a rider, and then offered to give that rider private rides in the future.  (Tr. V. I, 120:3-9, 277:4-21.)  Dorr believed that it was a fair form of competition to solicit a rider that had initially been located by the Uber app for a later private ride.  (Tr., V. I, 302:12.)

1   to connect with full-sized luxury SUVs.[2]  Drivers who wish to offer their transportation services

2   using UberBLACK and UberSUV must be fully licensed livery drivers.  More specifically, all

3   livery vehicles transporting riders booked using the UberBLACK and UberSUV products are

4   independently owned and operated by transportation companies that are themselves licensed by

5   the California Public Utilities Commission ("CPUC").  *Id.*

6       A rider may make a request through the app, with the choice of selecting a certain type of

7   vehicle.  Fare prices vary depending on various market-based factors, including the type of

8   vehicle. Typically, uberX is the most cost effective; UberSUV is the most expensive.  (Tr. V. II,

9   466:16-467:3, 482:21-483:12.)  Once a rider makes a request, the Uber algorithm uses GPS

10  tracking to determine the nearest available driver.  (Tr. V. II, 475:5-476:8, 556:9-16.) Uber does

11  not guarantee that all ride requests will be accepted, and as happens daily, a rider's request may

12  not be fulfilled because there are no available drivers willing to accept the request. (Tr. V. II,

13  476:9-477:8.)

14      Drivers select the vehicle they wish to utilize and which product they will offer their

15  vehicle on; there is no limit to the number of vehicles a driver can add to their account.  (Tr. V.

16  II, 483:13-484:16.)  Drivers indicate that they are available to pick up riders by logging onto the

17  app and pressing the "Go Online" button. (Tr. V. II, 477:9-20.)  If a driver is not online, he or she

18  will not receive a given trip request.  Similarly, when a driver who is on the app no longer wants

19  to use it, all she or he has to do is press the "Go Offline" button and then they are no longer sent

20  requests. (Tr. V. II, 525:14-23.)   There is nothing Uber can do to force drivers or their vehicles

21  back onto the app once they are offline.  Drivers are free to decide when they go online, and

22  when they go offline. They can go on and off line as many times in a day, week or month as they

23  wish (or even not at all). (Tr. V. II, 525:24-526:1.)   There is no way for the app to log a driver

24  on and require him or her to work. (Tr. V. II, 340:1-5, 390:24-391:25, 490:4-491:1, 525:24-

25  _____

[2] In Utah, uberX, uberXL and UberSELECT fall under the P2P network like in California.  Drivers who wish to use
the UberSUV product in Utah must have commercial insurance and additional permits. (Tr. V. II, 403:17-22; 464:9-
22.)

6

526:1.)

When a ride request is placed through the app, the app locates an available driver nearby, and then transmits the ride request to that driver.  The driver then has the option to accept or reject the request. (Tr. V. II, 479:21-480:3.)  If the driver chooses to accept a trip request, the driver then goes to the rider's location, the rider tells the driver their desired end location, and the rider and driver decide the best route to arrive at that destination.  (Tr. V. II, 478:6-479:10.) Drivers are free to accept or reject ride requests as they see fit; Uber does not control if a driver accepts any particular trip.  (Tr. V. II, 479:21-480:24.)  Further, drivers may cancel a trip after they have already accepted a ride request.  (Tr. V. 486:10-487:4.)

Uber helps to facilitate the initial connection between riders and drivers who may not otherwise be able to know that someone is nearby who wants to give or receive a ride.  But, after that initial connection, Uber does not have visibility or control over how the rider and driver progress in their relationship. Uber does not prohibit drivers and riders from exchanging contact information and agreeing to do business off of the app another time.  (Tr. V. II, 482:6-10.)

### 2.      How Fares Are Determined And How Riders Compensate Drivers.

Throughout the time period relevant to Dorr's claims, for each type of ride, Uber established a default base fare, plus default amounts based on distance and time.  However, the default prices for each product fluctuated, often multiple times per day, based on rider demand or low driver supply.  (Tr. V. II, 487:16-488:21.) If there was substantially more rider demand than available drivers, prices increased to attract more drivers to log on. This is referred to as "surge pricing," and more often happened during rush hour, events, and late nights on weekends.  *Id.* Drivers can thus ultimately offer their services in different capacities to optimize their economic success.  (Tr. V. II, 488:22-489:25, 491:2-492:8.)

During the time period relevant to Dorr's claims, at the end of the trip, riders were charged a fare calculated by the app on behalf of the driver, typically a combination of the applicable base price, plus additional sums based on time and distance.  *Id.*  The fare calculated by the app was the maximum fare for the trip.  The driver and rider could agree to adjust the fare

downward, which a driver might do for any number of reasons, including in exchange for arranging a future ride with that rider.[3] The rider and driver then have the option to rate each other; Uber does not determine the ratings. Both riders and drivers can lose access to the app for low ratings or serious complaints. Significantly, only 1% to 3% of the thousands of drivers in Los Angeles have been deactivated for low ratings. (Tr. V. II, 476:2-6, 479:16-20, 516:17-517:22, 586:1-6 .)

Drivers pay Uber a portion of the revenue received from the riders as a licensing fee for using the app in connection with that trip. (Tr. V. II, 467:5-15.) Fares earned by drivers are generally transmitted to the driver via a third party pay vendor each week, though drivers have the option of receiving instantaneous payment up to five times daily. In exchange for the use of the Uber app, the driver pays Uber a licensing fee for each completed trip (typically between 20% and 28%). Per the agreement between Uber (or its subsidiaries) and a driver, Uber receives this fee out of the driver's fare before the remainder of the fare paid by the rider is remitted to the driver. (Tr. V. II, 492:9-493:1.) Uber does not reimburse drivers for operating expenses. (Tr. V. II, 535:14-19.)

### 3.    The CPUC Regulates Rasier-CA, LLC As A "TNC."

The California Public Utilities Commission ("CPUC") has determined that Uber's subsidiary Rasier-CA, LLC, the entity with whom Dorr contracted to obtain access to uberX, uberXL and UberSELECT in California, is a Transportation Network Company ("TNC"). (Tr. V. II, 464:24-465:25.) The Public Utilities Code created this designation to regulate app suppliers such as Uber, and defines a TNC as an organization operating in California that facilitates "prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle." (Cal. Pub. Util. Code § 5431(c), *effective Jan. 1, 2015*; Tr. V. II, 467:4-24.)

As a TNC, Rasier-CA, LLC is obligated to comply with certain safety requirements as it

---

[3] In fact, Dorr requested a fare adjustment on more than one occasion for his riders. (Exs. 272-273.)

relates to the drivers who offer their transportation services on Uber's P2P network. (Tr. V. II, 464:24-466:1, 473:9-23, 474:23-475:4.) These requirements are set forth in the Passenger Charter-Party Carriers' Act, California Public Utilities Code § 5351 *et seq.*, as well as rulemaking decisions by the CPUC. In September 2014, Assembly Bill No. 2293 enacted the new Public Utilities Code sections applicable to TNCs (*see* Cal. Pub. Util. Code §§ 5430-5445.2), effective January 1, 2015. Uber (and Rasier-CA, LLC) complied with these rules, as well as previous rules issued by the CPUC not set forth in the governing statute, throughout Dorr's contractual relationship. *Id.*

The CPUC imposes the following requirements, among others, on TNCs: (1) insurance requirements (Pub. Util. Code §§ 5431, 5433); (2) background checks (Cal. Pub. Util. Code § 5445.2); (3) each vehicle to be driven in connection with uberX, uberXL and UberSELECT must display required "trade dress"—a small placard with an Uber "U" logo approved by the CPUC CPUC Dec. No. 13-09-045 (September 19, 2013) at p. 31, ¶ h; (4) a 19-point vehicle inspection administered by a third-party (CPUC Dec. No. 13-09-045 (September 19, 2013) at p. 73, ¶ 5); (5) driving record checks on drivers through the DMV (CPUC Dec. No. 13-09-045 (September 19, 2013) at p. 73, ¶ 7; and (6) a driver safety program in order to ensure that drivers using vehicles in connection with uberX, uberXL and UberSELECT establish they are capable of safe vehicle operation before they are permitted access to the app (CPUC Dec. No. 13-09-045 (September 19, 2013) at p. 27, ¶ (f)).

### C. Dorr Signs Up To Use The Uber App To Generate Leads.

Dorr first signed up to use the Uber app in Los Angeles, California in June 2015, and electronically accepted the November 10, 2014 Rasier Software License and Online Services Agreement (the "Rasier Agreement") on July 20, 2015.[4] (Tr. V. II, 440:10-441:7; Exs. 201-202, 219.) The Rasier Agreement explicitly states that the relationship between Rasier-CA, LLC and

---

[4] Later, on April 5, 2016, Dorr electronically accepted a modified agreement, the December 10, 2015 Rasier Technology Services Agreement (the "TSA"). (Tr. V. II 440:10-441:7; Exs. 206, 219.) The terms of the December 10, 2015 TSA are largely the same as the November 10, 2014 Rasier Agreement.

Dorr is "solely that of independent contractors" and that the parties expressly agreed that "this Agreement is not an employment agreement, nor does it create an employment relationship" between Dorr and Uber.[5] (Ex. 201, ¶ 13.1.) On August 25, 2015, Dorr also accepted a Software License and Online Services Agreement with Uber USA, LLC, dated April 3, 2015, in connection with this his UberBlack profile, including similar terms. (Tr. V. II 440:10-441:7; Exs. 203, 218.)

In order to use the Uber app, and pursuant to CPUC requirements, Dorr had to present proof that he had a valid driver's license, insurance and registration, he had to consent to and pass a background check conducted by a third-party, and his vehicle had to meet minimum vehicle requirements. There was no formal application, no interview process, and no Uber-imposed training process that Dorr was required to complete before he began using the app. (Tr. V. I, 202:17-203:15; Tr. V. II, 350:8-351:21.)

From August 25, 2015 to September 12, 2015, Dorr used the Uber app licensed to another Uber driver-partner, David Ware. (Ex. 227.) David Ware held the partner contract with Uber. Under David Ware's partner app, his company, Host Cars L.A., engaged uberX drivers and provided them with vehicles owned by Mr. Ware to drive under his partner-app. Mr. Ware would charge the uberX driver a weekly leasing fee for the vehicle or a percentage of the amount of jobs.[6] (Tr., V. I, 272:6-14, 273:10-25.) Dorr paid a weekly lease fee of $300 to Mr. Ware, but ceased this arrangement in favor of making uberX and uberXL trips on his own partner account, so he no longer had to pay a weekly lease fee. (Tr. V. I, 275:7-14.) Dorr continued to offer transportation services on the P2P network in the Los Angeles market on and off until August 30, 2016. (Tr. V. I, 87:23-88:1; Ex. 230.)

Having a car in good working order was required in order to drive riders through the use

---

[5] Dorr could access the various contracts and agreements at any time by clicking on the contracts linked on his Driver Profile. (Tr. V. II, 386:22-388:6; Exs. 224-225.)

[6] Uber had no involvement in the details of the arrangement between Host Cars LA and its drivers, like Dorr. (Tr. V. II, 495:18-496:7.) Livery partners like David Ware are free to engage drivers (as employees or independent contractors) to drive vehicles for them; some livery partners do not drive at all and instead manage large fleets of vehicles and drivers utilizing the Uber app. (Tr. V. II, 496:8-497:15.)

of the Uber app. (Tr., V. I, 269:19-22.)  With the exception of his time under David Ware, Dorr provided the vehicles that he utilized while using the Uber app.  Dorr drove a Dodge Durango while on the uberX and uberXL platforms, for which he paid $48,000; he testified this was his largest cash outlay in his driving career.  (Tr., V. I, 186:22-187:2, 264:17-24; V. II, 437:15-438:2; Ex. 259.)  When Dorr bought that vehicle, he intended it to be used for Uber and his LLC, and did in fact use it to make trips using the Uber app.  (Tr., V. I, 248:4-14, 281:4-7.)  Dorr's Dodge Durango was registered under his own name, as well as his transportation business RSD Luxury Limousine Co., LLC.  Dorr provided his vehicle registration card to Uber.  (Tr., V. I, 263:9-263:17; Ex. 257.)

Dorr drove when he wanted, where he wanted and as much or as little as he wanted, without interference from Uber.[7]  Dorr chose when and where to drive on any given day, as well as which product to use, based on his own independent judgment regarding what was likely to be the most profitable.  (Tr., V. II, 336:22-340:5, 355:4-357:4; Exs. 231-243, 262.)  In fact, Dorr sometimes chose to ignore surge pricing and promotions, even though it would pay more and he could make more money that way.  (Tr. V. II, 372:25-373:20, 390:4-393:4.)  Although Dorr could drive on the uberX or uberXL platform with the Dodge Durango, he preferred to use the uberXL platform.  Dorr was aware that there were more rides available on the uberX platform, but that he would earn less money per ride.  Therefore, he chose to use the uberXL platform because he felt it was a better fit for that category because of his vehicle. (Tr., V. I, 294:11-18; Tr. V. II, 353:6-354:13; Ex. 262.)  By having a sport utility vehicle, Dorr was able to get a higher per ride fee from the rider using the uberXL platform.  (Tr., V. I, 248:15-249:1.)  Dorr put more miles on the Durango while driving with the Uber app than for personal use, causing the asset to depreciate faster when used in connection with the app.  (Tr., V. I, 249:6-14.)

Dorr understood that Uber did not impose restrictions or limits on his ability to drive

---

[7] Of the 53 weeks Dorr drove in Los Angeles, he only took trips in 27 of those 53 weeks.  For the weeks he drove, the mean number of hours he drove was 26 hours a week and the median was 23 hours a week. (Tr. V. II, 527:2-21; Ex. 231.)  Assuming "full-time" to be 40 hours per week, Dorr's usage of the app did not approach full-time status.

privately.  In fact, Dorr utilized the Lyft app concurrently with the Uber app while he was active in California and was not aware of any rule against doing so.  (Tr., V. I, 284:4-24.)  Further, Dorr chose when to use the app and when not to use the app.  (Tr., V. I, 293:19-22.)  Uber did not have a minimum hours requirement to be on app or number of jobs to be completed, never imposed a start time and never mandated a time when Dorr had to or could turn off the app; those were his decisions.  (Tr., V. I, 292:10-23, 293:2-9; Tr. V. II, 525:10-16.)  In fact, Dorr chose to turn off the app to do something else, like go to lunch or meet someone.[8]  (Tr., V. II, 333:5-23, 344:20-345:21.)

When Dorr would begin the day, he would turn on the app in his home, receive a ride request, accept it and go to his car to pick up the rider.  Sometimes he would surf the internet or watch TV while waiting for a request.  (Tr., V. II, 335:7-336:10.)  Sometimes, Dorr would go somewhere first before turning on the app or he might decide to drive to a certain area before turning it on.  (Tr. V. II, 373:21-374:11.)  Dorr was not supervised by any person at Uber.  (Tr., V. I, 218:18-21.)  Further, Dorr continued to drive using the Uber app, irrespective of whether a driver gave him negative feedback.  (Tr., V. II, 326:17-327:13, 328:15-18; Exs. 229, 230.)

Dorr admitted that Uber is just one tool he uses to build his own business, as it helps him to identify rider clients through the app (even on the uberX and UberXL platforms) in exchange for a fee.  (Tr., V. I, 307:18-308:8, 309:13-21.)  Dorr also used the Uber app to determine a ballpark price to charge private riders.  (Tr. V. II, 360:24-361:12.)

Dorr also incurred other business expenses in connection with his use of the Uber app for his transportation business, including the monthly cost of $700 for commercial insurance, about $500 per month in gas, the monthly cost of $100 for car washes, $50 for airport fees, car maintenance (including $750 snow tires for the Suburban), business cards and website hosting fees.  (Tr., V. I, 250:8-251:11, 253:7-17, 253:18-22, 255:20-1, 256:23-257:19, 259:11-261:11, 265:17-25, 269:3-7; Tr. V. II, 394:10-396:4; Exs. 214, 254, 255, 256, 260.)  Dorr did not submit

---

[8] Dorr agreed that was a good system that Uber would prefer that only people who are willing to accept rides are on app, in order for a match between a driver and a rider to happen as quickly as possible.  (Tr., V.2., 333:24-335:6.)

for mileage expense reimbursement from Uber in connection with the miles he drove using the Uber app.  (Tr., V. I, 254:19-23.)  If the money Dorr spent on gas, or the money Dorr spent on his Dodge Durango while driving on uberX and uberXL, exceeded the money he received from those trips on the Uber app, Dorr would lose money. (Tr., V. I, 256:2-14.) Dorr had to complete more rides and work longer to cover the monthly expense of the Suburban, than he did for the Durango.  However, Dorr made more driving on the UberBlack platform and took the risk that he would be able to afford the extra payment every month because the rides he chose with the Black platform paid more per ride.  (Tr., V. I, 189:11-190:19; 249:21-250:7.)

While utilizing the Uber app, Dorr hired an accountant to prepare his tax returns. Dorr was paid by the ride.  Dorr was provided with a 1099 form at the end of the year and was not required to submit a W-4 form.  (Tr., V. I, 233:17-25; Exs. 10.1-10.2, 220-223.)    Dorr understood the difference between a W-2 and 1099.  He kept track of his gas expenditures and cash tips and provided these records to his accountant.  Dorr's accountant deducted his business expenses so that he would not have to pay taxes on that money.  (Tr., V. I, 224:6-225:11; Tr. V. II, 393:10-394:1; Ex. 213.)

###   D.   Dorr Relocates His Transportation Business To Utah.

In September 2016, Dorr decided to move his business from California to Utah because he believed there was better opportunity there and because he wanted to take advantage of the UberBLACK platform.  (Tr., V. I, 295:17-20; Tr. V. II, 331:2-11, 357:10-358:11.)  Uber had no involvement in Dorr's decision making process and he did not need Uber's permission.  (Tr. V. II, 497:16-500:3.)  In the course of moving to Utah, Dorr moved RSD Limousine to Utah and registered it as a new LLC called Summit Black, LLC, to perform driving services using both the Uber app and serving private clients.[9]  (Tr., V. II, 330:8-17, 332:10-12; Ex. 210.)  Dorr continued to use the Uber app to generate leads for his business.  (Tr. V. II, 362:7-363:3.)

Dorr traded in his Dodge Durango for a Chevrolet Suburban, which was about $50,000.

---

[9] Dorr ran his UberBLACK income through his Summit Black, LLC.  (Ex. 222.)

(Tr., V. I, 249:15-20.)  His monthly payment for the Suburban was higher than the Durango, about $825 per month.  Also as part of the move, Dorr had to upload his insurance onto the Uber system and to provide his vehicle registration.  (Tr., V. I, 261:15-17, 264:2-9; Exs. 214, 256, 258.)

In Utah, Dorr was able to drive on multiple Uber platforms, including uberX, uberXL, SELECT and SUV.  Dorr made the decision not to utilize the uberX or uberXL platforms.  (Tr., V. I, 294:19-295:3.)  Dorr also made other choices in furtherance of his private business in Utah, including soliciting riders that were found by the Uber app for future private rides, which did result in private subsequent rides for which Uber did not get a licensing fee and he kept 100% of the fee.  Sometimes Dorr would pass out his business card and would tell his Uber passengers that he had better rates and can do better pickups at a cheaper rate than Uber.  Dorr testified that this aides in building his private business, Summit Black.  Dorr also testified that he could have stayed in California and done the same thing.  (Tr., V. I, 302:13-303:16; Tr. V. II, 434:24-435:8.)

Another way Dorr built his business was through taking "farmed out" jobs, that is, overflow work from other limousine drivers for which Dorr would retain the entire fee.  (Tr., V. I, 304:25-305:14; Tr. V. II, 389:16-390:3.)  Dorr was aware of other Uber app users who have a significant number of private clients.  (Tr., V. I, 305:18-306:13.)

Dorr advertised his Utah business online (on a webpage devoted to Summit Black, Facebook and on Twitter) and he could have also done so in California.  (Tr., V. I, 307:14-17; Tr. V. II, 379:24-381:21, 382:23-386:5; Exs. 251-253.)   He continues to license the Uber app today, running his business in the ski resort town of Park City, Utah.  (Tr. V. II, 351:22-24.)

**E.    Soren Jafari's Experience With The Uber App.**

Respondents put on testimony of Soren Jafari, whose business, Tesluxe, currently licenses the Uber app. Tesluxe is a TCP permitted livery service mainly focused on the high-end ride market and owns a number of luxury and super-luxury vehicles. (Tr., V. III, 638:3-8)  Mr. Jafari is the CEO of Tesluxe, and has a number of employee drivers who work shifts, attend company meetings, and drive a roster of private Tesluxe clients. Tesluxe also contracts with

independent contractor drivers, who lease some of its luxury vehicles and use the Uber app to find clients on the various app products, including uberBLACK and uberLUX. Mr. Jafari stated his drivers will choose a product to access, including uberX, based on the volume of work available. The independent contractor drivers pay a lease fee to Tesluxe for the use of the cars and Tesluxe does not control when, where or for how long those drivers work. The Uber app allowed Tesluxe to supplement its driving utilization of his fleet, and supplied a means to meet potential new private clients and increase revenue, which has led to the growth of his business. (Tr., V. III, 641:18:23, 642:4-8, 644:17-645:19.)

## II.   **BURDEN OF PROOF**

The Arbitrator issued the Statement of Decision Denying Claimant's Motion for Partial Summary Adjudication regarding the Burden of Proof on August 23, 2017. Since this Order, *Linton v. DeSoto Cab Company, Inc.*, 15 Cal.App.5th 1208 (Oct. 5, 2017) was published. *DeSoto* does not fundamentally change the Arbitrator's analysis.

The *DeSoto* court found that the trial court erred by failing to "apply the presumption of employment and not shifting the burden to defendant as the party attacking the relationship. *Id.* at 1220. However, *DeSoto* is distinguishable from the facts here and the Arbitrator finds that, even if the so-called presumption contained in Labor Code § 3357 were applicable, Dorr failed to establish that he rendered a service to Uber, which is a prerequisite for the presumption to apply.

In *DeSoto*, unlike here, taxi drivers were charged a fee by defendants for providing them with the primary tool of the trade, their cars. DeSoto owned a fleet of 230 taxicabs used by plaintiffs. Uber has no fleet and provided no car to Dorr. The plaintiffs were required to pay a $500 security deposit to defendants to drive their cabs, and a $100 gate fee for use of the cab. Uber has no such requirements. DeSoto stated that it could not operate without drivers. Uber has explained that it can operate in a number of ways without drivers. Desoto required drivers to check in to receive keys and begin driving. Uber has no check-in requirement. In *DeSoto*, the plaintiff was assigned day shifts from 3:00 a.m. to 1:00 p.m. and was required to lease the cab for 10 hours each shift. Uber does not assign shifts and imposes no limitations on the length of time

a driver must be on app, or whether the driver goes on app at all. Here, none of these indicia of rendering a service to Uber are present.

Thus, while *DeSoto* is noted, it does not change the allocation of the burden of proof set out in the Appendix. In any case, even if Respondents bore the burden of proof, they carried that burden and the result would be the same.

## III.   REQUESTS FOR JUDICIAL NOTICE

The Arbitrator took judicial notice of various administrative and civil decisions across the United States and acknowledges the majority found that users of the Uber app were not employees. The Arbitrator further reviewed two arbitration awards in prior hearings, and while such awards are not binding precedent, the facts and reasoning summarized below are found to be instructive and of assistance in reaching the determination here.

### A.   Eisenberg v. Uber

On November 23, 2016, the Honorable Michael D. Marcus (Ret.) found—after a three day arbitration followed by supplemental briefing—that a California driver who, like Dorr, had used the Uber app to generate ride leads, was an independent contractor and not an employee. *Eisenberg v. Uber Technologies, Inc., et al.* (ADRS Case No. 15-6878-MDM) ("*Eisenberg v. Uber*") [Respondents' Request for Judicial Notice ("RJN"), Ex. B.] In a nearly 50-page order analyzing the claimant's employment status under the *Borello* test, Judge Marcus found for Uber on every issue, holding: "Uber drivers are not supervised; supply the cars they drive; do not wear Uber uniforms or signage; can drive simultaneously for any competitor, including Lyft, Uber's biggest competitor; are paid for each ride and have the unfettered option to work as little or as much as they want and wherever they want in the geographical location assigned to their platform." *Id.* at p. 47.

In analyzing the right to control test, Judge Marcus distinguished drivers who transport riders arranged via the Uber app from a class of California FedEx drivers who successfully argued they were employees in California rather than independent contractors in *Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981 (9th Cir. 2014). Judge Marcus observed that FedEx

drivers were assigned service areas, required to report to a particular work location at the outset of each shift, required to deliver every assigned package within a specific time window, scheduled with workloads that would require a set number of work hours each day and attended required training. *Eisenberg v. Uber* at p. 36-37. FedEx required uniforms, conducted ride-along performance evaluations each year and although drivers supplied their own vehicles, FedEx dictated every detail of the vehicle from the dimensions and shelving to the colors and logos. *Id.* at pp. 37-38. In sum, FedEx controlled the appearance of drivers and vehicles, controlled drivers' work hours and controlled many aspects of when and how drivers delivered packages. *Id.*

In contrast to the FedEx drivers, Judge Marcus concluded that Uber lacked the right to control drivers. Judge Marcus noted that (i) no uniforms were required and drivers established their own schedules, (ii) Uber provided suggestions to drivers that did not need to be followed, (iii) vehicle inspection requirements were mandated by the state, not Uber, (iv) any training was minimal, (v) no minimum amount of hours were required, (vi) there was no requirement that drivers obtain permission to be off the app, (vii) there was no limitation on when or for how long drivers could take breaks, (viii) there was no assigned service area, and (ix) there was no rule prohibiting work for competitors. *Eisenberg v. Uber* at pp. 43-44. Judge Marcus found that the foregoing factors "individually, or in the aggregate, establish that Uber did and does not have the right to control [Claimant] or any comparable driver." *Id.* at 44.

**B.    Gollnick v. Uber**

On August 17, 2017, the Honorable Richard A. Kramer (Ret.) issued a decision following a four-day arbitration and a lengthy post-arbitration hearing on the burden of proof, finding that a California P2P driver (who used the Uber app to generate ride leads failed to prove he was improperly classified as an independent contractor. *Gollnick v. Uber Technologies, Inc., et al.* (JAMS No. 110082777) ("*Gollnick v. Uber*"), [RJN, Ex. C.] Judge Kramer first ruled that the claimant driver had not met the necessary factual predicate of proving he provided a service to Uber, as opposed to on behalf of his own business. *Id.* at pp. 6-8. Judge Kramer continued that the claimant had failed to meet his burden to prove he was an employee of Uber under the

*Borello* test.

With respect to the right to control factor, Judge Kramer noted that while the desired result for Uber "is to have drivers willing and able to get a person who has contacted Uber seeking to be driven from one place to another into a vehicle for that purpose[,]" there was *no* evidence that Uber's purpose was to get any person into a particular vehicle. *Gollnick v. Uber*, at p. 9. Judge Kramer went on to find the following key facts: (i) Uber did not control which cars would be available in what places and times, (ii) Uber did not assign driving routes or areas of operation, and (iii) Uber did not direct when and where drivers worked. *Id.* at p. 10. Judge Kramer also determined that Uber offered only suggestions, not directions that drivers were in any way required to follow. *Id.* Moreover, drivers were free to reject prospective business through the Uber app and drive for competitors such as Lyft which, in Judge Kramer's view, was entirely "inconsistent with any finding of control by Uber as to where and how [claimant] was available for service to passengers using Uber." *Id.* at pp. 10-11. Judge Kramer concluded as follows: "it cannot be said that Uber had any control over whether [claimant] or any other individual driver would be available to pick up people at a particular time or place." *Id.* at p. 10.

Judge Kramer further found that drivers were in control of pricing because they had the freedom to decide whether or not to accept a particular trip request at a particular price and therefore, they were "in control of how much [to] accept to transport a particular passenger." *Id.* at p. 11. Drivers were not required to follow any particular route, drivers themselves provided the vehicles (*i.e.* the "dominant tool" needed for the job), and drivers could use their vehicles for other purposes. *Id.* at pp. 11-12. Lastly, as to the other key tool, the Uber app itself, "is licensed and not provided for free by Uber. It is paid for by the drivers and they reap the profits from its use." *Id.* at p. 12.

Judge Kramer rejected the claimant's reliance on evidence that his relationship with Uber was terminable at will: "while many employees are terminable at will … this does not mean that if a worker is terminable at will, then that worker is an employee." *Id.* at p. 13.

As to the secondary *Borello* factors, Judge Kramer concluded that the balance tipped in

favor of independent contractor status. He found that there was "no evidentiary support for the assertion that there is no distinction between [claimant's] driving and Uber's supposed business of transporting people. The most obvious failure of evidence on this point is that it was not shown that Uber workers who are admittedly employees drive passengers." *Id.* at pp. 13-14. As further evidence of the claimant's independent contractor status, Judge Kramer highlighted the fact that drivers are not supervised, that even if driving is considered unskilled work that does not automatically support employment status, and that the parties' agreement expressly providing for an independent contractor relationship should "not be lightly disregarded." *Id.* at pp. 14-15.

## IV.    LEGAL ANALYSIS

### A.    <u>Dorr Has Not Proven That He Provides A Service To Uber.</u>

"An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished." *Varisco v. Gateway Science and Engineering, Inc.*, 166 Cal.App.4th 1099, 1103 (2008).

To demonstrate he was misclassified, Dorr first has the burden of proving he provided services on behalf of Uber, and not for his own independent business. *Cristler v. Express Messenger Systems, Inc.*, 171 Cal.App.4th 72, 84 (2009) (worker bears the initial burden of production to come forward with foundational evidence that links worker to the provision of services to the putative employer); *Callahan v. City of Chicago*, 813 F.3d 658, 660 (7th Cir. 2016) (court need not reach independent contractor or employee status of taxi driver under FLSA because "[s]he owns her own time, but Chicago does not require her to devote any of that time to taxi driving. Callahan and others similarly situated will not drive a taxi unless they believe they are apt to obtain more income (or other satisfactions) from that occupation than from the next best alternative. Competition in the labor market tells Callahan what an hour of her time is worth, and she cannot recover from the City if she now rues devoting as much time as she did to driving other people's taxis."). Dorr has not done so.

It is undisputed that Dorr established an independent transportation business in California

without any assistance from Uber.  He continued those business operations upon moving to Utah. To maximize the profitability of his business, Dorr licensed the Uber and Lyft apps as lead generation resources. And, having determined that airport trips would be profitable for his business, Dorr also chose to obtain permits from Los Angeles International and other local airports to pick-up and drop-off passengers. (Tr. V. II, 397:9-398:2; Ex. 214.)

Dorr's Agreement with Rasier-CA, LLC states: "Company … provides lead generation to independent providers of rideshare or peer-to-peer…passenger transportation services"; "Company is a technology services provider that does not provide transportation services"; "In consideration of Company's provision of the Driver App and the Uber Services for your use and benefit hereunder, you agree to pay Company a service fee."  (Ex. 201, Introduction and ¶ 4.4.) Dorr's conduct in his utilization of the Uber app is consistent with this description.  Dorr held himself out as being in business for himself, invested heavily in his business, developed his own customer base, and used the Uber app to do so. Dorr made an array of choices when it came to his transportation work and his app usage that were not for the benefit of *Uber*, but rather were in furtherance of his own business.

Under these circumstances, the analysis need not extend to *Borello*, as Dorr has failed to meet his burden of proving he provided a service to Uber. Uber is entitled to judgment as to Dorr's claims on this basis alone.  *Cristler*, 171 Cal.App.4th at 84.

## B.   Dorr Was Properly Classified As An Independent Contractor.

Assuming *arguendo* that Dorr established that he provided services on behalf of Uber, it remains his burden to prove he did so as an employee rather than an independent contractor. Dorr has failed to prove that he provided services on behalf of Uber.  Notwithstanding Dorr's failure of proof, in any event, the evidence establishes that under the "Control Test" and the factors set forth in *S.G. Borello & Sons, Inc. v. Dep't of Ind. Relations*, 48 Cal.3d 341 (1989) ("*Borello*"), Dorr is was an independent contractor.  Dorr's relationships with Uber had none of the elements of intrinsic control present in the cases where courts have found an employment relationship.  Unlike in those cases, there is nothing inherent in the work that Dorr performed

that required him to work at a specific time or for a specific amount of time, rather than where, when, and how he wanted:

- In *Borello*, while the company asserted that the farmers could pick cucumbers whenever they wanted, the growing cycle for cucumbers is only 60 days, and finicky cucumbers could only be picked at certain times of the day or risk crop damage, thus limiting the time during which farmers could, in fact, work. 48 Cal.3d at 347, 363. There is no such limitation with Uber; drivers can work any time of the day, week, month or year that they desire, with no consequences.

- In *Desoto*, drivers were charged a $100 gate fee for each time they used a taxi. 15 Cal.App.5th at 1212. Thus, drivers started every day $100 in debt to the company, and inherently were required to work a certain amount of time in order to pay back the gate fee, subjecting them to intrinsic control. There is no such gate fee at Uber, and drivers can drive as much or as little as they want without having to worry about owing Uber money if they failed to work more than a certain amount – because they would owe *nothing*, other than the fees for the leads they in fact accepted.

- In *Alexander v. FedEx Ground Package Sys*,. 765 F.3d at 984-85, once a driver was assigned a route, they were required to deliver each package on that route, every day, within a specific window of time, on each day FedEx was open for business. There is no such requirement with Uber, where drivers can log on or off the app whenever they want, wherever they want, with the only requirement being that if they accept a particular lead, they complete the ride.

Importantly, Uber did not exert control over Dorr, including the type of intrinsic control presented in each of the aforementioned cases. Thus, even under *Borello*, and irrespective of which party bears the burden on proof, the preponderance of the evidence establishes that Dorr was an independent contractor, and not an employee of Respondents.

### 1.   Dorr Is An Independent Contractor Under The "Control Test."

The primary test to determine whether a worker is an employee versus an independent

contractor is whether the principal has the right to control the manner and means by which the worker accomplishes the end result desired. *Borello*, at 350. This "requires that the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown." *Varisco*, 166 Cal.App.4th at 1103. The right of control can be evidenced by many factors and is highly dependent on context. *Borello*, at 351.

a. <strong>The TSA Supports Independent Contractor Status.</strong>

According to the terms of the TSA, Uber lacked the ability to control the manner and means of the transportation services Dorr provided; rather Dorr was in control of the manner and means:

- "As between [Uber] and you, you acknowledge and agree that … you shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services…" [Ex. 201, § 2.2.]

- "Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies." [Ex. 201, § 2.4.]

- "With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to: (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors." [Ex. , § 2.4.]

- "You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities. For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business." [Ex. , § 2.4.]

Uber did not concern itself with the manner in which any particular trip was performed; rather, Uber's concern is the outcome of a trip—namely, that it be conducted safely, legally and in line with minimum business standards. (Tr. V. II, 529:1-532:7, 533:16-17.)

## 2.     Uber Did Not Have The Right To Control The Manner And Means of the Work Dorr Performed.

The terms of the TSA are entirely consistent with the reality of the services Dorr actually provided in service of his business. *See Eisenberg v. Uber*, at p. 44 (in ruling that driver was independent contractor, arbitrator highlighted the fact that the following conditions were consistent with the terms of the Agreement: drivers are not guaranteed rides, drivers are not required to log on for a minimum amount of time, drivers may drive for competitors and drivers are not told where to drive while logged on to the app); *Gollnick v. Uber*, at pp. 9-12 (in determining that drivers, not Uber, controlled the manner and means of providing transportation, arbitrator ruled that Uber had no way to make any driver pick up any particular passenger, that drivers exercised control over pricing through their ability to refuse trip requests, that drivers could use competing products like Lyft and that drivers were free to ignore Uber's advice, choose where and when to drive and choose their own driving routes and vehicles.)

Dorr availed himself of all of the freedoms guaranteed under his contract. He alone chose how to establish and run his business. He chose the hours of operation and the business location, he chose who to partner with and he chose how and where to invest his company's resources. Uber's lead generation technology was one tool in which Dorr invested to grow his own business.

The following examples from the evidentiary record illustrate that Uber lacked the right of control over Dorr, and highlights the distinctions where a court found an employment relationship:

- **Ability To Compete With Uber.**

Dorr could work for Uber's direct competitors, unlike the drivers in *Yellow Cab Cooperative, Inc. v. Workers Comp. Appeals. Bd.*, 226 Cal.App.3d 1288, 1298 (1991), where drivers were prohibited from driving cabs for other cab companies; *Air Couriers Intern. v. Emp. Dev. Dept.*, 150 Cal.App.4th 923, 930 (2007) where plaintiff delivered packages only for defendant, and; *Estrada v. FedEx Ground Package System Inc.*, 154 Cal.App.4th 1, 12 (2007)

23

where drivers were required to work exclusively for FedEx

- **No Restrictions On When Or Where To Work.**

Dorr worked whenever he wanted. These facts distinguish Dorr's case from cases in which courts have found an employer-employee relationship and were in marked contrast to his employee driving. *See, e.g., Yellow Cab Cooperative*, at 1298 (drivers were assigned shifts by Yellow Cab); *Santa Cruz Transportation, Inc., v. Unemp. Ins. Appeals Bd.*, 142 Cal.App.4th 1363, 1368 (1991) (taxis were leased for 12 hour shifts from cab company at issue); *JKH Enters., Inc. v. Dept. Indus. Relations*, 142 Cal.App.4th 1046, 1051 (2006) (drivers required to inform company if they were available on a given day); *Toyota Motor Sales U.S.A. v. Super. Ct.*, 220 Cal.App.3d 864, 873 (1990) (restaurant requested that driver work particular shifts); *Ruiz v. Affinity Logistics, Corp.*, 754 F.3d 1093, 1097 (9th Cir. 2014) (defendant assigned drivers shifts and had discretion to deny drivers' requests for time off); *Alexander*, at 985 (drivers had to report to FedEx Center at the beginning of the day and at the end of the shift).

- **Dorr Determined His Preferred Driving Routes And Locations.**

Unlike *Estrada*, where drivers were assigned regular routes and *Alexander*, where drivers were assigned a primary service area, Dorr determined driving routes and preferred locations without any instruction from Uber. (Tr. V. II, 536:19-537:7; *Estrada*, at 12; *Alexander*, at 984). Indeed, Dorr moved his business operation to Utah without any approval or interference from Uber.

- **Dorr Made Investments In His Business.**

Uber did not provide the vehicle that Dorr drove. In *Yellow Cab*, Yellow Cab owned taxis and could demand that a taxi be returned to the yard during a shift. *Yellow Cab Cooperative*, at 1298. In *Santa Cruz*, the cab company owned the taxis plaintiff drove. *Santa Cruz*, at 1368. Finally, in *Ruiz*, the furniture company leased trucks to its delivery drivers. *Ruiz*, at 1097.

- **Dorr Exercised Complete Discretion In Accepting Or Rejecting Work.**

Dorr was free to decide, on his own, whether or not to accept any trip request he received through the Uber app, and was not required to accept the requests offered to him. In cases

finding an employer-employee relationship, the drivers did not have this freedom.  *See, e.g.,* *Toyota Motor Sales*, at 873 (driver required to deliver pizzas at specific times to specific people); *Alexander*, at 984 (drivers required to pick up packages in primary service areas); *Ruiz*, at 1098 (drivers required to deliver assigned furniture deliveries); *Yellow Cab Cooperative*, at 1298 (driver that refused a dispatch request was not assigned other available requests).

Dorr appears to argue that there was a "required" acceptance rate for rides and that this was a means by which Uber exercised control over him.  However, the evidence does not support that any such acceptance rate existed or was imposed.  Further, Dorr was free to log in and out as he pleased.  In any event, Dorr was never deactivated or warned of potential deactivation for a low acceptance rate.  (Tr. V. II, 327:14-328:18, 524:6-12.)

- **Uber Does Not Impose A Uniform Requirement.**

Dorr did not wear a uniform or display anything on his person or vehicle to indicate that he used the Uber app. other than legally required trade dress.  Unlike in cases where an employer-employment relationship has been found, Dorr alone determined what he wore while he was providing services on behalf of his business. (Tr. V. II., 341:2-343:1, 530:20-531:6; contra, *Air Couriers Intern.*, 150 Cal.App.4th at 931 (drivers were encouraged to wear uniforms, and provided with identification badges and vehicle placards); *Estrada*, at 12 (drivers were required to wear uniforms and mark their vehicles with the FedEx logo); *Santa Cruz*, at 1369 (drivers required to wear identifying clothing such as caps and "Yellow Cab" t-shirts); *Ruiz*, at 1098 (drivers required to wear uniforms, and prohibited from wearing earrings, displaying tattoos, and sporting certain designs of facial hair); *Alexander*, at 986 (FedEx dictated identifying colors, logos, marks and insignia on drivers' vehicles and required drivers to wear uniforms).

- **Uber Has No Training Or Meeting Requirements.**

Dorr did not attend any trainings or meetings with Uber, nor did Uber request or require his attendance.  Dorr has never visited any Uber office.  (Tr. V. I, 153:2-5.)  Further, drivers do not have to report to any Uber facility before going online or offline, nor do they have an assigned location.  (Tr. V. II, 537:17-538:5.) In contrast, in *Estrada*, drivers were required to

attend mandatory meetings, in *Air Couriers International*, drivers attended several meetings regarding driver complaints and in *Alexander*, FedEx managers conducted up to four ride-along performance evaluations each year.  *Estrada*, at 12; *Air Couriers Intern.*, at 929; *Alexander*, at 985.

- **Dorr Had No Uber Supervisor.**

Claimant testified that the Uber app itself was his supervisor. (Tr. V. I, 218:18-21.) However, Dorr admitted that unlike his other jobs, there was no person who was his supervisor and he had no performance evaluation related to his use of the Uber app. Uber does not utilize cameras in vehicles and the Uber app does not perform the managerial duties of a supervisor, for example, providing goal setting, weekly one-on-ones, performing annual review or discussing compensation. (Tr. V. II, 534:22-535:10.)  Further, Uber representatives do not have day-to-day contact with driver partners. (Tr. V. II. 535:20-22.)  By contrast, Dorr had supervisors who monitored his performance and meted out discipline when they deemed it necessary at BLS Limousine and Music Express Limousine.

- **Dorr Did Not Fill Out A Job Application Or Interview With Uber.**

Dorr argues that aspects of the onboarding process demonstrate that Uber exercised control over him. However, these onboarding requirements are legal requirements imposed by the CPUC.  Requirements imposed by the government may ***not*** be construed as altering the independent business relationship between Uber (or its subsidiary Rasier-CA, LLC) and Dorr. *SIDA of Hawaii, Inc. v. NLRB*, 512 F.3d 853, 862-863 (9th Cir. 1975) ("the fact that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship"); *see also Southwest Research Institute v. UIAB*, 81 Cal.App.4th 705, 709 (2000) (compliance with FAA and EPA training requirements not evidence of control); *Arnold v. Mutual Omaha Ins. Co.*, 202 Cal.App.4th 580, 588-589 (2011) (training required only with respect to compliance with state law directives regarding insurance sales did not constitute evidence of control).  Thus, these onboarding requirements are not evidence of the right to exercise control.

- **The Mutual Right To Terminate The Business Relationship Coupled With Dorr's Lack of Economic Dependence On Uber Suggest An Independent Contractor Relationship.**

One of the many factors considered in determining the right of control is whether the entity retains the right to discharge at-will. Uber possessed the right to sever its relationship with Dorr and deactivate Dorr's account for low rider ratings or serious rider complaints. (Ex. 201, ¶ 2.5.2.) However, Uber's minimum business standards are not inconsistent with an independent contractor relationship. They constitute, at most, the type of general supervision over the end result permitted in an independent contractor relationship. (Tr. V. II 513:8-514:21; *see Eisenberg v. Uber* at p. 47 (arbitrator concluded "the fact, alone, that Uber has an active interest in deactivating certain drivers does not establish an employer-employment situation because 'an employer is permitted to exercise a certain measure of control for a definite and restricted purpose without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled.'") (internal quotations omitted) [RJN, Ex. B]; *Beaumont-Jacques v. Farme,* 217 Cal.App.4th 1138, 1143 (2013), (even where owner retained right to inspect work, owner/independent contractor relationship not altered).); *Gollnick v. Uber, supra,* (ratings system was a "quality control system" that was not "tantamount to direction by Uber of the drivers' means and methods of driving.")

Further, both Dorr and Uber had equal rights to terminate their business relationship. (Tr. V. II, 510:4-511:25; Exs. 201, 206, § 12.) The right to terminate a relationship at-will may actually suggest an independent contractor relationship, particularly where both parties may mutually terminate the contract. *Arnold,* 202 Cal.App.4th at 589; *Ruiz,* 754 F.3d at 1105 ("the parties' mutual termination provision is consistent with either an employer-employee or independent contractor relationship"); *see also, Gollnick v. Uber,* at p. 13 (where a "contract provides that either party may terminate the working relationship at will, as is the case with the Uber contract, then the independent contractor and an employee are not distinguishable on this point.") [RJN, Ex. C].

In fact, the mutual right to terminate is far more indicative of an independent contractor

relationship than an employment relationship where the worker in question is not economically dependent on the principal. This is because a worker who is not economically dependent on the alleged employer does not feel compelled to comply with actions that are inconsistent with the rights set forth in their contract, such as the alleged employer's instructions, or "threats" of discharge. *Borello*, at 355 (farm laborers regularly determined to be employees, in part, because "they were dependent for subsistence on whatever farm work they could obtain. Under these circumstances, the authorities reason, the harvesters were within the intended reach of the protective [employment] legislation."); *see also Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998) (considering whether "as a matter of economic fact, [the plaintiff] depend[s] upon [defendant's] business for the opportunity to render service, or [is] in business for [himself]" and holding that an employment relationship is more likely where the plaintiff is dependent on the job at issue for income, and less likely where there is no such dependence).

Recently, in *Cotter v. Lyft, Inc.*, a case involving a claim that drivers using the Lyft app in California were misclassified as independent contractors, the Court explained: "Independent contractors do not receive [Labor Code] protections because they generally are in a far more advantageous position: [C]ontractors who are truly independent can readily sever the business relationship and take their services and equipment elsewhere when faced with unfair or arbitrary treatment, or unfavorable working conditions. They usually have contracts with more than one company, or contract with one company on a full-time basis for short durations, and consequently are not dependent on a single employer in the same all-or-nothing fashion as traditional employees who tend to work on a full-time basis for an indefinite term." *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1074 (N.D. Cal. 2015). This rationale applies to Dorr, who operated a separately established transportation business, had his own clients, and relied on multiple sources for client lead generation. In other words, Dorr could take his luxury SUV and "go home," if his relationship with Uber was not proving beneficial. In fact, Dorr did just this when he moved his business to Utah.

That Dorr could unilaterally decide to stop using the Uber app in California, move his

business to Utah, and unilaterally decide to start using the Uber app there is fundamentally incompatible with the notion that he was Uber's employee. *See, e.g., Varisco,* at 1108 (the mutual right of the parties to terminate their relationship created an association, not an employer-employee relationship); *Beaumont-Jacques,* at 1147 (a worker was an independent contractor despite the hiring-company's right to terminate her where she resigned voluntarily); *Desimone v. Allstate Ins. Co.,* 2000 WL 1811385, at *14 (N.D. Cal. 2000).   Thus, the right to terminate at-will factor does not support an employee-employment relationship between Dorr and Uber.

### C.   *Borello's* Secondary Factors Favor A Finding Of Independent Contractor Status.

Because the "right to control" is so fact-dependent, it must also be examined along with the *Borrello* "secondary" factors, rather than in isolation. *Borello,* at 350-51, 354-55.   These individual factors are not to be applied mechanically as separate tests; they are intertwined and their weight depends often upon particular combinations. *Id.*   Moreover, all factors need not point in one direction to support a finding that an individual is an independent contractor. *Arnold,* at 590.   Courts have held that plaintiffs were independent contractors as a matter of law, even while acknowledging that certain factors cut in favor of employee status. *See, e.g., Beaumont-Jacques,* at 1147.

### 1.   Dorr Operated A Distinct Occupation Or Business.

Dorr holds himself out to the public—through his website, business cards and word-of-mouth referrals—as a professional chauffeur. He was authorized by the CPUC in California to conduct for-hire transportation under RSD Luxury Limousine's TCP permit. *See Brown,* 32 Cal.App.4th 188, 199 (1995) (in finding truck drivers were independent contractors, court emphasized fact that truckers needed a special class of driver's license); *Arnold,* at 589-90 (fact that insurance agent was engaged in a distinct occupation requiring a license from the Department of Insurance weighed in favor of independent contractor status).   Upon moving to Utah, Dorr continued his luxury car service. In contrast, Uber does not use its TNC or TCP licensure to transport passengers. *Cf. Santa Cruz,* at 1376 (relying in part on Yellow Cab's

ownership of a municipal taxicab license and taxicabs as evidence that its business was not distinct from its drivers). The core of Uber's business is the technology provided through its app, which drives its business model. Thus, this factor supports Dorr's independent contractor status.

### 2. Dorr Performed His Work As A Specialist Without Supervision.

With respect to the relevant industry practice, companies, like Uber, that are in the business of connecting customers to service providers commonly utilize independent contractors. Courts and government agencies have accepted this classification as valid. *See, e.g., Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017); "Employment Tax Procedures: Classification of Workers Within the Limousine Industry", https://www.irs.gov/pub/irs-utl/limo.pdf; *Brown,* 32 Cal.App.4th at 192; *Browning v. CEVA Freight, LLC,* 885 F.Supp.2d 590, 592 (E.D.N.Y. 2012) (freight forwarding, customs brokerage, delivery services and warehousing company contracted with outside trucking businesses to provide trucking services to its customers and the court held that plaintiff trucking companies were properly classified as independent contractors.) Further, the California Public Utilities Code explicitly recognizes that drivers using vehicles in connection with a TNC platform can be independent contractors. *See* Cal. Pub. Util. Code § 5444. Dorr performed his transportation services without any supervision by Uber; he testified that no person at Uber supervised him. In fact, Dorr had little to no contact with Uber employees, no reporting requirements, and he did not attend trainings or meetings. Again, this factor weighs in favor of independent contractor status.

### 3. Dorr's Work Required Skill.

Safely and efficiently transporting passengers, while providing excellent customer service, particularly in a large city like Los Angeles requires a greater exercise of skill and discretion than "near-ministerial" tasks, or the simple manual labor performed by the individuals in *Borello*. *Brown*, 32 Cal.App.4th at 202-203. Dorr himself believed his work transporting passengers took skill and that driving in Southern California was a risky proposition, requiring insurance. (Tr. V. II, 346:16-348:24.) He also testified that he was required to attend a course by

Music Express in defensive driving, accident avoidance and safety.  (Tr., V.1., 241:13-242:4; Ex. 276, p. 83.)  Further, it requires substantial skill to successfully and profitably provide transportation services as an independent business person.  Therefore, this secondary factor supports independent contractor status.

**4.    Dorr Supplied The Instrumentalities, Tools, And Place Of His Work.**

The evidence is undisputed that Dorr chose when and where to operate his business and he supplied his own tools, instrumentalities, and place of work.  The Uber app was an important tool for Dorr that he paid for.  Dorr also chose whether and where to use the Uber app or the Lyft app and, in fact, chose to use the Lyft app concurrently for a time.  Dorr was free to log on from home or anywhere else.  He was also free to drive anywhere else in California on Uber's P2P network.   Moreover, outside the app, Dorr could drive anywhere else in California as a CPUC-licensed transportation provider. (Tr. V. II, 521:17-522:9.)  Dorr also made the independent decision to move his entire business operation to another state, Utah.

Dorr paid the costs for the tool most central to his work: the cars he used to transport riders.  Dorr was solely responsible for all equipment, tools and licenses needed to run and maintain his business: his luxury vehicles, the app itself which he licensed for a fee, the phone used to access the Uber app, gas, insurance, car maintenance and, once he established RSD Limousine, certification and renewal fees for the company's operating authority. *See Millsap v. Federal Express Corp.,* 227 Cal.App.3d 425, 431 (1991) (emphasizing that contractor "used his own car [ ] to deliver the packages, furnished his own gas and oil, furnished his own liability insurance, and paid for whatever car repairs were necessary."); *Amir Sahinovic v. Consol. Delivery & Logistics, Inc.,* 2004 U.S. Dist. LEXIS 31197, *20-21 (N.D. Cal. 2004) (when drivers supply vehicles and pay for gas, tolls, and maintenance, they are generally found to be independent contractors).

**5.    Dorr's Relationship With Uber Was Sporadic And Dictated Unilaterally By Him.**

It is undisputed that Dorr's usage of the Uber app was by the job.  Once he signed up for the app, he was not required to make a single trip.  (Tr. V. II, 523:14-525:4, 594:10-19.)  There

was no minimum or maximum number of jobs Dorr was required to do using the app; it was within his control and he was free to use the Uber app as much or as little as he wanted. In fact, Dorr went several months without making any trips at all, with no notice to Uber and no adverse consequences. The only requirement was that, once Dorr began a job, that he complete that job which is entirely consistent with an independent contractor relationship. Further, Dorr had the discretion to use the lead generation apps offered by Uber's direct competitors. He was also free to prioritize building his company's private customer base over any leads generated through use of the Uber app. This factor weighs in favor of independent contractor status.

### 6.   Dorr Received Payment For His Transportation Service From His Clients On A Per Job Basis.

The parties agree that Dorr was compensated solely on a job-by-job basis, which supports his independent contractor status. Exs. 227-228; *Millsap,* 227 Cal.App.3d at 432 (finding evidence of independent contractor relationship where driver was compensated on piecemeal basis for each delivery performed). Dorr received payment based on each ride he provided, rather than the hours he spent logged onto the Uber app. *Cf. Harris v. Vector Mktg. Corp.,* 656 F.Supp.2d 1128, 1140 (2009) (where a worker is paid an hourly rate, it typically suggests an employment relationship; where a worker is paid by the job, it points towards independent contractor status); *Arnold,* at 589 (independent contractor insurance agent's commission based payment was based on her results, not the amount of time she spent working on the insurance company's behalf). Therefore, this factor also supports independent contractor status.

### 7.   Dorr And Uber Intended To Create An Independent Contractor Relationship.

Dorr and Uber memorialized their intent to create an independent contractor relationship through the TSA. A written agreement stating the nature of the relationship is a significant factor in the independent contractor versus employee analysis. *Mission Ins. Co.,* 123 Cal.App.3d 211, 226 (1981) ("[A] lawful agreement…expressly stating that the relationship created is that of independent contractor should not be lightly disregarded when both parties have performed under the contract and relied on its provisions."). The fact that Dorr claims he did not read the

32

agreements he signed is of no consequence. *See Mission Viejo Emergency Medical Assoc. v. Beta Healthcare Group*, 197 Cal.App.4th 1146, 1155 (2011) (the receipt of a policy and its acceptance by the recipient without an objection binds the recipient and he cannot complain that he did not read it or know its terms). A party to a contract cannot escape its consequences by claiming to have not read it.

### 8. Dorr Had The Opportunity To Profit Or To Lose Depending On His Managerial Skill.

The evidence establishes that Dorr made business decisions based on what he deemed most beneficial for his business operation. Dorr testified that he took various risks, understanding that the risks he was taking might result in financial loss. In additional to everything he did in California, Dorr moved his business to Utah and upgraded his equipment because he determined it would be more profitable and he did so without approval or interference from Uber. Dorr's ability to control his profit or loss depended on his entrepreneurial skill utilizing the equipment, supporting independent contractor status. (Tr. V. II, 364:9-365:18.)

### 9. Dorr Invested Significantly In His Independent Transportation Business.

Dorr testified that he made substantial investments into his business. Chief among those investments were the cars he drove. Dorr's Dodge Durango cost him about $48,000, with a monthly payment of about $465 per month. In the course of moving his business to Utah, Dorr traded in his Dodge Durango for a Chevrolet Suburban, increasing his payments to $825 per month. Dorr stated that the purchase of his vehicles, which he testified was for use on the Uber app and his private business, was substantial to him. Dorr also invested in the Uber app itself, which he paid a fee to utilize. While Dorr has yet to hire employees or other helpers, he has the right and ability to do so; his freedom to hire and deploy personnel as he sees fit is undisputed. *See* Cal. Pub. Util. Code §§ 5351-5420; *Mission Ins. Co.*, 123 Cal.App.3d at 224 (in finding an alarm system serviceman was an independent contractor, court placed great significance on the fact that the serviceman "could have the services performed by persons selected, employed,

trained and supervised by him if he chose to do so"). Indeed, once Dorr obtained a TCP permit (which he could have obtained at any time), there was no impediment to his hiring of other workers. There was no difference between Dorr and Jafari, who hired a fleet of drivers and expanded his business using the Uber app.  (Tr. V. II, 500:17-501:8.)

      **10.    Dorr's Transportation Service Is Not Integral To Uber's Business.**

Uber does not provide rides any more than EBay provides collectables, or a freight broker transports freight. Uber simply offers a mechanism to connect those in need of transportation services with those who provide such services. *See Brown*, 32 Cal.App.4th at 203 (where freight transportation broker merely arranges delivery between its customer and owner-operator truckers, the regular part of principal's business factor does not support a finding of employee status). This factor too supports the conclusion that Dorr was properly classified as an independent contractor.

      Taken as a whole, these secondary factors weigh in favor of independent contractor status.

**V.    CONCLUSION AND AWARD**

      In sum, Dorr has not met his burden of proving he provided a service to Respondents, as opposed to his own business. Moreover, irrespective of whether Dorr has met that burden or whether Respondents bore either the initial or ultimate burden of proving Dorr was an independent contractor, Respondents have met that burden. As such, Dorr is awarded nothing from Respondents.  Each party has thirty days from issuance of this decision to file any appropriate submission. If none is filed, this Interim Award shall become the Final Award and will be the final resolution of all claims submitted.

Dated: December 15, 2017

_____

Hon. Jon M. Mayeda (Ret.)
Arbitrator

34

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Dorr, Randolph Scott vs. Uber Technologies, Inc.
Reference No. 1210033721

I, Rose Mitchell, not a party to the within action, hereby declare that on December 18, 2017, I served the attached INTERIM AWARD on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

Caleb LH Marker Esq.
Benjamin Gubernick Esq.
Zimmerman Reed
2381 Rosecrans Avenue
Suite 328
Manhattan Beach, CA   90245
Phone: 877-500-8780
caleb.marker@zimmreed.com
ben.gubernick@zimmreed.com
    Parties Represented:
      Randolph Scott Dorr

Laila Tafreshi Esq.
Keith Jacoby Esq.
Maggy M. Athanasious Esq.
Steven A. Groode Esq.
Littler Mendelson
2049 Century Park East
5th Floor
Los Angeles, CA   90067-2709
Phone: 310-553-0308
kjacoby@littler.com
mathanasious@littler.com
sgroode@littler.com
    Parties Represented:
      Raiser, LLC
      Uber Technologies, Inc.

Andrew M. Spurchise Esq.
Littler Mendelson
900 Third Ave.
8th Floor
New York, NY   10022
Phone: 212-583-9600
aspurchise@littler.com
    Parties Represented:
      Raiser, LLC
      Uber Technologies, Inc.

Sophia Behnia Esq.
Littler Mendelson
333 Bush St.
34th Floor
San Francisco, CA   94104
Phone: 415-433-1940
Sbehnia@littler.com
    Parties Represented:
      Raiser, LLC
      Uber Technologies, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on December 18, 2017.

_____

Rose Mitchell
romitchell@jamsadr.com

1  KEITH A. JACOBY, Bar No. 150233
   SOPHIA BEHNIA, Bar No. 289318
2  LITTLER MENDELSON, P.C.
   2049 Century Park East, 5th Floor
3  Los Angeles, CA  90067.3107
   Telephone:     310.553.0308
4  Fax No.:        310.553.5583

5  ANDREW M. SPURCHISE, Bar No. 245998
   LITTLER MENDELSON, P.C.
6  900 Third Avenue
   New York, NY 10022.3298
7  Telephone: 212.583.9600
   Fax No.: 212.832.2719

8

9  Attorneys for Defendants/Petitioners
   UBER TECHNOLOGIES, INC., RASIER, LLC,
   and RASIER-CA, LLC

10

                    ELECTRONICALLY
                    **F I L E D**
                    Superior Court of California,
                    County of San Francisco

                    **10/10/2017**
                    Clerk of the Court
                    BY:NEYL WEBB
                    Deputy Clerk

11              SUPERIOR COURT OF CALIFORNIA

12              COUNTY OF SAN FRANCISCO

13  ROBERT GOLLNICK,                         Case No.  CGC-15-547878

14              Plaintiff,                   **NOTICE OF ENTRY OF ORDER**

15      v.
                                            Complaint Filed:  September 11, 2015
16  UBER TECHNOLOGIES INC., LP AND
    DOES 1-20 inclusive,                    JAMS Case No.  1100082777
17                                          Arbitrator: Hon.  Richard Kramer (Ret.)
                Defendants.                 Arbitration Date: January 25-27, 2017
18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

Case No. CGC-15-547878

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 29, 2017, the Court entered an Order Granting Defendants/Petitioners Uber Technologies, Inc. Rasier, LLC, and Rasier-CA, LLC's Petition to Confirm Arbitration Award. A true and correct copy of the Order is attached as hereto as **Exhibit A**.

A true and correct copy of the August 17, 2017 Final Award this Court confirmed on September 29, 2017 is attached hereto as **Exhibit B**.

A true and correct copy of the transcript from the September 29, 2017 hearing on Defendants' Petition to Confirm is attached hereto as **Exhibit C**.

Dated: October 10, 2017

SOPHIA BEHNIA
LITTLER MENDELSON, P.C.
Attorneys for Defendants/Petitioners
UBER TECHNOLOGIES, INC., RASIER,
LLC, and RASIER-CA, LLC

Firmwide:150577159.1 073208.1100

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

2.                    Case No. CGC-15-547878

# EXHIBIT A

(10)

1  KEITH A. JACOBY, Bar No. 150233
   SOPHIA BEHNIA, Bar No. 289318
2  LITTLER MENDELSON, P.C.
   2049 Century Park East, 5th Floor
3  Los Angeles, CA  90067.3107
   Telephone:    310.553.0308
4  Fax No.:       310.553.5583

5  KARIN M. COGBILL, Bar No. 244606
   MICHAEL W. M. MANOUKIAN, Bar No. 308121
6  LITTLER MENDELSON, P.C.
   50 W. San Fernando
7  15th Floor
   San Jose, CA  95113.2303
8  Telephone:    408.998.4150
   Fax No.:       408.288.5686
9
   ANDREW M. SPURCHISE, Bar No. 245998
10 LITTLER MENDELSON, P.C.
   900 Third Avenue
11 New York, NY 10022.3298
   Telephone: 212.583.9600
12 Fax No.: 212.832.2719

13 Attorneys for Defendants
   UBER TECHNOLOGIES, INC., RASIER, LLC,
14 and RASIER-CA, LLC

15                    F I L E D
                      San Francisco County Superior Court

                      SEP 2 9 2017

                      CLERK OF THE COURT
                      BY: _____
                                    Deputy Clerk

16              SUPERIOR COURT OF CALIFORNIA

17                 COUNTY OF SAN FRANCISCO

17 ROBERT GOLLNICK,                Case No.  CGC-15-547878
18
             Plaintiff,            [PROPOSED] ORDER GRANTING
19                                 PETITION TO CONFIRM ARBITRATION
      v.                           AWARD
20
   UBER TECHNOLOGIES INC., LP AND  Date of Hearing: September 21, 2017
21 DOES 1-20 inclusive,            Time: 9:30 a.m.
                                   Dept.: 302
22           Defendants.
                                   Reservation No.: 08280921-01
23
                                   Complaint Filed:  September 11, 2015
24
                                   JAMS Case No.  1100082777
25                                 Arbitrator: Hon.  Richard Kramer (Ret.)
                                   Arbitration Date: January 25-27, 2017
26
27
28

R.MENDELSON, P.C.
I.FERNANDO, 15TH FLOOR
JOSE  CA  95113 2303
  408.598 4150

1    Petitioners/Defendants UBER TECHNOLOGIES, INC., RASIER, LLC, and

2    RASIER-CA, LLC, ("Petitioners") petitioned this Court for an Order confirming the Final Award

3    ("Award") issued by Arbitrator Honorable Richard Kramer (Ret.) on August 17, 2017, and entering

4    judgment in conformity with that Award against Respondent/Plaintiff ROBERT GOLLNICK.  The

5    matter was heard on September 29, 2017, at 9:30 a.m. in Department 302.

6         Having considered the merits of the Petition to Confirm the Arbitration Award,

7    **IT IS HEREBY ORDERED:**

8         1.    The Award in the matter of *Robert Gollnick v. Uber Technologies, Inc., et al.,*

9    JAMS Reference No. 1100082777, issued on August 17, 2017, is hereby confirmed;

10        2.    Judgment is entered in favor of Petitioners.

11   **IT IS SO ORDERED.**

12   Dated: _September 29_____, 2017

13

14

15                              JUDGE OF THE SUPERIOR COURT

16

17                                   CHARLENE P. KIESSELBACH

18

19

20   Firmwide:149831164.1 073208.1100

21

22

23

24

25

26

27

28

MENDELSON, P.C.
ERMANDO, 15TH FLOOR
SE, CA  95113 2303
108 998-4150

                                    2.

# EXHIBIT B

1
2
3
4
5
6
7
8
9

JAMS ARBITRATION

10
11
12

ROBERT GOLLNICK,

JAMS Reference No.: 1100082777

13

Claimant,

14

FINAL AWARD

15

vs.

16
17
18

UBER TECHNOLOGIES, INC, LP, RAISER, LLC-CA, LLC, AND DOES 1-20, INCLUSIVE,

Respondents.

19
20

## Introduction

21
22

This arbitration presents the question as to whether the Claimant is an

23

employee of one or more of the Respondents[1] under California law. California law

24
25
26
27
28

---

[1] The various Respondent entities are lumped together in the parties' briefing and in this Decision as "Uber." In light of the decision here, it is not necessary to discuss which entity would be the "employer" of Mr. Gollnick had that result occurred.

FINAL AWARD- 1

on this question includes a presumption of employment status where a worker provides services "for the benefit of" the putative employer. If not, then the would-be employee has the burden of proving that he/she should be deemed to be an employee under the applicable standards.

Here, Mr. Gollnick failed to demonstrate the factual predicate required to invoke California's presumption of employment status. Thus, it was his burden to prove he was an employee of Uber under applicable standards. Mr. Gollnick failed to present sufficient evidence to meet that burden of proof. Accordingly, he will take nothing by his action here.

## I.   Does the Labor Code Sec. 3357 Presumption of Employment Apply Here?

California Labor Code Sec. 3357 ("§3357") provides:

> Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee.

The presumption created by §3357 is somewhat circuitous in that it does not apply where a worker is an independent contractor, in which case the worker is not an employee. There is a scant of case authority to resolve this seemingly tautological presumption, but sense can be made by looking at the relevant authorities.

*Yellow Cab Cooperative, Inc. v. Workers Comp. Appeals Board* (1991) 226 Cal. App. 3d 1288 interpreted the applicability of the §3357 presumption. There, Yellow Cab had previously been a traditional taxicab business which provided rider services to the general public. Yellow Cab's drivers had been unionized employees.

In 1976, Yellow Cab went into bankruptcy. While the opinion does not provide explicit detail as to what transpired in the bankruptcy proceeding, it appears that the Debtor restructured its business and created a "division" called Yellow Leasing Co. ("YLC"). YLC's business model was to own cars outfitted as taxis and leased them to drivers. The taxis were all painted yellow and essentially looked the same as they had before the bankruptcy. The lease agreement appeared designed to establish that the lessee-driver would not be an employee of the lessor but rather would use a vehicle for ten hour shifts for a fixed price upon the following terms (among others):

- The lease would automatically be renewed at the end of each week.
- The lease could be terminated by either party upon prior notice or cancelled for breach without notice.
- The driver was not required to provide any service to the lessor.
- There was no employment relationship between lessor and lessee and the lessee would be a "self-employed person…free from authority and control of LEASING COMPANY".
- The lessee was not worker for workers' compensation insurance purposes.
- Once the lessee took possession of the taxicab, he or she would exercise complete discretion in its operation and did not have to use any taxi stand, answer radio calls or report the taxi's location.
- The lessee had to display a sign in or on the taxicab identifying the driver as self-employed.

In return, the lease provided that the lessor would provide telephone call and dispatch services, vehicle maintenance, liability insurance, and pay all license, taxes and fees for the taxicab.[2]

In evaluating whether the §3357 presumption applied under this arrangement, the Court first analyzed the statutory requirement that the work be performed "for another." That is, whether YLC was in the business of "merely leasing taxicabs" or whether it was in the business of transporting the riders. It is emphasized that this issue was related to whether the §3357 presumption applied and not whether the driver was an employee or an independent contractor.

The Court recognized that §3357 is "somewhat tautological" for the reason described above, and stated that §3357 "is best understood as creating a presumption that a service provider is presumed to be an employee unless the principal affirmatively proves otherwise." *Id.* at 1294. This straightforward statement of how the presumption applies is what Mr. Gollnick advocates here.

The problem with Mr. Gollnick's interpretation is that the Court in *Yellow Cab* did not apply such a straightforward understanding of §3357. Instead, it found that the Respondent (i.e., a driver) "had laid the factual predicate for the application of the § 3357 presumption." *Id.* That factual predicate consisted of evidence that YLC did not simply collect rent, but cultivated the passenger market by soliciting riders, distinctively painting and marking the cabs, and concerning itself with "various matters unrelated to the lessor-lessee relationship." These other

---

[2] The opinion is less than precise as to the name of the Yellow Cab entity or entities involved in the restructured business. YLC is clearly the lessor, but according to the opinion "Yellow Cab" provided the services. In other portions of the opinion, "Yellow" is used. It is assumed that these differences are not significant here and that the lessor is the same entity operating throughout the opinion.

FINAL AWARD- 4

matters included instructing drivers in "service" and "courtesy" and other behavioral standards. The Court also said that "we follow courts elsewhere in holding that Yellow's enterprise consists of operating a fleet of cabs for public carriage" citing opinions from other states.[3]

Thus, the Court found the §3357 presumption applied because the driver in its case had presented sufficient evidence to conclude that YLS was in the business of providing transportation services for riders. In other words, for the presumption to apply, the services of the claimant had to be directed to the business of the putative employer.

In *Jones v. Workers' Comp. Appeals Bd.,* (1971) 20 Cal. App 3d 124, Mr. Jones was an employee of Phillips Petroleum Company and was also a member of a labor union. He was designated as a picket captain by the union during a strike against Phillips and was injured while on the picket line when he was run over by an oil truck. He sought workers' compensation benefits from his union, which he claimed was his employer when he was injured. He also invoked the §3357 presumption upon the argument that he was furthering the union's business when injured. The Court agreed after finding that Mr. Jones had made the predicate showing that he had satisfied the working "for another" prerequisite by actively picketing at the time of injury, thus benefitting the union's business of furthering the interests of its members. *Id.* at 128. Hence, the presumption applied to him.

---

[3] These citations are puzzling in that there is no indication that the taxicab business in these other states was being conducted by the same or even a related entity was before the Court or that these non-Yellow Cab companies used a business model in any way similar to that of YLC. *See Central Management v. Industrial Comm'n* (1989) 162 Ariz. 187 and *Globe Cab Co. v. Industrial Commission* (1981) 86 Ill. 2d. 356.

In *Ware v. Workers' Comp. Appeals Bd.* (1999) 78 Cal. App 4th 508, caddies at the Bel-Air Country Club claimed that they were employees and not independent contractors. The court found that "…since caddies were provided by the Club for its members, caddying is an integral part of the Club's business. Thus, Ware [the Petitioner caddie] provided services which also benefitted the Club, and employment is presumed. (§3357)" *Id.* at 515. While not thoroughly explained, this quote is reasonably read as dealing with the "for another" prerequisite to the presumption.

Finally, in *Bain v. Tax Reducers, Inc.* (2013) 219 Cal. App 4th 110, the Court considered whether the trial court erred in finding that the requisite predicate for applying the §3357 presumption, but found that it did not matter because Bain's evidence satisfied his burden of proof without the presumption anyway.

Accordingly, the question here becomes did Mr. Gollnick lay a sufficient factual predicate for the application of the §3357 presumption?

Mr. Gollnick asserts that he has laid his factual predicate because the evidence has established that Uber registered as a Transportation Network Company ("TNC"), which is defined under California Public Utilities Code §543 as "an entity operating in California that provides prearranged transportation services for compensation using an internet-enabled application or platform to connect passengers with drivers using a personal vehicle." Mr. Gollnick also argues that his evidence established that the CPUC had issued orders that TNCs provide passenger transportation services for compensation and that as a TNC, Uber could only transport passengers using drivers' personal vehicles. The evidence did establish these facts.

These facts, however, did not lay a sufficient factual predicate to establish that Uber is in the passenger transportation business. Mr. Gollnick provided no

evidence or authority that registration as a TNC establishes that the registrant is indeed operating as a TNC, or that registration is an admission of operating as a TNC, or any other basis for concluding that Uber had operated as a TNC during the relevant period here. There was no evidence sufficient to establish why Uber registered as a TNC.  Further, the CPUC orders submitted by Mr. Gollnick offer no support regarding the §3357 presumption. Exhibit 91 says only that TNCs are providing passenger services for compensation, and Exhibit 91 says that as a TNC, Uber can only transport passengers using drivers' vehicles. Both beg the question as to whether Uber was in fact transporting passengers so as to be covered by those orders.

Also, Mr. Gollnick did not provide any governing authority as to whether CPUC orders have any binding effect on this case. In *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal. 4th 1 upon which Mr. Gollnick relies, the Court  defined its issue: "[t]he question presented is what legal effect courts must give to the Board [of Equalization]'s annotations when they are relied on as supporting its position in taxpayer litigation." [4] *Yamaha* has nothing to do with rules of the CPUC.

Mr. Gollnick also offered evidence that under his agreement with Uber, only he could drive using Uber's software. This evidence does not lay a foundation sufficient to invoke the §3357 presumption. Uber's prohibition on drivers from sharing their software licenses has no logical connection to Uber being in the passenger transportation business. For present purposes, this anti-sharing provision is best interpreted to support Uber's contention that it is in the business of licensing

---

[4] "Annotations" are summaries of State Board of Equalization opinions generated by the Board's attorneys and made available for publication.

software. It is obvious that Uber limits sharing of that software by licensees so that it can sell more licenses.

Thus, Mr. Gollnick has not laid a sufficient foundation to invoke the §3357 presumption. Accordingly, he has the burden of proof to establish his claimed employment relationship with Uber.

## II.   Did Mr. Gollnick Meet His Burden of Proof?

Since the presumption of employment does not apply to Mr. Gollnick, it is his burden to proof that his relationship with Uber is one of employer/employee. The parties virtually agree to the standard for resolving whether a worker is an independent contractor as opposed to an employee. The analysis starts Labor Code §3353, which defines an independent contractor as "any person who renders service for a specified recompense for a specific result, under the control of his principal as the result of his work only and not as to the means by which the result is accomplished." All other workers are employees. Labor Code §3351.

Using these definitions, the courts have consistently held that the most important factor in determining the nature of the working relationship is the right to control the manner and means of accomplishing the result of the services arrangement. *Empire Star Mines Co. v. Cal. Emp. Com. ("Empire")* (1946) 28 Cal. 2d. 33, 43-44). Each service arrangement must be evaluated own its facts, and the dispositive circumstances may vary from case to case. *S.G. Borello & Sons, Inc. v. Department of Industrial* Relations (1989) 48 Cal. 3d. 341 ("*Borello*"). Accordingly, a litany of "secondary elements" has developed in the cases, some seemingly more related to the control factor and some less so. These secondary elements have included (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation with reference to whether in the locality, the work is usually done under the direction of the principal

or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. *Empire* at 43-44; *see,* Rest. 2d Agency, sec. 220.

These factors apply to the facts presented by Mr. Gollnick as to his experience and that of other drivers[5] in this case as follows. First is the question of control of the methods and means as to how the result of the services arrangement is to be accomplished. It is axiomatic that it must initially be determined what the desired result of the services arrangement between Mr. Gollnick and Uber was. It appears clear that from Uber's perspective, the desired result is to have drivers willing and available to get a person who has contacted Uber seeking to be driven from one place to another into a vehicle for that purpose. There was nothing presented into evidence to suggest that Uber's purpose was to get the person into a particular vehicle, including Mr. Gollnick's. This means that there had to be a sufficient quantity of cars available to handle passengers as they appeared for transport. The evidence from Mr. Gollnick was that Uber did not control which cars would be available in what places and times. That is, there was no evidence that drivers had assigned routes or designated areas of operation. Mr. Gollnick and

---

[5] The repeated references to the experiences of other drivers covered by Mr. Gollnick's evidence is in recognition that the law looks to how much control the hirer retains the right to exercise, not just how much control is exercised. *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal. 4th 522, 533.

his witnesses presented evidence that did show that from time to time Uber suggested to drivers that they locate in a particular geographical area or a special event so that there would be a sufficient pool of cars available to handle an anticipated surge in business from that area or event. The drivers, however, were free to ignore such advice, and the testimony was that many drivers had their own systems for being in the right place at the right time.

A key reason that Uber did not control whether Mr. Gollnick's vehicle could be in the right place to answer requests for a ride was that Uber did not direct when Mr. Gollnick worked or when he did not. Mr. Gollnick's testimony was unequivocal that he worked when he wanted to and did not work when he did not want to. Thus, it cannot be said that Uber had any control over whether Mr. Gollnick or any other individual driver would be available to pick up people at a particular time or place.

Likewise, Mr. Gollnick testified that when he did work, he had unfettered discretion to drive around (or park and wait, for that matter) wherever he wanted. Sometimes he took suggestions from Uber as to where business might be brisker, sometimes he did not. Similarly, even when a ride was available on the Uber software program, he or other drivers rejected the prospective business for whatever reason deemed appropriate. These reasons included if a driver did not want to go where the prospective ride would take him or if he chose not to have the prospective passenger in his car.

Along the same lines, Mr. Gollnick testified drivers were free to drive for competitors of Uber such as Lyft. To be sure, drivers were prohibited from taking Uber leads from its software and transporting those passengers as a competitor's driver, but this restriction is simply common sense prohibiting a driver from redirecting business generated by the Uber system to a competitor. The fact that a

driver could drive for competitors is inconsistent with any finding of control by Uber as to where and how Mr. Gollnick was available for service to passengers using Uber.

Thus, Mr. Gollnick failed to establish that Uber had any control over when and where Mr. Gollnick or any other driver would be available to be part of the Uber cache of cars to handle requests for rides.

Control could also be shown as to how Mr. Gollnick was to exercise the methods and means of transporting riders once they got into his car. An obvious component of control is how much the driver would be paid for the trip. While the evidence showed that the Uber app attached a price for the trip, a driver could decide that he did not want to make that trip for that price. The driver was thus in control of how much he would accept to transport a particular passenger.

Another aspect of control of the actual trip could be the route by which the driver travelled to deliver the passenger. Here, Mr. Gollnick's evidence showed that drivers were not required to follow any particular route to deliver passengers but instead could go any way desired.

There were elements in Mr. Gollnick's evidence that might be seen as giving Uber some control over what happens while the passenger is aboard. These elements involve standards of courtesy, safety and the like which were disseminated by Uber through periodic communications. These standards may appear similar to those imposed by YLC in the Yellow Cab case discussed above, but they are not determinative and must simply be evaluated with the other evidence presented by Mr. Gollnick.

Another potential area where control by the principal might be found is in the tools needed to perform the subject work. The dominant tool for Uber drivers is the vehicle that is used to drive passengers. Mr. Gollnick purchased the car he used

for Uber passengers before he began working as an Uber driver. Uber had no say in what he had purchased, did not require him to buy a new car, and did not specify any color, equipment or other component unifying Gollnick's car with those of other Uber drivers. There was no evidence of such limitations for applicants who bought their cars in order to become an Uber driver. True, Mr. Gollnick did demonstrate that Uber cars had to post a sign bearing Uber's logo in a window of their otherwise non-descript vehicles. That requirement, however, is more logically viewed as evidence of business purpose (letting a passenger know which car to get into, advancing safety, and common sense) than as the kind of meaningful control over vehicle appearance present in other cases, such as a bright yellow vehicle marked prominently as a "Yellow Cab."

Along this line, Mr. Gollnick testified that he could drive his car whenever and wherever he wanted when it was not being used with an Uber passenger. It was his car, of his choosing, and looked like whatever he wanted it to rather than, say, a commercial vehicle. Mr. Gollnick could use his car when he was off duty for whatever purpose he wanted. In doing so, he was not, for example, driving his family around in a bright yellow taxi.

The other significant tool used by the drivers is the Uber app, which is licensed and not provided for free by Uber. It is paid for by the drivers as they reap profits from its use.

Mr. Gollnick also relies heavily on his evidence that his relationship with Uber was terminable at will. Citing *Borello*, he argues that this fact is "strong evidence in support of an employment relationship." Maybe such is true in some contexts. Nonetheless, while many employees are terminable at will (although some employees may have employment contracts providing for the contrary), this does not mean that if a worker is terminable at will, then that worker is an

employee. And while the Supreme Court in *Ayala v. Antelope Valley Newspapers, Inc., supra,* 59 Cal. 4th at 531, n.2 did say "[a]n employee may quit, but an independent contractor is legally obligated to complete his contract," if that contract provides that either party may terminate the working relationship at will, as is the case with the Uber contract, then the independent contractor and an employee are not distinguishable on this point.

Mr. Gollnick also argues that "secondary factors" from *Borello* support the position that the drivers are employees. First, is whether the work constitutes a distinct occupation or business. Mr. Gollnick quotes Uber's self-characterization as "everyone's private driver" and similar articulations as evidence that Uber is in the transportation business. The syllogism offered is "Uber is in the business of transporting people [because it has said so]. Gollnick transported some of those people for Uber. There is no distinction between Gollnick's driving and Uber's business of transporting people, thus he must be an employee." Robert Gollnick's Closing Brief dated March 13, 2017 ("Gollnick's C.B"), p. 15, lines 20-23. This logic is a far cry from Socrates being a man because he is mortal. Mr. Gollnick offers no authority that the implied proposition that Uber's self-characterizations are binding here, and there is no evidentiary support for the assertion that there is no distinction between Mr. Gollnick's driving and Uber's supposed business of transporting people. The most obvious failure of evidence on this point is that it was not shown that Uber workers who are admittedly employees drive passengers.

The next "secondary factor" is whether the worker performs under supervision. Mr. Gollnick admits that drivers tend not to be supervised because supervisors usually do not ride around with their underling drivers. This is likely so. Uber does track driver performance through a star-rating system and can by contract terminate those whose performance is not up to snuff. Mr. Gollnick,

however, did not demonstrate how this quality control system should be viewed as tantamount to direction by Uber of the drivers' means and methods of driving.

Mr. Gollnick asserts that because driving takes little skill, "this factor weighs heavily in favor of finding employee status." Gollnick's C.B., pg. 16, line 25- pg. 17, line 7. Perhaps the argument is simply that unskilled workers cannot independently contract to provide their unskilled services, but without some additional facts or authorities, this "secondary factor" offers no support on the employment question.

A *Borello* "secondary factor" with more substance in this case is whether the parties believe they have created an employer/employee relationship or an independent contractor arrangement. Here, Mr. Gollnick's evidence was more persuasive but not helpful to his position. Mr. Gollnick's testified that before signing on as a driver, he asked and was told by Uber that his relationship was would be one of an independent contractor to Uber. Consistently, his written driver's contract expressly provided that "the Parties intend this agreement to create the relationship of principal and independent contractor and not that of employer and employee" [Ex. 203]. This agreement should not be lightly disregarded in determining the employee v. independent contractor issue. *Mission Ins. Co. v. Workers' Compensation Appeals Bd.* (1981)123 Cal. App 3d 211, 226. Mr. Gollnick's explanation that he did not really read his driver's contract is not believable in light of his inquiry before joining Uber as to what his working status would be and his evidence that he received "1099" tax documentation rather than employee type tax information from Uber while he was working. Also persuasive was Mr. Gollnick's testimony that he tracked his business expenses for tax deductions in the manner he would as an independent contractor.

The other "secondary factors" from *Borello* as presented by Mr. Gollnick are not sufficient to overcome the conclusion that Mr. Gollnick did not demonstrate that the key determinate for establishing employment: that Uber exercised sufficient control over the methods and means of Mr. Gollnick's work as an Uber driver.

One additional non-*Borello* factor appeared in the cases which is worthy of mention. Virtually every case interpreting the Labor Code "control of work" factors did so in the context of a Workers' Compensation claim by an injured worker. These cases were decided under California's express policy to protect people who provide work to others and are injured in the process. How this policy manifests itself is expressly set forth in *Borello*:

> We agree that under the [California Workers' Compensation] Act, the "control of work" details test for determining whether a person rendering services to another is an "employee" or an excluded "independent contractor" must be applied with deference to the purposes of the protective legislation. The nature of the work, and the overall arrangement between the parties, must be examined to determine whether they come within the "history and fundamental purposes" of the statute.

> The fundamental purposes of the Act are several. It seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guaranty prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries. *Borello, supra,* at 353-54.

In other words, the Supreme Court has directed that the interpretation of whether a worker is an employee or an independent contractor in the context of a Workers' Compensation case <u>must</u> take into account California's strong public policy quoted above. This means that any cases like *Borello,* which analyze the "right to control" standard and its concomitant "secondary factors" in the context

FINAL AWARD- 15

1  of a Workers' Compensation, must conduct their individualized factual analysis

2  with reference to the strong public policy to protect workers who are injured in the

3  service to others. Whether this approach results in a more liberal interpretation of

4  "employee" in Workers' Compensation cases need not be determined here because

5  any such impact would not help Mr. Gollnick in meeting his burden of proof in the

6  context of this non-Worker's Compensation case.

7      It is also noted that the Arbitrator posed the question at final argument as to

8  whether and how the Workers' Compensation "employee" cases should apply to

9  this case. The matter was not resolved through responsive argument, and is not

10 decided now.

11 //

12 //

13 //

14 //

15 //

16 //

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26

27

28

FINAL AWARD- 16

# FINAL AWARD

Having failed to meet his burden of proof that he was an employee of Uber for the purposes of the claims asserted here, Claimant Robert Gollnick shall take nothing from his claims in this arbitration. This award resolves all issues presented for resolution in this arbitration.

Dated: August 17, 2017

Judge Richard A. Kramer (ret.)
Arbitrator

# EXHIBIT C

IN THE SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

HONORABLE CHARLENE P. KIESSELBACH, JUDGE PRESIDING

DEPARTMENT 302

--o0o--

```
_____ )
                         )
ROBERT GOLLNICK,         )
                         )
            Plaintiff,   )
                         )                    COPY
vs.                      )
                         )   Case No. CGC-15-547878
UBER TECHNOLOGIES, INC., )
LP, et al.,              )
                         )
            Defendants.  )
                         )
                         )
_____ )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Friday, September 29, 2017


A P P E A R A N C E S:

FOR THE PLAINTIFF:            AUDET & PARTNERS, LLP
                             711 Van Ness Avenue
                             Suite 500
                             San Francisco, CA 94102
                             BY: MARK BURTON, ESQ.

FOR THE DEFENDANT:           LITTLER MENDELSON, P.C.
                             333 Bush Street
                             34th Floor
                             San Francisco, CA 94104
                             BY: KEITH A. JACOBY, ESQ.
                             and
                             SOPHIA BEHNIA, ESQ.

REPORTED BY:
     REYES F. HUNTER
     C.S.R. No. 6576

1    September 29, 2017                            9:52 A.M.

2                    P R O C E E D I N G S

3                         ---OoO---

4        THE CLERK:  Line ten.  Robert Gollnick vs. Uber

5    Technologies, Inc. and others.  Case Number 547878.

6        MR. BURTON:  Good morning, Your Honor.  Mark Burton

7    on behalf of the plaintiff.

8        MR. JACOBY:  Good morning, Your Honor.  Keith

9    Jacoby on behalf of defendants, Uber Technologies

10   Rasier, LLC and Rasier, California, LLC.

11       MS. BEHNIA:  Good morning, Your Honor.

12   Sophia Behnia on behalf of the plaintiff.

13       THE COURT:  Okay.  Good morning.  One moment,

14   please.

15       All right.  Before we proceed further, I have a

16   brief disclosure to make.  And that is that many years

17   ago, I was acquainted with Mr. Burton.  You probably

18   don't remember because I had a different name then.  But

19   I knew Mr. Burton in a social capacity.  And I believe

20   we haven't seen each other for at least 15 years.

21       So I do not believe there's anything about my prior

22   casual, social acquaintance with Mr. Burton that would

23   in any way affect my ability to be completely fair and

24   impartial in this matter.  But I did want to make that

25   disclosure for the record.

26       MR. JACOBY:  Defendants have no objection to

27   proceeding, Your Honor.  Thank you for the disclosure.

28       THE COURT:  Thank you.

1          I had an opportunity to review the papers in this

2     matter, and the basis for the request that Uber seeks to

3     confirm the award, and that Mr. Gollnick seeks to have

4     it set aside, and the Court's tentative ruling, so that

5     you can focus your comments, is that the award would be

6     confirmed, that there's no basis to vacate the award

7     under California or Federal Arbitration Act.

8          In addition, Plaintiff fails to show that the

9     arbitrator's finding in that Plaintiff failed to lay the

10    factual predicate for the application of Labor Code

11    Section 3357 was an error of law, and a basis to vacate

12    the award under the party's arbitration agreement.

13    Substantial evidence supported the arbitrator's finding

14    that Plaintiff was not rendering the service for Uber.

15    Plaintiff provides no authority that Uber's TNC

16    registration is dispositive.  And the arbitrator

17    properly evaluated the actual conduct between the

18    parties.

19         In *Yellow Cab Corporation, Inc. vs. Workers'*

20    *Compensation Appeal Board*, 1991 226 Cal.App.3rd 1288,

21    Yellow Cab attempted to characterize itself merely as an

22    entity that leases cabs.  The Yellow Cab court applied

23    the labor code presumption because Yellow Cab concerned

24    itself with various matters unrelated to the

25    lessor-lessee relationship, such as instructing the

26    driver and operating a fleet of cabs.

27         Unlike Yellow Cab, Uber is not a traditional

28    transportation business; it is in the connection

1    business.  And Mr. Gollnick retained merely plenary

2    power over when and how he would work.  He could work

3    for competitors while logged into Uber's app.  The Court

4    reviewed Uber's Exhibit F.  So this is the transcript,

5    as you know.  There's different days of the proceedings

6    before the arbitrator.

7        It's Uber's Exhibit F at page 837, lines 12 through

8    25, page 839, lines 5 through 9:  "Uber did not dictate

9    Plaintiff's dress or monitor him during a specific

10   trip."

11       Exhibit F at page 836, lines 4 through 7, page 847

12   lines 15 through 22:  "Plaintiff could control pricing."

13       Exhibit E at page 696, lines 2 through 25; Exhibit

14   F at page 814, line 20 through page 815, line 16.

15       In sum, Plaintiff was not providing services to

16   Uber, rather he was using Uber's connection services to

17   facilitate his ability to service the public.

18   Accordingly, the arbitrator's conclusions were not

19   legally erroneous.

20       Mr. Burton, do you wish to be heard?

21       MR. BURTON:  Yes, Your Honor.  Thank you.

22       Your Honor, the unique aspects of this particular

23   case gives this presumption, which obviously affects the

24   burden of proof, who has the burden of proof to prove

25   whether or not Mr. Gollnick was an employee or an

26   independent contractor of Uber?

27       The arbitrator correctly focused on whether or not

28   Uber was operating as a transportation company.  The

1    error that the arbitrator made was in this crucial

2    finding where the arbitrator actually found that they

3    were a registered transportation network company with

4    the Public Utilities Commission.

5         It's also admitted, and undisputed, and found that

6    Gollnick was driving under that transportation network

7    company license.  So Your Honor's tentative points out

8    the conclusion that Uber is in the connection business,

9    not the transportation business, which is their

10   argument.

11        However, the arbitrator found and fully

12   acknowledged that it was proven that Uber was a

13   registered TNC, which is defined under Public Utilities

14   Code 5431 as an entity operating in California that

15   provides prearranged transportation services for

16   compensation.

17        Given that finding and that admission, there cannot

18   be a contrary conclusion properly for purposes of the

19   presumption that somehow Uber is not in the

20   transportation business.  It has a transportation

21   business license.  It operates that license.

22   Mr. Gollnick drove under that license.  Mr. Gollnick did

23   not have a license to transport passengers in the State

24   of California.  He could only legally do so working

25   under Uber's California PUC TNC license.

26        So that's really where that error is.  And no

27   matter what the facts may or may not have shown

28   regarding -- you know, obviously we dispute things like

1    whether or not Mr. Gollnick could control the price and
2    different factual findings like that, but it is
3    undisputed, and it was found by the arbitrator that Uber
4    has a TNC license.
5         And nowhere in their papers did they explain how
6    you can resolve the fact that they have a TNC license,
7    which clearly defines them as operating a transportation
8    service, and then turn around and decide, nope, they're
9    not in the transportation passenger service business.
10   They're merely in the connection business.
11        So I also want to point out -- we didn't have a
12   chance for a reply here -- but the FAA doesn't apply in
13   this particular matter because Mr. Gollnick was working
14   as a transportation worker.  So under *Garrido*, 241
15   Cal.App.4th 833 at 840, that's a 2015 case, the FAA
16   doesn't apply to contracts involving transportation
17   workers, that's an explicit part of the FAA itself.
18        But the particular contract here, the arbitration
19   clause, didn't say the arbitrator's decision is full and
20   final.  This is a very unique arbitration clause that
21   Uber imposed.  And you cannot apply the cases that say,
22   generally, you can only set aside an arbitrator's
23   decision under these particular circumstances.  And I
24   think *Moncharsh* is one of the most important cases to
25   read on that, just because that's the California Supreme
26   Court's discussing, under what circumstances you can set
27   aside an arbitration award when there is no specific
28   language reserved in the arbitration clause.

1          And there are a lack of cases that have discussed

2     the issue of when the parties have a clause in the

3     arbitration agreement, talking about other circumstances

4     that a party can set aside a decision that goes beyond

5     the statutory scope.  The statutory requirements for

6     things like fraud and misconduct, those only apply when

7     the clause specifically says the arbitrator's decision

8     is full and final.

9          As a matter of fact, we fully acknowledge the cases

10    that says the arbitrator in those circumstances can

11    actually make a mistake in interpreting the law or apply

12    the wrong law.  But here, the clause specifically said

13    that the arbitrator could not make an error of law for a

14    legal reason.

15         So that particular clause has to be upheld by the

16    court by reviewing, okay, was there a mistake of

17    lawmaking?  Was there a mistake of reasoning?

18         And when you see that the arbitrator fully

19    acknowledged that Uber is a registered transportation

20    network company, defines -- operating as a passenger

21    service, you can't come to a contrary conclusion that,

22    no, they're not in that business, they're actually only

23    connecting drivers and passengers.

24         THE COURT:  All right.  Thank you, Mr. Burton.

25         MR. JACOBY:  Your Honor, if the Court is inclined

26    to waive its tentative, I'm happy to waive oral

27    argument, but I'm also happy to address Mr. Burton's

28    points briefly.

1      THE COURT:  Please address Mr. Burton's points

2  briefly.

3      MR. JACOBY:  Sure.

4      Both the CPUC and Arbitrator Kramer address the

5  issue of whether Rasier's possession of a TNC license

6  was dispositive of the issue of Mr. Gollnick's status,

7  and both reach the same conclusion.  The CPUC in its

8  rule-making stated that the requirement that Rasier,

9  which is the subsidiary of Uber, require this TNC

10  license is not dispositive on the question of whether

11  the drivers, who ride under that authority, are

12  independent contractors or employees.

13      That was pointed out to the arbitrator and

14  acknowledged by the arbitrator.  It was also

15  acknowledged by the arbitrator on pages six and seven of

16  the award that the mere possession of the TNC license is

17  not dispositive of whether Mr. Gollnick acted as an

18  independent contractor or an employee.

19      There's no dispute that by possessing the TNC

20  permit, that Rasier and Uber are part of the

21  transportation ecosystem writ large, but that doesn't

22  mean that they are in business of transporting

23  passengers, which they are not.  And it does not mean

24  that they exercise sufficient control over Mr. Gollnick

25  to make him an employee, which they did not.

26      And so it's simply not dispositive on the dispute.

27  In any case, Arbitrator Kramer went the additional step

28  of essentially assuming that the plaintiffs had met the

1    burden and would be entitled to the presumption, and

2    considered the *Borello* factors and found the evidence

3    wanting in that regard, as well.

4        So we believe that Plaintiff -- or plaintiffs in

5    the arbitration was given the benefit of the doubt.  And

6    in return, the evidence was all considered.  And on no

7    fronts, whether it's under *Borello* or whether it's under

8    the presumption, was he entitled to a ruling in its

9    favor.

10       In our view, this motion or this petition to vacate

11   is simply challenging the facts that were found by the

12   arbitrator.  There's no allegation that there was an

13   error of law made, which would be the only basis under

14   the contract to vacate the arbitration award.  And that

15   basis is even narrower under CCP 1286.

16       And so for all those reasons, we would ask that the

17   Court adopt its tentative, and affirm the award and

18   grant the petition to confirm the award.

19       THE COURT:  Anything further, Mr. Burton?

20       MR. BURTON:  Just briefly.  I want to make it clear

21   to the Court that we're not saying that the issue of the

22   TNC license is dispositive on the issue of whether or

23   not Mr. Gollnick was an independent contractor or an

24   employee.  But given the arbitrator's finding, it is a

25   fact that they were operating through transportation

26   service because they had that license.

27       And that's the predicate fact the arbitrator found

28   was lacking for applying the presumption.  So because of

1    that predicate fact, it can only be interpreted one way

2    reasonably.  That's why the presumption applies.

3         Now, whether or not he ends up being an independent

4    contractor or an employee is not something we're asking

5    this Court to rule on.  It's the mistake of the

6    presumption that mandates that the case needs to be sent

7    back to another arbitrator.

8         Thank you.

9         THE COURT:  Okay.  Thanks.

10        MR. JACOBY:  Would it be possible just to read one

11   sentence from the award into the record?

12        THE COURT:  You can.

13        MR. JACOBY:  From the award -- this is page six and

14   seven.

15        THE COURT:  Yes.

16        MR. JACOBY:  The arbitrator wrote, "Mr. Gollnick

17   provided no evidence or authority that registration as a

18   TNC establishes that the registrant is indeed operating

19   as a TNC, or that registration is an admission of

20   operating as a TNC, or any other basis for concluding

21   that Uber had operated as a TNC during the relevant

22   period here."

23        THE COURT:  I read the award.

24        MR. JACOBY:  Okay.  Thank you.

25        THE COURT:  Yes.  All right.  I'll take the matter

26   under submission now.  I recently had some discussion

27   with attorneys before me about what those words mean.

28   What that means is -- and I'm cutting off closing

1    argument now, and I'm going to make a decision.  That's

2    what it means to me.  So the arbitrator's award -- the

3    motion to confirm the arbitrator's award is granted.

4        Mr. Burton, I understood your argument in your

5    papers and your argument now, that you are of the

6    position that the arbitrator did not properly apply the

7    presumption of Labor Code Section 3357.

8        My evaluation of the decision of the arbitrator is

9    that the arbitrator gave appropriate consideration to

10   that presumption, and notes that the presumption applies

11   only in a situation where someone is not an independent

12   contractor, which begs the issue in this case.  That is

13   the issue.

14       Is this person an employee or is this person an

15   independent contractor.  But notwithstanding the

16   arbitrator's first evaluation of the situation are the

17   circumstances of the relationship as an independent

18   contractor, the arbitrator then went on to consider in

19   extreme detail with particularity the *Borello* factors,

20   which are the factors that one applies to determine

21   whether a person is an employee or an independent

22   contractor.

23       So even if it could be said that the arbitrator

24   started out not applying the presumption of 3357, the

25   arbitrator then went on to examine the factual evidence

26   as if the presumption applied.  And under both tests by

27   the arbitrator, both evaluations reach the conclusion

28   that the plaintiff was an independent contractor.

1       And I did read the arbitrator's evaluation in your
2   briefs about the issue of TNC.  And the arbitrator
3   found, and this Court does not disagree with that, that
4   that is not dispositive, that the company can be a
5   transportation company.  But that doesn't define the
6   relationship that that company has with everybody who
7   interacts with it.  So the petition to confirm the award
8   is granted.
9       MR. JACOBY:  I believe we submitted a proposed
10  order.
11      THE COURT:  You probably did.  I have it here.
12  Just one moment, please.  I will have to find it --
13      MR. JACOBY:  Okay.
14      THE COURT:  -- in these papers.
15      MS. BEHNIA:  I do have one copy of it, Your Honor.
16      THE COURT:  That might be --
17      THE CLERK:  If it's back to back, I can't process
18  it.
19      THE COURT:  Okay.  Just a second.  I just have so
20  many papers.  It has to be here.
21      But before you leave the table, I just want to
22  thank you all for your work on this.  It was excellent
23  work.
24      MR. BURTON:  Thank you.
25      THE COURT:  And for your argument.
26      I cannot find it.  Perhaps it's in my chambers.
27  I'll have to look for the order.  If I don't have it,
28  maybe you could submit another one.

```
 1        MS. BEHNIA:  We can do that, Your Honor.
 2        THE COURT:  I'll let you know.
 3        MS. BEHNIA:  We can submit one later today, if that
 4   would be easier.
 5        THE COURT:  Probably.
 6        MS. BEHNIA:  It was attached to the original
 7   petition to confirm the arbitration award that we filed
 8   on September --
 9        THE COURT:  Well, I usually get all the pages.
10   Just a minute.
11        I'm sorry.  I just don't see it here.
12        MS. BEHNIA:  I think they're going to photocopy
13   that version so it's not front to back, and then you can
14   sign that one.
15        THE COURT:  All right.  Please do.
16        THE CLERK:  So if you'll take a seat, we'll do that
17   for you.
18        MS. BEHNIA:  Thank you.
19        (Whereupon, the proceedings adjourned.)
20                          --oOo--
21
22
23
24
25
26
27
28
```

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF SAN FRANCISCO)


                    CERTIFICATE OF REPORTER


     I, REYES F. HUNTER, a Certified Shorthand Reporter,

hereby certify that the foregoing proceedings were taken

in shorthand by me, a disinterested person, at the time

and place therein stated, and that the proceedings were

thereafter reduced to typewriting, by computer, under my

direction and supervision.

          I further certify that I am not of counsel or

attorney for either or any of the parties to the said

proceedings, nor in any way interested in the event of

this cause, and that I am not related to any of the

parties thereto.

          DATED:  October 9, 2017




          _____

          REYES F. HUNTER, CSR No. 6576

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

FEB 21 2017

Sherri R. Carter, Executive Officer/Clerk
By: J. Richardson, Deputy
T. Richardson

RECEIVED
JAN 25 2017

1  KEITH A. JACOBY, Bar No. 150233
   RACHAEL LAVI, Bar No. 294443
2  LITTLER MENDELSON, P.C.
   2049 Century Park East
3  5th Floor
   Los Angeles, CA  90067.3107
4  Telephone:     310.553.0308
   Fax No.:        310.553.5583
5
   ANDREW M. SPURCHISE, Bar No. 245998
6  LITTLER MENDELSON, P.C.
   900 Third Avenue
7  New York, NY 10022.3298
   Telephone: 212.583.9600
8  Fax No.: 212.832.2719

9  SOPHIA BEHNIA, Bar No. 289318
   UBER TECHNOLOGIES, INC.
10 1455 Market St., Fl. 4
   San Francisco, CA 94103.1355
11 Telephone     678.677.3390

12 Attorneys for Petitioners
   UBER TECHNOLOGIES, INC. RASIER, LLC, and
13 RASIER-CA, LLC

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                       COUNTY OF LOS ANGELES

17 UBER TECHNOLOGIES, INC., RASIER,        Case No.  BS166561
   LLC, and RASIER-CA, LLC
18                                          ASSIGNED FOR ALL PURPOSES TO
                Petitioners,                JUDGE MICHAEL L. STERN
19
          v.                                [PROPOSED] ORDER GRANTING
20                                          PETITIONER'S RENEWED PETITION TO
   YOSEF EISENBERG,                         CONFIRM ARBITRATION AWARD
21
                Respondent.                 Date:  February 21, 2017
22                                          Time:  8:30 a.m.
                                            Dept.:  62
23
                                            Petition Originally Filed:  December 9, 2016
24

25

26

27

28

[PROPOSED] ORDER GRANTING PETITION TO CONFIRM ARBITRATION AWARD

ORIGINAL

BY FAX

# [~~PROPOSED~~] ORDER

Petitioners UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC ("Petitioners") petitioned this Court for an Order confirming the Binding Arbitration Award against Respondent Yosef Eisenberg, and entering judgment in conformity with the Award.  The matter was heard on _Submitted no_ 20___, at _____m. in Department 62.

Having considered the merits of the Petition to Confirm the Binding Arbitration Award, IT IS HEREBY ORDERED:

1. The Arbitration Award in the matter of *Yosef Eisenberg v. Uber Technologies, Inc., et al.,* issued on November 23, 2016 is hereby confirmed; and

2. Judgment is entered in favor of Petitioners.

IT IS SO ORDERED.

Dated: ___Feb 21,___ , 2017

_____
JUDGE OF THE SUPERIOR COURT

Firmwide:144387516.1 073208.1090

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

[PROPOSED] ORDER GRANTING RENEWED PETITION TO CONFIRM ARBITRATION AWARD

Hon. Michael D. Marcus (Ret.)
ADR SERVICES, INC.
1900 Avenue of the Stars, Suite 250
Los Angeles, California 90067
Phone: (310) 201-0010
Fax: (310) 201-0016

## IN THE MATTER OF THE ARBITRATION BETWEEN

| | |
|---|---|
| YOSEF EISENBERG, an individual, ) | ADRS Case No. 15-6878-MDM |
| ) | |
| Claimant, ) | |
| v. ) | **BINDING ARBITRATION AWARD** |
| UBER TECHNOLOGIES, INC., a Delaware ) | |
| Corporation; RASIER, LLC, a Delaware ) | |
| Limited Liability Company, and RAISIER- ) | |
| CA, LLC, a Delaware Limited Liability ) | |
| Company, ) | |
| Respondents. ) | |

## I. INTRODUCTION

Claimant Yosef Eisenberg (Eisenberg) claims that he was an employee of Uber Technologies, Inc. (Uber) and Rasier, LLC (Rasier) and, as such, is entitled to the protections and benefits afforded employees in California. In turn, Uber contends that Eisenberg was an independent contractor and not an employee. Rasier contends that it never had a relationship of any kind with Eisenberg. It is found that Eisenberg, as a driver for Uber, was an independent contractor. Also, the claim against Raisier is dismissed with prejudice for an absence of proof.

## II.  THE ARBITRATION PROCEEDING APPEARANCES

This binding arbitration took place on July 6, 7 and 8, 2016 at ADR Services, Inc., 1900 Avenue of the Stars, Suite 250, Los Angeles, California 90067.  Additional briefing and written argument by the parties followed that hearing. Appearing for Eisenberg were Brian Gudmundson, Esq. of Zimmerman Reed in Minneapolis, Minnesota and Caleb L. Marker, Esq. and Hannah Belknap, Esq. of Zimmerman Reed in Manhattan Beach, California. Uber and Rasier were represented by Keith A. Jacoby, Esq. and Andrew M. Spurchise, Esq. of Littler Mendelson, P.C. and Sophia Behnia, Esq. and Dalene Bramer, Esq. of Uber.

## III.  THE FACTS

Ordinarily, the facts in an arbitration award are established before the applicable law is discussed and then applied to those facts. That order is not followed here because it is clear that the applicable law as to the issues at hand is conclusively set forth in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, which established a series of factors to be followed in deciding whether an individual is or is not an employee of a business. Accordingly, it is preferable to first discuss *Borello* (and *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522 to the extent it supplements *Borello*) and then apply the admitted facts to the *Borello* standards in arriving at a decision in this matter. (Claimant's counsel submitted additional authority on November 2, 2016, consisting of an October 7, 2016 court's memorandum concerning a judgment on the pleadings in a Pennsylvania federal district court matter and an October 28, 2016 United Kingdom decision. Both cases involved Uber. Uber has objected to this submission. Neither matter is considered because the parties herein rested on July 8, 2016, subject to written argument which was limited to an analysis of the facts as they applied to the *Borello* standards. The last date for submission of that argument was August 31, 2016. Besides, the Pennsylvania and United Kingdom actions are clearly distinguishable: The Pennsylvania action involves the defendants' motion for judgment on the pleadings, which was

2

both granted and denied. A judgment on the pleadings does not involve live testimony; rather, according to the legal principles summarized in the memorandum, the court in that type of proceeding considers only the allegations in the complaint, attached exhibits, matters of public record and undisputable authentic documents. Thus, it is very much like a demurrer to a complaint. The United Kingdom matter involved an employment tribunal, which heard live testimony and argument. This Arbitrator did not review those submitted facts. The applicable law in that forum were English statutes or regulations apparently governing what are or are not "workers." The legal principles or law relied upon by the tribunal in interpreting those statutes or regulations was British. Thus, while what a British jurist decides regarding the legal relationship between Uber and its drivers may be of interest, it has no precedential value on this arbitration.)

## IV.  *S. G. BORELLO & SONS, INC. v. DEPARTMENT OF INDUSTRIAL RELATIONS* (1989) 48 CAL.3d 341 and *AYALA v. ANTELOPE VALLEY NEWSPAPERS, INC.* (2014) 59 CAL.4TH 522

*Borello* recognizes the continued vitality of the control test in looking at the employer-employee relationship but acknowledges that other indicia are needed to evaluate that relationship.

Following common law tradition, California decisions applying such statutes uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' ¶ However, the courts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship.

(*Id.* at p. 350.)

Along with "the right to discharge at will, without cause" which is "[strong] evidence in support of an employment relationship," *Borello* provides eight additional factors from the Second and Third Restatements of Agency for determining whether an individual is or is not an employee. They are:

(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

(*Id.* at pp. 350-351.) These factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." (*Id.* at p. 351.)

*Borello* notes that other jurisdictions have developed their own standards to determine the independent relationship.

We also note the six-factor test developed by other jurisdictions which determine independent contractorship in light of the remedial purposes of the legislation. Besides the 'right to control the work,' the factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working

relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

(*Id.* at pp. 354-355.) Despite the obvious similarity of "the other jurisdiction" standards to many of its own, *Borello* finds that all of the guidelines "are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law." (*Id.* at p. 355.)

Although *Ayala* is significant principally for reversing a trial court's rejection of class certification in a wage and hour case concerning newspaper deliverers and not because of differences in the paper's right to exercise control, but on variations in how that right was exercised, its discussion of the tests for determining the employment relationship are still useful. Like *Borello*, it first recognized that "'[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to (necessarily) control the manner and means of accomplishing the result desired ... .'" (*Id.* at p. 531.) To that standard, *Ayala* added, "'[T]he fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it.'" (Authorities.) Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because "[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" (Authorities.)." (*Ibid.*) *Ayala* then acknowledges *Borello*'s eight other "secondary indicia." (*Id.* at p. 532.)

Unlike *Borello's* observation that the several factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations," *Ayala* provides greater guidance in how to apply the various standards to the case at hand.

When the issue of common law employment is involved, that weighing must be conducted with an eye to the reality that the considerations in the multifactor test are not of uniform significance. Some, such as the hirer's right to fire at will and the basic level of skill called for by the job, are often of inordinate importance. (Authority.) Others, such as the "ownership of the instrumentalities and tools" of the job, may be of "only evidential value,"

relevant to support an inference that the hiree is, or is not, subject to the hirer's direction and control. (Authorities.)

(*Id.* at p. 539.)

## V.  APPLYING *BORELLO* AND *AYALA* TO THE INSTANT FACTS

### A.  The Control Test

### 1.  Eisenberg's "contractual relationship" with Uber

Some of the facts concerning the right to control, or the lack thereof, may be reflected in a written agreement between Eisenberg and Uber. Other facts, that are part of or related to the "driving experience," are discussed after that agreement.

The first agreement relating to Eisenberg that could be found was for April 3, 2015. (Exhibit 203; "Agreement".) Eisenberg is uncertain that the April 3, 2015 Agreement is the first one that may apply to him. (For example, see exhibit 201, a June 21, 2014 Uber software license and online services agreement, and exhibit 202, a June 21, 2014 Uber driver addendum related to Uber services.) Regardless, for the purposes of this hearing, the operative agreement is the April 3, 2015 writing. (In the absence of documented evidence, Uber accepts July 30, 2013 as the date on which Eisenberg began his relationship with Uber. [See exhibit 209].)

The Agreement states, as to the "relationship of the parties," that "Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contractors. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any

Driver." (Par. 13.1.) Another part of the Agreement also discusses the absence of control between Uber and its drivers:

> Customer acknowledges and agrees that Uber's provision to Customer of the Driver App and the Uber Services creates a direct business relationship between Uber and Customer. Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customers business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when and for how long each of them will utilize the Driver App or the Uber Services. ("Driver app" is defined as "Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users …"; "User" is defined as "an end user authorized by Uber to use Uber's mobile application for the purpose of obtaining Transportation Services offered by Uber's transportation provider customers.")

(Par. 2.4.) The above language, by itself, is not sufficient to identify Eisenberg's status with Uber because "The label placed by the parties on their relationship is not dispositive." (*Borello*, *supra*, at p. 349.) It may however, with respect to all of the other factors, have value in in determining the nature of that relationship.

The Agreement describes Uber's drivers as "customers" or "transportation service providers." "Driver" is defined, in part, as a "principal, employee or contractor of Customer." (While the Agreement does not include the term "livery partner," it would appear that that term, as used by Brad Rosenthal, the Risk Manager for Uber Tech, Inc., who helps manage Uber's operations and logistics, and was Uber's only witness, is one and the same as a "customer." Thus, a customer, or livery partner, may employ individuals who drive for Uber. Individuals, who do not have an association with a livery partner, may also drive for Uber.  (See par. 2.4 of the Agreement.)

The Agreement also refers to the relationship of livery partners or customers and users. "Customer acknowledges and agrees that Customer's provision of Transportation Services to Users creates a direct business relationship between Customer and the User. Uber is not responsible or liable for the actions or inactions of a User in relation to the activities of a Customer, a Driver or any Vehicle." (Par. 2.3.)

At the end of the Agreement, the following language appears: "By clicking 'I accept,' Customer expressly acknowledges that Customer has read, understood and taken steps to thoughtfully consider the consequences of this Agreement, that Customer agrees to be bound by the terms and conditions of the Agreement and that Customer is legally competent to enter into this Agreement wit Uber."

The Agreement was sent electronically to Eisenberg who clicked on the "I accept" button without reading the agreement. He explained that he accepted the terms because he wanted to work and did not read the agreement because, "they were long and they gave it to us on an IPhone 4 and I'm not going to read a contract within a few minutes of needing to go to work. So, if they would have sent it to me in the mail and I would have had it in my hand, I would have taken it to somebody to go over it, and then I would decide if I want to sign it or not. ... I just wasn't going to read legal contracts on this small phone."

Eisenberg's explanations for not reading the Agreement are insufficient for its invalidation. The fact that he could not work for Uber without agreeing to its terms does not make the Agreement unconscionable or unenforceable in the absence of evidence that it was "overreaching". (*Hernandez v. Badger Construction Equipment Co*. (1994) 28 Cal.App.4th 1791, 1816 ["generally . . . one who assents to a contract cannot avoid its terms on the ground he failed to read it before signing it."]; *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1291 ["The general rule ' " 'that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it" 'applies only in the absence of ' " 'overreaching' " (citation) or " ' "imposition." ' "]; *Rosencrans v. Dover Images, Ltd.* (2011)

8

192 Cal.App.4th 1072, 1080 ["Generally, it is not reasonable to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. [Citation.] Reasonable diligence requires a party to read a contract before signing it. [Citation.]".)

### 2.  The Uber Application Process

Rosenthal said that prospective drivers can apply online at Uber's web site or in person. That process includes providing their names, telephone or cell phone numbers, email information, banking information, the make and model of their cars, proof of insurance, a driver's license for each driver, the TCP permit if the car is in the livery class, proof of commercial insurance, certificate of liability insurance and an insurance card for each vehicle.

In applying to Uber, Eisenberg provided a background check and then had an interview with an Uber employee.

### 3.  Eisenberg' initial relationship with Uber

Eisenberg said when he started with Uber, he was not in a direct relationship with the Company. Instead, he drove with or for ZA Limo Transportation, the Arrue Company and Boyds Limousine Service, three different companies that "partnered" with Uber. It is assumed that these entities were livery partners. (Before driving for these companies, Eisenberg had asked Uber in May 2013 for the names of companies that did business with Uber because his current "limo" company did not wish to work for Uber. [ex. 225].)

### 4.  Livery partners

Although the term "livery partner" is not used in the above Agreement, it is assumed that it is interchangeable with the term "customer," which is, as discussed above, an entity that may employ individuals who drive for Uber. Individuals, who do not have an association with a livery partner, may also drive for Uber. And, individuals may drive both for a livery partner that has an

association with Uber and as an individual. Rosenthal said that, because of regulatory requirements and public safety, a California entity with over fifty vehicles cannot drive on the Uber platform. He said that drivers with a livery partner are not screened and that over fifty percent of Uber's drivers are in the livery category. Uber does not require the inspection of vehicles on the livery side. It may, however, confirm that the make and model of the livery vehicles conform to the UberBlack platform. Rosenthal added that Uber does not direct its livery partners how to use its drivers

Rosenthal testified that Eisenberg was a livery partner with Uber in September 2014. He said that the State of California, and not Uber, required that Eisenberg have a livery license and that livery partners do not need a driver's license because "the company doesn't take trips," but that all drivers for that company, including the owner, must have a valid license. As such, Eisenberg was required to register with the state of California (on September 30, 2015, Eisenberg advised Uber that he had an LLC [see exhibit 229]; see also exhibit 134), obtain a car; obtain a TCP permit (see exhibit 205); have commercial automobile insurance (see exhibit 206, an April 23, 2015 certificate of liability insurance issued to Sefis Luxury Service, LLC); consent to a motor vehicle record check and be subject to a background check. Eisenberg agreed that he was subject to these requirements and understood, as a livery partner with Uber, that he could either drive himself or have another person drive his car or cars.

Eisenberg testified he applied for a TCP permit because Uber told him he had to. Eisenberg claimed he attempted to hire two additional drivers but that Uber rejected them. He could not recall the reasons for the rejection. Rosenthal said that Uber never rejected Eisenberg's drivers; instead, the drivers never completed Uber's "onboarding" process. (See exhibit 102.) Rosenthal explained that onboarding occurs when a driver goes through the sign-up criteria, which is "going through a motor vehicle record and background check process or more of a screening …" If a driver is involved in "incidents" after having onboarded, Uber "rerun(s) motor vehicle record checks as well as background checks, and if a driver does not meet the screening criteria, they will be deactivated …"

Rosenthal said that a livery partner determines how its drivers, who are subcontractors, shall be paid. He said that Uber does not direct its livery partners how to use its drivers. Soren Jafari, the CEO of Tesluxe, a Los Angeles car rental company, testified that his company owns thirteen mostly "high end" vehicles, each with its own TCP numbers. Tesluxe employs up to 100 drivers and pays them $20 an hour. Jafari said he gives the drivers drug tests and then submits their names to Uber. Tesluxe, according to Jafari, has its own clients which Uber does not discourage, and that 50% of his business is from private clients. He said Uber is aware that his drivers hand out Tesluxe cards to passengers. His cars are on the Uber Luxe, SUV and Black platforms.

### 5.   Manuals or handbooks

Rosenthal testified that Uber does not provide its partners or drivers with a manual or handbook and, specifically, there was no manual or guidelines in Los Angeles for drivers or partners.

### 6.   Training

Eisenberg said that Uber had a PowerPoint at its Santa Monica office which showed drivers how the app worked and what was expected of them. After he was deactivated in July 2015, he took a course, on his own, to learn more about himself. (Exhibit 223.) Teitelbaum, a former Uber driver, said that online training was mandatory when he started with Uber around Thanksgiving 2013. He also said that about fifty new drivers went to Uber's offices in Santa Monica to learn how to use the Uber app.

Rosenthal testified that no training is required to gain access to the Uber app. Drivers only have to watch a fifteen-minute video shown at a "green-light hub" or presented by an Uber operations manager on how to use the app. The video also provides customer service tips. (At his deposition, Rosenthal said Uber "outline(s) the onboarding process, which is what a driver needs to do to become active on our platform.") Additionally, before using the app for the first time, he

said the driver must consent to a software licensing agreement and, if applicable, a City addendum.

### 7.   Vehicles

The Agreement in par. 3.2 describes the drivers' responsibilities for the vehicles they are to use:

> (E)ach Vehicle shall at all times be: (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by Customer, or otherwise in Customer's lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards …; and in a clean and sanitary condition." (Par. 3.2.)

Both Rosenthal and Eisenberg agree that drivers for Uber must use their own cars. They differ in that Eisenberg said Uber "directed" him to Best Limos for a car and that he could only rent from Uber. (See exhibit 225, a May 2013 email stream where Eisenberg communicated with an Uber employee about companies that "work with Uber so I can apply with them.") Gary Teitelbaum, who also drove for Uber in Los Angeles, said he was required to buy a Prius to drive for the Company.

Rosenthal denied that Uber "partners" with any car dealer or rental companies. Instead, it "connected" drivers with lenders that would lease vehicles to the drivers. (The use of the term "connected" was not further explained.) He said that Uber, itself, has a subsidiary called "Exchange Leasing" that purchases vehicles and leases them to driver partners. (This subject, too, was not further developed; for example, it was not shown whether Eisenberg ever leased a vehicle from Exchange Leasing.)

Rosenthal testified that Uber has several platforms for its riders, from luxury cars to ordinary four-door sedans: the highest one is Luxe, then SUV, Black (which is also "high end"), Select (or "mid-tier sedans"), X for more economical sedans, XL consisting of cars for 6 passengers and Pool, which is the least costly and for people who pool together to reduce the cost of the ride.

Rosenthal explained that Uber does not require that a partner have a certain type of car but, to drive on a particular platform, the driver must conform to the Uber standard for that platform. The eligibility requirements for each category are set by Uber's general managers and operation managers and, as well, in some instances, by the CUPC. A car which comes under the UberLuxe classification is eligible for all levels. The car must also not be too old. Rosenthal said the minimum eligibility for the UberX, XL and pool vehicle is a 2001 model year car, with four doors and does not have a salvage title. (Raed Alokour testified that Uber requires that a car be no more than three or four years of age.) After research, Uber changed its eligibility requirement in mid-2014 to create a greater demand for its product. (See exhibit 74 providing that 2000 model year cars were now "off the platform" for UberX and XL; 2007 model year cars were eligible for UberX; 2010 year SUVS were in the UberXL platform; 2010 vehicles had been "transitioned" from UberBlack to UberSelect and former 2010 cars in UberLuxe were now in UberBlack.

Rosenthal also said that livery drivers are not limited to driving on the Luxe or SUV platforms but can drive on the platforms for Select, XL or X. It is Eisenberg's perception that a driver needed to have a Town Car or Cadillac to drive on the UberBlack platform. In June 2013, he wanted to drive for UberBlack but was told Uber was not hiring for that platform and to "please check back next month." (Ex. 23.) In July 2014, Eisenberg was advised that "Your car was never onboarded as UberSUV or Black, you were onboarded as UberXL. We are not onboarding vehicles to UberBlack or SUV at this time." (Ex. 218, p. 278.)

Before dealing directly with Uber, Eisenberg drove for ZA Limo Transportation, the Arrue Company and Boyds Limousine Service, three different Uber livery partners. He rented vehicles

from each, paying at least $650 a week, and was paid directly by ZA, Arrue and Boyds. (See exhibit 240, a 2013 W-2 statement from Boyds; exhibit 241, a 1099 statement from Arrue and exhibit 242, a 1099 statement from ZA. Despite the 1099s, Eisenberg testified he thought he was an employee of both ZA and Arrue.) While driving for ZA and Arrue, Eisenberg paid for his own gas. Boyd paid for Eisenberg's gas and insurance. After leaving Arrue for Uber, Eisenberg first bought a Toyota Camry for $17,000 and drove on the UberX platform and later bought a Chevrolet Suburban for $35,000.

### 8.  Vehicle inspections

Eisenberg said Uber required that cars had to pass an inspection at Penske. (Exhibit 110 are documents he gave Uber to show his Chevrolet Suburban had passed an inspection at Powertech in Culver City on October 10, 2014; Manhattan Auto Center on January 2, 2015 and at Pep Boys in Redondo Beach on January 6, 2015.) Rosenthal denied that inspections are required for livery drivers except to occasionally verify, because of driver complaints, that vehicles on the UberBlack and SUV platforms conformed to the criteria for those platforms. In his deposition, Rosenthal was uncertain that a particular inspection application was in use when Eisenberg was a driver. (The application mentioned that "All Uber partners need to have their vehicles inspected before they can hit the road.") At the deposition, Rosenthal testified that vehicle inspections are required for non-livery vehicles under the Transportation Network Company business model as mandated by the CPUC. (Page 81, ll. 21-25; p. 82, ll. 1-10.)

### 9.  Driver schedules

Eisenberg conceded that Uber drivers establish their own schedules; there was no minimum number of hours to work; there was no required start time; he rarely worked before 11 a.m.; took as long as he liked for lunch; was off of the app for the entire summer of 2014 when he was in New York City; did not tell Uber he was going to be off and did not need permission to be off.

The Agreement discusses the drivers' freedom to work when they want to:

Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber services.

(Par. 2.4.)

## 10.  Driver expenses

According to the Agreement, except for the Uber devices, such as the driver app, that Uber provides, "Customer shall provide all necessary equipment, tools, and other materials, at Customer's own expense, necessary to perform the Transportation Services." (Par. 2.2.) Rosenthal said that Uber does not reimburse driver expenses. In fact, at Uber's discretion, its "customers," if they "elect to use any Uber device," may be required to reimburse Uber for the wireless plan of such device and to provide a deposit for the device. (Agreement, par. 2.7.1.)

Eisenberg testified that he paid for his own liability insurance in the amount of $750,000. (Exhibit 206.) He added that Uber did not require that he use any particular carrier. Rosenthal said that drivers must have commercial vehicle insurance of at least $750,000. (See the Agreement, par. 8.1, which requires each customer to maintain on all vehicles commercial liability insurance that includes protection against bodily injury and property damage to third parties at levels that satisfy all applicable laws in the Territory, and par. 8.2, providing that the Customer shall also maintain commercial general liability insurance that provides protection against personal injury, advertising injury and property damage to third parties at levels that satisfy all applicable laws in the Territory.)

//

### 11.   Driver performance

According to an April 3, 2015 Uber USA, LLC "software license and online services agreement," (April 2015 Agreement), "Uber does not, and shall not be deemed to, direct or control Customer or its drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or commissions of Drivers or the operation and maintenance of any Vehicles." (Joint ex. 3, p. 0004.)

Eisenberg testified that he did not have a supervisor while driving for Uber.

### 12.   Driver conduct

Rosenthal testified that Uber has a Code of Conduct on its website with respect to its drivers. (That code was not further described at the arbitration.) He said that Uber provides suggestions, rather than instructions, to the drivers, which do not have to be followed, and not instructions as to how to engage with customers (identified in the Agreement as "Users) concerning such matters as tips and asking about a preferred route. For example, in a weekly report card, it reminded Eisenberg that "top positives" were to return lost items; offer complimentary refreshments, such as water and gum; be professional and open doors whereas the "top negatives" were use of inefficient routes, dirty cars, use of a cell phone and poor driving. (Ex. 62.)

Eisenberg said that Uber told its drivers to have water, gum and cell phone chargers in their cars to keep the customers happy.

### 13.   The Uber App

Rosenthal testified that the Uber app is at the center of the rider-driver experience. (The Agreement, at par. 2.4, defines the app as "Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand

requests for transportation services by Users ..." Rosenthal opined that Uber has invested above "seven figures" in its development. (Eisenberg had no knowledge of the app's capitalization.) According to Rosenthal, Uber drivers must agree to the terms of a software license and online services agreement before they can have access to the "driver app" and, therefore, drive for Uber.

Rosenthal explained that partners can use their own phones or rent an Uber telephone to access the app, which takes up a significant amount of data. Riders who want a transportation service use a function on their cell phone or smart phone to advise Uber where they want to be picked up. The rider is randomly matched with the closest driver whose app is turned on. (After the app is turned on, Uber gets a GPS of that driver every three seconds. Additionally, the app records every time the driver turns the app on and off.) The app beeps in the car of the closest driver and provides the  rider's first name and the pickup address. (Agreement, par. 2.2.) If the app is turned off, the driver does not know of an incoming call except if he or she looks at the screen or the phone is on vibrate. The driver has fifteen seconds to accept the trip by clicking the screen. (However, drivers cannot accept a trip if they have not previously consented to the addendum regarding fees.) If the driver does not respond or accept, the rider is matched with the next closest driver. Although drivers are not required to accept any trip, Rosenthal testified they are "encouraged" to do so because a rejection is "poor business experience" since the rider must then wait longer for a response to the ride request. (On that point, the Agreement provides, "Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies." [Par. 2.4.].)

Eisenberg testified that drivers first learn of the rider's destination after they arrive at the pickup location and that they are not allowed to reject a short ride for a longer one. In actuality, the rider has the option to provide the destination on his or her mobile application or upon the Uber driver's arrival. (Agreement, par. 2.2.) Eisenberg also said that drivers ask the riders for their preferred route and, if they have none, the driver uses the GPS provided by Uber.

## 14.  Fares

Uber sets base or default fares, including the per-minute, per-mile and minimum-fare rates, for each of its platforms.

> Customer is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("Fare") where such Fare is calculated based upon a base fare amount plus mileage and/or time amount as detailed for the applicable Territory. ... (A)s between Customer and Uber, the fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Customer's request, a fare that is lower than the pre-arranged Fare ... Uber agrees to remit to Customer on at least a weekly basis: (a) the Fare less the applicable Service Fee ...

(Agreement, par. 4.1.) For example, the fare for an UberBlack ride is $8 to start; $0.45 every minute; $3.55 a mile with a $15 minimum and a $10 cancellation fee. (Ex. 65.) Uber also might increase the rates during periods of high demand. Uber takes a "software licensing fee" from the driver of 25% from each UberBlack trip. Eisenberg said the fee was 28% for UberSUV rides. (See par. 4.4 of the Agreement which provides that "Customer agrees to pay Uber a service fee on a per transportation Services transaction basis calculated as a percentage of the Fare (regardless of the Negotiated Fare), as provided or otherwise made available by Uber from time to time in the applicable Territory.") As for taxes, "Customer acknowledges and agrees that it is responsible for collecting and remitting all applicable gross receipts, sales and use, excise or any other transaction tax on the provision of Transportation Services." (Par. 4.8.)

Rosenthal testified that while Uber sets the "baseline fare" for the product, it is aware that some drivers may negotiate both a lower fare and the charges for a return trip. He added that some drivers may end a trip early and not charge for the whole ride. Other conditions regarding

the fares to be charged are that "Uber retains the right to change the Fare Calculation at any time in its discretion based upon local market factors ..." (Agreement, par. 4.2.)

The rider pays the fare at the end of the trip by a credit card. Rosenthal explained that credit cards are used because the payment of cash presents a safety issue for the driver. Uber "facilitates" the payment to the driver for each ride. Livery partners, on the other hand, determine how their drivers shall be paid.

Eisenberg and Teitelbaum testified that drivers had no input on the rates Uber charged riders. However, Uber might adjust the fare upon a driver's complaint that the drop off address was incorrect (ex. 28) or provide the driver an additional credit to clean the car because the passenger threw up in it. (Ex. 17.) Eisenberg said he unsuccessfully asked Uber to change its fares, for example, where he had to wait an hour for a passenger since, according to Uber's rules, the trip did not start until the passenger entered the car. (Ex. 6.) On one occasion, he unsuccessfully asked Uber to raise its rates for UberBlack rides because he believed they were too low. (Ex. 6.)

### 15. Tips

Rosenthal said it is not required that passengers tip the driver; the rider may do so if he or she wants to. He further testified that drivers are not deactivated in Los Angeles for accepting tips. On the other hand, Rosenthal said that drivers have been warned for soliciting tips because that can create a "negative experience in the market place"; it can cause "reputational damage" for Uber.

Eisenberg testified he had accepted tips, if offered, while driving on the Uber app, even though he knew Uber had a rule against accepting them.

### 15. Drivers' pay and licensing fees

Rosenthal said that drivers pay a licensing fee established by Uber to Uber out of each fare collected. At the time of Rosenthal's deposition, the licensing fee for UuberSUV was 28% and

25% for UberBlack. Rosenthal added that drivers cannot accept trips if they do not consent on the app to the addendum regarding fees. Eisenberg said that Uber's licensing fees were not based on the rider's evaluations.

Raed Alokour, a former Uber driver, said that his drivers, whom he treats as independent contractors, pay him a small percentage of their fares. In the beginning, he said Uber took 20% from the total charged; it now takes 28% of charges for SUVs. Alokour once had two drivers, besides himself, but now can only afford one car.

### 16.    Signage and driver clothing

Rosenthal testified that livery cars do not have Uber decals. According to the April 2015 Agreement, "With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or ay Driver to: (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s)." (Ex. 3, sec. 2.4.)

### 17.   Number of rides

Rosenthal said that the drivers are not guaranteed any number of rides, there is no minimum amount of time a driver must be online and there are no minimum number of trips a driver must be online before going offline. In other words, he said all of this is up to the driver.

### 19.   Driver unavailability

Alokour said that drivers must tell Uber if they are going to be unavailable for two or three months but there is no obligation to inform Uber if that time is under a month.

Rosenthal testified that Uber does not deactivate drivers who are off for two months or more. That testimony may be inconsistent with the Agreement which states that "Customer acknowledges and agrees that each Driver is required to fulfill a request for Transportation Services using the Driver App at least once a month to maintain an active Driver profile, and

Uber reserves the right to deactivate the Driver ID of those Drivers who have not fulfilled a request for Transportation Services using the Driver App at least once a month." (Par. 2.1.) In the absence of clarifying evidence, of which there was none, it is uncertain whether this condition was enforced or if a driver's notice that he or she was going "out of town for a while" was an observed exception.

Rosenthal also testified that there is no requirement that drivers be on line when they are in their cars.

### 20.  Where to drive

For the purposes of this discussion, "where to drive," as distinguished from the acceptance of rides, refers to where a driver may drive when he or she is "on the app."

Eisenberg said he could drive anywhere for Uber when he started but, in 2014, was restricted, when he lived in Hermosa Beach, to driving in Orange County on UberBlack. His email exchange with Uber clarifies that situation. On July 26, 2014, Eisenberg requested that his SUV with new leather seats be added to the UberBlack platform. Uber responded on July 27, 2014 that it could not put the car on the Los Angeles system at that time but could place it on the Orange County Black or SUV platforms. Eisenberg, in response, asked "what hours and what city is the busiest in Orange County?" Before being activated in Orange County, Eisenberg was told on July 28 that he would have to "Take the background check (for Orange County)," which would take "5-7 days to process." On August 2, 2014, Eisenberg wrote that he had completed more than five background checks in the past few months. Uber replied on August 4, 2014 that he was active and to start driving on UberXL. (Ex. 218.) Thus, it appears that it was Eisenberg's choice to drive with UberBlack in Orange County rather than on the Uber platform as an XL in Los Angeles.

When Eisenberg was driving in Los Angeles, he chose not to obtain a permit to pick up passengers at the airport because it was too much of a hassle. Rosenthal said that local

government, and not Uber, regulates who can pick up passengers at LAX, that obtaining a permit to do so can take up to six months and that Uber lets the livery partner decide whether it wants to obtain a permit.

According to Rosenthal, drivers are not obligated to go where Uber may suggest or the Uber GPS might indicate that they drive to. He said that drivers can unsubscribe from this list or related text messages. "Promotions" suggested by Uber, which might attract large numbers of people, such as Coachella, are relatively frequent (ten percent of the trips in Los Angeles are of the surge type) but drivers do not have to participate; in fact, Rosenthal said that most drivers decline to participate. Rosenthal also said that Uber can determine, from its app records, the percentage of drivers who participate in a "promotion." (The Agreement requires its Customers to agree to having their location available to Uber through a device when the Driver is logged into the Driver App or providing Transportation Services. (Par. 2.8.).) Uber also gave its drivers advice on the best times to drive. (See exhibit 62 that the best times for weekends, which are the busiest times, are rush hours, 10 p.m. to 12 midnight and 12:30 a.m. to 2:00 a.m.)

Eisenberg confirmed that Uber might tell him about particular events where drivers could "expect a high volume of calls." Teitelbaum testified there was no guarantee that a driver would get a surge passenger but was encouraged to participate at certain events at his discretion.

### 21. Driving for a competitor

Eisenberg said he could have a Lyft app at the same time as an Uber app and drove for Lyft for an undetermined period. Similarly, Gary Teitelbaum, another individual who drove for Uber from Thanksgiving 2013 to October 2015, had Uber and Lyft apps and drove for both at the same time. He said he received a 1099 from Lyft, with which he had an independent contractor relationship.

Rosenthal confirmed that Uber drivers can have both Uber and Lyft apps and that both apps can be open at the same time. He explained that Lyft is Uber's biggest competitor in the United

States. Rosenthal also said that drivers are free to have their own clients outside of those that are arranged by using the Uber app.

### 22.  Expert evidence regarding Uber's policies and the control issue

Eisenberg offered the opinions of Alex Rosenblatt on the issue of Uber's control of its drivers.  Rosenblatt, whose credentials are not known (other than, according to exhibit 11, he is a researcher and technical writer for the Intelligence & Autonomy Initiative at Data & Society, a project supported by the John D. and Catherine T. MacArthur Foundation), analyzed Uber's Rideshare service in a draft paper (draft) for the Centre for European Studies in Brussels, Belgium. (Exhibit 10.) (This award considers Rosenblatt's analysis, opinions and conclusions in the draft rather than his article in exhibit 11, "The Truth About How Uber's App Manages Drivers" in the April 2016 Harvard Business Review, because the draft is more comprehensive and the article appears to be a shorter summary of the draft.)

Rosenblatt concludes that "indirect management gives Uber power over its workers for which it is often not held accountable. Uber's claims regarding its labor model – which center on freedom, flexibility and entrepreneurship – are not borne out in the experience of Uber drivers, in large part due to the information asymmetries and controls that Uber exerts over the driver behaviors through performance metrics, behavioral nudges, unreliable, dynamic rates, and scheduling prompts and design." He contends that "Movers digitally and algorithmically mediated system of flexible employment builds new forms of surveillance and control into the experience of using the system, which results in asymmetries around information and power for workers. In Uber's system, algorithms, CSRs (Community Support Representatives), passengers, semi-automated performance evaluations, and the rating system all act as a combined substitute for direct managerial control over drivers, but distributed responsibility for remote worker management also exacerbates power asymmetries between Uber and its drivers." One conclusion from the paper is that "the information asymmetries produced by Uber's system are fundamental to its ability to structure indirect control over its workers."

In arriving at the above conclusion, Rosenblatt examined Uber's electronic monitoring, surge pricing and labor scheduling; and the conflation of real-time and predictive analysis and driver ratings. Rosenblatt relied essentially on the comments made by Uber drivers on five dedicated online forums, supplemented by seven individual driver interviews. (One of the problems in analyzing Rosenblatt's findings is that he footnotes some of them, such as that "the data was observed and collected from five dedicated forums," but does not publish the footnotes at the end of the draft. Instead, he only sets forth the "works cited," without numbers, in alphabetical order.)

While recognizing that Uber's promise of "flexible employment" has great appeal, Rosenblatt notes that it "belies the fact that these jobs lack benefits or worker protections." He also notes that in the Uber system, its use of "surveillant practices" effects "soft control over otherwise flexible independent contractors." Rosenthal goes on to assume that the information gathered can be compared by Uber's full-time employees to "drivers in aggregate and ranked accordingly."

Rosenblatt was critical of Uber's use of surge pricing in which fares are temporarily raised for a particular geographic location because of a need for more drivers. (There was some testimony in the arbitration about surge pricing but Rosenthal provided little of substance about it and Eisenberg and his witnesses were generally uncritical about it as a policy.) In any event, Rosenblatt thought that it "generate(s) and co-ordinates(s) clusters of labor in response to dynamic market conditions without explaining the reliability of its cluster incentives or guaranteeing the validity, accuracy, or error rates of its labor deployments." The fallacy behind Rosenthal's finding in this particular area is that the term "deployment" connotes the involuntary movement of a person or persons from one location or job to another whereas, at the same time, he recognizes that Uber's drivers, at least on the surface, have the freedom to choose where and when they want to work. Rosenblatt then adds, without any support, that surge pricing, in effect, undercuts the "free will" of Uber's drivers: "The regular occurrence of surge pricing along with heat maps of passenger activity and affective messaging all work as behavioral engagement tools that impact how drivers schedule their work, and their effect is amplified when low base rates

result in unreliable income, undercutting the 'freedom that drivers have to login and log-out at will."

At another point in the draft, Rosenblatt repeats the theme that the drivers are often unawares of the effect of Uber's analytics on their actions: "The opaque combination of algorithmic data analytics and their rhetorical invocation act as a substitute for direct managerial power and control. The ambiguities between real time analytics and predictive analytics shape the drivers' own assessments of when they plan to drive." (Query whether California's right to control test contemplates a 21st Century model where indirect actions by a business are used to control the thoughts and movements of its employee and contractors?)

Rosenblatt is very critical of Uber's ratings of individual drivers. He opines that the rating by a passenger on a 1 to 5 scale of the drivers "acts as a remote threat and a tangible nudge to drivers to be in compliance with workplace expectations" and that "In a service economy supported by the practices and characteristics of digital labor, the data that workers produce and are monitored by creates affordances for managerial control." He also writes that passengers are empowered to act as middle managers over drivers, whose ratings directly impact their employment eligibility." (None of these "findings" are supported by a footnote or another source.) Through ratings, Rosenblatt concludes that Uber can achieve an organization where the workforce behaves relatively homogenously without giving explicit directives – as with traditional employers." Homogeneity might possibly be produced if Uber were to give its riders factors to consider in rating the drivers on a scale from 1 to 5 (for example, "pleasant," "courteous" or "on time" are a 5, whereas "rude," "vulgar" or "got lost" are a 1) but, without any factors as guidelines or standards, as is the case here, riders use their own subjective criteria to rate each driver, which produces the antithesis of group thinking, a theme which appears to motivate Rosenblatt. In this context, it is difficult to see how one rider's rating of 4.0, for example, has any correlation to another rider's 4.0 rating.

Rosenblatt also finds that "the rating system provides a channel for direct feedback, such that a negative passenger experience can directly affect the employability or income-earning potential of platform-based workers." Rosenblatt misunderstands the impact of one low rating. Rosenthal testified that a passenger's negative comment might be brought to the attention of the driver, and can affect his or her employability (for example, where the passenger complained that Eisenberg "hugged her) but, otherwise, one low rating, such as a 1.0, has a negligible effect when considered with four hundred ninety-nine other ratings, especially if the other ratings were mostly 5s.

Regarding the practice of "logging out" of the Uber App to avoid being given an unacceptable ride, such as the prospect of a low minimum fare or a ride in a high-crime area, Rosenblatt states that such practice is a resistance to Uber's policies rather than indicative of an entrepreneurial strategy – "they log out precisely because they would not be 'free' to refuse an unprofitable ride otherwise." Rosenblatt does not, however, explain the loss of freedom in this context.

Thus, Rosenblatt's draft is not considered in deciding whether Uber, for the purposes of this arbitration, had the right to control Eisenberg. In addition to the above comments, his draft is based on data observed and collected by others from five "dedicated forums" and eight "in-depth" interviews with seven individual drivers." The accuracy of the information from these forums and interviews has not been established. The methodology used by sources, other than Rosenblatt, for analyzing the content of the forums was not discussed. There is no showing whether these five forums attract a broad spectrum of Uber drivers or are a source for only the disaffected. On a broader scale, the accuracy of forums of all types in which people anonymously post their thoughts is not shown. Also, no one, including Rosenblatt, interviewed anyone associated with Uber; instead, he relied apparently on comments by former and present drivers. Accordingly, the premises he arrives at are interesting but have little weight in this arbitration.

### B. "The Right to Discharge at Will, without Cause"

Uber passengers and drivers may rate each other at the end of a trip. The ratings for the drivers, according to par. 2.6.1 of the Agreement, may have certain negative consequences:

> Uber desires that Users have access to high-quality services via Uber's mobile application … In order to continue to receive access to the Driver App and the Uber Services, each Driver must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Uber for the Territory, as may be updated from time to time by Uber in its sole discretion. … In the event a Driver's average rating falls below the Minimum Average Rating, Uber will notify Customer and may provide the Driver in Uber's discretion, a limited period of time to raise his or her average rating above the Minimum Average rating. If such Driver does nor not increase his or her average rating above the Minimum Average Rating within the time period allowed (if any), Uber reserves the right to deactivate such Driver's access to the Driver App and the Uber Services. Additionally, Customer acknowledges and agrees that repeated failure by a Driver to accept User requests for Transportation Services while such Driver is logged in to the Driver App creates a negative experience for Users of Uber's mobile application. Accordingly, Customer agrees and shall ensure that if a Driver does not wish to accept User requests for Transportation Services for a period of time, such Driver will log off of the Driver App." (Par. 2.6.2.)

Rosenthal explained that the rating system helps to determine whether drivers are meeting Uber's minimum business standards. He testified that drivers and passengers rate each other on a 1 to 5 scale at the end of a trip and that a driver's rating is an average of the driver's last 500 trips. In Los Angeles, Rosenthal stated that the minimum rating, both for livery partners and individual drivers, is approximately 4.65 to 4.70 and that a driver can be deactivated if his or her rating falls below that number. (Eisenberg said the minimum rating was 4.65 and then became 4.70.) The minimum  rating was created in Los Angeles by looking at a distribution curve and at

various standard deviations below the curve. The average driver rating is 4.85. Rosenthal said that drivers cannot see the ratings by individual customers because of privacy concerns (Uber considers its customer lists to be proprietary) but have access to their own, individual ratings. Rosenthal also testified that Uber drivers in Los Angeles are notified of their ratings by email and receive weekly "report cards." (Ex. 62.). Eisenberg acknowledged the existence of this system.

According to Rosenthal, Uber prefers that drivers accept trips when offered "for the general health of the platform," because the refusal to pick up a rider causes the rider to wait longer for a car and becomes a "poor rider experience." In other words, although "driver(s) cannot select which riders they want to pick up. … (On the other hand), a driver can accept or decline or not accept any particular trip." Eisenberg said that drivers can be deactivated if they do not accept at least 85 percent of the rides assigned to and accepted by the drivers. (See exhibit 24, a July 22, 2013 email message in which Uber advised Eisenberg he was in danger of being deactivated because his acceptance rate had dropped below 85 percent.) Teitelbaum, who drove for Uber from Thanksgiving 2013 to October 2015, testified drivers were deactivated if their acceptance rate fell below 80 percent. Rosenthal said that drivers are deactivated when their cancellation rate is "abnormally high," which is usually greater than 50 percent of the trips.

Rosenthal testified that fewer than three percent of Uber's drivers are deactivated in California for "material" breaches of the software licensing agreement. He said that Uber investigates rider complaints about reckless driving and egregious conduct and that the driver has the opportunity to tell his or her side of the story. He added that "hugging" a passenger could come under "inappropriate behavior" as a basis for deactivation. Altercations with a rider is another reason for deactivating a driver. At his deposition, Rosenthal said that Uber also deactivates drivers for "breaches of a contract that we would have with the driver partner."

The Agreement, at par. 12.2, provides for its termination by either Uber or its customers and/or drivers:

Either party may terminate this Agreement: (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or is otherwise set forth in this Agreement.

Eisenberg said he was deactivated by Uber "more times than I could remember." Some of the deactivations were for having low ratings. (See exhibit 9 where Eisenberg was deactivated on February 9, 2015 for having a 4.75 rating.) On one occasion, he was deactivated for giving a passenger a ride and then later driving the person home; afterward, the rider's secretary complained because the total Eisenberg had charged was greater than the amount Uber had charged. Another time he was deactivated when Uber learned he had asked riders for their telephone numbers. Eisenberg explained that Uber did not want its drivers to contact riders for any reason after a trip, except if a personal item had been left in the car. (See ex. 32 and par. 2.2 of the Agreement which provides that "Customer shall not, and shall ensure that all Drivers do not, contact any Users for any reason except for the purpose of fulfilling Transportation Services..") Teitelbaum testified it was his "understanding" that he could be deactivated for handing out his own business cards to riders and then giving rides to such customers separately from the Uber app.

Before his last and permanent deactivation, Eisenberg said that he did not take any courses provided by Uber, which he described as discretionary and not mandatory, before being reactivated. (See ex. 123, a sign up by an Uber partner for drivers who have low ratings or had

been deactivated.) On the other hand, Alokour, said that he had to take a class offered by Uber before he could be reactivated. Rosenthal said that a third party, and not Uber, offers a "quality improvement" course for drivers who have been deactivated; it is one of the methods that drivers could use to regain access to the Uber platform.

Eisenberg was deactivated permanently on July 6, 2015 for what he described as giving a hug to a female passenger and what Uber described as "sex harassment." (Ex. 21.) Eisenberg explained he had given a "drunk" female passenger a ride and rather than sit in the rear of his car, she sat in the front next to him. He said the passenger wanted to "hang out" with him and that he gave her a hug after she asked him for one "to diffuse the situation." Uber advised Eisenberg on August 9, 2015 that it could not reactivate him because "Sexual harassment is a serious offense.") Paragraph 2.4 of the Agreement appears to cover that situation:

> Uber retains the right to, at any time in Uber's sole discretion, deactivate or otherwise restrict Customer or any Driver from accessing or using the Driver App or the Uber Services in the event of a violation of this Agreement, a violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliate's brand, reputation or business as determined by Uber in its sole discretion, or for any other reason at the reasonable discretion of Uber.

## B. *Borello*'s Secondary Indicia of Control

### 1. Whether the one performing services is engaged in a distinct occupation or business

The response to this factor depends on whether "the one performing services" is Uber or its drivers. Rosenthal sees Uber as more than a transportation company. He explained that Uber is in the business of facilitating and providing information to determine where rider demand is – it is a software company that provides mobile apps that connect riders with providers. It can provide

for the transportation of people, goods and food. He said that Uber's technology is being used to determine the demand for food and goods; it has designed a market plan for determining what the public desires and wants to connect people with transactions by car or even helicopter.

Rosenthal said that Uber Tech globally has approximately 8,000 employees, roughly 2,000 of them are engineers. Rosenthal testified at his deposition that Uber's application, at one point, used to say that it was, "Everyone's Private Driver."

Eisenberg apparently had no other means of support than his income from driving for Uber, Lyft and private taxi services. On a larger scale, Uber's "customers" include its livery "partners" and individual drivers who, like Eisenberg, derive some or all of their support from driving for themselves or others, or work at other jobs and supplement that income by driving.

## 2. The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision

While Eisenberg did not have a supervisor at Uber and Uber did not provide its drivers with a manual, this factor is somewhat of an oxymoron because Uber has apparently brought a new dimension to the workplace in which an app has replaced human intervention. Regardless, this factor cannot be considered because, assuming Uber is a transportation company, there was no evidence how or by what means other transportation companies in Southern California, such as Lyft or taxi companies, supervise their drivers.

## 3. The skill required in the particular occupation

To drive for Uber, a person needs a driver's license, a vehicle and insurance. See par. 3.1 of the Agreement, which states that:

Driver shall at all times (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate the Vehicle assigned to such, and (ii) all

31

licenses, permits, approvals and authority applicable to Customer and /or Driver that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy.

Eisenberg said that one needs only to be able to drive and open a door to work for Uber. Teitelbaum testified no specialized skill was required. Jafari testified that the livery business requires customer service skills, attention to detail and a genuine interest in the client, especially with high-end clients.

### 4.   Whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work

As noted in the Agreement, except for the driver app, that Uber provides, "Customer shall provide all necessary equipment, tools, and other materials, at Customer's own expense, necessary to perform the Transportation Services." (Par. 2.2.) An essential piece of equipment, besides a cell phone, is the vehicle which, Eisenberg agreed, the driver provides. As noted earlier, there was evidence that Uber was involved in the rental or sale of these vehicles. (Eisenberg said he rented a car from a company that Uber recommended and Alokour said he bought a Chevrolet Suburban through Uber at Penske Chevrolet in Cerritos Auto Square.)

### 5.   The length of time for which the services are to be performed

The driving services are of an undetermined basis; depending on the needs of the passenger, the ride can be short or long. According to Rosenthal, the average participation by a driver on the Uber platform is for six months. It does not appear that this factor is relevant to the control issue herein.

### 6.   The method of payment, whether by the time or by the job

32

Uber drivers are paid for the individual ride, giving Uber a percentage of that fare, based on a predetermined rate for the vehicle used and the distance and time of the ride.

### 7.   Whether or not the work is a part of the regular business of the principal

The answer to this factor depends on the meaning of the term "principal." As a principal, Rosenthal said that Uber is a software service that provides transportation services through an app available to consumers. Its primary competitors are rail, buses, taxi companies, taxi dispatch services, black car companies and Lyft. If the individual driver is the "principal," the answer to that issue is idiosyncratic and depends upon the individual needs or characteristics of each driver; some, like Eisenberg, may depend entirely on the transportation business for their incomes; others may use it to supplement their incomes.

### 8.   Whether or not the parties believe they are creating the relationship of employer-employee

The Agreement states, as to the "relationship of the parties," that "Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contractors. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver." (Par. 13.1.)

Rosenthal testified that Eisenberg's relationship with Uber was as a livery partner, which, according to the Agreement, made him an independent contractor. Uber issued Eisenberg a 1099K for 2014 (ex. 244) and sent him information about filing his 2014 returns "as a partner." (Ex. 246.) Eisenberg's Linkedin page (exhibit 247), in which he described himself as an

"entrepreneur," is not given any weight because that self-description was most probably first used before Eisenberg began driving for Uber.

The fact that Eisenberg had private clients when driving for Uber is not necessarily determinative herein because one can be employed and under the control of an entity and have a private business "on the side."

Eisenberg said he believed he was an employee because, "I was W-2 … and I figured – I went to Uber thinking – I didn't even know I could be a partner, actually. So I thought I was just working for somebody. … I did not even think to differentiate between Arrue and Uber. I was working whoever gave me the car, follow – follow the payment structure, and that's it." (Boyd's Limousine Service issued Eisenberg a W-2 for 2013 [ex. 240]; Arrue LLC issued him a 1099 for 2013 [ex. 241]; S. A. Limo issued him a 1099-Misc for 2013 [ex. 242] and Centurion Car Service issued him a 1099-Misc for 2014 [ex. 245].) Like Eisenberg, Teitelbaum thought he was an employee of Uber although  he knew he had signed a contract providing he was an independent contractor.

### C.   The Six-Factor Test of Other Jurisdictions

### 1.   The alleged employee's opportunity for profit or loss depending on his managerial skill

Rosenthal testified there was a skill in how to use the Uber market place in order to maximize earnings. He explained that drivers decide when to drive, can have their own clients (as confirmed by Alokour who said that two percent of his rides are from his own clients); can market their own businesses and establish their own rates with their own passengers.

Eisenberg noted that there was a higher return for having a nice car, which therefore impacts compensation.

## 2. The alleged employee's investment in equipment or materials required for his task, or his employment of helpers

This factor is the same as *Borello*'s "instrumentalities" secondary factor and is not discussed further.

## 3. Whether the service rendered requires a special skill

This factor is the same as *Borello*'s "skills" secondary factor and is not discussed further.

## 4. The degree of permanence of the working relationship

This factor is the same as *Borello*'s "length of time" secondary factor and is not discussed further.

## 5. Whether the service rendered is an integral part of the alleged employer's business.

This factor is the same as *Borello*'s "regular business" secondary factor and is not discussed further.

## VI.  NO EVIDENCE WAS INTRODUCED REGARDING RAISIER, LLC AND RAISIER-CA, LLC

Raisier, LLC, a Delaware Limited Liability Company, and Raisier-CA, LLC, a Delaware Limited Liability Company, are respondents, along with Uber, in this arbitration. Since Eisenberg does not know the relationship between either Raiser and Uber, never had an agreement with either Raiser entity, never drove for them, never received any monies from them and never got a tax form from either, he has failed to prove by a preponderance of evidence that he had an employment relationship with either of them. Accordingly, his claim against both Raisier, LLC, a Delaware Limited Liability Company, and Raisier-CA, LLC, a Delaware Limited Liability Company, is dismissed with prejudice.

## VII.   UBER DOES NOT HAVE THE RIGHT TO CONTROL ITS DRIVERS

### A.   The "Right to Control" Test as Interpreted by the Courts

A review of the "right to control" test as applied in *Alexander v. FedEx Ground Package Sys.* (9th Cir. 2014) 765 F.3d 981 (*Alexander*); *Arnold v. Mutual of Omaha Ins. Co.* (2011) 202 Cal.App.4th 580 (*Arnold*), *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425 (*Millsap*) and *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1 (Estrada) is helpful in applying that test to the facts herein.

*Alexander* is an action in which a class of FedEx drivers alleged that they were employees in California rather than independent contractors.  The Court of Appeals, finding that the *Borello* right to control test applied (at p. 988), held that the drivers were employees and remanded the matter to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status.

The relationship in *Alexander* between the drivers and FedEx is governed by an Operating Agreement (OA) which requires the drivers to pick up and deliver packages within assigned service areas. Drivers must deliver packages every day that FedEx is open for business, and must deliver every package they are assigned each day. They must deliver each package within a specific window of time negotiated between FedEx and its customers. FedEx does not require drivers to follow specific delivery routes. However, FedEx tells its managers to design and recommend to its drivers routes that will "reduce travel time" and "minimize expenses and maximize earnings and service."

FedEx does not expressly dictate working hours, but it structures drivers' workloads to ensure that they work between 9.5 and 11 hours every working day. Drivers are compensated according to a somewhat complex formula that includes per-day and per-stop components. Drivers are expected to arrive at their delivery terminals each morning, and they are not to leave the terminal until all of their packages are available for pick-up. The OA gives FedEx the authority to

"reconfigure" a driver's service area upon five days' written notice. Drivers have the right to propose a plan to avoid reconfiguration, "using means satisfactory to FedEx."

FedEx trains its drivers on how best to perform their job and to interact with customers. The OA provides that, during the first 30 days of the contract term, FedEx "shall … familiarize [drivers] with various quality service procedures developed by FedEx." The OA requires drivers to conduct themselves "with integrity and honesty, in a professional manner, and with proper decorum at all times."

A driver's managers may conduct up to four ride-along performance evaluations of the sriver each year, "to verify that [the driver] is meeting the standards of customer service" required by the OA. After finishing a ride-along evaluation, managers are to give immediate feedback to drivers about the quality of their work. Drivers must follow FedEx's "Safe Driving Standards." These standards prohibit many illegal acts, such as "[d]riving while under the influence of alcohol or drugs" and "[u]sing a motor vehicle in the commission of a felony." They also forbid some legal conduct, including "[d]riving a motor vehicle in a speed exhibition, contest or drag race" and "[c]arrying passengers not authorized by FedEx."

FedEx requires its drivers to provide their own vehicles. Vehicles must not only meet "all applicable federal, state and municipal laws and regulations," but also must be specifically approved by FedEx. All vehicles must be painted "FedEx white." They must be marked with the FedEx logo. FedEx requires vehicles to have specific dimensions, and all vehicles must also contain shelves with specific dimensions. Drivers must provide maintenance at their own expense and must "bear all costs and expenses incidental to operation" of the vehicle.

The OA requires that while vehicles are "in the service of FedEx," they must be used "exclusively for the carriage of the goods of FedEx … and for no other purpose." Drivers may use their vehicles "for other commercial or personal purposes when [they are] not in the service of FedEx," but only if all "identifying numbers, marks, logos and insignia" are removed or covered up.

The OA allows drivers to operate more than one vehicle and route, but only "with the consent of FedEx" and only if "consistent with the capacity of the [driver's] terminal." Drivers may also

hire third parties to help perform their work. Third-party helpers must be "qualified_ pursuant to applicable federal, state and municipal safety standards and [FedEx's] Safe Driving Standards." Drivers enter into the OA for an initial term of one, two, or three years. At the end of the initial term, the OA provides for automatic renewal for successive one-year terms if neither party provides notice of their intent not to renew. The OA may be terminated by the parties' mutual agreement; for cause, including a breach of any provision of the OA; if FedEx stops doing business or reduces operations in all or part of the driver's service area or upon thirty days' written notice.

The OA requires drivers to comply with personal-appearance _standards and wear a FedEx uniform "maintained in good condition." Drivers must keep their "personal appearance consistent with reasonable standards of good order as … promulgated from time to time by FedEx."

*Alexander* found several factors of importance in holding that FedEx had the right to control its drivers: FedEx can and does control the appearance of its drivers and their vehicles. "FedEx dictates the vehicles' dimensions, including the dimensions of their 'package shelves' and the materials from which the shelves are made. Managers may prevent drivers from working if they are improperly dressed or groomed, or if their vehicles do not meet specifications." "Second, FedEx can and does control the times its drivers can work." "Third, FedEx can and does control aspects of how and when drivers deliver their packages. It assigns each driver a specific service area, which it 'may, in its sole discretion, reconfigure.' It tells drivers what packages they must deliver and when. It negotiates the delivery window for packages directly with its customers." (*Id.* at p. 990.) In so holding, *Alexander* discussed *Millsap* and *Arnold*, both of which applied the right to control standard.

*Millsap* also involved FedEx but from a personal injury rather than an employment perspective. The plaintiff was injured when her car was struck by a vehicle driven by an individual who was delivering parcels for FedEx and North Country Express (NCE), another delivery company. The appellate court, in affirming the trial court's summary judgment motion

and dismissals for FedEx and NCE, found that the individual driver was an independent contractor because he used his own car to deliver the packages, furnished his own gas and oil, furnished his own liability insurance, paid for whatever car repairs were necessary and was paid on a "per route" basis; i.e., he was paid a lump sum based on the distance traveled to deliver the packages he delivered. Also, "he would be called if there were packages available for delivery, or he would stop by to see if there was anything available. He received no employee benefits and no taxes were withheld by NCE from his paychecks. Other than to say 'be careful' or to give him directions to a particular location, or possibly to tell him to deliver the packages in the order received, NCE did not instruct (the driver) how to make the deliveries or how to drive his car. (He) was required to obtain a signed confirmation of delivery which he then returned to NCE. NCE gave him a Federal Express Guide and a list of prices, apparently so that he could answer questions posed by the persons to whom the packages were delivered." (*Id.* at p. 431.)

*Arnold* was a suit by a former insurance agent for Mutual of Omaha who sued it for unpaid employee benefits after leaving the company. She appealed from a summary judgment in favor of defendant Mutual, in which the trial court determined that she was an independent contractor rather than an employee. The critical facts in affirming the trial court's dismissal were that Arnold had the responsibility to maintain the proper licenses to solicit and procure applications for Mutual's products; she was paid by commissions for products she sold; either party could terminate the contract with or without cause through written notice to the other (*id.* at p. 584); she did not receive performance evaluations; her work was not monitored or supervised; attendance at training sessions was not required; she was required to pay for her own business expenses; Mutual did not provide business cards, vehicles, or computers free of charge and agents, such as Arnold, if they chose to work out of the Concord, California office, were required to pay monthly fees to cover "workspace and telephone service." (*Id.* at p. 585.)

The facts of *Estrada*, in which the court, in part, affirmed a trial court order granting class certification for FedEx drivers and the finding that the drivers were employees, are substantially similar to those in *Alexander*. The drivers were subject to an Operating Agreement, the terms of which required the drivers to provide their own trucks, mark the trucks with the FedEx logo, pay all

costs of operating and maintaining the trucks and use them exclusively in the service of FedEx (or mask the logo if the truck is used for any other purpose). A driver leases a scanner from FedEx and purchases or leases a truck (usually obtained from FedEx preferred vendors) that meets FedEx's size, model and condition specifications, paints the truck "FedEx White," and applies the FedEx logo to the truck.

Drivers work full time and exclusively for FedEx, and must work every day FedEx provides service unless they have preapproved replacements. FedEx sets the drivers' work hours (9.5 to 11 hours a day). Trucks must be parked in assigned spots and loaded by FedEx employees with the packages assigned to the driver by management (the drivers may not refuse an assignment). FedEx adjusts the number of assigned packages (thereby controlling the driver's hours and pay) by "flexing" from an adjacent route to balance the workload between drivers and in furtherance of its goal—deliver "every package, every day." Almost all drivers participate in the flex program.

The driver must provide "fully competitive" service to a "primary service area" assigned by FedEx, and the Operating Agreement acknowledges the driver's "proprietary interest" in his primary service area's customer accounts—but gives FedEx the right to reconfigure primary service areas (and to reassign packages to another driver) if the volume of packages in the driver's primary service area exceeds the amount the driver could reasonably be expected to handle on any given day. Drivers may not leave the terminal at the beginning of the workday until sorting is completed, and terminal managers may contact drivers during the day about additional assignments. Drivers may "sequence" the order of deliveries and pickups but must meet all pickup and delivery times or "windows" arranged by FedEx's sales representatives and certain customers. These windows affect a driver's ability to sequence his or her own route. Drivers must comply with FedEx's rules for obtaining signatures on scanners, releasing packages without signatures, special handling of overnight and C.O.D. packages, and tracing undelivered or improperly delivered packages. Drivers must place their scanners in their computers after each delivery and, at the end of each day, must return to their assigned terminal

parking spaces, deliver all paperwork and cash from C.O.D. payments, download their scanners, and provide details about any unsuccessful deliveries.

When on any given day a driver makes no attempt to deliver a package, misses a pickup time or window, or is the subject of a complaint, the matter must be discussed with the terminal manager who, in addition, meets with each driver twice each year to communicate and document shortcomings. Several times each year, terminal managers evaluate each driver's performance by means of a "customer service ride" and there are covert checks and security audits conducted in the field. Each driver receives an annual progress review. Terminal managers decide which "failures to service" or alleged breaches of the Operating Agreement to document, and they have discretion (subject to the regional managers' and upper management's approval) to recommend termination or nonrenewal.

Drivers must also "cooperate" with FedEx's employees, customers, and other drivers for the common goal of efficient pickup delivery; wear a FedEx-approved uniform and maintain his or her appearance "consistent with reasonable standards of good order." Drivers are paid weekly at rates set by FedEx without negotiation (the drivers' rate is based on a daily rate, a piece rate for packages handled, and bonuses for length and quality of service).

*Estrada* found that FedEx had the right to control "every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair … The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items—trucks and scanners—are obtained from FedEx-approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income." ¶ Drivers "must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed. The drivers are not engaged in a separate profession or business, and they are paid

weekly, not by the job. They must work exclusively for FedEx. Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by "flexing" and withheld approvals, and for very slight violations of the rules." (*Id.* at pp. 11-12.)

## B.   Eisenberg was an Independent Contractor Rather than an Employee of Uber's

### 1.   Eisenberg as a livery driver

Other than the Agreement, itself, which has already been discussed as not being determinative as to whether Eisenberg is an employee, Eisenberg's status must be analyzed in two parts: his position as a livery partner and as a driver for Uber. From the description in the Agreement and from Rosenthal's testimony, it is undisputed that livery partners are treated differently by Uber. A livery partner may employ individuals who drive for Uber. It pays the drivers according to a scale or rate determined by the livery company. Livery companies are regulated by the State of California, which requires that the company have a permit. Drivers with a livery partner are not screened by Uber. Uber does not direct its livery partners how to use its drivers. Uber does not require the inspection of vehicles on the livery side.

The fact that Eisenberg was unsuccessful in being unable to hire drivers for his Sefis Luxery Service company does not make it any less a livery business. (Rosenthal said that Uber did not reject Eisenberg's drivers; instead, the drivers never completed Uber's "onboarding" process.) Thus, any person who is a livery company or has been "hired" by a livery company licensed with the State of California to drive on an Uber platform is not within the control of Uber and Uber has no right to control that person. The analysis does not end here because it is unclear when, or if, Eisenberg stopped being a livery partner and became a driver for Uber. Thus, it is also necessary to examine Eisenberg's relationship as a driver with Uber. The facts that demonstrate that Uber did not have the right to control Eisenberg will be discussed first.

//

## 2.   Factors that do not constitute the right to control

Uber does not provide drivers with a manual or handbook. Drivers are instructed (in this instance, at a Santa Monica location) how the app works and what was expected of them. Teitelbaum, the former Uber driver, said the training was mandatory. Rosenthal testified otherwise. He said that drivers need only watch a fifteen-minute video shown at a "green-light hub" or presented by an Uber operations manager on how to use the app. The video also provides customer service tips. The conflict between Teitelbaum and Rosenthal is not material because, even if Teitelbaum's version is accepted, the training is modest and brief, at best.

Uber requires that drivers provide their own vehicles, whether they are owned or leased, pay for any repairs on the vehicles, the gas used and the liability insurance coverage. The type of car (luxury to a basic four-door sedan) will determine which platform the driver is eligible for. The vehicle must also be in good operating condition and be clean and sanitary.

Eisenberg and Teitelbaum testified, in effect, that drivers were required to either rent or buy from companies affiliated with Uber. Rosenthal denied that Uber "partners" with any car dealer or rental companies. Instead, it "connected" drivers with lenders that would lease vehicles to the drivers. (The use of the term "connected" was not further explained.) He said that Uber, itself, has a subsidiary called "Exchange Leasing" that purchases vehicles and leases them to driver partners. (This subject, too, was not further developed; for example, it was not shown whether Eisenberg ever leased a vehicle from Exchange Leasing.) In the absence of evidence confirming Eisenberg's and Teitelbaum's conclusions, it is found that Uber does not require that drivers must buy or lease with Uber-affiliated companies.

Uber provides suggestions to drivers, which do not have to be followed, such as return lost items; offer complimentary refreshments, such as water and gum; be professional and avoid using inefficient routes, dirty cars, use of a cell phone and poor driving. It was also suggested that drivers have cell phone chargers in their cars to keep the customers happy.

According to Rosenthal, the State of California requires that the cars of non-livery drivers must be inspected.

Uber does not guarantee its drivers the number of rides they shall be given, does not require a minimum amount of time a driver must be online, allows its drivers to drive for competitors and to be available to both Uber and the competitor at the same time and does not tell drivers where to drive while they are on the app. (Uber might "encourage" drivers to participate in certain "surge" events by offering a higher volume of calls for their participation in the "surge.") Uber drivers establish their own schedules; have no required start time; take as long as they want for lunch; do not tell Uber when they are going to be off the app and do not need permission to be off the app. These conditions are consistent with par. 2.4 of the Agreement which states:

Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber services.

Uber does not require either a livery customer or driver to wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors.

These factors, individually, or in the aggregate, establish that Uber did and does not have the right to control Eisenberg or any comparable driver.

### 3. Factors that arguably may constitute the right to control drivers

Facts from which it may be inferred that Uber has the right to control drivers include the following: Every person who drives for Uber, whether it be with a livery company or as an

individual, must agree to the terms of a software license and online services agreement before they can have access to the app and, therefore, drive for Uber.

Uber sets base or default fares, including the per-minute, per-mile and minimum-fare rates, for each of its platforms. Uber also retains the right to change the fare calculation at any time in its discretion based upon local market factors. Drivers have no input on the fares passengers are to be charged. Drivers pay a licensing fee established by Uber to Uber from each fare collected. The fee varies, depending on the platform used in the particular instance.

Uber discourages its drivers from soliciting tips from passengers and Eisenberg accepted tips, while driving on the app, even though he knew the practice was discouraged. Uber did not deactivate drivers in Los Angeles who accepted tips.

Uber uses ratings by passengers in evaluating drivers which may lead to its deactivating (i.e., terminating) drivers whose average rating falls below the acceptable standard for the area in which the driver operates, in this instance Los Angeles County. Passengers are not given criteria or standards for rating drivers between a 1 to 5 scale. In Los Angeles, a driver could be deactivated if his or her rating fell below 4.65 or 4.70. The minimum rating was created by looking at a distribution curve and at various standard deviations below the curve. Uber drivers in Los Angeles are notified of their ratings by email and receive weekly "report cards." Rosenthal explained that the rating average of 500 trips helps to determine whether drivers are meeting Uber's minimum business standards.

Drivers may also be deactivated for refusing to accept trips when offered on the app. There was no uniformity on the percentage of refusals which may lead to deactivation: Eisenberg thought that drivers must accept at least 85 percent of the trips offered; Teitelbaum said it was 80 percent and Rosenthal said that drivers are deactivated when their cancellation rate is "abnormally high," which is usually greater than 50 percent of the trips. Regardless, Uber does terminate drivers "for the general health of the platform" who refuse to accept too many trips

because the refusal to pick up a rider causes that rider to wait longer for a car and becomes a "poor rider experience."

Uber also deactivates drivers in California for "material" breaches of the software licensing agreement, which can include reckless driving, inappropriate behavior (such as hugging a passenger) and asking riders for their telephone numbers. More specifically, the Agreement, at par. 12.2, provides for termination by Uber its customers or drivers in the following circumstances:

> Either party may terminate this Agreement: (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or is otherwise set forth in this Agreement.

Par. 2.4 of the Agreement provides a more general basis for termination:

> Uber retains the right to, at any time in Uber's sole discretion, deactivate or otherwise restrict Customer or any Driver from accessing or using the Driver App or the Uber Services in the event of a violation of this Agreement, a violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliate's brand, reputation or business as determined by Uber in its sole discretion, or for any other reason at the reasonable discretion of Uber.

Drivers who have been deactivated may take a course to regain access to the Uber app. The course is not a requirement for reactivation.

*Ayala* noted, in instructing how the various *Borello* factors shall be applied, that the right to fire at will and the basic level of skill called for by the job are of inordinate value and that other factors, such as the owner of the instrumentalities and tools are of "only "evidential value." (*Supra*, 59 Cal.4th at p. 539.)

Although the Agreement herein contained a provision that either Uber or the driver could terminate the relationship without cause upon seven day's notice (which is comparable to an at-will termination, which may not include a notice clause), that language does not have the importance *Ayala* placed upon it because the Agreement also provides several other bases for termination: a material breach of the Agreement; a violation of a driver addendum; disparagement of Uber; an act that causes harm to Uber's brand or reputation; insolvency or bankruptcy of a party and a driver no longer qualifies under existing law or Uber's policies to operate a vehicle. Further, there was no evidence introduced at the hearing that Eisenberg or his peers were ever terminated without cause.

The circumstances in this case are much closer to those in *Millsap* and *Arnold* than those in *Alexander* and *Estrada*. Uber drivers are not supervised; supply the cars they drive; do not wear Uber uniforms or signage; can drive simultaneously for any competitor, including Lyft, Uber's biggest competitor; are paid for each ride and have the unfettered option to work as little or as much as they want and wherever they want in the geographical location assigned to their platform. The fact, alone, that Uber has an active interest in deactivating certain drivers does not establish an employer-employment situation because an employer "is permitted to exercise a certain measure of control for a definite and restricted purpose without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled." (*Bohanon v. James McClatchy Publishing Co.* (1936) 16 Cal.2d 188, 199; see also *Milsapp, supra*, 227 Cal.App.3d 425, 432.) Uber's right to require drivers to use an app to obtain rides and

to set passenger fares and the percentages that drivers shall receive from those fares and to terminate drivers who do not meet passengers' and Uber's standards fall under the same rubric and do not constitute the right to control drivers.

## VIII.   CONCLUSION

Because Yosef Eisenberg has not proven by a preponderance of evidence that he was an employee of Uber Technologies, Inc., his claim(s) against that company are dismissed with prejudice.

November 23, 2016

Hon. Michael D. Marcus (Ret.), Arbitrator

48

# REQUEST FOR CERTIFIED MAIL

| Case Name: | *EISENBERG v. UBER* |
|---|---|
| Addressee: | Caleb L. Marker, Esq.<br>Bradley C. Buhrow, Esq.<br>ZIMMERMAN REED<br>2381 Rosecrans Avenue, Suite 328<br>Manhattan Beach, CA 90245 |
| **AFFIX LABEL HERE:** | 7015 1520 0001 8077 0554 |
| Case Manager: | Christie Woo |
| Date: | November 23, 2016 |

| Case Name: | *EISENBERG v. UBER* |
|---|---|
| Addressee: | Andrew Spurchise, Esq.<br>LITTLER MENDELSON<br>650 California Street, 20th Floor<br>San Francisco, California 94108 |
| **AFFIX LABEL HERE:** | 7015 1520 0001 8077 0530 |
| Case Manager: | Christie Woo |
| Date: | November 23, 2016 |

| Case Name: | *EISENBERG v. UBER* |
|---|---|
| Addressee: | Sophia Behnia, Esq.<br>UBER TECHNOLOGIES, INC.<br>1455 Market Street Floor 4<br>San Francisco, California |
| **AFFIX LABEL HERE:** | 7015 1520 0001 8077 0547 |
| Case Manager: | Christie Woo |
| Date: | November 23, 2016 |

# PROOF OF SERVICE

**State of California**
**County of Los Angeles**

I certify that I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1900 Avenue of the Stars, Suite 250, Los Angeles, California 90067.

On November 23, 2016, I served the foregoing document described as the **BINDING ARBITRATION AWARD** on the interested parties in this action as follows:

<table>
<tr>
<td>
Caleb L. Marker, Esq.<br>
Bradley C. Buhrow, Esq.<br>
ZIMMERMAN REED<br>
2381 Rosecrans Avenue, Suite 328<br>
Manhattan Beach, CA 90245<br>
caleb.marker@zimmreed.com<br>
brad.buhrow@zimmreed.com
</td>
<td>
Andrew Spurchise, Esq.<br>
LITTLER MENDELSON<br>
650 California Street, 20th Floor<br>
San Francisco, California 94108<br>
aspurchise@littler.com<br><br>
Sophia Behnia, Esq.<br>
UBER TECHNOLOGIES, INC.<br>
1455 Market Street Floor 4<br>
San Francisco, California<br>
sbehnia@uber.com
</td>
</tr>
</table>

___X___  **BY U.S. CERTIFIED MAIL,** I placed a true copy of the document described above in a sealed envelope and caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

_____  **BY FACSIMILE,** I caused such to be faxed to the attorneys on November 23, 2016

___X___  **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address *patricia@adrservices.org*  to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

_____  **BY PERSONAL SERVICE,** I caused such envelope to be delivered by hand to the attorneys on November 23, 2016.

___X___  **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____  **FEDERAL** I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 23, 2016 at Los Angeles, California



Patricia Taylor